**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: FEDLOAN STUDENT LOAN SERVICING LITIGATION | MDL Docket No. 18-2833 |
| | Hon. C. Darnell Jones, II |
| ALL CASES | JURY TRIAL DEMANDED |

**<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................ 1

PARTIES ........................................................................................................... 8

    A.    Plaintiffs ............................................................................................. 8

    B.    Defendants ....................................................................................... 50

JURISDICTION AND VENUE ....................................................................... 50

BACKGROUND ............................................................................................. 52

    A.    Federal Student Loans and Loan Forgiveness Programs ................... 52

        1.    Federal Student Loans ............................................................ 52

        2.    Repayment and Income-Driven Repayment ("IDR") Plans ..... 54

        3.    General and Administrative Forbearance ................................. 58

        4.    Public Service Loan Forgiveness Program .............................. 59

        5.    The TEACH Grant Program .................................................. 63

    B.    PHEAA's Contract with The Department to Service Federal Student Loans and Teach Grants .................................................................... 66

    C.    PHEAA's Fiduciary Role as a Consumer Advocate for Borrowers .... 71

        1.    The Department Delegates Advisory Duties to PHEAA .......... 71

        2.    PHEAA Holds Itself Out as an Advisor .................................. 76

    D.    The Department's Oversight of Federal Student Loans and Student Loan Servicers .................................................................................... 76

PHEAA FAILS TO PROPERLY SERVICE TITLE IV PROGRAMS ........................ 82

    A.    PHEAA's Pattern and Practice of Improperly Servicing the TEACH Grant Program .................................................................................. 82

        1.    PHEAA is Financially Incentivized to Convert TEACH Grants to Loans 83

        2.    PHEAA Improperly Converts Grants to Loans on Hyper-Technicalities Despite Receipt of Recipients' Intent to Satisfy the Service Obligation .. 84

        3.    PHEAA Fails to Provide the Required Notice of the Annual Certification

Deadline ................................................................................. 85

    4.    PHEAA Fails to Provide Recipients with Sufficient Time to Submit the Annual Certification.................................................................. 89

B.    PHEAA's Pattern and Practice of Improperly Servicing IDR Plans. ................... 90

    1.    PHEAA is Financially Incentivized to Steer Borrowers into Forbearance 90

    2.    PHEAA Steers Borrowers into Forbearance Instead of More Beneficial IDR Plan Options .................................................................. 93

    3.    PHEAA Fails to Timely and Properly Process Applications for Enrollment in IDR Plans ........................................................................ 97

    4.    PHEAA Fails to Provide Borrowers with Sufficient Time to Correct Deficiencies in Annual IDR Recertification Paperwork........................ 100

    5.    PHEAA Fails to Apply the Missed Deadline Exception for IDR Recertifications ...................................................................... 102

    6.    PHEAA Fails to Provide Notice of Important Deadlines ....................... 105

    7.    PHEAA Fails to Adequately Inform Borrowers that Changing IDR Plans Will Result in the Capitalization of Accrued Interest............................ 108

C.    PHEAA'S Pattern and Practice of Improperly Servicing the PSLF Program .... 110

D.    PHEAA Fails to Implement a Complaint Resolution System ............................ 113

E.    PHEAA Fails to Adequately Train its Loan Servicing Employees ................... 116

THE DEPARTMENT FAILS TO OVERSEE AND ADMINISTER TITLE IV PROGRAMS IN FURTHERANCE OF THE GOALS OF THE HEA ................................................................. 117

A.    Defendants Penalize Borrowers for Technical Mistakes on Forms Not Approved by OMB. ......................................................................................... 119

B.    The Department Fails to Submit the required report on the TEACH Grant Program to the authorizing committees. ............................................................ 121

C.    The Department's TEACH Grant Reconsideration Process Fails to Adequately Remedy Grants Improperly Converted to Loans ............................................... 121

D.    The Department Fails to Implement a Common Policies and Procedures Manual for the Direct Loan Program .......................................................................... 122

E.    The Department Arbitrarily Withdrew the Only Existing Policy Memorandum Providing Guidance to Direct Loan Servicers ................................................... 123

F.      The Department Fails to Use the Enforcement Tools Available to Hold PHEAA Accountable for its Continued, Documented Failures to Borrowers. ................. 124

G.      The Department Fails to Maintain Records Transferred from Prior Loan Servicers ................................................................................................................. 126

H.      The Department Fails to Comply with Congressional Mandate When Administering the TEPSLF Program ................................................................ 129

I.      The Department Fails to Adhere to Federal Internal Control Standards ............ 133

      1.      The Department fails to implement and adhere to internal monitoring procedures as required by Federal Internal Control Standards ............... 134

      2.      The Department fails to communicate necessary quality information to borrowers or servicers ........................................................................... 135

      3.      The Department Fails to Remedy Identified Deficiencies in a Timely Manner ................................................................................................. 137

STATE AND FEDERAL INVESTIGATIONS INTO DEFEENDANTS' MISCONDUCT .... 139

CLASS ACTION ALLEGATIONS ........................................................................ 141

COUNT 1 – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious, an Abuse of Discretion or Not in Accordance with Law (TEACH Grant Program), ....................................................................................... 145

COUNT 2 – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious, an Abuse of Discretion or Not in Accordance with Law (IDR Plans) ....................................................................................................................... 148

COUNT 3 – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious, an Abuse of Discretion or Not in Accordance with Law (PSLF Program) ................................................................................................................... 152

COUNT 4 - FIFTH AMENDMENT DUE PROCESS ............................................. 155

COUNT 5 - FIFTH AMENDMENT DUE PROCESS ............................................. 156

COUNT 6 - BREACH OF CONTRACT (TEACH AGREEMENT TO SERVE) .................... 157

COUNT 7 - BREACH OF CONTRACT (MASTER PROMISSORY NOTE) ........................ 158

COUNT 8 – BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY) ........................ 159

COUNT 9 – BREACH OF FIDUCIARY DUTY .................................................... 164

COUNT 10 - CONSTRUCTIVE FRAUD .............................................................. 165

COUNT 11 - UNJUST ENRICHMENT ................................................................. 168

COUNT 12 – NEGLIGENCE ............................................................................... 170

COUNT 13 - NEGLIGENCE *PER SE* (VIOLATIONS OF 34 C.F.R. § 682.211(E)(1); VIOLATIONS OF CONSUMER FIANCIAL PROTECTION ACT OF 2010) ...................... 175

COUNT 14 - NEGLIGENT MISREPRESENTATION ........................................... 179

COUNT 15 - VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW AND CONSUMER LEGAL REMEDIES ACT, Cal. Bus. & Prof. Code § 17200 *et seq.*; Cal. Civ. Code § 1750 *et seq.* ............................................................................................. 181

COUNT 16 - VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT, Conn. Gen. Stat. Ann. § 42-110a *et seq.* ................................................................. 185

COUNT 17 - VIOLATION OF THE DISTRICT OF COLUMBIA'S CONSUMER PROTECTION PROCEDURES ACT, D.C. Code. § 28-3901 *et seq.* ........................ 189

COUNT 18 - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. § 501.201 *et seq.* ............................................... 192

COUNT 19 - VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFDBPA"), 815 ILCS 505/2 ............................... 196

COUNT 20 - VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT, Kan. State. Ann. § 50-623, *et seq.* ..................................................................................... 200

COUNT 21 - VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, Md. Com. Law Code Ann § 13-101 *et seq.*) ............................................................. 203

COUNT 22 - VIOLATION OF MASSACHUSETTS'S CONSUMER PROTECTION LAW, M.G.L.A 93A § 1 *et seq.* ............................................................................... 207

COUNT 23 - VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT, Mo. Rev. Stat. § 407.010, *et seq.* ..................................................................... 211

COUNT 24 - VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT, N.J. Stat. Ann. § 56:8-1 *et seq.*) ................................................................................................. 214

COUNT 25 - VIOLATION OF N.Y. GEN. BUS. LAW § 349 *et seq.* ...................... 218

COUNT 26 - VIOLATION OF OREGON'S UNLAWFUL TRADE PRACTICES ACT, Or. Rev. Stat. § 646.605 et *seq.* ............................................................................ 222

COUNT 27 - VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Stat. Ann. § 201-1 *et seq.*) ................... 224

COUNT 28 - VIOLATION OF WASHINGTON'S CONSUMER PROTECTION ACT, Wash.

Rev. Code § 19.86.010 *et seq.* ............................................................. 228

PRAYER FOR RELIEF ........................................................................ 231

Plaintiffs, Arielle M. Anderson, Tanuja Goulet Arany, Michael Asby, Katie Bonham, Laura Brady, Jacquelynn Charles, Jamie Coleman a/k/a Jamie McFarland, Andrea Davis, Arianne Gallagher, Dr. Garima Gupta, Nathan Harig, Mark Hawkins, Seniqua Johnson, Lindsey Jones, Brittany King, Yannet Lathrop, Amanda Leone, Adela Levis, Shon Meckfessel, Steven Meyer, Amanda Miller, Adam Morris, Megan Musser a/k/a Megan Holland, Heather Pruess, Meagan Pryor, Stacey Puccini, Hannah Rockwell, Seth Shelley, Chris Stevens, Adele S. Turnage, Katherine Wardlow, Maggie Webb, and Nichole Wolff, (collectively "Plaintiffs"), individually and on behalf of those similarly situated, bring this Consolidated Amended Class Action Complaint (the "Complaint") against Defendants Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing ("FedLoan") (collectively "PHEAA"), the United States Department of Education (the "Department"), and Elisabeth "Betsy" DeVos ("Secretary DeVos"), in her official capacity as Secretary of Department of Education (collectively "Defendants"), and allege the following based on personal knowledge, the investigation of counsel, and information made public during ongoing investigations by various state and federal governmental entities, and upon information and belief as to all other matters:

**<u>NATURE OF THE ACTION</u>**

1.      The nation's federal financial aid system for higher education was created for a single purpose: to serve the best interests of students and their families. The system is failing its purpose.

2.      Plaintiffs – a group of teachers, librarians, emergency responders, government employees, and other public servants – bring this lawsuit to hold the Department and one of its largest federal student loan servicers, PHEAA, accountable for their long-standing failure to properly administer and service important federal financial aid programs.

3.    To make the cost of higher education more affordable for students who otherwise could not afford it, Congress established several federal financial aid programs and repayment plan options under Title IV of the Higher Education Act. The programs and repayment plans at issue in this case are: (1) The Teacher Education Assistance for College and Higher Education ("TEACH") Grant Program; (2)  income-driven repayment plans ("IDR Plans") under the Federal Family Education Loan ("FFEL") and William D. Ford Federal Direct Loan ("Direct Loan") Programs, and (3) the Public Service Loan Forgiveness ("PSLF") Program.[1]

4.    Congress granted the Department with authority to administer and oversee these programs to achieve the objective of benefitting borrowers. In discharging those duties, the Department in turn contracts with PHEAA and several other loan servicers to provide not only traditional loan servicing services (*i.e.* collect and process loan payments), but also to establish a relationship with borrowers, educate them on the complicated repayment plan and loan forgiveness options, and help them choose a repayment strategy that best suits their needs. PHEAA has been the exclusive loan servicer of the TEACH Grant Program since 2013 and the PSLF Program since 2012.

5.    However, things have gone painfully awry. As early as 2009, Defendants have neglected to comply with established laws, regulations, and internal policies and procedures to the financial detriment of Plaintiffs and other borrowers.

6.    Defendants' extreme misconduct has been widely reported by several government entities, including the Department's own Office of Inspector General ("OIG"), the U.S. Government Accountability Office ("GAO"), and the U.S. Consumer Financial Protection

---

[1] For purposes of this lawsuit, the TEACH Program, the IDR Plans, the FFEL and Direct Loan Programs, and the PSLF Program will be referred to collectively as the "Title IV Programs."

Bureau ("CFPB"). An April 16, 2017 letter to Defendant Secretary DeVos from 136 members of Congress aptly sums it up: "After years of pervasive and widespread failures in student loan servicing, many borrowers are simply fed up with delays, errors, and mismanagement of their loans."

7.      It's no surprise that student loan debt – nearly 90% of which is owed to the Department – is now the largest category of non-housing related consumer debt in the United States and reached an all-time high in 2019 at $1.56 trillion.

**A.  The TEACH Program**

8.      The TEACH Grant Program provides grants up to $4,000 each year for students who teach in a high-need subject area, such as special education, mathematics, and science, in a school that serves low-income families for at least four years within eight-years of graduation. Grant recipients must execute an "Agreement to Serve" in exchange for the Grant and agree to submit (i) certification upon completion of each year of qualified teaching, and/or (ii) annual certification that he or she "intends to satisfy the service obligation." If recipients do not submit these certifications, their TEACH Grant will be converted into an interest-bearing federal loan.

9.      Defendants, however, failed to properly administer and service the TEACH Grant Program and have consistently engaged in conduct which is contrary to statutory authority, the Departments' own regulations and procedures, and federal internal control standards. These failures include:

- Routinely converting recipients' TEACH Grants into interest-bearing loans ("TEACH Loans") after recipients actively confirmed their intention to satisfy the service obligation, because of hyper-technical mistakes on the certification form;

- Routinely converting recipients' TEACH Grants to interest-bearing TEACH Loans after failing to provide proper notice to recipients of their annual certification due date; and

- Routinely converting recipients' TEACH Grants to interest-bearing TEACH Loans without providing the required amount of time after notice of the annual certification deadline to submit their annual certification form.

10.    For example, Plaintiff Chris Stevens' TEACH Grant was converted to a loan after his certification was denied because the teaching service end date was "in the future." Plaintiff Megan Musser's TEACH Grant was converted to a loan after Defendants posted notice of her annual certification deadline to an online "paperless inbox" on PHEAA's website (instead of her address or email address) without her knowledge, causing her to miss the deadline.

11.    Although the Department announced a TEACH Grant Reconsideration Process earlier this year, in which recipients may apply to have their loans reconverted into TEACH Grants, Defendants' administration of that program has come up short too. Defendants have denied reconsideration to many eligible recipients and, for those lucky enough to have their TEACH Grants reinstated, Defendants failed to refund and/or credit recipients for the amounts paid towards their improperly instituted TEACH Loan(s). Plaintiffs Stevens and Musser both applied for reconsideration. Defendants reinstated only one of Stevens' four TEACH Grants and refunded Musser only $1,676.50 of the $7,325.25 in payments she made towards her improper TEACH Loans.

**B.  Income-Driven Repayment Plans for the FFEL and Direct Loan Programs**

12.    The FFEL and/or Direct Loan Programs have made federal student loans available to students since 1965. To address the financial difficulties students have in repaying their student loans, Congress required the Department to offer borrowers repayment plans that base the monthly repayment amount on the borrower's income and provide other benefits that traditional repayment plans do not, including loan forgiveness after a period of 20 or 25 years.

13.    The monthly payment under these "IDR Plans" is calculated each year a borrower remains on the plan. Thus, borrowers must annually submit income documentation for the

recalculation of their payment. The Department is required to provide borrowers with notice of this obligation and the recertification deadline.

14.     Defendants, however, failed to properly administer and service loans for borrowers who were either on an IDR Plan or were otherwise eligible for an IDR Plan and have consistently engaged in conduct which is contrary to the Department's own regulations, internal procedures, and federal internal control standards. These failures caused borrowers to incur severe financial consequences they otherwise would not have, such as the capitalization of accrued interest, which increases borrowers' outstanding loan balances and monthly payments. Defendants' failures include the following:

- Failing to assist and inform financially distressed borrowers about the availability of more affordable monthly payments under the IDR Plans and steering them instead into a general forbearance based on economic hardship and capitalizing accrued interest;

- Improperly capitalizing interest during periods of "B-9 administrative forbearance," in violation of 34 C.F.R. § 685.205(b)(9), when additional time is necessary to process a borrower's request to change repayment plans;

- Placing borrowers' loans into general forbearance and capitalizing accrued interest when additional time is necessary to process a borrower's request to change repayment plans, contrary to the requirements of 34 C.F.R. § 685.205(b)(9);

- Denying a borrower's annual recertification request because of deficiencies in the completed IDR Plan Request form, which causes accrued interest to capitalize and a borrower's IDR monthly payment to increase to an unaffordable amount;

- Failing to apply the regulatory exception to certain borrowers who submit their annual recertification paperwork after the deadline;

- Failing to effect proper notice of mandated disclosures, including the deadline for submitting the annual IDR Plan recertification paperwork; and

- Failing to sufficiently notify borrowers who request a change from an IDR Plan to another repayment plan that accrued interest will capitalize upon changing plans.

15.    For example, Plaintiff Adele S. Turnage ("Turnage"), an assistant principal in Gainesville, Florida, reached out to PHEAA for help after struggling for a year to make the high payments under the Standard Repayment Plan. But instead of informing Turnage about the availability and affordability of the various IDR Plan options, PHEAA steered her into a one-year forbearance. Turnage continued to make a $430.00 monthly payment while in forbearance. When she ultimately learned about and enrolled in an IDR Plan more than a year later, her new IDR monthly payment amount decreased to $342. Because she unnecessarily spent a year in forbearance, Turnage incurred $4,864.34 in capitalized interest, partially exhausted her eligibility for future forbearances, and lost the opportunity to make payments towards loan forgiveness.

16.    In 2016, Plaintiff Arianne Gallagher ("Gallagher"), a Director-Program Manager in the Office of Presidential Fellowship, submitted her annual paperwork for the recalculation of her IDR Plan monthly payment. Instead of promptly recalculating her new payment, as required by applicable regulation, Defendants took more than three months to process her request. To accommodate their delay, Defendants improperly placed her loans into a general forbearance for nearly two months and capitalized more than $13,000 in interest.

17.    The next year, Gallagher contacted PHEAA to discuss other repayment options. Rather than review her options and help her choose the one that best suits her needs, PHEAA required her to change plans to compare the differences for herself. In addition to completely failing to assist and advise Gallagher of her repayment options, Defendants failed to disclose that changing from her current IDR Plan to another plan would cause interest to capitalize and that changing back to her original plan if the new plan did not suit her needs, would cause any further accrued interest to capitalize. Consequently, more than $2,200 in interest capitalized as a result of switching plans to explore her repayment options.

18.     Plaintiff Yannet Lathrop ("Lathrop"), a Research and Policy Analyst at the
National Employment Law Project ("NELP"), timely submitted her IDR Plan recertification
paperwork in January 2016 and requested to switch to a different IDR Plan. It took Defendants
nearly five months to process her request. To accommodate their delay, Defendants improperly
placed her loans into general forbearance for four months which caused interest to capitalize.
Defendants further failed to advise Lathrop that changing from one IDR Plan to another would
cause accrued interest to capitalize.

## C.  The PSLF Program

19.     The Public Service Loan Forgiveness Program ("PSLF") provides incentives for
graduates to work full-time in public service careers, such as teachers, police officers, fire
fighters, public health workers, and non-profit workers. Participants in the PSLF Program are
eligible for loan forgiveness after making qualifying payments on a qualifying repayment plan
for 10 years while working in a public service position.

20.     Defendants failed to properly administer and service the PSLF Program and have
consistently engaged in conduct which is contrary to the Department's own regulations and
internal procedures, and federal internal control standards. As a result, borrowers' progress
towards loan forgiveness has been substantially delayed and borrowers are forced to make
payments of principal and interest they otherwise would not have to make. Defendants' failures
include:

- Failing to advise borrowers that they do not hold eligible federal loans and/or
  are not on an eligible repayment plan; and

- Miscalculating the number of qualifying payments a borrower makes towards
  PSLF forgiveness.

21.     For example, Plaintiff Nichole Wolff ("Wolff"), a special education teacher from
Depoe Bay, Oregon, has made consistent and timely payments towards her loans since 2005.

She submitted paperwork in 2016 to check her progress towards PSLF forgiveness. Her loans were transferred to PHEAA as the exclusive loan servicer for the PSLF Program. Neither at that time, nor any time up to that point, did Defendants advise Wolff that she was not on a qualifying repayment plan. It was only when Wolff applied for PSLF in 2017 was she notified that her repayment plan did not qualify.

22.     Unfortunately, Wolff's health is uncertain due to a stage 4 appendix cancer diagnosis and cannot now afford to switch to a PSLF qualifying repayment plan because the payments would actually be higher than her current plan. Had she known to switch plans 10 years earlier when she could afford it, her loans would be forgiven.

23.     Plaintiffs bring claims against the Department for injunctive relief under the Administrative Procedures Act, for injunctive and declaratory relief for violation of due process under the Fifth Amendment of the U.S. Constitution, and for monetary relief for breach of contract. Plaintiffs bring claims against PHEAA for monetary and injunctive relief for breach of contract, breach of fiduciary duty, constructive fraud, unjust enrichment, negligence, negligence per se, negligent misrepresentation, and violation of state consumer protection laws.

## PARTIES

### A.     Plaintiffs

### Arielle M. Anderson

24.     Plaintiff Arielle M. Anderson ("Anderson") is a resident of Spokane, Washington. Anderson received various federal student loans to help pay the costs of her post-graduate school education. To help manage her repayment obligations, Anderson enrolled in the IBR Plan and is pursuing loan forgiveness under the PSLF program. PHEAA services Anderson's federal student loans.

25.     Anderson has been employed by a PSLF eligible employer and made consistent, on-time monthly payments, as required by the PSLF Program, since July 2015. PHEAA however, has credited her with only 5 payments as of January 2018.

26.     In December 2017, Anderson timely submitted her annual income documentation to PHEAA. Although she did not submit the IDR Plan Request Form at that time, PHEAA acknowledged receipt of Anderson's income documentation and advised that it will "process [her] recertification request once the final bill of your current schedule is generated." At no time did it advise her that her application was deficient because she failed to submit the Request Form itself.

27.     Instead, PHEAA placed Anderson on the Standard Repayment Plan and capitalized approximately $15,000 in accrued interest for purportedly failing to timely recertify her IDR Plan. When Anderson contacted PHEAA about her inability to pay the Standard Repayment Plan amount, PHEAA steered her into general forbearance and advised her to reapply for IDR.

28.     On February 9, 2018, Anderson submitted her income documentation again along with the IDR Plan Request Form, shortly after which PHEAA determined her new IBR payment to be $0.

29.     Anderson has suffered various injuries as a result of PHEAA's failure to process her IDR paperwork, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; and (c) denial of the opportunity to make qualifying payments towards forgiveness under an IDR Plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Tanuja Goulet Arany**

30.     Plaintiff Tanuja Goulet Arany ("Arany") is a resident of Loma Linda, California. Arany earned the degrees of Doctor of Acupuncture and Oriental Medicine from Oregon College of Oriental Medicine after earning her master's degree from the same school. Until July 2019, Arany owned and operated the Tanuja Goulet Acupuncture & Oriental Medicine clinic, a small business in Bend, Oregon.

31.     From 2010 to 2014, Arany received various Direct Loans to help pay the costs of her post-secondary education. Today, Arany owes more than $250,000 in student loans, which because of interest capitalization, is approximately $40,000 more than when she completed her education just five years ago. PHEAA services Arany's federal student loans.

32.     In late 2015, Arany timely submitted to PHEAA an IDR Plan Request form for the annual recalculation of her monthly payment.

33.     PHEAA rejected Arany's IDR Plan Request, citing Arany's failure to provide supporting documentation of her annual income.

34.     In December 2015, Arany responded to PHEAA, explaining she could not provide a paystub or similar document because, as a small business owner, such documentation did not exist. Instead, Arany provided a summary of her small business' gross earnings.

35.     PHEAA did not timely process Arany's 2015 IDR Plan Request and supporting documentation. As a result, PHEAA instead placed Arany's account into forbearance status, causing $22,707.56 of accrued interest to capitalize on or about January 2, 2016.

36.     Arany has suffered various injures as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under an IDR plan; (c) denial of federal interest subsidies that the Department must

contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Michael Asby**

37.     Plaintiff Michael Asby ("Asby") is a resident of Daytona Beach, Florida. Asby received a TEACH Grant in 2009 to help pay the costs of pursuing his Bachelor of Applied Science in Special Education and Teaching degree from the University of Central Florida and executed the required Agreement to Serve. Asby has taught full-time as a highly qualified teacher in a high-need field at a school serving low-income students since 2011. PHEAA serviced Asby's converted TEACH Loan.

38.     Asby submitted the initial 120-day certification upon completing his TEACH eligible program of study to confirm that he was employed full-time in a qualifying teaching position or intended to meet the terms and conditions of the Agreement to Serve.

39.     Asby thereafter submitted the annual certification in 2013, 2014, and 2015 to certify that he had taught for one complete academic year or was currently teaching full-time in a qualifying teaching position.

40.     In 2016, PHEAA posted notice of the annual certification obligation only to Asby's paperless inbox at www.myfedloan.com, which Asby was not aware and did not receive. Before 2016, Asby had always received notice of the annual certification deadline via regular mail. As a result, he missed his certification deadline.

41.     In November 2016, Asby received notice that his TEACH Grant had been converted to an interest-bearing loan. Asby has since paid off his TEACH Loan.

42.     In 2019, Asby requested reconsideration of his TEACH Grant conversion. Defendants denied his request.

43.     Asby has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments he made towards the TEACH Loan, (b) provide credit for the four years of qualified teaching he has completed and certified, (c) discharge his obligations under his Agreement to Serve; and (d) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Katie Bonham**

44.     Plaintiff Katie Bonham ("Bonham") is a resident of Chelsea, Alabama. Bonham graduated from Faulkner University with degrees in criminology and psychology. For the last ten years, Bonham has served as a law enforcement officer.

45.     Bonham received federal student loans to help pay the costs of her education. Today, Bonham still owes approximately $23,000 in federal student loans. To help manage her repayment obligations, Bonham began pursuing loan forgiveness under the PSLF program. She has worked for PSLF qualifying employers since January 2009. PHEAA services Bonham's federal student loans.

46.     Bonham has made consistent, on-time, monthly payments as required by the PSLF program for more than ten years while working for a PSLF qualified employer. However, PHEAA has credited her for less than 60 payments.

47.     Bonham has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR Plans, and (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under the PSLF Program and her IDR Plan.

**Laura Brady**

48.     Plaintiff Laura Brady ("Brady") is a resident of Smithtown, New York. From 2010 to 2013, Brady received various Direct Loans to help pay the costs of her education. Today,

Brady owes approximately $125,000 in student loans. PHEAA services Brady's federal student loans.

49.     Brady has worked for a qualifying public service organization for the purpose of PSLF since 2013, including as a Child Life Specialist at Stony Brook Children's Hospital in Stony Brook, NY. Brady enrolled in the IBR Plan and is pursuing loan forgiveness under the PSLF program.

50.     In 2017, PHEAA posted notice of the annual IDR recertification deadline to Brady's paperless inbox at www.myfedloan.com, which Brady was not aware and did not receive. As a result, Brady missed the recertification deadline, which caused $7,615.73 interest to capitalize and her monthly payment to jump from $192 to almost $2,000.

51.     Brady contacted PHEAA, who steered her into forbearance in October and November 2017. Brady returned to her IBR Plan in December 2017.

52.     Brady has suffered various injuries as a result of Defendants' misconduct, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR Plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Jacquelynn Charles**

53.     Plaintiff Jacquelynn Charles ("Charles") is a resident of Chicago, Illinois. Charles received three TEACH Grants totaling $12,000 between 2009 and 2012 to help pay the costs of pursuing her degree in Bilingual/Bicultural Education from Loyal University Chicago and executed the required Agreement to Serve. Charles has taught full-time as a highly qualified

teacher at a school serving low-income students in a high-need field since 2013. PHEAA services Charles' converted TEACH loans.

54.     Charles submitted the annual certification in 2015 and 2016 to certify that she had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position.

55.     Although Charles actively confirmed her intention to satisfy the service obligation, Defendants converted her TEACH Grants to interest bearing loans ("TEACH Loans") claiming she missed the deadline for annual certification.

56.     Charles informed PHEAA that she was actively fulfilling her obligations and intended to continue to fulfill them via a letter. At that time, PHEAA responded that her loans could not be reconverted back to Grants.

57.     Charles thereafter made payments towards her TEACH Loan consistent with her IDR repayment plan.

58.     In 2019, Charles requested reconsideration of her TEACH Grant conversion. Defendants approved her request and only partially reinstated her TEACH Grant in July 2019.

59.     Charles is still waiting for the last 5 refunds because they were applied to loans instead of being refunded to her. PHEAA did not refund Charles any of the interest she had paid on her TEACH Loan.

60.     Charles has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loan, (b) provide credit for the four years of qualified teaching she has completed and certified, (c) discharge her obligations under her Agreement to Serve; and (d) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Jamie Coleman a/k/a Jamie McFarland**

61.     Plaintiff Jamie Coleman a/k/a Jamie McFarland ("Coleman") is a resident of Wharton, New Jersey. Coleman earned a bachelor's degree in psychology and minor in Spanish from the University of Delaware in 2008, and a master's degree in social work from Rutgers University in 2010.  Coleman has been a social worker for the past nine years and is currently a legal advocate for victims of domestic violence. Coleman previously worked with children who experienced trauma, as well as at a shelter for pregnant women.

62.     In 2010, Coleman took out Direct Loans to pay for her master's degree. To help manage her repayment obligations, Coleman enrolled in an IDR Plan and began pursuing forgiveness through the PSLF Program. Coleman has made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program, for the past 8 years. PHEAA services Coleman's federal student loans.

63.     On November 8, 2017, Coleman submitted her annual IDR Plan Request Form and requested a change from the IBR Plan to REPAYE. Coleman contacted PHEAA and specifically inquired if interest would capitalize upon switching plans. PHEAA confirmed (incorrectly) that it would not.

64.     Upon processing Coleman's request to switch plans, $7,352.15 accrued interest capitalized on December 14, 2017.

65.     Since graduating, Coleman has worked for a PSLF qualifying employer. To help manage her repayment obligations, Coleman enrolled in an IDR plan and began pursuing forgiveness through the PSLF Program. She has made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program, for at least the past 8 years.

66.     In October 2017, Coleman submitted a PSLF Employment Certification to her previous loan servicer, after which her loans were transferred to PHEAA as the exclusive PSLF loan servicer. On December 5, 2017, PHEAA notified Coleman that it provided her credit for only 32 of her 86 qualifying payments.

67.     Coleman has suffered various injures as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under both the PSLF program and IDR Plan; (c) denial of federal interest subsidies that the Department must contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Andrea Davis**

68.     Plaintiff Andrea Davis ("Davis") is a resident of East Hartland, Connecticut. Davis has worked for a qualifying public service organization for the purpose of PSLF since 2010, including as a Hearing Parole Officer for the State of Connecticut Board of Pardons and Paroles. Previously, she worked at The Connection, Inc., a nonprofit, from 2006 to 2010.

69.     Davis received federal student loans to help pay the costs of her education. Davis consolidated her loans on or about September 27, 1999. Today, Davis owes approximately $75,000 in student loans. To help manage her repayment obligations, Davis enrolled in the IBR Plan and is pursuing loan forgiveness under the PSLF program.  PHEAA services Davis's federal student loans.

70.     Davis has made consistent, on-time, monthly payments as required under the PSLF program for more than ten years while working for a PSLF qualified employer. However, PHEAA has credited her for only 59 payments as of June 2019.

71.     Davis has suffered various injures as a result of these servicing failures, including: (a) denial of the benefits of an IDR Plan; (b) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (c) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Arianne Gallagher**

72.     Plaintiff Arianne Gallagher ("Gallagher") is a resident of Washington, District of Columbia. Gallagher obtained a Bachelor of Arts in Political Science and Communication from the University of Pittsburgh in 2008 and a Juris Doctor from the University of Pittsburgh School of Law in 2011.

73.     Gallagher has worked for a qualifying public service organization for the purpose of PSLF since 2012, including as a Program Advisor to the U.S. Chief Technology Officer, and a Policy Advisor for the U.S. Office of Personnel Management. Today, Gallagher serves as a Director-Program Manager in the Office of Presidential Fellowships.

74.     From 2004 to 2010, Gallagher received multiple FFEL and Direct Loans, as well as private loans, to help pay the costs of her education. In December 2011, Gallagher consolidated many of her private loans into Direct Consolidation Loans. Today, more than eight years after graduating from law school, Gallagher's student loan balance has grown to more than $160,000. PHEAA has been Gallagher's student loan servicer since entering repayment status in 2011.

75.     Consistent with the requirements of the IBR Plan, Gallagher timely submitted her 2016 IDR Plan Request Form to PHEAA on January 27, 2016 for the annual recalculation of her IBR monthly payment. Because Gallagher did not request a change in repayment plans, she should have been permitted to continue making payments at her current IBR payment until PHEAA could promptly recalculate her new payment.

76. But instead, PHEAA placed Gallagher's account into general forbearance from at least March 5, 2016 to April 30, 2016. As a result, PHEAA caused more than $13,000 of interest to capitalize on Gallagher's loans, adding to her outstanding principal and increasing her monthly payment amount. This also prevented Gallagher from making qualifying payments towards forgiveness under the PSLF Program and the IBR Plan.

77. In 2017, Gallagher timely submitted her IDR Plan Request Form on January 25, 2017 for the annual recalculation of her monthly payment. Gallagher at that time did not request any changes to her repayment plan.

78. About a week after submitting her 2017 IDR Request Form, Gallagher contacted PHEAA to inquire about other repayment options that may better suit her needs. Rather than discuss Gallagher's options and which one might be best for her, PHEAA advised Gallagher to apply for the new plan, and then compare her repayment obligations under the new plan to those of the old, after the fact. PHEAA then processed a change from Gallagher's IBR Plan to another IDR Plan over the phone.

79. At no time did Defendants adequately advise Gallagher that changing from the IBR Plan to another plan would cause accrued interest to capitalize. As a result, $1100 in accrued interest capitalized when Gallagher changed plans.

80. When Gallagher received notice of the new plan's payment amount, she immediately requested that she be returned to the IBR Plan, which PHEAA approved on February 4, 2017. At no time did Defendants adequately advise Gallagher that changing from the "new" IDR Plan back to the IBR Plan would cause accrued interest to capitalize. As a result, $1,124.17 in accrued interest capitalized when Gallagher changed back to the IBR Plan.

81.     Gallagher has suffered various injuries as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under both the PSLF program and IDR Plan; (c) denial of federal interest subsidies that the Department must contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Dr. Garima Gupta**

82.     Plaintiff Dr. Garima Gupta ("Dr. Gupta") is a resident of Kensington, California. Dr. Gupta earned a Bachelor of Arts at the University of California – Berkeley and a Master of Arts at the University of Southern California. She then attended medical school at Touro University College of Osteopathic Medicine. Dr. Gupta received Direct Loans in at least 2002, 2003, and from 2010 to 2012 to pay for her education.

83.     Dr. Gupta worked for a PSLF qualifying employer from 2013 to 2019. Dr. Gupta currently practices critical care medicine and is affiliated with Alta Bates Summit Medical Center and Eden Medical Center in and around Oakland, California.

84.     To help manage her repayment obligations, Dr. Gupta consolidated her Direct Loans in 2013, enrolled in an IDR Plan, and began pursuing forgiveness through the PSLF Program. PHEAA has been Dr. Gupta's loan servicer since April 2014.

85.     Dr. Gupta worked for a PSLF qualifying employer from 2013 to 2019. Defendants have credited Dr. Gupta with fewer qualifying payments than she is entitled, despite having made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program. Defendants have credited Dr. Gupta with only 32 qualifying payments.

86.     Dr. Gupta has suffered various injuries as a result of Defendants' misconduct, including the denial of credit for PSLF qualifying payments she is entitled to, which delays forgiveness under the PSLF Program.

**Nathan Harig**

87.     Plaintiff Nathan Harig ("Harig") is a resident of Carlisle, Pennsylvania. Harig earned a bachelor's degree in political science from St. Vincent's College in 2008 as well as a master's degree in transatlantic studies from Jagiellonian University in 2010. Harig is currently the Assistant Emergency Medical Service Chief in Pennsylvania at Cumberland Goodwill Emergency Medical Services.

88.     Harig received federal student loans to pay for his master's degree. In 2011, he consolidated his loans into a Direct Consolidation Loan, enrolled in an IDR Plan and began pursing forgiveness under the PSLF Program. PHEAA has been Harig's loan servicer since May 2014, although his loans previously had been transferred among other loan servicers three times between 2011 and 2014.

89.     In 2018, Harig submitted a PSLF Employment Certification. Despite having made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program, since April 2011, Defendants have credited Harig with only 70 payments as of October 3, 2018.

90.     Harig requested that PHEAA review his payment history to confirm the number of qualifying payments made towards PSLF.  However, PHEAA has not provided Harig with credit for the "missing" qualifying payments he has made.

91.     Harig has suffered various injuries as a result of Defendants' misconduct, including the denial of credit for PSLF qualifying payments he is entitled to, which delays forgiveness under the PSLF Program.

**Mark Hawkins**

92.　Plaintiff Mark Hawkins ("Hawkins") is a resident of Philadelphia, Pennsylvania. Hawkins received various federal student loans to help pay the costs of his education. After Hawkins graduated in or around 2015, his consolidated loans were assigned to Navient Solutions, Inc. Hawkins' loans were transferred to PHEAA on April 11, 2016. PHEAA has serviced Hawkins' loans since that time.

93.　For example, in early 2016, Hawkins requested that his REPAYE Plan be renewed. When the loans were transferred to PHEAA, they were switched from the REPAYE Plan to IBR, a different IDR Plan with terms and benefits that are less favorable for many borrowers. When Hawkins's loans were mistakenly switched to the IBR plan, he lost his eligibility for the aforementioned benefits. Accordingly, Hawkins contacted PHEAA to report the error and requested that he be switched back to the REPAYE plan. To process Hawkins request and correct its errors, PHEAA placed Hawkins' loans into administrative forbearance from April 19, 2016 through May 18, 2016, during which interest may not be capitalized. Nonetheless, PHEAA unlawfully capitalized $2,431.95 of interest that accrued during this administrative forbearance. By capitalizing the interest, PHEAA increased Hawkins' principal loan amount on which future interest charges would be calculated.

94.　On May 19, 2016, (at the conclusion of the above one-month administrative forbearance), PHEAA placed Hawkins's loan into a "reduced payment forbearance" which would remain in effect until June 18, 2016. PHEAA placed the loan into this forbearance as a step in the process of restoring Hawkins's loans back to the correct payment plan, the REPAYE plan. A "reduced payment forbearance" is provided for under 34 C.F.R. § 685.221(d)(2)(ii), which pertains to a borrower who "no longer wishes to repay under the income-based repayment plan and who is required to repay under the Direct Loan standard repayment plan." (emphasis

21

added). This provision did not apply to Hawkins because he had timely renewed his income based REPAYE Plan and was therefore not required to repay under the Direct Loan standard repayment plan. Moreover, 34 C.F.R. § 685.209(c), which governs the administration of the REPAYE plan, does not provide for the use of such "reduced payment forbearances" for borrowers who are already properly enrolled in REPAYE.

95.     At the conclusion of a properly applied reduced payment forbearance, interest that accrues during the forbearance is required to be capitalized "in accordance with § 685.205(a)." *See* 34 C.F.R 685.221(d)(2)(ii). At the conclusion of the improperly applied reduced payment forbearance, PHEAA capitalized $1,238 of accrued interest. Thus, PHEAA shifted to Hawkins the cost of its own improper forbearance classification.

96.     Hawkins has suffered various injuries as a result of Defendants' misconduct, including the: (a) exhaustion of his eligibility for forbearance in the future, when he may actually need it; (c) denial of the opportunity to make qualifying payments, which delays loan forgiveness under PSLF and an IDR Plan; (d) denial of Federal Interest Subsidies that the Department must contribute on his behalf during repayment; and (e) capitalization of accrued interest, which adds to his principal and increases his monthly payment amount.

**Seniqua Johnson**

97.     Plaintiff Seniqua Johnson ("Johnson") is a resident of Dover, New Jersey. Johnson attended Oglethorpe University in Atlanta, Georgia, where she earned a Bachelor of Psychology in 2009. Since 2012, Johnson has been a Supervisor for the New Jersey Courts.

98.     Johnson received various federal student loans to help pay the costs of her post-secondary education. Today, Johnson owes almost than $100,000 in student loans. To help manage her repayment obligations, Johnson is pursuing loan forgiveness under the PSLF program. PHEAA services Johnson's federal student loans.

99.     After consolidating her loans in 2016, Johnson enrolled in the REPAYE IDR Plan. To ensure she made her payments on time, and to take advantage of a 0.25% interest rate reduction, Johnson enrolled in PHEAA's "direct debit" program, whereby monthly payments are automatically debited from a borrower's bank account. However, at the time she enrolled in its direct debit program, PHEAA placed her account into forbearance status. Johnson did not request PHEAA to place her account into forbearance, nor did PHEAA inform Johnson that the interest on her student loans would capitalize upon leaving the REPAYE plan.

100.     Johnson has suffered various injuries as a result of PHEAA's mismanagement, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to take part in alternative repayment plans; (c) denial of the opportunity to make Qualifying Payments, which delays loan forgiveness under both the PSLF program and REPAYE plan; (d) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; (e) denial of reduced interest rates available for borrowers in repayment status; and (f) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Lindsey Jones**

101.     Plaintiff Lindsey Jones ("Jones") is a resident of Topeka, Kansas. Jones received $8,000 in TEACH Grants in 2011 and 2012 to help pay the costs of pursuing her Bachelor of Science in Elementary Education from Iowa State University and executed the required Agreement to Serve.  Jones has taught full-time as a highly qualified teacher in a high-need field at a school serving low-income students since 2013.

102.     PHEAA services Jones's federal student loans.

103.     During her third year of fulfilling the teaching obligation, PHEAA switched Jones to paperless billing without her permission or knowledge.

104.     In 2016, PHEAA posted notice of the annual certification obligation only to Jones' paperless inbox at www.myfedloan.com, which Jones was not aware and did not receive. Jones had not authorized PHEAA to provide such notices via paperless inbox. As a result, she missed her certification deadline.

105.     On August 30, 2016, Defendants converted Jones' TEACH Grants to interest-bearing loans. Jones thereafter made payments towards her TEACH Loans consistent with her IDR repayment plan.

106.     On February 11, 2019 Jones requested reconsideration of her TEACH Grant conversion. Defendants approved her request and reinstated her TEACH Grant(s) on June 1, 2019 and provided Jones credit for the four year of qualified teaching she had completed.

107.     Jones has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loan, and (b) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Brittany King**

108.     Plaintiff Brittany King ("King") is from Saint Clair, Missouri. In 2011, she attended a one-year program at Sanford Brown College for medical billing and coding. King has worked for a qualifying public service organization for the purpose of PSLF since 2016. King received multiple Direct Loans to help pay the costs of her education. PHEAA services King's federal student loans.

109.     King has contacted PHEAA repeatedly since leaving school about the difficulties she was having in making her monthly loan payments, which ultimately led to a delinquency on

her account. Rather than advise King about the availability of IDR Plans that may provide an affordable monthly payment as low as $0 and assist her in selecting a plan that best fits her needs, PHEAA steered King into periods of economic hardship forbearance and deferment. PHEAA further failed to adequately notify her that going into forbearance would capitalize interest.

110.    When King ultimately learned about her IDR Plan options, she submitted an application for an IDR Plan in early 2019. On March 21, 2019, she was approved for the REPAYE Plan with a new monthly payment amount of $0. Had Defendants previously advised her of her options, she would have applied for an IDR Plan much earlier and avoided periods of economic forbearance and deferment and the resulting capitalization of interest.

111.    King has suffered various injuries as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR Plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount

### Yannet Lathrop

112.    Plaintiff Yannet Lathrop ("Lathrop") is a resident of Rockville, Maryland. Lathrop earned an undergraduate degree from the University of Minnesota, a Master of Philosophy and Political Science from the New School for Social Research, and a Master of Information Science from the University of Toronto.

113.    From 2003 to 2011, Lathrop received multiple Direct Loans to help pay the costs of her education. In 2011, Lathrop consolidated her loans into Direct Consolidation Loans. Today, Lathrop owes over $200,000 in student loans.

114.     PHEAA has been Lathrop's federal student loan servicer since 2015. Prior to PHEAA, Lathrop's loans were serviced by Mohela.

115.     Lathrop has worked for a qualifying public service organization for the purpose of PSLF since 2012. She currently works as a Research and Policy Analyst at the National Employment Law Project (NELP) in Washington, DC. Previously, Lathrop served as a policy analyst for the Michigan League for Public Policy and was a researcher for the Identity, Privacy and Security Institute of the University of Toronto.

116.     In January 2016, Lathrop timely submitted to PHEAA an IDR Plan Request Form for the annual recalculation of her monthly payment and requested that her repayment plan be switched from her existing IBR Plan to the REPAYE Plan.

117.     In January 2016, Lathrop requested that PHEAA switch her from her existing IBR plan to the REPAYE Plan, which would reduce her monthly payments from 15% of her discretionary income to 10%.  At that time, Defendants failed to advise her that switching plans would cause any accrued interest to capitalize and require her to make one payment under the Standard Repayment Plan or enter into a Reduced Payment Forbearance.

118.     PHEAA further failed to timely process Lathrop's request, and to accommodate its failure, improperly placed her account into general forbearance from January 1, 2016 through April 30, 2016.

119.     As a result, interest was capitalized and Lathrop could not make any Qualifying Payments towards PSLF forgiveness, despite being ready, interested, and able to do so.

120.     Around that same time, Lathrop received a bill for $10.00 representing the one-time reduced payment she must pay for leaving the IBR Plan, which she paid. However, Lathrop

was not aware that her account would be simultaneously placed into a Reduced Payment Forbearance from May 7, 2016 through June 6, 2016.

121.    PHEAA ultimately approved her request and calculated her new payment under the REPAYE Plan on June 8, 2016 – nearly 5 months after her initial request. Despite PHEAA's approval, it placed her account into Administrative Forbearance from June 7, 2016 through June 30, 2016, further denying her the ability to make qualifying payments toward loan forgiveness.

122.    Lathrop has suffered various injures as a result of these servicing failures, including: (a) denial of the benefits of an IDR Plan; (b) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR Plan; and (c) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Amanda Leone**

123.    Plaintiff Amanda Leone ("Leone") is a resident of Hoboken, New Jersey. Leone earned a bachelor's degree in Political Science and Government from Lafayette College in Easton, Pennsylvania in 2010 and her Juris Doctor from Seton Hall University School of Law in 2013. Upon graduation, Leone clerked for the Honorable Thomas R. Vena, J.S.C. in the Superior Court of New Jersey. Today, she is an attorney in New York City.

124.    Leone received various Direct Loans to help pay the costs of her education. Today, Leone is enrolled in the PAYE income-driven repayment plan. PHEAA services Leone's federal student loans.

125.    Leone submitted her IDR request sometime before March 23, 2016, at which time PHEAA confirmed its receipt via email. On April 12, 2016, PHEAA notified Leone that "[a]t this time, we are currently experiencing a high volume of IDR requests." PHEAA continued,

thanking Leone "for [her] patience as [PHEAA] work[s] through this unexpectedly high volume of requests."

126.    Furthermore, Leone routinely followed Defendants' recommendation to choose "the income-driven repayment plan with the lowest monthly payment." But Defendants failed to advise Leone that doing so may require a change in IDR Plans, which would cause accrued interest to capitalize. To this end, $2,270.35 of accrued interest capitalized on June 1, 2016 after Leone submitted an IDR request on or about May 12, 2016.

127.    Leone has suffered various injuries as a result of PHEAA's mismanagement, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the IDR Plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Adela Levis**

128.    Plaintiff Adela Levis ("Levis") is a resident of Arlington, Virginia. In 2005, Levis earned a Bachelor of Arts in German Literature from Oakland University and a master's in international politics from American University. In addition to her current studies, Levis is an Academic and NGO Liaison at the U.S. Department of State, where she has served in various capacities since 2010. The U.S. Department of State is a qualifying public service organization for the purpose of PSLF.

129.    In 2006, Levis consolidated her undergraduate student loans into Direct Consolidation Loans. From 2009 to 2012, Levis received various Direct Loans to help pay the costs of her post-graduate education. To help manage her repayment obligations, Levis enrolled in the REPAYE Plan in or about May 2013. She is pursuing loan forgiveness under the PSLF program.

130.    PHEAA has been Levis' student loan servicer since May 2017. Prior to PHEAA, Levis' student loan servicer was Nelnet.

131.    Levis has made consistent, on-time, monthly payments as required under the PSLF program for at least six years while working for the U.S. Department of State – a PSLF qualifying employer - and therefore should have credit for at least 72 PSLF qualifying payments. As of January 2019, however, PHEAA has credited her for only 12 payments.

132.    Levis has suffered various injures as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Shon Meckfessel**

133.    Plaintiff Shon Meckfessel ("Meckfessel") is a resident of Seattle, Washington. Meckfessel received federal student loans to help pay the costs of his undergraduate and graduate education. Following graduation, Meckfessel entered qualifying employment as a community college professor and attempted to enroll in an IDR Plan and the PSLF program.  PHEAA is Meckfessel's current loan servicer. Prior to PHEAA, Meckfessel's servicer was Nelnet.

134.    When Meckfessel inquired about the PSLF Program, Defendants incorrectly informed him that he was not eligible for an IDR Plan. Based on PHEAA's false and misleading information, Meckfessel made payments under a non-qualifying plan for approximately 3 years. None of these payments counted as "qualifying payments" under the PSLF program.

135.    After repeated inquires, Defendants eventually enrolled Meckfessel in the REPAYE Plan years after he first contacted them about repayment options.

136.    Meckfessel has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR repayment plans; (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under PSLF and IDR Plans; and (c) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment.

**Steven Meyer**

137.    Plaintiff Steven Meyer ("Meyer") is a resident of Lexington, Tennessee. Meyer received $7,000 in TEACH Grants in 2009 and 2010 to help pay the costs of pursuing his master's degree in education from Union University, which he earned on July 20, 2011, and executed the required Agreement to Serve. Meyer has taught full-time as a highly qualified teacher in a high-need field at a school serving low-income students since 2011. PHEAA services Meyer's improperly converted TEACH Grant loans.

138.    Meyer submitted the initial 120-day certification upon completing his TEACH eligible program of study to confirm his intention to meet the terms and conditions of the Agreement to Serve.

139.    Meyer thereafter submitted the annual certification in 2012, 2013, 2014, and 2015 to certify that he had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position.

140.    On October 1, 2015, PHEAA notified Meyer in writing to confirm that, "[a]s of today, you have fully satisfied your service obligation for the program of study for which you received the TEACH Grants listed below. You have no further teaching, certification, or other obligations for these grants."

141.    PHEAA attempted to contact Meyer to notify him that its prior determination was "in error." The basis for PHEAA's sudden reversal was Defendants' own incorrect determination

that Meyer was not entitled to a qualifying teaching service credit in 2012. PHEAA posted this letter to Meyer's paperless inbox at www.myfedloan.com. However, because PHEAA previously told him that he "ha[d] no further teaching, certification, or other obligations for these grants," Meyer did not visit his paperless inbox to view this letter.

142.     PHEAA similarly posted notice of Meyer's resurrected annual recertification obligation to his paperless inbox on December 30, 2016, January 31, 2017, and February 28, 2017. However, again, because PHEAA told him on October 1, 2015 that he "ha[d] no further teaching, certification, or other obligations for these grants," Meyer did not visit his paperless inbox to read these letters. As a result, he missed his certification deadline.

143.     Although Meyer actively confirmed his service obligation until October 1, 2015, and despite having taught full-time as a highly qualified teacher in a high-need field at a school serving low-income students since 2011, Defendants converted his TEACH Grants to an interest-bearing loan on April 12, 2017.

144.     In addition to his TEACH Grants, Meyer received $17,500 in loan forgiveness under the Teacher Loan Forgiveness ("TLF") program. After Meyer's eligibility was approved, Defendants used this $17,500 credit, in part, to pay off his TEACH Loans effective August 11, 2017.

145.     Meyer requested reconsideration of his TEACH Grant conversion in October 2019. The request is still pending.

146.     Meyer has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments he made towards the TEACH Loans, (b) provide credit for the four years of qualified

teaching he has completed and certified, (c) discharge his obligations under her Agreement to Serve; and (d) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Amanda Miller**

147.     Plaintiff Amanda Miller ("Miller") is a resident of Richmond, Virginia. Miller earned a bachelor's degree in Psychology and Criminal Justice from Thiel College in Greenville, Pennsylvania in 2014 and her Master of Arts in Forensic and Legal Psychology in 2014 from Marymount University. During school, Miller interned with the Pennsylvania Board of Probation and Parole, as well as the U.S. Marshals Service. Today, Miller is a Capital Mitigation Specialist with the Office of the Capital Defender in Richmond, Virginia.

148.     Miller received various federal student loans to help pay the costs of her education. Today, Miller owes almost $100,000 in student loans. To help manage her repayment obligations, Miller enrolled in a PAYE Plan and is pursuing loan forgiveness under the PSLF program. PHEAA has serviced Miller's federal student loans since January 2017. Prior to that, Miller's loans were serviced by Navient.

149.     Miller has made consistent, on-time, monthly payments since enrolling in an IDR Plan with another servicer for approximately two years as required by the PSLF Program. As a result, she should have approximately 30 Qualifying Payments towards loan forgiveness under the PSLF program. However, PHEAA has credited her for less than half that amount.

150.     Miller has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR Plans, and (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under the PSLF Program and her IDR Plan.

**Adam Morris**

151.     Plaintiff Adam Morris ("Morris") is a resident of Cumberland County, Pennsylvania. Morris earned a bachelor's degree from Penn State University in 2005 and a Juris

Doctor from Duquesne University School of Law in 2012. After graduating law school, Morris was employed full time by Warren and Forest Counties, Commonwealth of Pennsylvania, as a judicial law clerk from November 1, 2012, until August 22, 2014. Morris was employed full time by Centre County, Commonwealth of Pennsylvania, as an Assistant District Attorney from September 2, 2014, until October 1, 2015. Morris currently works full time in the Governor's Office of General Counsel in Harrisburg, where he has served as Assistant Counsel for the Pennsylvania Department of Labor and Industry and Prosecutor for the Pennsylvania Department of State since 2015.

152.     To help pay for his education, Morris took out an FFEL Loan and several Direct Loans. Morris enrolled in the IBR or another IDR Plan and is pursuing loan forgiveness under the PSLF program. Had Morris known that his FFEL loan was ineligible for PSLF, he would have consolidated that loan into a PSLF Direct Consolidation Loan at the earliest possible opportunity.

153.     PHEAA has serviced Morris' loans since graduating from law school in 2012.

154.     Beginning in 2012 and each year thereafter, as well as with each change of employment, Morris submitted a PSLF Employment Certification Form to PHEAA. PHEAA determined that Morris's employment with the Commonwealth of Pennsylvania, the Governor's Office of General Counsel, Warren and Forest Counties, and Centre County qualified as eligible employers for the PSLF program. However, PHEAA did not advise Morris that his FFEL loans did not qualify for PSLF until 2016.

155.     To qualify his FFEL loan for PSLF, Morris had to consolidate his FFEL loan with some of his undergraduate Direct Loans into a Federal Direct Consolidation Loan.  However, by doing so, Morris lost credit for any qualifying payments he made toward those undergraduate

Direct Loans. Had PHEAA advised him that his FFEL loan did not qualify for PSLF when he first submitted his Employment Certification Form in 2012, he would have consolidated his loans then.

156.    Furthermore, in January 2017, Morris submitted an IDR Plan Request Form to request that he be placed on "the plan with the lowest monthly payment." Defendants, however, failed to advise him that being placed on the plan "with the lowest monthly payment" could result in a change of repayment plans, which in turn would cause any accrued interest to capitalize.

157.    When PHEAA processed his recertification paperwork, they processed a change from Morris' current IBR Plan to REPAYE – the plan with the lowest payment. As a result, interest was capitalized.

158.    Morris has suffered various injuries as a result of Defendants' misconduct, including the: (a) denial of the opportunity to make qualifying payments towards the PSLF program and IDR Plan, which has delayed his progress towards loan forgiveness; and (b) capitalization of accrued interest, which increases his overall principal balance and monthly payment amount.

**Megan Musser a/k/a Megan Holland**

159.    Plaintiff Megan Musser a/k/a Megan Holland ("Musser") is a resident of Tinley Park, Illinois. Musser received three TEACH Grants totaling $12,000 from 2008 to 2011 to help pay the costs of pursuing her bachelor's degree in mathematics and psychology from North Central College and executed the required Agreement to Serve. Musser has taught full-time as a highly qualified teacher at a school serving low-income students in a high-need field since August 2011. PHEAA serviced Musser's improperly converted TEACH Grant loans.

160. Musser submitted the initial 120-day certification upon completing her TEACH eligible program of study in 2011 to confirm that she was employed full-time in a qualifying teaching position.

161. Musser thereafter submitted the annual certification in 2012 and 2013 to certify that she had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position.

162. In 2014, PHEAA posted notice of the annual certification obligation only to Musser's paperless inbox at www.myfedloan.com, which Musser was not aware and did not receive. As a result, she missed her certification deadline.

163. On August 27, 2014, Musser logged into her online account at www.myfedloan.com and saw that her TEACH Grants had been converted to interest-bearing loans.

164. Musser made approximately $7,325.25 in payments toward her TEACH loans from 2014 to 2019.

165. In February 2019, Musser requested reconsideration of her TEACH Grant conversion. Defendants approved her request on July 12, 2019 and reinstated her TEACH Grants on September 28, 2019. Defendants, however, refunded Musser only $1,676.50 of the $7,325.25 in payments she made towards her TEACH loans.

166. On October 4, 2019, PHEAA notified Musser that her TEACH Grant obligation was fulfilled.

167. Musser has suffered various injuries as a result of Defendants' misconduct, including, failing to provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loans.

**Heather Pruess**

168.     Plaintiff Heather Pruess ("Pruess") is a resident of Portland, Oregon. She earned a Bachelor of Science in Sociology from Boise State University in 2000 and an MPA in Public Administration/Nonprofit Management in 2007 from Portland State University. Today, Pruess is a Donor Relations Officer at a community foundation, a statewide community foundation supporting diverse communities across Oregon through philanthropy.

169.     From 1995 to 2000 and 2005 to 2007, Pruess received various federal student loans to help pay the costs of her education. Today, Pruess owes approximately $100,000 in student loans. To help manage her repayment obligations, Pruess is enrolled in the REPAYE Plan and is pursuing loan forgiveness under the PSLF program. PHEAA services Pruess's federal student loans.

170.     On January 22, 2017, Pruess received a letter from PHEAA advising her that her IDR recertification deadline was March 27, 2017. Pruess submitted her recertification paperwork in early February 2017, well before this deadline. Still, PHEAA failed to process Pruess' paperwork until May 2017.

171.     Furthermore, at no time did Defendants adequately advise Pruess that switching from an IDR Plan to another plan would cause any accrued interest to capitalize.

172.     As a result of the above delays in processing her paperwork and/or from switching IDR Plans, $4,667.25 of accrued interest capitalized on February 22, 2017 and another $530.04 of interest capitalized on April 11, 2017.

173.     Pruess suffered various injuries as a result of PHEAA's mismanagement, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments towards loan forgiveness under the PSLF program and the IDR Plan; (c) denial of Federal Interest Subsidies

that the Department must contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Meagan Pryor**

174.     Plaintiff Meagan Pryor ("Pryor") is a resident of Clarks Summit, Pennsylvania. Pryor graduated from Nova Southeastern University with a degree in Clinical Psychology. Upon completion of her program, Pryor began practicing as a psychotherapist under the supervision of a licensed psychologist. Pryor became licensed as a clinical psychologist in March of 2018, at which time she started to practice independently.

175.     Pryor received federal student loans to help pay the cost of her education. Today, Pryor has approximately $332,000 in student loans outstanding including principal and interest. PHEAA has been Pryor's loan servicer since May 2013.

176.     Pryor had been repaying her loans under an IBR Plan. On November 29, 2014, Pryor received a letter indicating that her application to recertify her IBR application for 2015 needed to be received within ten days of January 25, 2015. On January 24, 2015, Pryor mailed her IBR application documents along with a letter dated that same date. The letter enclosed Pryor's income tax documents for verification purposes and explained that because Pryor had not yet received her 2014 tax documents from her former employer, she included her final pay stub which reflected her full year earnings. In response to her submission, Pryor received a letter from PHEEA dated January 30, 2015 titled "the IBR application you requested."

177.     Instead of using the income documents Pryor submitted to recalculate her new IBR monthly payment, as regulations require, PHEAA calculated Pryor's monthly payment under the Standard Repayment Plan at a much higher monthly amount.

178.     Faced with a much higher new payment amount, Pryor agreed under duress to be placed into general forbearance for approximately two months starting in March 2015. As a

37

result, PHEAA improperly capitalized over $34,000 in interest on her loans increasing her principal balance dramatically.

179.    Pryor has suffered various injuries as a result of PHEAA's failure to process her IDR paperwork, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; (c) denial of the opportunity to make qualifying payments towards forgiveness under an IDR Plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Stacey Puccini**

180.    Plaintiff Stacey Puccini ("Puccini") is a resident of Wheeling, Illinois. From 2010 to 2015, Puccini received Direct Loans to pay for her education. PHEAA services Puccini's federal student loans.

181.    On May 24, 2017, Puccini submitted a completed IDR request form to PHEAA requesting a change in repayment plan from the Standard Repayment Plan to an IDR Plan. She used the version of the form available on FSA's website at that time.

182.    In October of 2016, the Department issued a modified version of the IDR Request form to replace its previous version of the form.[2] The revised version, however, displayed the same expiration date – October 31, 2018 – as did the previous version.[3]

183.    Despite its 2016 revisions, the Department continued to display the old version of the form on its website until at least January of 2018. When submitting her IDR request form, Puccini used the old version of the form which was replaced by the 2016 revised version.

---

[2] *See* form at https://static.studentloans.gov/images/idrPreview.pdf (last visited Oct. 18, 2019).

184.     On June 22, 2017, PHEAA sent a letter to Puccini, informing her that PHEAA could not process her request because the version of the IDR request form she had submitted was expired. The letter instructed Puccini to complete and send the revised version of the IDR request form, a copy of which was enclosed with the letter.

185.     Shortly after her first IDR request was denied, Puccini completed and signed the revised version of the IDR request form and sent it to PHEAA. On July 27, 2017, PHEAA sent a letter to Puccini, informing her that her second IDR request form could not be processed because it contained "conflicting information." Puccini contacted PHEAA who further explained that she had answered a question that she was supposed to leave blank. Enclosed with the letter was an additional IDR request form. The letter instructed Puccini to complete and return the enclosed form with all required documents.

186.     Despite the fact that more time was needed to process Puccini's request for a change in repayment plan, PHEAA did not place Puccini's loans into administrative forbearance, pursuant to 34 C.F.R. §685.205(b)(9), when it denied her IDR request. Had it done so, any interest that accrued during the remaining processing of her request would not have been capitalized or added to her loan balance.

187.     Puccini has suffered various injuries as a result of PHEAA's failure to process her IDR paperwork timely and properly, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments towards loan forgiveness under the PSLF program and the IDR Plan (c) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Hannah Rockwell**

188.     Plaintiff Hannah Rockwell ("Rockwell") is a resident of Park Ridge, Illinois.
Rockwell received federal student loans to help pay for the cost of her education. Rockwell
consolidated her loans on March 25, 2013. PHEAA services Rockwell's federal student loans.

189.     In June of 2016, Rockwell applied for enrollment in the REPAYE plan.
Unbeknownst to her, Rockwell's request was approved on June 30, 2016, and her monthly
payment under the plan was calculated at $643.35.

190.     PHEAA posted notice of Rockwell's enrollment, payment amount, and first
installment being due on July 7, 2016 to Rockwell's paperless inbox at www.myfedloan.com,
which Rockwell was not aware and did not receive. PHEAA did not send these notices to
Rockwell by first class mail or by email. As a result, Rockwell missed not only the July 7, 2016
payment deadline, but also those deadlines in August 2016 to January 2017, causing her loans to
become delinquent.

191.     By January 2017, Rockwell still had not received any emails, letters, or billing
statements regarding her enrollment in REPAYE. At or around this time, she called PHEAA to
inquire as to the status of her IDR request. PHEAA informed her that the request had been
approved six months earlier, and that she had failed to make monthly payments ever since.
PHEAA also advised Rockwell that she could avoid missing future payments by enrolling in
PHEAA's "direct debit" program, whereby monthly payments are automatically debited from the
borrower's bank account. The representative also advised that borrowers who enroll in direct
debit receive an interest rate reduction of 0.25%.

192.     To avoid missing future payments, Rockwell agreed to enroll in direct debit, and
provided her bank account and routing information in writing. Her direct debit plan was
approved, and timely payments were processed for the remainder of the annual payment period.

193.    On March 24, 2017, PHEAA posted notice that Rockwell's annual IDR recertification paperwork was due by May 27, 2017 to her paperless inbox at www.myfedloan.com, again which Rockwell was not aware and did not receive. As a result, she missed her recertification deadline.

194.    As a result, PHEAA increased Rockwell's monthly payments to $1,704.48, and capitalized $558.76 of accrued interest.

195.    Rockwell has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of an IDR Plan; (b) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR Plan; and (c) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Seth Shelley**

196.    Plaintiff Seth Shelley ("Shelley") is a resident of Richmond, Virginia. Shelley earned a bachelor's degree from Penn State University and a Juris Doctor from Pace School of Law. Since graduating law school in 2007, Shelley has worked for qualifying employers under the PSLF program. Today, Shelley is an attorney in the Office of the Capital Defender in Richmond, Virginia.

197.    From 2004 through 2007, Shelley received various federal student loans to help pay the costs of attending law school. Today, Shelley owes approximately $30,000 in student loans. To help manage his repayment obligations, Shelley enrolled in IDR Plans and is pursuing loan forgiveness under the PSLF program. PHEAA has serviced Shelley's federal student loans since mid-2012.

198.    Shelley has made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF Program since 2008. Shelley should have

been eligible to apply for PSLF loan forgiveness in 2018. However, Defendants miscounted his qualifying payments.

199.     Because of inconsistent information he has consistently received from PHEAA, Shelley delayed applying for forgiveness under the PSLF program until paying his November 2019 bill. To this end, Shelley logged into his online PHEAA account on October 16, 2019 to view his November 2019 bill and schedule payment of that bill for October 17, 2019. When he logged into his account on October 16, 2019, his account displayed a projected forgiveness date of November 7, 2019 for both of his loans, consistent with his mid-2018 review of his account and close to the date provided in the letter he received from PHEAA on March 20, 2018. Shelley logged back into his account on October 17, 2019. When he did so, his account displayed a projected forgiveness date of May 7, 2019, which is close to the date provided in the other letter described above, the one dated May 17, 2018. Shelley contacted PHEAA who indicated that Shelley made his 120th Qualifying Payment months ago.

200.     On October 21, 2019, PHEAA sent Shelley a letter, dated October 19, 2019, advising him to apply for loan forgiveness under PSLF, which he did, also on October 21, 2019.

201.     Shelley has suffered various injuries as a result of Defendants' misconduct, including the: (a) the opportunity to make qualifying payments towards the PSLF program and IDR Plan, which has delayed his progress towards loan forgiveness; (b) denial of Federal Interest Subsidies that the Department must contribute during repayment; (c) capitalization of accrued interest, which adds to his principal and increases monthly payment amounts; and (d) requiring Shelley to make more than the required 120-payments for loan forgiveness under PSLF.

**Chris Stevens**

202.     Plaintiff Chris Stevens ("Stevens") is a resident of Redlands, California. Stevens received four TEACH Grants totaling $7,515.60 for the years 2012-2015 to help pay the costs of

pursuing his degree from National University and executed the required Agreement to Serve. Stevens has taught full-time as a highly qualified teacher at a school serving low-income students in a high-need field since 2015. PHEAA serviced Stevens' converted TEACH Loans.

203. Stevens submitted the initial 120-day certification upon completing his TEACH eligible program of study in 2015 to confirm that he was employed full-time in a qualifying teaching position.

204. Stevens thereafter submitted the annual certification in April 2016 and April 2017 to certify that he had taught for one complete academic year, and was currently teaching, full-time in a qualifying teaching position.

205. PHEAA denied his 2016 certification because "the teaching service end date your certifying official provided is in the future." In other words, Stevens certified his employment through the end of the school year when he had not yet completed that school year. Stevens made the required change to his dates of employment and resubmitted his certification.

206. In September 2016, Stevens received notice that one of his Grants had been converted into an interest-bearing loan.

207. When Stevens contacted PHEAA, PHEAA advised that it had not received his certification and refused to reinstate his TEACH Grant. PHEAA also denied his 2017 certification.

208. Although Stevens actively confirmed his intention to satisfy the service obligation for both years, Defendants converted his TEACH Grants to TEACH Loans based on a hyper-technicality on the certification form.

209. Stevens could not afford to make payments towards his TEACH loans and they entered default status on or about August 14, 2018.

210.     On February 4, 2019 Stevens requested reconsideration of his grant-to-loan conversions. Defendants approved his request on April 24, 2019 but reinstated only one of his four TEACH Grants. Defendants have not reinstated his other Grants.

211.     On April 23, 2019, the Department issued a wage garnishment order to withhold 15% of Stevens' disposable income to collect on the remaining three TEACH loans that Defendants failed to reinstate. To date, the Department has garnished approximately $1,250.00 of Stevens' income.

212.     Stevens has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) reinstate his TEACH Grants upon approval of his reconsideration request, (b) provide a credit or refund for the full amount of principal and interest payments he made towards the TEACH Loans, (c) provide a credit or refund for the amount of income garnished from his wages; and (d) correct any credit reporting issues as a result of the grant-to-loan conversions.

**Adele S. Turnage**

213.     Plaintiff Adele S. Turnage ("Turnage") is a resident of Gainesville, Florida. From 2009 to 2012, Turnage received multiple FFEL loans to pay for her daughter's college education. Turnage consolidated these loans in 2013 into a Direct Consolidation Loan. Today, Turnage owes approximately $125,000 on the student loans she took out on her daughter's behalf. PHEAA has been Turnage's student loan servicer since 2013.

214.     Turnage's loans entered repayment status in 2013 and she paid $861.80 per month under the Standard Repayment Plan from June 2013 through July 2014.

215.     When the Standard Repayment Plan amount proved to be unaffordable, Turnage contacted PHEAA for help in August 2014. Rather than advise Turnage about the availability of IDR Plans and review her options, PHEAA steered Turnage into a forbearance from August

2014 through July 2015. Despite the fact she was excused from making any payments during this time, Turnage paid $430.00 per month just to keep up with the interest that was accumulating. Furthermore, when Turnage contacted PHEAA in August 2014 for help, PHEAA failed to disclose that entering forbearance would cause accrued interest to capitalize at the end of the forbearance period. To this end, $4,864.34 of accrued interest was capitalized on Turnage's account on August 5, 2015.

216.    After her forbearance period ended, Turnage again contacted PHEAA in October 2015. At that time, PHEAA finally informed her of the availability of IDR Plans and she enrolled in the IBR Plan. Her new IBR monthly payment was $342.00 – nearly $100 less than the $430 monthly payment she had made without obligation during the twelve month forbearance from August 2014 through July 2015. When Turnage later asked PHEAA why it had not informed her before about IDR Plan options when she first sought help in August 2014, PHEAA replied: "PHEAA isn't required to inform borrowers about these options if the client doesn't ask."

217.    Turnage has suffered various injures as a result of Defendants' misconduct, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR Plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Katherine Wardlow**

218.    Plaintiff Katherine Wardlow ("Wardlow") is a resident of Rochester, New York. Wardlow received a $2,000 TEACH Grant in 2010 to help pay the costs of pursuing her degree for English as a Second Language from Nazareth College and executed the required Agreement to Serve. Wardlow has taught full-time as a highly qualified teacher in a high-need field at a

45

school serving low-income students since 2013. PHEAA services Wardlow's federal student loans.

219.    Wardlow submitted the initial 120-day certification upon completing her TEACH eligible program of study in 2012 or 2013 to confirm that she was employed full-time in a qualifying teaching position and intended to meet the terms and conditions of the Agreement to Serve.

220.    Wardlow thereafter submitted the annual certification in 2013, 2014, 2015, and 2016 to certify that she had taught for one complete academic year, and was currently teaching, full-time in a qualifying teaching position.

221.    Although Wardlow actively confirmed her intention to satisfy the service obligation, in 2016, Defendants improperly converted her TEACH Grant to an interest-bearing loan based on a hyper-technicality on the certification form.

222.    As a result, Wardlow began making $50 monthly payments towards her TEACH Loan until February 4, 2019 when she requested reconsideration of her TEACH Grant conversion.

223.    On February 4, 2019, Wardlow received notice that her TEACH Loan would be reconverted back into a TEACH Grant and that Defendants would "make the appropriate adjustments to [her] account to ensure that [Wardlow] receive credit for any payments made on those loans." Defendants, however, only partially refunded Wardlow $193.45 in payments she made towards her TEACH loan.

224.    Wardlow has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loan, (b) provide credit for the four years of qualified

teaching she has completed and certified, (c) discharge her obligations under her Agreement to Serve; and (d) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Maggie Webb**

225.     Plaintiff Maggie Webb ("Webb") is a resident of Arlington, Massachusetts. Webb received a $4,000 TEACH Grant in 2012 to help pay the costs of pursuing her degree from University of Massachusetts - Boston and executed the required Agreement to Serve. Webb has taught full-time as a highly qualified teacher in a high-need field at a school serving low-income students since 2013.

226.     Plaintiff Webb submitted the annual certification in 2014 and 2015 to certify that she had taught for one complete academic year, and was currently teaching, full-time in a qualifying teaching position.

227.     Although Webb actively confirmed her intention to satisfy the service obligation, Defendants converted her TEACH Grant to an interest-bearing loan effective October 8, 2015.

228.     PHEAA claims it converted Webb's TEACH Grant to a Loan because Webb failed to submit her 2015 certification before the August 24, 2015 deadline.

229.     However, Webb submitted her 2015 annual TEACH certification by U.S. Mail on August 7, 2015, more than two weeks before this deadline.

230.     In March 2019, Webb requested reconsideration of her erroneous TEACH Grant conversion. Defendants approved her request and reinstated Webb's TEACH Grant.

231.     Webb has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loan, and (b) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Nichole Wolff**

232.     Plaintiff Nichole Wolff ("Wolff") is a resident of Depoe Bay, Oregon. She earned a Bachelor of Science and master's degree from the University of Minnesota. Wolff received various Direct Loans to help pay the costs of her education. On or about June 18, 2007, Wolff consolidated her loans into Direct Consolidation Loans. Today, Wolff still owes approximately $30,000 on her student loans.

233.     PHEAA has been Wolff's student loan servicer since December 2016. Prior to PHEAA, Wolff's loans had been serviced by other loan servicers.

234.     Wolff has worked for a qualifying public service organization for the purpose of PSLF since graduating in 2005 and has made consistent, on-time PSLF qualifying payments during this time.

235.     In August and September 2016, Wolff submitted PSLF Employment Certification Forms, one for each of her two employers, to EdFinancial Services, LLC, her then student loan servicer. Her loans were then transferred to PHEAA (as the exclusive PSLF loan servicer). PHEAA notified Wolff in writing of the transfer and acknowledged her interest in PSLF. PHEAA, however, did not advise Wolff that she was not on a PSLF-eligible repayment plan. Wolff's prior loan servicers also failed to advise her that she was not on a PSLF-eligible repayment plan.

236.     Having made 120-months of payments as of 2017, Wolff submitted a PSLF application for loan forgiveness in the second half of that year.

237.     After several months, during which she continued to make monthly payments, Wolff contacted PHEAA to ask about the status of her PSLF application. Only then did Defendants inform her that she was not on a PSLF-eligible repayment plan and had not made a

single qualifying payment. PHEAA reviewed with Wolff her repayment plan options, including both PSLF-eligible and non-PSLF-eligible repayment plans.

238.    However, because Wolff has been diagnosed with Stage 4 appendix cancer and her health is uncertain, Wolff chose to enroll in the repayment plan with the lowest monthly payment, which was a non-qualifying PSLF repayment plan. She continues to make her monthly payments under this new payment schedule.

239.    Plaintiff Wolff was told by a PHEAA representative that there simply was no appeal process.

240.    Had the Department and its loan servicers timely advised Wolff that she was not on a PSLF-qualifying repayment plan, she would have already obtained PSLF loan forgiveness.

241.    Defendants (1) failed to notify Wolff that despite working in public service her loan type and/or repayment plan did not qualify for Public Service Loan Forgiveness and (2) improperly placed her into forbearance. Wolff has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR Plans; and (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under the PSLF Program and her IDR Plan.

242.    Plaintiffs Asby, Charles, Charles, Jones, Meyer, Musser, Stevens, Wardlow, and Webb are collectively referred to as the "TEACH Plaintiffs."

243.    Plaintiffs Anderson, Arany, Brady, Coleman, Gallagher, Hawkins, Johnson, Leone, King, Lathrop, Meckfessel, Morris, Pruess, Pryor, Puccini, Rockwell, Shelley, Turnage, and Wolff are collectively referred to as the "IDR Plaintiffs."

244.     Plaintiffs Bonham, Coleman, Davis, Gallagher, Dr. Gupta, Harig, King, Lathrop, Levis, Meckfessel, Miller, Morris, Pruess, Shelley, and Wolff are collectively referred to as the "PSLF Plaintiffs."

## B.     Defendants

245.     Defendant Pennsylvania Higher Education Assistance Agency, or PHEAA, is a Pennsylvania corporation with its principal place of business at 1200 North 7th Street, Harrisburg, Pennsylvania 17102. PHEAA is a national provider of student financial aid services, including servicing of student loans owned by the federal government. PHEAA conducts its federal student loan servicing activities as FedLoan Servicing ("FedLoan"). PHEAA is financially independent of the Commonwealth of Pennsylvania, generates its own commercial revenue, and makes its own fiscal and policy decisions.

246.     Defendant U.S. Department of Education ("Department) is a United States federal agency headquartered in the District of Columbia with its principal office located at 400 Maryland Avenue, SW, Washington DC, 20202.

247.     Defendant Secretary Elisabeth DeVos ("Secretary DeVos") is sued solely in her official capacity as Secretary of Education, in which capacity she has the ultimate responsibility for the activities of the Department, including the actions complained of in this Complaint. Secretary DeVos maintains an office at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## JURISDICTION AND VENUE

248.     This court has original subject matter jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C. § 1361.

249.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds the

sum or value of $5,000,000, exclusive of interest and costs, and is between citizens of different states. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367.

250. This Court has personal jurisdiction over PHEAA because PHEAA conducts business throughout the United States, including this District, has substantial contacts with this District, and has engaged in the illegal scheme alleged in this Complaint, that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

251. The Department has waived sovereign immunity as to the relief requested in this matter pursuant to 5 U.S.C. § 702.

252. Defendants' actions give rise to an actual controversy for purposes of the Declaratory Judgment Act and Article III of the U.S. Constitution. As described herein, Plaintiffs have suffered an invasion of a legally protected interest which is concrete and particularized and actual and imminent. There is a causal connection between Plaintiffs' injuries and Defendants' offensive conduct. And Plaintiffs' injuries will be redressed by a favorable decision.

253. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly conduct business in this District and a substantial part of the events giving rise to the claims occurred here.

## BACKGROUND

**A.    Federal Student Loans and Loan Forgiveness Programs**

### 1.   Federal Student Loans

254.    Approximately 92%, or $1.4 trillion, of all outstanding student loan debt is currently owned by the federal government.[4]

255.    Federal student loans offer many benefits that private loans issued by traditional lenders do not. These include fixed interest rates, income-based repayment plans, loan cancellation for certain types of employment, deferment (postponement) options, and interest rate reduction based on repayment method. Also, private loans usually require a credit check, while most federal loans for students do not.

256.    Since 1965, federally guaranteed student loans have been available either through the FFEL (1965 – 2010) or Direct Loan (1994 – present) Programs.

257.    The FFEL Program was established by the Higher Education Act of 1965 ("HEA") and guaranteed student loans issued by private lenders to students and parents. The Program was terminated in 2010 with the passage of the Health Care and Education Reconciliation Act of 2010. Although no new FFEL loans have been made since June 30, 2010, millions of FFEL loans originated and disbursed on or before that date are still serviced today.

258.    The Direct Loan Program was authorized by the Student Loan Reform Act of 1993 under the HEA,[5] and was first implemented in the 1994 –1995 academic year. Loans issued under the Direct Loan Program are issued directly to students and parents through the Department of Education. Unlike FFEL Loans, Direct Loans originate with the Department and

---

[4] Teddy Nykiel, *2019 Student Loan Debt Statistics*, Nerd Wallet, (Sept. 20, 2019), *avaible at* https://www.nerdwallet.com/blog/loans/student-loans/student-loan-debt/.

[5] 20 U.S.C. §§ 1087a (2008).

are funded through the U.S. Department of the Treasury. Since the termination of the FFEL Program in 2010, all new federal loans have been disbursed under the Direct Loan Program.

259.     The FFEL and Direct Loan Programs were designed to expand access to higher education to those who have financial need and to serve the best interests of those students. As the Senate Health Committee on Health, Education, Labor, and Pensions ("HELP") stated in its 2007 Report on the HEA:

> The committee believes strongly that lenders, guaranty agencies and institutions of higher education must act with honesty and integrity at all times to ensure that the financial aid programs under title IV serve the ***best interests of students***.[6]

260.     The Department echoed that objective in a June 2008 "Dear Colleague" letter, noting the Department's "pledge to work with the student lending community in forward looking solutions to ensure FFEL Program and other student lending programs ***serve the best interests of students*** and taxpayers for years to come."[7]

261.     Similarly, the House of Representatives Committee on Education and Labor stated: "[t]he nation's financial aid system exists for a single purpose: ***to serve students*** and their families."[8]

---

[6] S. REP. NO. 110-231, at 27 (2007), *available at* https://www.congress.gov/110/crpt/srpt231/CRPT-110srpt231.pdf.

[7] Letter from Vincent Sampson, Deputy Assistant Secretary, Office of Postsecondary Education, to Department Colleagues (Jun. 19, 2008), *available at* https://ifap.ed.gov/dpcletters/061908GEN0808.html (last visited Nov. 8, 2019) (emphasis added).

[8] H. REP. NO. 110-500, at 240 (2007), *available at* https://www.congress.gov/110/crpt/hrpt500/CRPT-110hrpt500.pdf.

## 2. **Repayment and Income-Driven Repayment ("IDR") Plans**

262.    When federal student loans first enter repayment, borrowers may select from one of several repayment plans.

263.    Under the Standard Repayment Plan, a borrower's monthly payments are fixed for a 10-year repayment term. This plan typically results in the highest monthly payment amount, but less interest over the term of the loan. The Standard Repayment Plan is the default repayment plan for borrowers who do not choose another plan.

264.    Borrowers may also choose the Graduated Repayment Plan, which maintains a 10-year repayment term but allows the payments to start small and gradually increase every two years. The Extended Repayment Plan extends the repayment term to as many as 25 years and allows for either fixed or graduated monthly payments.

265.    Recognizing the financial challenges that borrowers face when repaying their loans, the federal government also offers four income-drive repayment plans designed to make the repayment of federal student loans less onerous and help borrowers better manage their student loan debt. These IDR Plans include:

- Income-Contingent Repayment ("ICR");

- Income-Based Repayment ("IBR");

- Pay-As-You-Earn ("PAYE); and

- Revised Pay-As-You-Earn ("REPAYE").

(collectively "IDR Plans").

266.     As of March 2019, more than 7.8 million Direct Loan and FFEL borrowers were enrolled in an IDR Plan.[9]

267.     IDR Plans are unique to the federal financial aid system and have several qualities that make them attractive to student loan borrowers.

268.     For example, a borrower's monthly payment amount is based on his or her annual income and family size. The monthly payment amount is calculated as a percentage of his or her discretionary income and capped at 10-20% of that income.[10] This income-driven payment is designed to provide a more affordable monthly payment than is available under the 10-year Standard Repayment Plan and may be as low as $0 per month.

269.     Certain IDR Plans (IBR and PAYE) are available only to borrowers with a "Partial Financial Hardship," *i.e.* their annual payments under the 10-year Standard Repayment Plan exceed 10% (PAYE) or 15% (IBR) of the difference between their Adjusted Gross Income and 150% of the poverty line for their family size.[11]

270.     Another benefit of IDR Plans is loan forgiveness (separate from the Public Service Loan Forgiveness Program). Each IDR Plan forgives the outstanding balance on eligible loans after 20 or 25 years (depending on the plan) of qualifying repayment. Periods of forbearance, however, *do not* count towards the qualifying repayment period.

271.     Certain IDR Plans (IBR, PAYE, and REPAYE) further provide for federal interest subsidy benefits. If a borrower's monthly payment amount does not cover the interest

---

[9] Press Release, Federal Student Aid, U.S. Dept. of Educ., Federal Student Aid Posts New Reports to FSA Data Center (Aug. 7, 2019), *available at* https://ifap.ed.gov/eannouncements/080719FSAPostsNewReportsToFSADataCenter.html.

[10] 34 C.F.R. § 685.209(a)(1)(v) (PAYE); 34 C.F.R. § 685.209(b)(1)(ii) (ICR); 34 C.F.R. § 685.209(c)(2) (REPAYE); 34 C.F.R. § 685.221(a)(5) (IBR).

[11] 34 C.F.R. § 685.209(a)(1)(v) (PAYE); 34 C.F.R. § 685.221(a)(5) (IBR).

that accrues, the government will pay 100% of the outstanding interest on subsidized loans for the first three years the borrower begins repaying the loans under the plan. For REPAYE, the federal government additionally pays 50% of the outstanding interest on a borrower's unsubsidized loans for the first three years and 50% of the outstanding interest on subsidized loans after the first three years. The government does not pay accrued interest during periods for which the borrower receives an economic hardship deferment.[12]

272.     Exhibit A summarizes and compares the terms and benefits of the four IDR Plans.

273.     When borrowers enroll in an IDR Plan, it is effective for a one-year period ("Annual Repayment Period"). To renew the plan for each subsequent year, borrowers must submit documentation each year to certify their income level and family size.[13]

274.     The Department is required to send the borrower written notice of the annual deadline for recertifying their IDR Plan eligibility and the consequences for failing to recertify within ten days of the annual deadline. These consequences include a significant increase in monthly payments from a low affordable amount to the amount dictated by the Standard Repayment Plan, and the capitalization of any accrued interest. In addition, the valuable federal interest subsidy benefit provided under the IBR, PAYE, and REPAYE plans is lost.

275.     When a borrower submits his or her annual IDR Plan paperwork, the loan servicer must "promptly" determine the new monthly payment amount.[14] The Department has stated that the target turnaround time to process IDR applications and recertifications is approximately

---

[12] 34 C.F.R. § 685.209(a)(2)(iii).

[13] 34 C.F.R. § 685.209(a)(5)(i) (PAYE); 34 C.F.R. § 685.209(b)(3)(vi) (ICR); 34 C.F.R. § 685.209(c)(4)(i) (REPAYE); 34 C.F.R. § 685.221(e)(1) (IBR).

[14] 34 C.F.R. § 685.209(a)(5)(viii)(a) (PAYE); 34 C.F.R. § 685.209(b)(3)(vi)(E)(1) (ICR); 34 C.F.R. § 685.209(c)(4)(viii)(a) (REPAYE); 34 C.F.R. §685.221(e)(8)(i) (IBR)).

fifteen days.[15] And according to a July 20, 2016 policy direction memorandum on student loan servicing from then Under Secretary for the Department, Ted Mitchell, to James Runcie, Chief Operating Officer of Federal Student Aid ("FSA") (FSA is an office of the U.S. Department of Education),[16] loan servicers should process IDR paperwork within ten days.[17]

276. Thus, the loan servicer has an affirmative duty to efficiently process the borrower's recertification materials to ensure smooth re-enrollment from one year to the next.

277. While the loan servicer is processing a borrower's IDR renewal request, it "must maintain the borrower's current scheduled monthly payment amount" until the new payment amount is determined.[18]

278. Regardless of which repayment plan a borrower is on, borrowers may change plans at any time during the repayment period. Although not adequately disclosed to borrowers,

---

[15] Douglas-Gabriel, Danielle, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains*, THE WASHINGTON POST, April 5, 2016, http://wapo.st/2oAcgbJ (last visited Oct. 14, 2019) ("Officials at the department say the majority of servicers are meeting or exceeding the target turnaround time of 15 days. However, PHEAA, which primarily handles borrowers seeking public service loan forgiveness, has a significant backlog, according to the department.").

[16] According to the Department, FSA is a "performance-based organization." About Ed / Overview, U.S. Dept. of Educ., last modified Oct. 17, 2017, *available at* https://www2.ed.gov/about/offices/list/fsa/index.html (last visited Nov. 7, 2019).

[17] Policy Memo from Ted Mitchell, Under Secretary, U.S. Dept. of Educ., to James Runcie, Chief Operating Officer, Fed. Student Aid, July 20, 2016, as updated October 17, 2016, 11, *available at* https://www.help.senate.gov/imo/media/doc/Servicing%20Recompete%20Policy%20Memo.pdf (last visited Oct. 14, 2019) (hereinafter "July 2016 Policy Memo").

[18] 34 C.F.R. §685.221(e)(8)(ii).

there may be harsh financial consequences for doing so. For instance, all outstanding interest is capitalized when changing from an IDR Plan to another plan.[19]

279.    For the IBR Plan, a borrower must also make one payment under the Standard Repayment Plan before switching to any other payment plan.[20] Because this payment amount is often unaffordable to borrowers, they can instead request a "reduced payment forbearance" and make a payment as low as $5.00.[21] However, any payments made during the "reduced payment forbearance," period do not count as a qualifying payment towards loan forgiveness.

### 3.  **General and Administrative Forbearance**

280.    Borrowers who cannot afford their monthly payments due to an economic hardship can seek relief by requesting a general forbearance. A general forbearance allows a borrower to temporarily stop making payments or to temporarily reduce his or her monthly payment amount for a specified period under certain circumstances such as financial hardship, poor health, or other acceptable reasons.[22]

281.    While a general forbearance may provide a borrower with temporary financial relief, it can be extremely costly in the long run. Any unpaid interest that accrues during the forbearance period is "capitalized," or added to the principal balance of the borrower's loan. Capitalization will therefore increase the principal balance and the total cost of the loan. Furthermore, because borrowers temporarily cease making payments, forbearance delays the borrower's progress toward loan forgiveness.

---

[19] 34 C.F.R. § 685.221(b)(4) (IBR); 34 C.F.R. § 685.209(a)(2)(iv)(A) (PAYE); 34 C.F.R. § 685.209(c)(2)(iv) (REPAYE).

[20] 34 C.F.R. § 685.221(d)(2)(ii).

[21] 34 C.F.R. § 685.205(a).

[22] 34 C.F.R. §685.205(a).

282. Loan servicers may also place a borrower's loans into "administrative forbearance" in certain circumstances without the borrower's approval, such as a period necessary to determine a borrower's eligibility for discharge due to bankruptcy, closed school, and other qualifying events, local or national emergencies, and instances of death or disability.

283. Relevant to this case, a loan servicer may also grant an administrative forbearance for a period up to sixty days when additional time is needed to collect and process documents supporting a borrower's request to change repayment plans ("B-9 Administrative Forbearance").[23] Interest that accrues during a B-9 Administrative Forbearance period *is no*t capitalized.

### 4. Public Service Loan Forgiveness Program

284. Publicly available data suggests that 1-in-4 U.S. workers are employed by a public service organization.[24] Many professions in this segment of the workforce require advanced levels of education, including classroom teachers, first responders, clinical social workers, and early childhood education providers. But the financial costs of these new credentials fall on individuals in careers with limited opportunity for wage growth to offset these costs.

285. To address this problem, Congress established the Public Service Loan Forgiveness Program ("PSLF") in 2007 as part of the College Cost Reduction and Access Act ("CCRA") "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct Loans" after 10 years of

---

[23] 34 C.F.R. §685.205(b)(9).

[24] CFPB, *Public Service & Student Debt: Analysis of Existing Benefits and Options for Public Service Organizations* (Aug. 2013), *available at* http://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf.

service.[25] In other words, PSLF was designed "to ensure that nurses, teachers, first responders and other public servants can serve their communities without it being to their long-term financial detriment."[26]

286.    Recent data released by the Department shows that low-to-moderate income student loan borrowers comprise the largest share of borrowers expected to benefit from PSLF.[27] As of 2016, nearly two thirds (62 percent) of borrowers who have certified intent to pursue PSLF reported earning less than $50,000 per year.[28] The vast majority of borrowers (86 percent) earned less than $75,000 per year.[29]

287.    To qualify for PSLF, borrowers must:

- Have a qualifying loan, *i.e.* a Direct Loan or loans that are consolidated into the Direct Loan Program;

- Be enrolled in a qualifying repayment plan, such as an IDR Plan or the Standard Repayment Plan;

---

[25] 34 C.F.R. §685.219(a).

[26] CFPB, *Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving their Communities* (June 22, 2017), *available at* https://www.consumerfinance.gov/data-research/research-reports/staying-track-while-giving-back-cost-student-loan-servicing-breakdowns-people-serving-their-communities/.

[27] *See* U.S. Dept. of Educ., *Direct Loan Public Service Loan Forgiveness*, 23 (July 10, 2016), *available at* http://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAADirectLoanPSLF.pdf (last visited Oct. 16, 2019).

[28] Barbara Hoblitzell and Melissa Shoemaker, U.S. Dept. of Educ., Federal Student Aid, *Public Service Loan Forgiveness Policy and Operations*, 29 (November 2016), *available at* http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConfSession18.ppt (last visited Oct. 16, 2019).

[29] *Id.*

- Be employed full-time by a "qualifying employer," such as a public school, emergency management, the military, or a Federal, State, local, or Tribal government organization, agency or entity.[30]

- Make 120 "qualifying payments," *i.e.* payments for the "full scheduled installment amount" made within fifteen days of the scheduled due date.[31]

288.    Periods during which loans are in forbearance do not qualify towards loan forgiveness. Additionally, if a borrower consolidates his or her loans, they will lose credit for all previously made qualifying payments and must start accumulating qualifying payments from zero.

289.    In 2012, the Department awarded PHEAA an exclusive contract to manage the PSLF Program. When a borrower with loans serviced by another loan servicer expresses intent to satisfy the requirements for PSLF, that borrower's loan account is transferred from its current loan servicer to PHEAA. Borrowers participating in these programs therefore have no choice but to have their federal loans serviced by PHEAA.

290.    Beginning January 2012, borrowers seeking loan forgiveness under the PSLF program may voluntarily submit an Employment Certification Form ("ECF"). According to the Department, the ECF Process allows borrowers to certify that their employment and payments qualify for the PSLF Program. Thus, borrowers can confirm their qualifying employment and receive an up-to-date count of PSLF qualifying payments to monitor their progress towards loan forgiveness.

291.    While Defendants recommend that borrowers submit ECFs annually, or when they change employers, borrowers are not required to do so.

---

[30] 121 STAT. 801, Sec. 401(B); 34 C.F.R. §685.219(b)(1)(ii).

[31] 34 C.F.R. §685.219(1)(iii).

292.     As the exclusive servicer of the PSLF Program, the Department relies on PHEAA to process ECFs.

293.     After completing 120 eligible monthly payments, borrowers may apply for loan forgiveness through a separate application. If PHEAA determines that a borrower meets all of the requirements for forgiveness, it forwards the application to the Department for final review. If the Department agrees with PHEAA's determination, the Department directs PHEAA to forgive the remaining balance of the borrower's loans.

294.     Borrowers who began making qualifying PSLF payments when the program came into effect in 2007 were first eligible for loan forgiveness under the PSLF Program in September 2017. Over 19,300 borrowers had submitted loan forgiveness applications as of April 2018. But the Department approved only 55 of those applications – ***less than 1%*** of borrowers who applied.[32] Of the applications processed, over 40% were denied only because they had not yet made the 120 qualifying payments.

295.     After a public outcry over borrowers' inability to gain loan forgiveness under the PSLF Program, Congress created an add-on program called Temporary Expanded Public Service Loan Forgiveness ("TEPSLF") in 2018. Under TEPSLF, borrowers who made some or all of their payments under a nonqualifying repayment plan may receive loan forgiveness. Congress set aside $700 million for the program available to borrowers on a first come, first serve basis.

296.     But the TEPSLF Program proved to be as big of a failure as PSLF itself. According to a review by the United States Government Accountability Office ("GAO"),

---

[32] U.S. Gov't Accountability Office, GAO-18-547, Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers at 11 (Sept. 5, 2018) [hereinafter *September 2018 GAO Report*], *available at* https://www.gao.gov/assets/700/694304.pdf.

approximately 54,000 TEPSLF applications were processed; **99% of those applications were rejected**.[33]

### 5. The TEACH Grant Program

297. "The U.S. Department of Education estimates that our country will need approximately 430,000 new elementary and secondary teachers by the year 2020, particularly in high-need subject areas such as mathematics, science, and special education."[34]

298. To attract and retain highly qualified teachers in high-need fields at low-income schools, Congress established the Teacher Education Assistance for College and Higher Education ("TEACH") Grant program in 2007 under the CCRA.[35]

299. The TEACH Grant Program provides financial grants up to $4,000 per academic year to eligible undergraduate, post-baccalaureate, and graduate students who are completing or plan to complete course work needed to begin a career in teaching.[36] Undergraduate students are eligible to receive a maximum of $16,000 in TEACH Grants, while graduate students are eligible for a maximum of $8,000 in TEACH Grants.[37]

---

[33] U.S. Gov't Accountability Office, GAO-19-595, Public Service Loan Forgiveness: Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion at 11 (Sept. 5, 2019) [hereinafter *September 2019 GAO Report*], *available at* https://www.gao.gov/assets/710/701157.pdf (emphasis added).

[34] U.S. Gov't Accountability Office, GAO-15-314, Higher Education: Better Management of Federal Grant and Loan Forgiveness Programs for Teachers Needed to Improve Participant Outcomes at 1 (Feb. 24, 2015) [hereinafter *February 2015 GAO Report*], *available at* https://www.gao.gov/assets/670/668634.pdf.

[35] 20 U.S.C. § 1070g, *et seq*.

[36] 20 U.S.C. § 1070g-1(a)(1).

[37] 20 U.S.C. § 1070g-1(d).

300.    In 2013, the Department contracted with PHEAA to be the exclusive servicer of the TEACH Grant Program. As of June 30, 2015, PHEAA was servicing about $444.5 million in TEACH Grants.

301.    As of 2015, more than $593 million in TEACH Grants had been awarded since the start of the program in 2007.[38] Since then, the federal government has disbursed an additional approximate $330 million in TEACH Grants.[39]

302.    In exchange for each TEACH Grant, students must sign an Agreement to Serve with the Department that sets forth the recipients' rights and obligations under the TEACH Grant Program.[40] A representative copy of the Agreement to Serve is attached as Exhibit B.

303.    By signing an Agreement to Serve, recipients agree to fulfill a service obligation that requires them to teach (i) full time, (ii) at a low-income school (*i.e.*, an elementary school, secondary school, or educational service agency that serves students from low-income families); (iii) in a high-need field (such as bilingual education and English language acquisition, foreign language, mathematics, reading specialist, science, and special education); [41] (iv) for a total of at least four school years within eight years after completing (or ceasing enrollment in) the course of study for which they received the Grant (the "Service Obligation").[42]

---

[38] *February 2015 GAO Report*, at 8.

[39] *See* Department of Education, Title IV Program Volume Reports, Grant Volume, AY 2015-2016 (Award Year Summary), Q4; AY 2016-2017, Q4 (Award Year Summary); AY 2017-2018, Q4 (Award Year Summary); and AY 2018-2019, Q4 (Award Year Summary), *available at* https://studentaid.ed.gov/sa/about/data-center/student/title-iv (last visited Oct. 14, 2019).

[40] 20 U.S.C. § 1070g-2(b); 34 C.F.R. § 686.12(a).

[41] 20 U.S.C. § 1070g-2(b)(1)(C); 34 C.F.R. § 686.2(d).

[42] Exhibit B. *See also* 20 U.S.C. § 1070g-2(b)(1); 34 C.F.R. § 686.12(b).

304. Recipients must "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[43]

305. Recipients must also "actively confirm at least annually his or her intention to satisfy the agreement to serve."[44]

306. Under certain limited circumstances, a recipient's TEACH Grant may be converted to a Federal Direct Unsubsidized Loan that the recipient must pay back with capitalized interest accruing from the date the TEACH Grant was initially disbursed to that recipient ("TEACH Loan").[45] The Department identifies five situations that permit the conversion of a TEACH Grant into a TEACH Loan:

   a.   At the recipient's request;

   b.   The recipient ceased enrollment in the qualifying teaching program prior to completion but fails to timely notify the Department that he or she is meeting or intends to meet the Service Obligation;

   c.   The recipient ceased enrollment in the qualifying teaching program prior to completion but has not been determined eligible for a suspension of the 8-year period for completing the Service Obligation, re-enrolled in a qualifying teaching program, or begun qualifying employment;

   d.   The recipient does not actively confirm to the Secretary, at least annually, his or her intention to satisfy the agreement to serve;" or

   e.   The grant recipient failed to begin or maintain qualified employment within the timeframe that would allow that individual to complete the service obligation.[46]

---

[43] 20 U.S.C. § 1070g-2(b)(1)(D). Exhibit B (Agreement to Serve at p. 5).

[44] 34 C.F.R. § 685.43(a)(4).

[45] 34 C.F.R. § 686.43.

[46] 34 C.F.R. § 686.43(a).

307.     Defendants, however, routinely converted TEACH Grants to interest-bearing federal loans for reasons not permitted by the Department's own regulations.

308.     In January 2019, the Department announced that certain TEACH Grant recipients whose TEACH Grants were converted to TEACH Loans could request reconsideration of the conversions by calling or emailing PHEAA and showing that they have met or are meeting the requirements of the Service Obligation. PHEAA would then determine whether the recipient qualifies to have his or her loans reconverted to a TEACH Grant.

309.     However, the Reconsideration Process has failed to adequately remedy the devastating financial consequences Plaintiffs suffered as a result of Defendants' failures.

## B.     PHEAA's Contract with The Department to Service Federal Student Loans and Teach Grants

310.     In 2009, the Department awarded PHEAA and three other for-profit loan servicers a servicing contract for an initial term of five years. These four companies are referred to as the Title IV Additional Servicer entities, or "TIVAS Entities."

311.     As of September 30, 2018, PHEAA was the largest servicer of federally owned student loans in the United States, according to data from the Department's National Student Loan Data System ("NSLDS").

312.     Federal student loan servicers are a crucial link between borrowers and lenders. Common loan servicing activities include:

- Providing required disclosures to borrowers about various Direct Loan terms and conditions during repayment;

- Providing information to borrowers on the several repayment plan options, such as the Standard Repayment Plan and the various IDR Plans;

- Providing information to borrowers about loan cancellation, discharge, and forgiveness benefits;

66

- Processing applications for enrollment in a borrower's selected repayment plan, calculating the amount of monthly payments, and sending occasional communications to borrowers regarding their selected repayment plans;

- Recertifying borrower eligibility for IDR Plans and recalculating monthly payments based on borrower income and family size information provided during the annual recertification process;

- Processing applications for loan forgiveness benefits, including benefits offered under the Public Service Loan Forgiveness Program;

- Collecting and applying loan payments to outstanding balances; and

- Providing delinquency and default prevention activities.[47]

313.    As the exclusive loan servicer for the TEACH Grant and PSLF Programs, PHEAA provides additional services with respect to the administration of those programs, including:

- Processing TEACH Grant annual certification paperwork;

- Processing PSLF Employment Certification Forms; and

- Processing applications for forgiveness under PSLF.

314.    The Department renegotiated the terms of PHEAA's and other TIVAS Entities' contracts in 2014. According to the Department's August 29, 2014 press release, the renegotiated contracts are further intended to benefit borrowers:

> As a result of President Obama's executive actions to help make student loans more affordable, the U.S. Department of Education has announced several new steps *to help federal student loan borrowers better manage their student debt*. … the Department has renegotiated the terms of its contracts with federal student loan servicers in order to strengthen incentives for them *to provide excellent customer service and help borrowers* stay up to date on their payments. This action will *help ensure that borrowers receive the highest quality support* as they repay their federal student loans

---

[47] Congressional Research Service Report, *Administration of the William D. Ford Federal Direct Loan Program*, May 11, 2017, prepared for Members and Committees of Congress, *available at* https://www.everycrsreport.com/files/20170511_R44845_042ef4643defb8ff20cb2ab457af085a0 479de60.pdf (last visited Oct. 14, 2019).

and help the Department better monitor the performance of loan servicers to help them continue to improve.

***

The renegotiated terms of the federal student loan servicer contracts are structured to create additional incentives for servicers to focus on the Department's priorities: ***effective counseling and outreach to ensure borrowers select the best repayment option for them, and enhanced customer satisfaction for student and parent borrowers*** at all stages of the student loan life cycle.[48]

315. A copy of the relevant portions of the 2009 and 2014 contracts between PHEAA and the Department are attached as Exhibits C and D.

316. At all times, PHEAA's contract with the Department was premised on its obligation to "maintain[] a full understanding of all federal and state laws and regulations and FSA requirements"[49] and "ensure[] that all aspects of the service continue to remain in compliance as changes occur."[50] PHEAA is obligated to maintain "procedures and systems" that "shall include a system of internal controls that ensures resource use is consistent with laws, regulations and policies."[51]

317. PHEAA's compliance with governing law is so important that PHEAA is prohibited from billing the government for loans that have not been "serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the

---

[48]Press Release, U.S. Dept. of Education, U.S. Department of Education Strengthens Federal Student Loan Servicing (Aug. 29, 2014) *available at* https://www.ed.gov/news/press-releases/us-department-education-strengthens-federal-student-loan-servicing (last visited Oct. 14, 2019) (emphasis added).

[49] Exhibit C (2009 Contract at 20, Paragraph C.1.4.3.

[50] *Id*.

[51] Exhibit C (2009 Contract, Attachment A-1, p. 7).

servicer (*i.e.* correct interest calculations, correct balances, interest determinations and calculations, notices sent properly, proper due diligence, etc.)."[52]

318.     PHEAA's loan servicing contract with the Department also requires PHEAA to deploy "best of business practices"[53] Although the contract does not specifically define "best of business practices," the Department has looked, in part, to best practices employed in servicing other forms of consumer debt, including the mortgage industry. As Defendant Secretary DeVos has stated, the Department must "ensure that the services [the Department] deliver are on par with those of world-class financial firms and world-class customer experiences."[54]

319.     Likewise, an interagency Presidential Task Force consisting of the Department, Office of Management and Budget, Department of the Treasury, and Domestic Policy Council appointed in 2015 to specifically recommend best practices for federal student loan servicers ("Presidential Task Force"), based its recommendations, in part, on its discussions with mortgage lenders, servicers, and mortgage industry experts.

320.     As with all federal loan servicers, PHEAA's contract is a performance-based contract intended to promote competition among loan servicers and provide the "best of business services" to borrowers. The Department "expects [PHEAA] to provide commercially available services that will yield high performing portfolios and high levels of customer satisfaction."[55]

---

[52] Exhibit C (2009 Contract, Addendum 1, p. 12).

[53] Exhibit C (2009 Contract, Attachment A1 at 3 and Attachment A-2 at 3).

[54] Press Release, U.S. Dept. of Education, Prepared Remarks by U.S. Secretary of Education Betsy DeVos to Federal Student Aid's Training Conference (Nov. 27, 2018) *available at* https://www.ed.gov/news/speeches/prepared-remarks-us-secretary-education-betsy-devos-federal-student-aids-training-conference (last visited Oct. 14, 2019).

[55] Exhibit C (2009 Contract, Attachment A-1, p.3).

321. The Department seeks to achieve the effective use of its performance-based contracts, in part, by establishing a common pricing schedule whereby PHEAA receives a per-unit fee for each loan that it administers. The amount of the fee depends on the status of the loan and the total volume of loans in that status category.

322. The 2009 common pricing structure is set forth below:

| STATUS | VOLUME LOW | VOLUME HIGH | UNIT PRICE |
|---|---|---|---|
| **Borrowers in in-school status** | N/A | N/A | $ 1.050 |
| ***Borrowers in grace or current repayment status*** | ***1*** | ***3,000,000*** | ***$ 2.110*** |
| | 3,000,001 | UP | $ 1.900 |
| **Borrowers in deferment or forbearance** | 1 | 1,600,000 | $ 2.070 |
| | 1,600,000 | UP | $ 1.730 |
| **Borrowers 31-90 days delinquent** | N/A | N/A | $ 1.620 |
| **Borrowers 91-150 days delinquent** | N/A | N/A | $ 1.500 |
| **Borrowers 151-270 days delinquent** | N/A | N/A | $ 1.370 |
| **Borrowers 270+ days delinquent** | N/A | N/A | $ 0.500 |

323. Under this fee structure, PHEAA is compensated only for those loans that remain in its portfolio. When the balance on a loan account is forgiven pursuant to an IDR Plan or PSLF, that loan account is removed from PHEAA's portfolio and PHEAA no longer receives compensation for that account. Thus, the longer a loan remains in repayment status, the more fees PHEAA will collect over the life of that loan.

324. The Department's common pricing structure was revised as of September 1, 2014 as follows:

| STATUS | UNIT | UNIT MEASURE | UNIT RATE |
|---|---|---|---|
| **In School** | 1+ | EA | $1.05 |
| **In Grace** | 1+ | EA | $1.68 |
| *In Repayment* | *1+* | *EA* | *$2.85* |
| **Service Member** | 1+ | EA | $2.85 |
| **Deferment** | 1+ | EA | $1.68 |

| | | | |
|---|---|---|---|
| *Forbearance* | *1+* | *EA* | *$1.05* |
| **Delinquent 6-30 days** | 1+ | EA | $2.11 |
| **Delinquent 31-90 days** | 1+ | EA | $1.46 |
| **Delinquent 91-150 days** | 1+ | EA | $1.35 |
| **Delinquent 151-270 days** | 1+ | EA | $1.23 |
| **Delinquent 271-360 days** | 1+ | EA | $0.45 |
| **Delinquent 361 or more Days** | 1+ | EA | $0.45 |
| **Delinquency Reduction Compensation Program** | N/A | N/A | Not-to-Exceed $2,000,000 |
| **Cohort Default Rate (CDR) Challenge Support** | | | |
| **Institution** | 1+ | EA | $213.00 |
| **Borrower** | 1+ | EA | $23.00 |
| **Loan Consolidation** | | | |
| **One-Time Development Cost** | N/A | N/A | Not-to-Exceed $1,200,000 |
| **Consolidations Completed** | 1+ | EA | $27.35 |
| **CDR Assistance Pilot (rate per school assisted)** | 1+ | EA | $18,000 |
| *Public Service Loan Forgiveness (PSLF)* | | | |
| *Approved Employment Certification Form* | *1+* | *EA* | *$5.00* |
| *Denied Employment Certification Form* | *1+* | *EA* | *$2.50* |
| *Borrowers in TEACH Grant Status* | *1+* | *EA* | *$1.05* |

325.    The revised pricing structure, however, still compensates PHEAA only for those loans that remain in its portfolio. Although the schedule added fees for servicing TEACH Grants and processing PSLF Employment Certification forms, PHEAA receives no compensation, and thus a financial incentive, for processing applications for loan forgiveness.

**C.    PHEAA's Fiduciary Role as a Consumer Advocate for Borrowers**

**1.    <u>The Department Delegates Advisory Duties to PHEAA</u>**

326.    Given the complexity of the FFEL and Direct Loan Programs, an important responsibility of PHEAA and other loan servicers is to provide borrowers with the necessary information to best manage their loans and assist them in making decisions throughout the life of their loan(s). As the U.S. Department of the Treasury acknowledged

[t]he natural consequence of th[e] complexity [of the federal student loan system] is that it is difficult for borrowers, even those who are sophisticated, to navigate the program and effectively manage their repayment responsibilities. Because the program is difficult to understand, ***borrowers rely on servicers*** to answer questions about repayment, enroll borrowers in an appropriate and sustainable repayment plan, and assist borrowers when they struggle to make their payments."[56]

327.   Thus, in authorizing the Department to contract with third parties like PHEAA to service such complex federal student loan programs, Congress intended for loan servicers to serve in a unique advisory capacity that far exceeds the role of conventional loan servicers.

328.   This Congressional intent is reflected in the structure of the Department and PHEAA's performance-based loan servicing contract. For example, in allocating loan servicing volume to PHEAA, the Department contractually reserves its "right to equitably introduce, eliminate, or modify loan deliverables/status items that are ***in the best interest of the … Borrower***" and its "right to unilaterally shift borrowers [among loan servicers] ***in the best interest of … Borrowers.***"[57]

329.   When the Department renegotiated the terms of PHEAA and other loan servicers' contracts in 2014, it further emphasized that the new terms are structured "to create additional incentives for servicers to focus on the Department's priorities: ***effective counseling and outreach to ensure borrowers select the best repayment option for them***."[58]

---

[56] U.S. Dept. of the Treasury, A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation at 124 (July 2018) [hereinafter *July 2018 Treasury Report*], *available at* https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf.

[57] Exhibit C (2009 Contract, at 14) (emphasis added).

[58] Press Release, U.S. Dept. of Education, U.S. Department of Education Strengthens Federal Student Loan Servicing (August 29, 2014), *available at* https://www.ed.gov/news/press-

330. When borrowers enter repayment, the Department directs loan servicers to "[e]stablish a relationship with the borrower"[59] and "discuss the appropriate repayment plan … [and] consolidation options;"[60] they also must "[e]ducate and inform borrowers regarding the tools and options available to assist them in the management of their student loans."[61] Borrowers are encouraged to "[c]all the servicer to obtain information on repayment options that best meet the borrower's financial situation" and should "[u]nderstand that servicers are there to help.").[62]

331. In fact, the Department refers to its loan servicer system as a "borrower-centric approach" intended to "serve borrowers."[63] The Department also routinely refers to loan servicers as advisers who can provide advice on repayment options and other resources:

- Student loan servicers "are responsible for *... **advising borrowers*** on resources and benefits to better manage their federal student loan obligations …."[64]

---

releases/us-department-education-strengthens-federal-student-loan-servicing (last visited Oct. 15, 2019) (emphasis added).

[59] Mary Oknich and Sue O'Flaherty, *Loan Repayment Options: What You Need to Know*, U.S. Dept. of Education, at 10 (July 2012), *available at* https://ifap.ed.gov/presentations/attachments/NASFAA2012LoanRepaymentOptionsWhatYouNeedtoKnow.ppt (last visited Oct. 15, 2019) (emphasis added).

[60] Mary Oknich and Sue O'Flaherty, *Loan Servicing Update*, U.S. Dept. of Education, at 29 (July 2012) [hereinafter *Loan Servicing Update*], *available at* https://ifap.ed.gov/presentations/attachments/NASFAA2012LoanRepaymentOptionsWhatYouNeedtoKnow.ppt (last visited Oct. 15, 2019) (emphasis added).

[61] Sue O'Flaherty, *Federal Loan Servicer Panel Discussion*, Federal Student Aid: An Office of the U.S. Dept. of Education, at 5 (Nov. 2012), *available at* https://ifap.ed.gov/presentations/attachments/2012FSAConfSession14FederalLoanServicerPanelDiscussion.ppt (last visited Oct. 15, 2019) (emphasis added).

[62] *Loan Servicing Update*, at 26.

[63] *Loan Servicing Update*, at 18, 19 (emphasis added).

[64] *Loan Servicing Contracts*, FSA, *available at* https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing. (emphasis added).

- "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will ***help you decide*** whether one of these plans is right for you."[65]

332. The Department also directs borrowers to seek "help" and "assistance" from their loan servicer for everything from payment plans to loan forgiveness:

- "***The loan servicer will work with you*** on repayment plans and loan consolidation and ***will assist you*** with other tasks related to your federal student loan.[66]

- "If you need help with this [IDR Request] form, contact your loan holder or servicer for free assistance."[67]

- "It is important to maintain contact with your loan servicer. If your circumstances change at any time during your repayment period, your loan servicer will be able to help."[68]

333. Making loan servicers available to help borrowers manage their loans is such an important objective for the Department, that the Department emphasizes that a borrower's loan servicer should be their first and only source for help. In a black box prominently displayed on FSA's website, the Department states:[69]

---

[65] *Income Driven Repayment Plans*, FSA, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[66] *Loan Servicers*, FSA, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/servicers. (emphasis added).

[67] A copy of the Income-Driven Repayment (IDR) Plan Request Form can be found at: https://static.studentloans.gov/images/idrPreview.pdf.

[68] A loan servicer will help you manage the repayment of your federal student loans—for free, FSA, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/servicers

[69] *Income Driven Repayment Plans*, FSA, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven. (emphasis added).

Why pay for help with your federal student loans when your loan servicer will help you for FREE? Contact your servicer to apply for income-driven repayment plans, student loan forgiveness, and more.

334.     An FSA Q&A similarly states:

What should I do if I am contacted by someone who wants to charge me fees to consolidate my federal student loans or to apply for an income-based repayment plan?

Contact your federal loan servicer; these services and more can be completed by your servicer for free! If you are contacted by a company asking you to pay "enrollment," "subscription," or "maintenance" fees to enroll you in a federal repayment plan or forgiveness program, you should walk away.[70]

335.     Similarly, the official blog of the Department published an article entitled, "Don't Be Fooled: You Never Have to Pay for Student Loan Help." In the article, the Department boasts:

You *never* need to pay for help with your student loans. **For the great price of** *free*, the U.S. Department of Education can help you:

- Lower Monthly Payments

- Consolidate Federal Student Loans

- Check on Loan Forgiveness; and

- Get Out of Default

Your loan servicer … can also help you with these goals for free.[71]

_____

[71] Ted Mitchell, *Don't Be Fooled: You Never Have to Pay for Student Loan Help*, HomeRoom: The Official Blog of the U.S. Dept. of Education (Jan. 29, 2016) *available at* https://blog.ed.gov/2016/01/dont-be-fooled-you-never-have-to-pay-for-student-loan-help/ (last visited Oct. 15 2019) (emphasis in original).

## 2. **PHEAA Holds Itself Out as an Advisor**

336.     PHEAA, too, represents itself as an advisor, available to offer assistance and advice to borrowers, particularly in relation to payment plan and loan forgiveness options. In fact, PHEAA refers to its call center representatives as "Loan Counselors."

337.     In addition to the advisory services provided by PHEAA's Loan Counselors, PHEAA maintains an "Office of Consumer Advocacy," whose stated mission is: to "***provide[] assistance to consumers with problems and concerns related to their student loans*** and "***listen to and investigate your concerns, and serve as your liaison with PHEAA operational staff regarding your issue***."[72] It instructs borrowers to be "transparent about your concerns and your situation ***so that we may best serve your needs.***"[73]

## D.     The Department's Oversight of Federal Student Loans and Student Loan Servicers

338.     Congress created the Department as a cabinet-level department in 1979 to oversee federal education programs because education "is too important to be mismanaged or denigrated within the federal government structure."[74] The Department's role includes "guaranteeing equal access to educational opportunities" and "maintaining significant higher education loan and grant programs to open doors for all students desiring to continue their education beyond public school."[75]

339.     The Department's founding purposes include:

---

[72]  PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last visited Oct. 15, 2019).

[73] *Id*. (emphasis added).

[74] S. REP. NO. 96-49 (1979).

[75] *Id*.

"[T]o **strengthen the Federal commitment** to ensuring access to equal educational opportunity for every individual;"[76]

****

"[T]o **improve the management and efficiency** of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds; . . ."[77]

*****

"[T]o **increase the accountability** of Federal education programs to the President, the Congress, and the public."[78]

340.     Today, the Department is one of the world's largest lenders, with a "consumer loan portfolio . . . larger than [that of] J.P. Morgan and Bank of America."[79] As of 2018, the Department's assets totaled $1.328 billion, over 90% of which is student loan receivables under the FFEL and Direct Loan Programs.[80]

341.     The Department established the Office of Federal Student Aid ("FSA")[81] to manage the administrative and oversight functions supporting the federal student financial aid

---

[76] 20 U.S.C. § 3402(1).

[77] 20 U.S.C. § 3402(6).

[78] 20 U.S.C. § 3402(7).

[79] Betsy DeVos, U.S. Sec'y of Education, *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, Statement Before the Committee on Education and Labor, 116th Cong. 5 (Apr. 10, 2019) *available at* https://edlabor.house.gov/imo/media/doc/SecretaryDeVosTestimony041019.pdf (last visited Oct. 17, 2019).

[80] *See* U.S. Dep't of Educ., *FY2018 Agency Financial Report* 9 (Nov. 15, 2018), *available at* https://www2.ed.gov/about/reports/annual/2018report/agency-financial-report.pdf (last visited Oct. 17, 2019).

[81] In the 1990s, the GAO designated FSA as a "high-risk agency with longstanding management problems." Then in 1998, to improve the efficiency and effectiveness of FSA and to mitigate the mishandling of limited resources moving forward, Congress converted it to a performance-based organization that would have to meet specific objectives under the HEA. *See Federal Student Aid: Performance-Based Organization Review: Joint Hearing Before the Subcomm. on Gov't Operations of the Comm. on Oversight and Gov't Reform*, 114th Cong. 5 (Nov. 18, 2015)

programs, including the TEACH Grant Program, the FFEL and Direct Loan Programs, and the

PSLF Program.[82] The Congressional mandated purposes of FSA include:

> (A) to improve service to students and other participants in [federal] student financial assistance programs…, including ***making those programs more understandable to students*** and their parents;
>
> \*\*\*
>
> (C) to ***increase the accountability*** of the officials responsible for administering the operational aspects of these programs;
>
> \*\*\*
>
> (G) to develop and maintain a student financial assistance system that contains complete, accurate, and timely data to ***ensure program integrity***.[83]

342. FSA administers the Title IV programs, in part, through PHEAA and other loan

servicers. In fact, Congress requires the Department to enter into loan servicing contracts, to the

extent practicable, for the Direct Loan Program and PSLF, and grants authority to contract for

"such other aspects of the direct student loan program as the Secretary determines are necessary

to ensure the successful operation of the program."[84] Similarly, the HEA authorizes the

Department to contract with loan servicers or otherwise delegate to loan servicers any of the

Department's functions concerning the FFEL Program.[85]

343. In contracting with loan servicers, however, "FSA is responsible for ensuring

servicers comply with all requirements for servicing federally held student loans, including

---

(statement of Hon. Virginia Foxx, Chairwoman of the Subcomm. on Higher Educ. and Workforce Training).

[82] 20 U.S.C. § 1018

[83] *Id.*

[84] 20 U.S.C. 1087f(b)(4).

[85] 20 U.S.C. 1086(a).

requirements relevant to income-driven repayment plan, forbearance and deferments of loan payments, consolidations of loans, and principal and interest payments."[86] The Department, however, maintains ultimate responsibility for the performance of the operational processes of its loan servicers.[87] Indeed, the Department has admitted that it "has the ultimate authority to review [PHEAA's] actions under its contract."[88]

344. Part of the Department's obligations in overseeing PHEAA and other student loan servicers is to provide clear, sufficient and consistent guidance to loan servicers and conduct monitoring activities of the servicers' operations. According to a July 27, 2018 GAO Report:

> In administering the Direct Loan program, Education uses numerous approaches to oversee the performance of its contractors, including issuing instructions and guidance to loan servicers. In addition to providing written communications, Education meets with servicers to discuss program operations and policy. Education also conducts various monitoring activities, including monitoring selected calls between servicers and Direct Loan borrowers to help ensure both acceptable customer service and servicer compliance with statutory, regulatory, and contractual requirements.[89]

---

[86] U.S. Dept. of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, Reissuance of Final Audit Report, Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans, at 7 (March 5, 2019) [hereinafter *March 2019 OIG Report*], available at https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf.

[87] Standards for Internal Control in the Federal Government ("Internal Standards"), Section OV4.01, p. 17 (Sept. 2014), *available at* https://www.gao.gov/assets/670/665712.pdf.

[88] Answer at ¶ 66, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476 (D.D.C.) (ECF No. 14).

[89] U.S. Gov't Accountability Office, GAO-18-587R, Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers, at 2 (July 27, 2018) [hereinafter *July 2018 GAO Report*], *available at* https://www.gao.gov/assets/700/693475.pdf.

345.     The loan servicing contracts similarly "provide [FSA] the ability to monitor phone calls remotely," "support quarterly monitoring reviews completed by FSA," and "support annual program compliance reviews done by FSA, or by an agent of FSA."[90]

346.     When a loan servicer falls out of compliance with its servicing obligations, including failure to properly calculate interest and send proper notice, the Department has two primary enforcement tools: (1) nonpayment of loan servicing fees, and (2) reallocation of loan volume to another loan servicer.[91]

347.     As alleged in this Complaint, however, the Department was well aware of PHEAA's non-compliance, but failed to impose these penalties and hold PHEAA accountable for its widespread and pervasive instances of non-compliance.

348.     The Department is also obligated to follow Federal Internal Control Standards, (commonly known as "The Green Book"), that apply to all federal executive agencies.[92] As with other statutory requirements, the purpose of these standards is to ensure that an entity's objectives will be achieved.[93] The Green Book sets out clear guidance that federal entities must follow, including guidance on assessing risks, information control, communication, compliance with federal guidelines, and remediation of deficiencies in any area of internal control.

349.     For example, agency management must ensure "compliance with applicable laws and regulations,"[94] actively "evaluate[s] and document[s] the results of ongoing monitoring…to

---

[90] Exhibit C (2009 Contract, A-2 at 11).

[91] Exhibit C (2009 Contract, at 12; Attachment A-4, page 2-3).

[92] 31 U.S.C. § 3512(b). Also known as the Federal Managers' Financial Integrity Act ("FMFIA").

[93] *Internal Standards*, at 5.

[94] *Id.* at 12.

identify internal control issues,"[95] "evaluate performance and hold individuals accountable for their internal control responsibilities,"[96] and "remediate identified internal control deficiencies on a timely basis."[97]

350.    As part of its internal monitoring processes, the Department "may contract with service organizations to perform roles in the organizational structure," however, the Department must:

> …communicate to the service organization the objectives of the entity and their related risks, the entity's standards of conduct, the role of the service organization in the organizational structure, the assigned responsibilities and authorities of the role, and the expectations of competence for its role that will enable the service organization to perform its internal control responsibilities.[98]

351.    The Green Book also dictates how the Department must communicate with loan servicers and borrowers, stating that the Department must communicate with borrowers in a way to effectively achieve the objectives and purposes of the Title IV financial aid programs.[99]

352.    When the Department learns of a deficiency in its internal controls, whether through its oversight functions or through external audits, it must take corrective action on a timely basis to remediate the identified deficiencies.[100]

353.    The Department has failed to administer the federal loan and forgiveness programs consistent with its obligations under Federal Internal Control Standards.

---

[95] *Id.* at 20.

[96] *Id.* at 21.

[97] *Id.* at 64.

[98] *Id.* at 32.

[99] *Id.* at 62 ("Management should externally communicate the necessary quality information to achieve the entity's objectives.").

[100] *Id.* at 32-33; 68-69.

# PHEAA FAILS TO PROPERLY SERVICE TITLE IV PROGRAMS

**A.    PHEAA's Pattern and Practice of Improperly Servicing the TEACH Grant Program.**

354.    Since PHEAA became the exclusive servicer of TEACH Grants in July 2013, PHEAA has improperly converted TEACH Grants to TEACH Loans  when PHEAA: (1) had confirmation from the recipient that he or she intended to satisfy the Service Obligation; (2) failed to provide recipients with sufficient notice of the deadline to actively confirm their intention to satisfy the Service Obligation; and (3) failed to provide recipients with sufficient time to actively confirm their intention to satisfy the Service Obligation; none of which are approved justifications for conversion.

355.    A February 2015 GAO report provided that in just a one-year period from August 2013 through September 2014, a remarkable 36,000 of the more than 112,000 TEACH Grants were converted to TEACH Loans -- 2,252 were converted in error. The report noted, however, that *"[t]he overall scope of the problem is unknown*."[101]

356.    The GAO also reported that 64% of requests for assistance from the FSA Ombudsman "cited problems submitting annual certification paperwork."[102] "The more common challenges cited included recipients not receiving reminders that their paperwork was due – as the servicer is required to send – or asserting that their grant was converted through no fault of their own."[103]

357.    The Department later reported in March 2018 that of those TEACH Grant recipients whose grants were converted to TEACH Loans and who reported the reason they did

---

[101] *February 2015 GAO Report*, at 26-27.
[102] *February 2015 GAO Report*, at 21.
[103] *Id.*

not certify annually, 44.0% "did not know about annual certification or the process," and 30.7% "found the annual certification process challenging."[104]

## 1. PHEAA is Financially Incentivized to Convert TEACH Grants to Loans

358.    Between 2014 and 2018, the value of federal student loans serviced by PHEAA grew from $185.2 billion to $320.1 billion. While PHEAA's portfolio grew, however, its operating income correspondingly, and significantly, decreased from $221.9 million in 2014 to $21.5 million in 2018.[105]

359.    With loan servicing costs increasing and profits dwindling, PHEAA had to determine a way to close this financial gap. Converting TEACH Grants to TEACH Loans was one way it could earn twice the amount of servicing fees per account.

360.    Pursuant to PHEAA's 2014 loan servicing contract, PHEAA receives $1.05 per TEACH Grant serviced. However, converting a TEACH Grant to a TEACH Loan earns it $2.85 – more than twice the amount – to service that loan.

361.    Instead of incentivizing PHEAA to provide better service to TEACH Grant recipients, the pricing structure actually *created* an incentive for PHEAA to convert TEACH Grants to Direct Loans, which PHEAA took full advantage for its own financial gain.

---

[104] American Institutes for Research, *Study of the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program*, 51 (March 2018), prepared for U.S. Dept. of Education: Office of Planning, Evaluation and Policy Development Policy and Program Studies Service, *available at* https://www2.ed.gov/rschstat/eval/highered/teach-grant/final-report.pdf (last visited Oct. 14, 2019).

[105] Bob Fernandez and Erin Arvedlund, *Is FedLoan, America's giant student loan servicer, running out of money?*, THE PHILADELPHIA INQUIRER, Feb. 24, 2019, *available at* https://www.inquirer.com/business/fedloan-student-loans-lending-pheaa-pennsylvania-higher-education-assistance-agency-james-steeley-20190224.html (last visited Oct. 15, 2019).

## 2. **PHEAA Improperly Converts Grants to Loans on Hyper-Technicalities Despite Receipt of Recipients' Intent to Satisfy the Service Obligation**

362.     Recipients may actively confirm their intention to satisfy the Agreement to Serve by submitting a TEACH Grant Certification form ("Certification form"). A representative copy of the TEACH Grant Certification form is attached as Exhibit H.

363.     Recipients complete the form by checking one of three boxes to indicate that they (1) completed a year of qualified teaching, (2) are not teaching but intend to satisfy the Service Obligation, or (3) have reenroll in another TEACH eligible program of study. For recipients who have completed a year of qualified teaching, the form must also be completed and signed by the Chief Administrative Officer of the school where the recipient taught to certify that the recipient has completed a year of qualified teaching.

364.     Each of the three options indicates a recipient's intention to meet his or her Service Obligation. Thus, regardless of which box a recipient checks (and even if they inadvertently forget to check a box), a recipient actively confirms his or her intention to satisfy the Service Obligation by simply submitting the TEACH Grant Certification form.

365.     Nevertheless, PHEAA routinely converts TEACH Grants to TEACH Loans based on hyper-technical mistakes on the Certification form, such as a missing signature or the inadvertent omission of the start and end dates for the qualifying academic year.

366.     Nothing in the HEA, the regulations promulgated thereunder, the TEACH Grant Program Requirements, or PHEAA's loan servicer contract authorize PHEAA to convert a grant to a loan for a mistake or missing information on the Certification form.

367.     Furthermore, the Department requires PHEAA to send recipients a "Request for Additional Information" when the Certification form is incomplete. But PHEAA fails to provide such notice or fails to provide recipients with sufficient time to correct any "mistakes."

368. Even if a recipient fails to provide the corrected or missing information, submission of the Certification form itself indicates that the recipient intends to meet the Service Obligation.

369. Because PHEAA improperly converted TEACH Grants to TEACH Loans based on hyper-technicalities, many teachers are now required to repay loans that they never intended to borrow. As a result, these teachers who are already on limited incomes, are struggling to manage their student debt.

370. For example, Plaintiff Stevens submitted the annual certification in April 2016 to certify that he had taught for one complete academic year, and was currently teaching, full-time in a qualifying teaching position. PHEAA denied his 2016 certification because "the teaching service end date your certifying official provided is in the future." In other words, Stevens certified his employment through the end of the school year when he had not yet completed that school year. In September 2016, Stevens received notice that one of his Grants had been converted into an interest-bearing loan.

371. Upon information and belief, PHEAA continues to improperly convert TEACH Grants to TEACH Loans on hyper-technicalities, such as missing information on the Certification form.

### 3. **PHEAA Fails to Provide the Required Notice of the Annual Certification Deadline**

372. Neither the federal regulations nor the Agreement to Serve specify a deadline for when a recipient must confirm his or her intention to satisfy the agreement to serve. Pursuant to 34 C.F.R. § 686.40(b), a recipient must do so "***at least annually.***"[106] The Agreement to Serve

---

[106] 34 C.F.R. § 686.40(b).

states that a recipient must document their teaching service ***"after [] complet[ing] each one of [the] four required school years of full-time teaching service***."[107]

373.    PHEAA's loan servicing contract, however, provides that, before November 1, 2018, a recipient's annual certification due date was calculated as 1-year from the date a recipient separated from the TEACH Grant eligible program.[108] For example, if a recipient graduated or ceased enrollment in her TEACH Grant program of study on May 23, 2015, her annual certification due date is May 23 for each following year.

374.    According to PHEAA's loan servicing contract, PHEAA is required to provide a series of notices to TEACH Grant recipients of the Annual Certification due date as follows:

    a.    First notice: an initial notice must be sent at least thirty days prior to the certification due date;

    b.    Second notice: if no response is received within thirty days of the first notice, PHEAA must send a follow-up notice;

    c.    Final notice: if no response is received within thirty days of the second notice, PHEAA must send a final notice.

    d.    Conversion: Recipients have thirty days from the date of the final notice to respond before PHEAA can convert their TEACH Grants to TEACH Loans. If PHEAA converts a grant to a loan, PHEAA must send the recipient confirmation notice of the conversion.

375.    Despite PHEAA's contractual obligations to provide Grant recipients with notice of the Annual Certification due date, PHEAA either failed to send the required notices or sent the notices without a recipient's consent or knowledge to a "paperless inbox" that corresponds with

---

[107] Exhibit B (Agreement to Serve, Paragraph 2.B).

[108] Starting in 2019, the annual certification due date will no longer relate to the recipient's separation date. Instead, all TEACH Grant recipients will have an Annual Certification due date of October 31.

the recipient's online account. Messages and notices sent to the paperless inbox can be viewed only by signing in to myfedloan.org.

376.     The *July 2018 Treasury Report* excoriated PHEAA's paperless inbox system, going onto say that "Federal student loan servicers employ emails that many borrowers and consumer advocates feel are of limited utility as they often contain messages similar to, 'A new message is available on your online account,' rather than more substantive emails."[109]

377.     When PHEAA posts a message to a recipient's paperless inbox – *including the required notice of the Annual Certification* – PHEAA sends the recipient an email with a non-descript subject line, "A new message is waiting for you to view." The body of the email further states very generally the following:

> A new message has been placed in your [PHEAA] Servicing paperless inbox. To access this message, select "Go To Paperless Inbox" below and sign in. Or go to Account Access at MyFedLoan.org to view your paperless inbox.

378.     The email does not indicate that action is required to prevent the TEACH Grant from converting to a loan or otherwise indicate that the message is an important notice about the recipient's Annual Certification due date.

379.     PHEAA's practice of sending notice only to a "paperless inbox" in inconsistent with industry best practices. According to the August 28, 2015 Presidential Task Force's *Recommendations On Best Practices In Performance-Based Contracting*, "various industries suggest that contractors should be required to provide a baseline set of tools for borrower communication." One of those tools include direct email communications which "would allow borrowers to both read and respond to account notifications through their inbox (***rather than***

---

[109] *July 2018 Treasury Report,* at 125.

*being directed to the contractor's website to access a message only viewable after logging in*) and interacting with representatives."

380.    Furthermore, PHEAA's "notice" of the Annual Certification requirement fails to provide recipients with ***the actual due date***. PHEAA's first notice vaguely informs recipients that "YOUR CERTIFICATION IS NOW DUE," "You **now** need to certify your status" and "Act now!" The second notice similarly states that "You now need to certify your status." Although the second notice warned that "You have 30 days to complete your annual certification," it too did not provide an actual due date. It's not until the final notice that a recipient's "certification is past due" that PHEAA informs recipients that they needed to certify "by the date of this letter."

381.    A March 2018 study conducted by the Department on the TEACH Grant Program found that 44% of grant recipients who did not submit an Annual Certification form said they did not know about the annual certification or the process.[110]

382.    Because of PHEAA's failure to provide proper notice to TEACH Grant recipients of the Annual Certification due date, many teachers are now required to repay loans that they never intended to borrow. These borrowers were penalized when grants were converted to TEACH Loans  and interest was capitalized.

383.    Plaintiff Musser submitted her annual certification in 2012 and 2013 to certify that she had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position. In 2014, PHEAA posted notice of the annual certification obligation only to Musser's paperless inbox at www.myfedloan.com, which Musser was not aware and did not receive. As a result, she missed her certification deadline.

---

[110] U.S. Dept. of Educ., Study of the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program 51 (March 2018).

384. Plaintiff Asby submitted his annual certification in 2013, 2014, and 2015 to certify that he had taught for one complete academic year or was currently teaching full-time in a qualifying teaching position. In 2016, PHEAA posted notice of the annual certification obligation only to Asby's paperless inbox at www.myfedloan.com, which Asby was not aware and did not receive. As a result, he missed his certification deadline.

385. Plaintiff Jones was in her third year of teaching when PHEAA switched her to paperless billing without her permission or knowledge. In 2016, PHEAA posted notice of the annual certification obligation only to Jones' paperless inbox at www.myfedloan.com, which Jones was not aware and did not receive. As a result, she missed her certification deadline.

### 4. PHEAA Fails to Provide Recipients with Sufficient Time to Submit the Annual Certification

386. Even when PHEAA sends recipients the required Annual Certification Request, it does not allow the recipient the required amount of time to submit his or her Annual Certification.

387. According to the February 2015 GAO report, 56% of recipients who had their grants erroneously converted to TEACH Loans were not given thirty days from the third and final notice of the Annual Certification to certify; 15% were not given a full year from graduation to certify their teaching; 6% were not given forty-five days from the first notification to certify; and 3% of the recipients had grants that were converted to TEACH Loans *before* the certification was even due.[111]

---

[111] *February 2015 GAO Report*, at 28.

388.    Similarly, an August 18, 2015 report from an FSA onsite review of PHEAA concluded that recipients were not provided with thirty days to respond to a denial of a certification notice.

**B.    PHEAA's Pattern and Practice of Improperly Servicing IDR Plans.**

### 1.    PHEAA is Financially Incentivized to Steer Borrowers into Forbearance

389.    The 2009 and 2014 servicing contracts do not incentivize PHEAA to assist borrowers with IDR and, in some instances, actually reward PHEAA for steering borrowers into forbearance.

390.    As alleged in Paragraphs 321-325, PHEAA receives compensation under the common pricing schedule set forth in PHEAA's 2009 and 2014 servicing contracts only for loans that remain in its portfolio.

391.    Thus, PHEAA is financially incentivized to maintain or maximize the number of borrowers in its portfolio, while minimizing the number of borrowers who successfully earn loan forgiveness and/or delaying the time it takes a borrower to successfully earn loan forgiveness. While borrowers enroll in IDR Plans to earn loan forgiveness and maintain affordable monthly payments, PHEAA has the opposite incentive: to keep loans active for as long as possible to continue earning servicing fees.

392.    PHEAA extends the life of loans eligible for forgiveness against the best interest of borrowers by improperly steering borrowers into forbearance, improperly capitalizing interest, and increasing the principal balance of the loan. By doing so, PHEAA pads the long-term accounts receivable on its balance sheet. Unless the Department transfers PHEAA's growing portfolio of 7.6 million borrowers to another servicer, PHEAA will profit on the backend of the loans it detours into forbearance by collecting additional service fees it would not be entitled but

for extending the life of borrowers' repayment period beyond the IDR and PSLF forgiveness schedules.

393.    For example, the PSLF Program – for which PHEAA is the exclusive servicer – forgives a borrower's remaining loan balance after the borrower makes 120 qualifying payments. Assuming a borrower makes 120 consecutive qualifying payments and PHEAA begins to service the loan before the first qualifying payment, PHEAA will profit $253.20 (120 months x $2.11/month[112]). If the time to loan forgiveness is delayed by four months because PHEAA placed that loan into forbearance, PHEAA will collect an additional $2.07 for each month the loan is in forbearance. Thus, PHEAA will profit $261.48 (4 months x $2.07/month[113]) + $253.20). The same motive equally applies to borrowers on IDR Plans with a loan forgiveness benefit.

394.    Additionally, PHEAA has saved untold sums of money by employing too few personnel to advise borrowers of the advantages of IDR Plans timely and properly.

395.    Borrowers who are having difficulty meeting their loan repayment obligations have two primary options: (1) enter forbearance, or (2) switch to an available IDR Plans that allows the borrower to make payments based on their income and family size.

396.    While forbearance may be appropriate during short-term financial difficulties and for borrowers who anticipate being unable to make payments for a short, defined period of time, forbearance is not appropriate for borrowers whose income is simply not adequate to make their monthly student loan payments. Such borrowers would instead benefit from enrollment in an IDR Plan.

---

[112] Assumes that PHEAA's repayment status loan volume is between 1 and 3,000,000.

[113] Assumes that PHEAA's forbearance volume is between 1 and 1,600,000.

397.     Enrolling in IDR takes time. PHEAA must explain the program, assist the borrower in filling out the application, and then process the application. The borrower must then complete an application along with income documentation. The process of enrolling in an IDR Plan can require multiple telephone conversations with PHEAA customer service representatives. Additionally, borrowers in IDR must re-certify their income and family size each year, requiring regular follow-up from PHEAA.

398.     By comparison, servicers can put borrowers into forbearance in the course of a single short phone call. For some forms of forbearance, there are no income or family-size requirements to verify.

399.     The natural and intended result is clear. By steering federal student loan borrowers down the faster path of forbearance, PHEAA can employ fewer customer service representatives to respond to borrowers' requests for servicing help.

400.     The 2009 and 2014 servicing contracts do nothing to compel a different result, and in some instances, reward PHEAA for steering borrowers into forbearance.

401.     For example, under the 2009 contract, once the total amount of loans in active repayment or grace period status exceeds 3,000,001, PHEAA receives a lower unit price per loan than the unit price for loans in deferment or forbearance. Thus, once the 3,000,001-loan threshold is reached, each loan that PHEAA moves from active repayment status into forbearance generates additional revenue for PHEAA. Borrowers, on the other hand, have any accrued interest capitalized and are prevented from making qualifying payments toward loan forgiveness.

402.     PHEAA has made untold sums of additional servicing fees to the financial detriment of borrowers. The relief Plaintiffs seek is necessary to remedy borrower harm and to prevent future harms.

### 2. PHEAA Steers Borrowers into Forbearance Instead of More Beneficial IDR Plan Options

403.     Federal student loan borrowers can choose IDR Plans that allow borrowers to make payments based on their income and family size, with the remaining balance forgiven after 20 or 25 years. Enrolling in an IDR Plan can result in payments as low as $0 per month. These plans ensure that monthly payments are manageable and enable struggling borrowers to avoid defaulting on their loans.

404.     Borrowers who are in IDR Plans are significantly less likely to enter into default. One report by the GAO found that from 2010–2014, less than 1% of IDR participants defaulted on their loan, compared to 14% in a standard repayment plan.[114]

405.     The August 2015 GAO Report also estimates that 51% of federal Direct Loan borrowers would benefit from an IDR Plan.[115] However, as of March 2018, only around 29% of borrowers of federal Direct Loans in repayment were enrolled in an IDR Plan.[116]

406.     Borrowers who are having difficulty meeting their loan repayment obligations also have the option of entering forbearance. While in forbearance, borrowers are not obligated to make payments on their loan. However, the interest on the loan continues to accrue during

---

[114] U.S. Gov't Accountability Office, GAO-15--663, Federal Student Loans: Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options at 2 (Aug. 25, 2015) [hereinafter *August 2015 GAO Report*],

[115] *Id.* at i.

[116] CollegeBoard, *Trends in Student Aid 2018: Outstanding Federal Loans*, *available at* https://research.collegeboard.org/pdf/01469-061-trends-saf13af13bf14af14b.pdf (last visited Oct. 15, 2019).

most types of forbearance and is capitalized at the end of the forbearance period. This adds to the total cost of the loan and can increase the amount a borrower must pay each month. In addition, a borrower in forbearance is unable to make payments that count for PSLF or IDR loan forgiveness.

407. While forbearance may be appropriate during short-term financial difficulties and for borrowers who anticipate being unable to make payments for a short, defined period of time, forbearance is not appropriate for borrowers whose income is simply not adequate to make their monthly student loan payments. Such borrowers would instead benefit from enrollment in an IDR Plan.

408. Borrowers are often unaware of the repayment plan options that are available to them. PHEAA's borrowers are thus dependent on PHEAA to provide accurate information concerning the repayment options available to them.

409. Enrolling a borrower in an IDR Plan takes time. PHEAA must explain each of the available IDR Plans, assist the borrower in filling out the application, and then process the application. The process of enrolling in an IDR Plan can require multiple telephone conversations with PHEAA customer service representatives. Additionally, borrowers in an IDR Plan must re-certify their income and family size each year, requiring regular follow-up from PHEAA.

410. By comparison, servicers can put borrowers into forbearance in the course of a single short phone call. For some forms of forbearance, there are no income or family-size requirements to verify.

411.    PHEAA holds itself out as a source of reliable information and assistance for borrowers who are struggling to repay their loans. PHEAA's website states:[117]



412.    On its page for borrowers having trouble making payments, PHEAA additionally promises:[118]



413.    However, PHEAA misrepresents the options available to struggling borrowers by often failing to advise of the availability of IDR Plans and instead steering borrowers into forbearance.

---

[117] FedLoan Servicing, Homepage, *available at* https://myfedloan.org/ (last visited Oct. 15, 2019).

[118] FedLoan Servicing, Trouble Paying, *available at* https://myfedloan.org/borrowers/trouble-paying (last visited Oct. 15, 2019).

414.    Indeed, a March 2019 OIG Report describes a Department audit of telephone calls with borrowers of all nine servicers that contract with the Department to service federal loans. The report states that the Department's April 2017 audit found that in more than 10% of PHEAA's calls with borrowers, PHEAA representatives failed to meet the Department's established standards for calls with borrowers. [119] Specifically, that Report states that in 25 of the 106 failed calls, the call failed because PHEAA failed to provide adequate information to the borrower about repayment options.[120]

415.    PHEAA's rate of failing to provide adequate information on repayment options was more than four times higher than the average among all servicers that contract with the Department.[121]

416.    Borrowers who are told only of the option of forbearance may not be aware of the availability of IDR Plans and therefore are unable to enroll (or even consider enrolling) in IDR.

417.    For example, when the Standard Repayment Plan amount proved to be unaffordable, Plaintiff Turnage contacted PHEAA for help in August 2014. Rather than advise Turnage about the availability of IDR Plans and review her options, PHEAA steered Turnage into a forbearance from August 2014 through July 2015, which caused $4,864.34 of accrued interest to capitalize on Turnage's account.

418.    Plaintiff King has contacted PHEAA repeatedly since leaving school about the difficulties she was having in making her monthly loan payments, which ultimately led to a

---

[119] *March 2019 OIG Report*, at 11.

[120] *Id.*

[121] *Id.*

delinquency on her account. Rather than advise King about the availability of IDR Plans, PHEAA steered King into periods of economic hardship forbearance and deferment.

### 3. **PHEAA Fails to Timely and Properly Process Applications for Enrollment in IDR Plans**

419.    To apply for an IDR Plan, or to change from one IDR Plan to another IDR Plan, borrowers complete and submit an "IDR Plan Request Form" along with their income documentation.

420.    Department guidance provides that IDR applications should be processed at most within fifteen days.[122]

421.    If additional time is necessary "to collect and process documentation supporting the borrower's request," PHEAA may grant a B-9 Administrative Forbearance for a period of up to sixty days.[123] Any interest that accrues during this period is ***not*** capitalized.[124]

422.    When the REPAYE Plan was rolled out in December 2015, a significant amount of applications were submitted to PHEAA and other loan servicers.

423.    Although PHEAA's loan servicing contract requires PHEAA to "provide a service flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes,"[125] PHEAA failed to timely and properly process the IDR applications causing a significant backlog.

424.    To accommodate the backlog and resulting processing delays, PHEAA placed some borrowers' accounts initially into B-9 Administrative Forbearance, as it is permitted to do.

---

[122] *July 2016 Policy Memo.*

[123] 34 C.F.R. § 685.205(b)(9).

[124] *Id.*

[125] Exhibit C (2009 Contract, Section C.1.4.4, p. 20).

However, PHEAA improperly capitalized interest during this B-9 Administrative Forbearance period in violation of governing regulations.

425.    If PHEAA needs additional time after the expiration of the permitted sixty day B-9 Administrative Forbearance period, PHEAA then improperly places borrower's accounts into a general forbearance, which triggers the capitalization of any accrued interest, disqualifies borrowers from making payments towards loan forgiveness under PSLF, and blocks the Federal interest subsidy the Department otherwise pays on the borrower's behalf.

426.    For example, Plaintiff Hawkins was switched from the REPAYE Plan to IBR in error. To correct its errors, PHEAA placed Plaintiff Hawkins' loans into a B-9 administrative forbearance from April 19, 2016 through May 18, 2016, but improperly capitalized $2,431.95 of interest that accrued during this administrative forbearance period.

427.    Plaintiff Pruess submitted her recertification paperwork in early February 2017, but PHEAA failed to process Pruess' paperwork until May 2017. As a result of the delay, $4,667.25 of accrued interest capitalized on February 22, 2017 and another $530.04 of interest capitalized on April 11, 2017.

428.    PHEAA's backlog in processing IDR Request Forms has been widely reported. The CFPB reported on the complaints it received from borrowers relating to this backlog:

> Borrowers report that when they attempt to recertify their IDR Plan, their loans are placed into forbearance, despite their right to continue making IDR payments while their new payment amount is determined. Borrowers are required to annually recertify their income and family size in order to continue to qualify for an affordable monthly payment under an IDR Plan.10F 11 Generally, servicers are expected to process borrowers' recertification applications in a few weeks.11F 12 However, when this process takes longer, borrowers are entitled under federal law to continue making income-driven payments at the same amount until their new payment is calculated.12F 13 Borrowers complain that when their recertification application is not timely processed by their servicers,

rather than extending their current income-driven payments, servicers require that borrowers make their full, standard monthly payment amount, or direct them to enter forbearance. Borrowers complain that when their standard monthly payment is unaffordable, forbearance is their only realistic option. Borrowers further complain that their loans may spend months in forbearance while their recertification application is under review, preventing them from progressing towards loan forgiveness available through IDR forgiveness options or Public Service Loan Forgiveness (PSLF).)[126]

429. The Washington Post similarly reported that "[o]fficials at the department say the majority of servicers are meeting or exceeding the target turnaround time of 15 days" however "[PHEAA], which primarily handles borrowers seeking public service loan forgiveness, has a significant backlog[.]"[127]

430. PHEAA is aware of, but has failed to rectify, these processing errors and delays. Instead, PHEAA has consistently shifted the consequences of its failing service system onto borrowers.

431. For example, Plaintiff Gallagher timely submitted her 2016 IDR Plan Request Form to PHEAA on January 27, 2016 for the annual recalculation of her IBR monthly payment. Because Gallagher did not request a change in repayment plans, she should have been permitted to continue making payments at her current IBR payment until PHEAA could promptly recalculate her new payment. But instead, PHEAA placed Gallagher's account into general forbearance from at least March 5, 2016 to April 30, 2016 and capitalized more than $13,000 of interest on Gallagher's loans and she could not make payments towards loan forgiveness.

[126] *2017 CFPB Report*, 12-13.

[127] Danielle Douglas-Gabriel, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains.* WASHINGTON POST, Apr. 5, 2016, *available at* https://www.washingtonpost.com/news/grade-point/wp/2016/04/05/delays-backlogs-confusing-applications-obamas-latest-student-loan-plan-is-having-growing-pains/?utm_term=.2e1bb3620545).

432. Plaintiff Lathrop timely submitted an IDR Request form in January 2016. To accommodate its failure to timely process Lathrop's request, PHEAA improperly placed her account into general forbearance from January 1, 2016 through April 30, 2016. As a result, interest was capitalized and Lathrop could not make payments towards loan forgiveness.

433. PHEAA ultimately approved her request and calculated her new payment under the REPAYE Plan on June 8, 2016 – nearly 5 months after her initial request. Despite PHEAA's approval, it placed her account into Administrative Forbearance from June 7, 2016 through June 30, 2016, further denying her the ability to make qualifying payments toward loan forgiveness.

### 4. **PHEAA Fails to Provide Borrowers with Sufficient Time to Correct Deficiencies in Annual IDR Recertification Paperwork**

434. For each year that a borrower remains on an IDR Plan they must recertify their eligibility for the plan by submitting documentation of their current income and family size to Defendants. To do so, borrowers complete and submit, along with their income documentation, the same "IDR Plan Request Form" used to enroll in the IDR Plan.

435. When a borrower submits their annual recertification paperwork, PHEAA must "*promptly* determine[] the borrower's new scheduled monthly payment amount."[128]

436. Like applications for enrollment in IDR Plans, internal guidelines suggest that recertification requests must be processed "[w]ithin 10 days of receiving … a recertification of income and family size, the servicer shall complete processing of the application or

---

[128] 34 C.F.R. § 685.209(a)(5)(viii) (PAYE), § 685.209 (b)(3)(vi)((E) (*I*CR), §685.209(c)(4)(viii) (REPAYE), § 685.221(e)(8)(i) (IBR).

recertification."[129] Similarly, FSA has stated that it should not take student loan servicers more than "a few weeks" to process a borrower's IDR Request Form.[130]

437.    If additional time is necessary to collect and process a recertification request, PHEAA *is not* authorized to place borrowers' accounts into administrative forbearance like it is permitted to do for requests to *change* repayment plans. Rather, PHEAA must maintain the borrower's current monthly payment amount under the IDR Plan until it can recalculate the new monthly payment amount. This is so even when PHEAA identifies a deficiency in the recertification request.

438.    According to an April 4, 2016 PHEAA – Department loan servicing contract amendment, if PHEAA identifies a deficiency in the IDR re-certification paperwork, it is required to contact borrowers by both phone and mail or e-mail. They must call the borrower at least two times, initially within seven days of reviewing the application and again within another seven days. The servicer must leave a message if there is no answer stating that the call is on behalf of the Department. They must also send notice by mail or e-mail ten days after reviewing the application. If PHEAA has not received sufficient information fourteen days after review, they must again attempt to contact the borrower by phone two more times within seven days. If PHEAA still has not received sufficient information within twenty-five days after review, it must contact the borrower again by e-mail or mail.

439.    The Department's July 20, 2016 policy guidance memo likewise provides:

> When an incomplete application is submitted, borrowers can expect
> their servicer to make a good faith effort to establish contact within

---

[129] *July 2016 Policy Memo*.

[130] U.S. Dept. of Education, Federal Student Aid Office, Income-Driven Repayment Plans: Questions and Answers, 22, *available at* https://web.archive.org/web/20171207034903/https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment-q-and-a.pdf (last visited Oct. 16, 2019).

10 business days or receipt of the incomplete application, with a description of all actions required to complete the application or otherwise correct any deficiencies in the application. Contact could also be made via personalized email if the borrower has opted into receiving electronic communications and the borrower responds to this contact by addressing the deficiency identified by the servicer. ***Borrowers should be able to correct errors on an income-driven repayment plan application based on clear oral instructions provided over the phone, or through plain language written or electronic communications.***[131]

440. The goal is to provide "high touch servicing" and "a clear expectation of what is needed to complete their enrollment or re-enrollment so they can stay on track."[132]

441. But PHEAA routinely denies recertification requests without providing the required high-touch service, sufficient time to correct the deficiency, and/or the option to correct the deficiencies over the phone or in writing. Instead, PHEAA requires borrowers to submit an entirely new IDR form and start the process all over again.

442. As a result of PHEAA's failures, borrowers are deemed by PHEAA to have failed with their recertification obligations, their monthly payments skyrocket to an unaffordable amount under the Standard Repayment Plan, any accrued interest is capitalized, and the borrower is steered into forbearance.

### 5. <u>PHEAA Fails to Apply the Missed Deadline Exception for IDR Recertifications</u>

443. PHEAA must provide borrowers with notice of the deadline for submitting their recertification request[133] and the consequences for failing to submit the required documentation

---

[131] *July 2016 Policy Memo,* at 19. (emphasis added).

[132] *July 2016 Policy Memo,* at 18-19.

[133] 34 C.F.R. § 685.209(a)(5)(iii) (PAYE); §685.209(b)(vi)(B)) (ICR); §685.209(c)(4)(iii) (REPAYE); 34 C.F.R. § 685.221(e)(3)) (IBR).

within ten days following the deadline.[134] If a borrower fails to submit their recertification paperwork within this ten day grace period, the following consequences occur:

   a. <u>PAYE and IBR</u>: Defendants determine that the borrower no longer has a partial financial hardship and their monthly payment amount is recalculated under the standard repayment plan. Any unpaid accrued interest is capitalized at the end of the borrower's IDR annual repayment period.[135]

   b. <u>ICR:</u> Defendants designate the standard repayment plan.[136]

   c. <u>REPAYE:</u> Defendants remove the borrower from the REPAYE Plan and place the borrower on an "alternative repayment plan" for which the monthly repayment amount is the amount necessary to repay the loan within ten years or the ending date of the twenty or twenty-five year loan forgiveness period, whichever comes first.[137] Any unpaid accrued interest is capitalized at the end of the borrower's IDR annual repayment period.

444.    The regulations, however, carve out certain exceptions for submitting the IDR Plan recertification paperwork after the ten day grace period.

445.    First, if Defendants are "able to determine the borrower's new monthly payment amount before the end of the borrower's current annual payment period," the borrower's new

---

[134] 34 C.F.R. § 685.209(a)(5)(iii)(B) (PAYE); §685.209(b)(vi)(B)(2) (ICR); §685.209(c)(4)(iii)(B) (REPAYE); 34 C.F.R. § 685.221(e)(3)(ii) (IBR).

[135] 34 C.F.R. § 685.209(a)(2)(iv)(A) and (a)(5)(iii)(B) (PAYE); 34 C.F.R. § 685.221(e)(7) and (b)(4) (IBR).

[136] 34 C.F.R. § 685.209(b)(3)(vi)(C) (ICR).

[137] 34 C.F.R. § 685.209(c)(4)(v) (REPAYE).

monthly payment amount *will not* be recalculated under the standard repayment plan and any accrued interest *will not* be capitalized.[138]

446.     Yet Defendants failed to apply the regulatory exception to borrowers whose new monthly IDR payment amount could be determined before the end of the borrower's annual repayment period. Instead, Defendants placed the borrower on the Standard Repayment Plan. When a borrower contacted PHEAA for help because they could not afford the inflated amount under the Standard Repayment Plan, PHEAA steered them into forbearance and instructed them to submit a new IDR Plan Request Form.

447.     Second, if Defendants recalculated the borrower's monthly payment amount under the Standard Repayment Plan (for PAYE, ICR and IBR), Defendants must grant the borrower an administrative forbearance for any payments that are overdue or would be due when the new IDR payment is determined, if the new IDR payment amount is $0.00 or is less than the borrower's previous IDR payment amount. Interest that accrues during this forbearance period is ***not*** capitalized.[139]

448.     Yet, PHEAA fails to apply this exception too. Instead, Defendants placed borrowers on the Standard Repayment Plan. When a borrower contacted PHEAA for help because they could not afford the inflated amount under the Standard Repayment Plan, PHEAA steered them into general forbearance, rather than the mandated administrative forbearance, and capitalized the accrued interest.

---

[138] 34 C.F.R. § 685.209(a)(5)(vii) (PAYE); § 685.209(b)(vi)(D) (ICR); § 685.209(c)(4)(v) and (c)(4)(vii) (REPAYE); 34 C.F.R. § 685.221(e)(7)(IBR).

[139] 34 C.F.R. § 685.209(a)(5)(ix)(A) (PAYE); § 685.209(b)(3)(vi)((F)(1) (ICR); 34 C.F.R. § 685.221(e)(9)(i) (IBR).

449.     Plaintiff Pryor mailed her IBR income documents along with a letter to PHEAA on January 24, 2015. Rather than calculate her new payment using the income documents submitted, PHEAA recalculated Pryor's monthly payment amount under the Standard Repayment Plan. Faced with a much higher new payment amount, Pryor agreed under duress to be placed into general forbearance for approximately two months starting in March 2015. As a result, PHEAA improperly capitalized over $34,000 in interest on her loans increasing her principal balance dramatically.

450.     In December 2017, Plaintiff Anderson timely submitted her annual income documentation to PHEAA, which PHEAA acknowledged. When PHEAA processed her request, instead of calculating her new payment, it placed Anderson on the Standard Repayment Plan and capitalized approximately $15,000 in accrued interest for purportedly failing to timely recertify her IDR Plan. When Anderson contacted PHEAA about her inability to pay the Standard Repayment Plan amount, PHEAA steered her into general forbearance and advised her to reapply for IDR.

451.     PHEAA's failures have had catastrophic financial consequences to borrowers, including improperly placing borrowers on the unaffordable Standard Repayment Plan, capitalizing any accrued interest and steering borrowers into forbearance where they lose the opportunity to make qualifying payments toward loan forgiveness.

### 6.  **PHEAA Fails to Provide Notice of Important Deadlines**

452.     According to the Master Promissory Notes ("MPNs") that govern Federal Direct and FFEL Loans[140], PHEAA must send the statutorily mandated notice of the annual

---

[140] Representative Master Promissory Notes for FFEL and Federal Direct Loans are attached as Exhibits E and F, respectively.

recertification deadline to borrowers via first class mail, or, if the borrower has provided an e-mail address, via e-mail. The MPNs provide:

> FFEL MPN:
>
> Any notice required to be given to me will be effective if sent by first class mail to the latest address the lender has for me or by electronic means to an electronic address that I have provided.[141]
>
> Direct Loan MPN:
>
> Any notice required to be given to you will be effective if it is sent by first-class mail to the most recent address that we have for you, by electronic means to an email address you have provided, or by any other method of notification that is permitted or required by applicable law and regulation.[142]

453. Yet, PHEAA routinely places the required notice of a borrower's upcoming annual recertification deadline in a "Paperless Inbox" of the borrower's online account at www.MyFedLoan.org. A non-descript email with the subject line, "A new message is waiting for you to view," is then sent to the borrower's email address on record. The body of the email simply states:

> A new message has been placed in your FedLoan Servicing paperless inbox. To access this message, select "Go To Paperless Inbox" below and sign in. Or go to Account Access at www.MyFedLoan.org to view your paperless inbox."

454. The email does not indicate the importance or urgency of the message.

455. Furthermore, if the borrower does not previously designate PHEAA as a "trusted sender," the email typically is directed to the borrower's spam folder where they are not likely to see it.

---

[141] Exhibit E at p. 3.
[142] Exhibit F at pp. 7-8.

456.     By contrast, other emails sent by PHEAA describe the content or purpose of the email. For example, the subject line of one email states, "Your Results: The Results of your request are now available in your Paperless Inbox!" The body of that same email further states "We added the following message to your Paperless Inbox at MyFedLoan.org. · Your Deferment or Forbearance Results." The subject line of another email states, "Your Monthly Bill is Now Available to View." The body of that email further states in detail: "Your FedLoan Servicing account is due for a payment on [date]. To make this payment, select 'Make a Payment' below and sign in. Or go to Account Access at MyFedLoan.org and select 'Payments and Billing.' You may also view your most recent billing statement at this same location and in your paperless in box."

457.     At least one other federal loan servicer, Navient, had a similar practice of posting the mandatory notice of the IDR Recertification Notice in borrowers' paperless inboxes. When Navient changed the subject line of its email from "New Document Ready to View" to "Your Payment Will Increase Soon!" and the text of the email to state, "[I]n order to keep your lower payment amount, it's important that you apply soon to renew your repayment plan," the rate at which borrowers timely submitted IDR Recertification Requests more than doubled.[143]

458.     For example, in 2017, PHEAA posted notice of Plaintiff Brady's annual IDR recertification deadline to her paperless inbox at www.myfedloan.com, which Brady was not aware and did not receive. As a result, Brady missed the recertification deadline, which caused $7,615.73 interest to capitalize and her monthly payment to jump from $192 to almost $2,000.

---

[143] Complaint at ¶¶ 68-76, *CFPB v. Navient Corp., et al.*, No. 3:17-cv-00101 (M.D. Pa.) (ECF No. 1).

### 7. **PHEAA Fails to Adequately Inform Borrowers that Changing IDR Plans Will Result in the Capitalization of Accrued Interest.**

459.     When a borrower leaves an IDR Plan (PAYE, REPAYE, and IBR) for another plan (*e.g.,* another IDR Plan or the standard plan), any unpaid accrued interest is capitalized,[144] which increases a borrower's principal balance, potentially by tens of thousands of dollars. This consequently extends the loan repayment period by months or years.

460.     Despite the obligation to advise borrowers in selecting the "right" payment plan and keeping them on track towards repayment, Defendants routinely steer all borrowers towards the plan with the "lowest monthly payment" and casually encourage borrowers to change repayment plans without sufficient notice of the potential financial consequences for doing so.

461.     For instance, the Department's website misleadingly states: "Although you may select or be assigned a repayment plan when you first begin repaying your student loan, you can change repayment plans at any time—*for free*."[145]

462.     But borrowers may incur significant expense in the way of capitalized interest. Yet, nowhere on the webpage is there a disclosure that changing from an IDR Plan to another plan will cause any unpaid accrued interest to capitalize. In fact, the words "capitalize" and "interest" do not appear on that page.

463.     Even more egregious is Defendants' IDR Request Form itself, which explicitly advises borrowers to choose the IDR Plan with the lowest payment – without proper disclosure that doing so may result in a change or repayment plan that requires all unpaid accrued interest to capitalize:

---

[144] 34 C.F.R. § 685.209(a)(2)(iv)(A)(2) (PAYE); § 685.209(c)(2)(iv) (REPAYE); 34 C.F.R. § 685.221(b)(4) (IBR).

[145] Federal Student Aid, An Office of the U.S. Dept. of Education, *Repayment Plans, available at* https://studentaid.ed.gov/sa/repay-loans/understand/plans (last visited Oct. 15, 2019).

| 2. **Choose a plan and then continue to Item 3.** |  |
|---|---|
| ☐ (Recommended) I want the income-driven repayment plan with the lowest monthly payment. |  |
| ☐ REPAYE | ☐ IBR |
| ☐ PAYE | ☐ ICR |

A copy of the IDR Plan Request Form is attached as Exhibit G.

464.     Nowhere on the page of the form does it notify borrowers that this could result in interest capitalization.

465.     Likewise, in Section 6 of the IDR Plan Request Form, "Borrower Requests, Understandings, Authorization, and Certification," Defendants disclose that they will choose the plan with the lowest monthly payment if the borrower does not qualify for the plan(s) requested or selects more than one plan. Defendants also disclose that if the borrower requests a change from IBR to another plan, they must make one payment on the Standard Repayment Plan or make a payment under a reduced-payment forbearance. But Defendants *do not* disclose that changing plans may result in the capitalization of any accrued interest.

466.     For example, in January 2017, Morris submitted an IDR Plan Request Form to request that he be placed on "the plan with the lowest monthly payment." Defendants, however, failed to advise him that being placed on the plan "with the lowest monthly payment" could result in a change of repayment plans, which in turn would cause any accrued interest to capitalize. When PHEAA processed his recertification paperwork, they processed a change from Morris' current IBR Plan to REPAYE – the plan with the lowest payment. As a result, interest was capitalized.

467.     In January 2016, Plaintiff Lathrop timely submitted an IDR Plan Request form for the annual recalculation of her monthly payment and requested that her repayment plan be

switched from her existing IBR Plan to the REPAYE Plan. At that time, Defendants failed to advise her that switching plans would cause any accrued interest to capitalize.

468.     On November 8, 2017, Plaintiff Coleman submitted her annual IDR Plan Request Form and requested a change from the IBR Plan to REPAYE. Coleman contacted PHEAA and specifically inquired if interest would capitalize upon switching plans. PHEAA confirmed (incorrectly) that it would not. Upon processing Coleman's request to switch plans, $7,352.15 accrued interest capitalized on December 14, 2017.

## C.     PHEAA'S Pattern and Practice of Improperly Servicing the PSLF Program

469.     "Student loan servicers are contracted and compensated for helping consumers navigate the process of qualifying for PSLF."[146] As a result, "[s]ervicers are the primary point of contact for all borrower questions related to repayment matters, including PSLF requirements."[147]

470.     As described above, to be eligible for PSLF, borrowers must (1) have one or more Direct Loans; (2) make 120 qualifying payments; (3) be enrolled in a qualifying repayment plan; and (4) work full-time for a qualified employer.

471.     As to this first point, only loans made under the Direct Loan Program are eligible to be forgiven under PSLF.[148] Borrowers with other types of federal loans, such as FFEL Loans or Perkins Loans, are not eligible for PSLF, but may consolidate these loans into a Direct

---

[146] *2017 CFPB Report.*

[147] *Id.* at 29.

[148] 34 C.F.R. § 685.219(c)(1)(iii).

Consolidation Loan in order to become eligible.[149] However, a recent report from the CFPB

found that "[b]orrowers report spending years making payments, believing they were making

progress towards PSLF, before servicers explain that their loans do not qualify for PSLF."[150] The

CFPB's report explains, "[b]orrowers with FFELP or Perkins Loans complain to the Bureau that

despite informing their servicer that they work in public service, or specifically mentioning that

they are pursuing PSLF, their servicer never advised them that their student loans were not

eligible loans."[151]

472. Relatedly, borrowers must be enrolled in a qualifying repayment plan to be

eligible for PSLF.[152] Qualifying repayment plans primarily consist of income-driven repayment

plans.[153] Graduated and extended repayment plans generally do not qualify.[154] Any payments

made while in a nonqualifying repayment plan will not count towards PSLF. Notwithstanding

the obligation of PHEAA and other servicers to "help[ ] consumers navigate the process of

qualifying for PSLF," CFPB's investigations revealed that "[b]orrowers complain that servicers

---

[149] U.S. Dept. of Educ., Federal Student Aid, *Public Service Loan Forgiveness*, *available at* https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service (last visited Oct. 16, 2019).

[150] *2017 CFBP Report*, at 29.

[151] *Id*. at 29-30.

[152] 34 C.F.R. § 685.219(c)(1)(iv); *see also* U.S. Dept. of Educ., Federal Student Aid, *Public Service Loan Forgiveness: What is a qualifying repayment plan*, *available at* https://studentaid.ed.gov/sa/repayloans/forgiveness-cancellation/public-service-qualifying-repayment-plan.

[153] 34 C.F.R. § 685.219(c)(1)(iv). While standard repayment is a qualifying repayment plan, a borrower would pay off his or her loan after ten years, the same time he or she became eligible for loan forgiveness under PSLF.

[154] Payments made under extended or graduated repayment plans may qualify if "the monthly payment amount is not less than what would have been paid under the Direct Loan standard, 10-year repayment plan described in [the fixed, standard 10-year plan provision]." 34 C.F.R. § 685.219(c)(1)(iv)(D).

may enroll them into non-qualifying repayment plans, despite borrowers expressing interest in PSLF."[155]

473.    For example, Plaintiff Wolff has worked for a qualifying public service organization for the purpose of PSLF since graduating in 2005 and has made consistent, on-time PSLF qualifying payments during this time.

474.    In August and September 2016, Wolff submitted PSLF Employment Certification Forms to EdFinancial Services, LLC, her then student loan servicer. Her loans were then transferred to PHEAA (as the exclusive PSLF loan servicer). PHEAA notified Wolff in writing of the transfer and acknowledged her interest in PSLF. PHEAA, however, did not advise Wolff that she was not on a PSLF-eligible repayment plan. Wolff's prior loan servicers also failed to advise her that she was not on a PSLF-eligible repayment plan.

475.    Having made 120-months of payments as of 2017, Wolff submitted a PSLF application for loan forgiveness in the second half of that year. PHEAA denied her application because she was not on a PSLF-eligible repayment plan and had not made a single qualifying payment. Had the Department and its loan servicers timely advised Wolff that she was not on a PSLF-qualifying repayment plan, she would have already obtained PSLF loan forgiveness.

476.    PHEAA falsely informed Plaintiff Meckfessel that he was not eligible for any IDR Plan, requiring him to enroll in a repayment plan which did not offer loan forgiveness or qualify for the PSLF program. Based on PHEAA's false and misleading information, Meckfessel made payments under a non-qualifying plan for approximately 3 years. None of these payments counted as "qualifying payments" under the PSLF program. Meckfessel was eligible for an IDR Plan at the time PHEAA forced him into another repayment plan. Following repeated inquiries,

---

[155] *2017 CFPB Report.*

PHEAA eventually enrolled Meckfessel in the REPAYE Plan years after he first contacted them for help about his repayment options.

477.    Plaintiff Morris submitted PSLF Employment Certification forms each year beginning in 2012 and each time he changed employers. Although PHEAA certified his employer each time as a qualifying PSLF employer, at no time before 2016 did PHEAA advise Morris that his FFEL loan did not qualify for PSLF forgiveness.

478.    Such misrepresentations were so widespread in 2014 that the Department granted a "one-time override" to borrowers, allowing PHEAA to retroactively award qualifying payment credits to borrowers enrolled in nonqualifying repayment plans.[156] The Department appears to have granted a similar "one time override" in 2010 as well.[157]

**D.    PHEAA Fails to Implement a Complaint Resolution System**

479.    PHEAA's loan servicing contract requires it to "respond and resolve customer complaints; and create and execute a plan to escalate complaints to FSA and the Ombudsman."[158]

---

[156] Pennsylvania Higher Education Assistance Agency, Letter to the Committee on Health, Education, Labor, and Pensions from PHEAA (May 19, 2014).

[157] Letter from Tim Kaine to Secretary DeVos, *Failure to Implement Public Service Loan Forgiveness*, 1 (June 19, 2018) ("June 19, 2018 Kaine Letter"), *available at* https://www.kaine.senate.gov/imo/media/doc/Kaine,%20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure%20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf (last visited Oct. 17, 2019) ("The Department itself has been aware of these issues for some time, as it granted a waiver in 2010 for a servicer to adjust qualifying payments for borrowers with Direct Consolidation Loans who were incorrectly advised by their previous servicer to enroll in graduated repayment plans, rather than income-driven repayment plans.").

[158] Exhibit C (2009 Contract, Attachment A-2, p. 11).

480.    The intention of this contractual provision was spelled out in a set of repayment rights for borrowers with federal Direct Loans, released April 28, 2016 by the Department of Education and the Department of the Treasury, in consultation with the CFPB:

- Borrowers should have access to a simple process to file complaints about their federal student loans and receive a response to their concerns. With a limited set of streamlined, consistent systems and processes, the Department of Education will be able to more effectively manage and oversee vendors' performance. The new enterprise complaint system, in particular, should be leveraged to ensure accuracy and excellence in federal student loan borrower customer service.

- Borrowers should expect that requests for assistance and account disputes shouldn't go unanswered, and borrowers have a right to get a second opinion. When borrowers contact their servicer, they should be able to expect clear rules for handling inquiries, complaints, and disputes in a timely manner and should be able to rely on servicers to provide full, substantive responses, even if no action was taken. Borrowers should also be able to access an escalation process where borrowers' concerns are reevaluated by senior personnel, and borrowers are provided with a substantive response.

- Borrowers should be protected while their complaints are reviewed. Borrowers should not be penalized while waiting for their servicer to review their accounts.[159]

481.    The 2015 Presidential Task Force developed recommendations on servicing best practices in "robust borrower protections and complaint resolution process."[160] The Task Force recommended that loan servicers have "a clear complaint and resolution process, including a

---

[159] April 28, 2016 Fact Sheet: Protecting Student Loan Borrowers *available at* https://www2.ed.gov/documents/press-releases/04282016-protecting-borrowers.doc.

[160] Recommendations on Best Practices in Performance-Based Contracting, *available at* https://www2.ed.gov/finaid/loans/repay/best-practices-recommendations.pdf.

timeline for addressing the complaint and specified personnel responsible for responding to complaints."[161]

482.    Yet, PHEAA failed to implement an adequate process for borrowers to make and timely receive a response to complaints and failed to implement any plan that provided a procedure for borrowers to "escalate complaints to FSA and the Ombudsman."[162] Indeed, the Presidential Task Force noted that although loan servicers "currently are required to have a complaint resolution process, this process does not appear to be standardized and has only a limited role for FSA."[163]

483.    According to the February 2015 GAO Report, "Education established a dispute process to address concerns about TEACH Grants converted to TEACH Loans in error, however, GAO found that Education and the servicer provide incomplete and inconsistent information to recipients about the availability of and criteria for disputing conversions."

484.    For example, standardized correspondence and policy documents provided to Grant recipients state that "once a TEACH grant is converted to a loan it cannot be reconverted to a grant," indicating that a dispute process was not available. The GAO report noted that this was inconsistent with the Department's assertion that a grant-to-loan conversion dispute process does in fact exist and conversions will be reversed if servicer error is found.[164]

485.    Borrowers also were routinely advised that there was no appeal process or discouraged from filing an appeal. Plaintiff Wolff was told by a PHEAA representative that there

---

[161] *Id*. at 12.

[162] Contract Appendix A-2, p. 11.

[163] August 28, 2015 Recommendations on Best Practices in Performance-Based Contracting. https://www2.ed.gov/finaid/loans/repay/best-practices-recommendations.pdf.

[164] *February 2015 GAO Report*, at 31.

simply was no appeal process. NPR similarly reported that a grant recipient was told that an appeal could be filed, but they never get approved.[165] Likewise, according to the February 2015 GAO Report, another TEACH Grant recipient whose grant was improperly converted to a loan "was told she could file an appeal but that she should not bother because most appeals are rejected."[166]

486.    Likewise, communications to borrowers about their eligibility for PSLF in response to an Employer Certification Form submission likewise fail to advise borrowers of a process for disputing PHEAA's determination of the qualifying status of a borrower's employment or the number of qualifying payments made.

487.    The report further found that Defendants' failure to communicate the availability of and criteria for the TEACH Grant dispute process "is inconsistent with federal internal control standards that highlight effective external communication."[167]

**E.    PHEAA Fails to Adequately Train its Loan Servicing Employees**

488.    After PHEAA was awarded its loan servicing contract in 2009, it opened call centers throughout Pennsylvania, including in Chester, Pittsburgh, Harrisburg, Mechanicsburg, and State College. Its employee payroll increased to approximately 3,000 employees. In 2018, it created an outsourced call center in Florida.[168]

489.    Despite the complexity of the federal student loan programs with which employees would be required to understand and help borrowers understand to make decisions

---

[165] *Exclusive: Ed Department to Erase Debts of Teachers, Fix Troubled Grant Program.* https://www.npr.org/2018/12/09/664317114/exclusive-ed-department-to-erase-debts-of-teachers-fix-troubled-grant-program.

[166] *February 2015 GAO Report*, at 21-22.

[167] *February 2015 GAO Report*, at Intro.

[168] *See Is FedLoan, America's giant student loan servicer, running out of money?*.

about what best suits their needs, the minimal educational requirements for a loan counselor position is a High School Diploma or GED Equivalent.

490. Despite the vast number of loan servicing employees, PHEAA failed to create, or created insufficient and inaccurate, employee training manuals, handbooks, telephone scripts, and written policies and procedures.

491. As just one example, the employee who prepared the agency's manual for "default collections" wasn't an expert in debt collection but was instead a high school graduate who had gone to trade school for massage therapy. When asked why she was chosen to write this manual, she replied, "I have no idea."[169]

492. Former customer service representatives have described "absurd quotas" and "changing procedures" as routine within the PHEAA call centers. They described how "people make stuff up as they go along and put borrowers at risk because the company is so incompetent." Further, "procedures tended to change on a week to week basis" and the company was "so far behind in processing IBR's that people are having their credit ruined."[170]

## THE DEPARTMENT FAILS TO OVERSEE AND ADMINISTER TITLE IV PROGRAMS IN FURTHERANCE OF THE GOALS OF THE HEA

493. As explained in the July 27, 2018 GAO Report, the U.S. Government Accountability Office conducted a performance audit of the Department's "efforts to implement our prior recommendations for improving oversight of federal student loan services" between April 2018 and July 2018.[171] The audit concluded that the Department failed to address four

---

[169] *Id.*

[170] INDEED.COM, *available at* https://www.indeed.com/cmp/Pennsylvania-Higher-Education-Assistance-Agency-(pheaa)/reviews?ftopic=paybenefits&start=60

[171] *July 2018 GAO Report*, at 1.

recommendations the GAO made in 2015 and 2016 "addressing weaknesses in Education's management and oversight of student loan services:"

- "Ensure clear, sufficient, and consistent guidance to loan servicers;"
- "Establish minimum call center hours for servicers;"
- "Improve tracking of borrower complaints;" and
- "Evaluate and adjust performance metrics used for servicers."[172]

494.    According to GAO, some of the risks of the Department's insufficient oversight are clear: "Unless Education better aligns its servicer performance metrics, borrowers will continue to be at risk of experiencing errors and poor customer service."[173]

495.    As described later, in addition to GAO finding the Department to have failed to implement the above policies, an investigation by the OIG found the Department to have also failed in its duties to "use[ ] available contract accountability provisions to hold servicers accountable for instances of noncompliance."[174]

496.    As recently as September 2019, the Department admitted its own failures in overseeing loan servicers. In connection with the litigation surrounding the Department's failure to discharge the debt of tens of thousands of borrowers defrauded by Corinthian College, the Department admitted that it had been "negligent overs[eeing] [] the Department's servicers."[175] After a judge in California found Defendant Secretary Devos in contempt for failure to comply

---

[172] *July 2018 GAO Report*, at 3.

[173] *July 2018 GAO Report*, at 6.

[174] *March 2019 OIG Report*, at 9.

[175] ECF 125 at p. 6, *Manriquez v. U.S. Department of Education, et al.*, Case No. 3:17-cv-07210-SK (N.D. Cal.).

with a court injunction, the Department "acknowledged that servicers made unacceptable mistakes."[176]

## A.    Defendants Penalize Borrowers for Technical Mistakes on Forms Not Approved by OMB.

497.    Defendants provide TEACH Grant recipients with a "TEACH Grant Certification" form to complete and submit for the Annual Certification process. *See* Exhibit H.

498.    But as the Department admits in an internal document, the TEACH Grant Certification form is "too complicated and confusing because it attempts to capture very different requirements for different populations."[177]

499.    The complicated nature of this form could have been avoided had the Department taken the required steps to ensure that the form is not overly burdensome or confusing for TEACH Grant recipients.

500.    Under the Paperwork Reduction Act ("PRA"),[178] the Department must seek approval from the Office of Management and Budget ("OMB") for any "information collection," including forms that more than ten members of the public will complete. The Department must, among other things, certify that the information will have "practical utility," that the Department has reduced any burden on respondents to the extent practicable; and that the form "is written

---

[176] U.S. Dept of Educ. (@usedgov). "We're disappointed in the court's ruling. We acknowledged that servicers made unacceptable mistakes. @BetsyDeVosED directed @FAFSA to take immediate action to help every impacted borrower. As of today, @FAFSA has taken the actions needed to make every impacted borrower whole." Oct. 24, 2019 7:35 p.m. Tweet, *available at* https://twitter.com/usedgov/status/1187558162968272896 (last visited Nov. 6, 2019).

[177] Department Response to February 2015 GAO Report, *Better Management of Teacher Aid Programs Needed to Improve Participant Outcomes*, 1, *available at* https://www.citizen.org/wp-content/uploads/ed_response_to_gao_certification_form_june.pdf (last visited Oct. 16, 2019).

[178] 44 U.S.C. § 3506(c); 5 C.F.R. § 1320.5.

using plain, coherent, and unambiguous terminology and is understandable to those who are to respond."[179]

501.    An agency proposing a form covered by the PRA must publish a notice in the Federal Register, take public comment on the proposed form, and estimate the amount of time that it will take for respondents to complete the form. OMB then reviews the form and when warranted, approves it. If approved, OMB assigns a number to the form, which must appear on the first page of an authorized form.

502.    It does not appear, however, that the Department ever followed the process to gain approval of the TEACH Grant Certification form from OMB. Indeed, the TEACH Grant Certification form does not bear an OMB approval number. And there is no notice in the Federal Register seeking public comment on the form.

503.    The Department violated the PRA by imposing on TEACH Grant recipients the TEACH Grant Certification form without going through the review and public comment process.

504.    Because the TEACH Grant Certification form was never approved by OMB, TEACH Grant recipients cannot be subjected to any penalty for failing to comply with the form such as the conversion of their TEACH Grant to an interest-bearing loan.

505.    The TEACH Plaintiffs were all penalized for technical mistakes made on the TEACH Grant Certification form.

506.    Upon information and belief, the Department continues to use the same non-approved TEACH Grant Certification form.

---

[179] 44 U.S.C. § 3506(c); 5 C.F.R. § 1320.5 (requiring that an agency seeking OMB approval of an information collection must show that it has taken "every reasonable step to ensure" the collection is "the least burdensome necessary for the proper performance of the agency's functions" and "has practical utility.").

**B.** **The Department Fails to Submit the required report on the TEACH Grant Program to the authorizing committees.**

507. Congress directed the Department to submit, beginning in 2010 and every two years after that, a report on the TEACH Grant Program with respect to the schools and students served by recipients of such grants, including the number of TEACH Grant recipients, the degrees obtained by such recipients, the location where the recipients completed the Service Obligation, the duration of such service, and any other data necessary to conduct such evaluations.

508. Upon information and belief, the Department has never complied with its reporting obligation.[180]

**C.** **The Department's TEACH Grant Reconsideration Process Fails to Adequately Remedy Grants Improperly Converted to Loans**

509. Beginning February 4, 2019, TEACH Grant recipients whose grants were converted to TEACH Loans could apply for reconsideration of that conversion. ("Reconsideration Process"). According to the Department, "[r]ecipients are eligible to request reconsideration if they met or are meeting the TEACH Grant service requirements within the eight-year service obligation period, but had their grants converted to TEACH Loans because they did not comply with the annual certification requirement."[181]

510. However, the Department tasked PHEAA – the same loan servicer that improperly converted the grants to TEACH Loans in the first instance – to administer the Reconsideration Process. Thus, the same faulty system that resulted in the improper conversion

---

[180] 20 U.S.C. § 1070g-4.

[181] Federal Student Aid, *available at* https://studentaid.ed.gov/sa/types/grants-scholarships/teach/teach-reconsideration (last visited 11/8/2019).

of grants to TEACH Loans is being used to determine when a TEACH loan should be reconverted back to a TEACH Grant.

511.    To no surprise, some recipients had their TEACH Loans reconverted to TEACH Grants, but many were improperly denied.

512.    Furthermore, many others who had their TEACH Loans reconverted to TEACH Grants were not fully refunded the amount of principal and interest the recipient had paid toward the TEACH Loan.

513.    For example, Plaintiff Musser was refunded only $1,676.50 of the $7,325.25 in payments she made towards her TEACH Grant loans.

**D.    The Department Fails to Implement a Common Policies and Procedures Manual for the Direct Loan Program**

514.    As reported in the November 2015 GAO Report, "[s]ome FSA guidance and instructions to servicers is inadequate, resulting in inconsistent and inefficient services to borrowers."[182]

515.    In response to the November 2015 GAO report, Congress directed the Department to publish a common policies and procedures manual for all Direct Loan servicers by March 1, 2016.[183]

516.    A common policies and procedures manual would provide a single, standardized set of current student loan rules and policy guidance for loan servicers. The manual could also be used to help train new loan servicer employees and assist the experienced loan counselors in finding answers to questions about federal regulations and policies.

---

[182] U.S. Gov't Accountability Off., GAO-16-196T, Federal Student Loans: Key Weaknesses Limit Education's Management of Contractors, at 6 (Nov. 18, 2015) [hereinafter *November 2015 GAO Report*], *available at* https://www.gao.gov/assets/680/673725.pdf.

[183] Consolidated Appropriations Act of 2016 (P.L. 114-113).

517. As of the date of this Complaint, however, the Department has yet to publish a common policies and procedures manual.

518. In September 2018, the GAO again reported on the problems that arise, in part, from the absence of a standardized set of instructions for loan servicers. With respect to the PSLF Program, the GAO noted, "[t]he absence of a central, authoritative source of PSLF guidance and instructions creates a risk of differing interpretations and inconsistent implementation."[184]

519. As a result of the Department's failure, PHEAA and other loan servicers lack a comprehensive and standardized authoritative guide on how to service Direct Loans.

## E. The Department Arbitrarily Withdrew the Only Existing Policy Memorandum Providing Guidance to Direct Loan Servicers

520. On July 20, 2016, former Under Secretary of the Department, Ted Mitchell, issued a memorandum to "provide[] policy direction for the servicing of all federal student loans"[185] The memorandum included standard policies and procedures related to the IDR application and recertification process and a complaint resolution process, among others.

521. Less than one year later, on April 11, 2017, newly appointed Secretary, Defendant DeVos, issued a memorandum withdrawing the July 20, 2016 memorandum.

522. On April 26, 2017, 136 members of Congress asked that Defendant Secretary DeVos "immediately reverse [her] decision and reinstate the previous memos and directives to Federal Student Aid."[186] As Congressmen and Congresswomen noted, Defendant DeVos's

---

[184] *September 2018 GAO Report*, at 17.

[185] *July 2016 Policy Memo*.

[186] Letter to Department Secretary DeVos from 136 Members of Congress, Apr. 26, 2017, at 2, *available at*

decision to withdraw the memo "signals an unwillingness to support and safeguard the best interest of borrowers" and was inconsistent with "the previously-established principles for student loan servicing reform and repeated bipartisan request from Members of Congress to reform student loan servicing in a manner that puts the interests of students and families first." The members of Congress further noted that Secretary DeVos has "not presented a strategy for ensuring borrowers are being treated fairly and equitably by servicers..."[187]

**F.      The Department Fails to Use the Enforcement Tools Available to Hold PHEAA Accountable for its Continued, Documented Failures to Borrowers.**

523.      In addition to GAO finding the Department to have failed to implement the common policies and procedures discussed herein, an investigation by the OIG found the Department to have also failed in its duties to "use[ ] available contract accountability provisions to hold servicers accountable for instances of noncompliance" with requirements for servicing federally held student loans.[188]

524.      In a March 5, 2019 report, OIG explained that the Department "rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance."[189] Nor did the Department "incorporate a performance metric relevant to

---

https://www.help.senate.gov/imo/media/doc/Servicing%20Memo%20Bicam%20Letter%20(FINAL).pdf (last visited Oct. 16, 2019).

[187] *Id.*

[188] *March 2019 OIG Report.*

[189] *Id.* at 2.

servicer compliance with Federal requirements into its methodology for assigning loans to servicers."[190] GAO previously had reached the same conclusions in August 2018.[191]

525. The consequences to borrowers—and windfall to servicers—of the Department's non-enforcement, OIG explained, is clear and foreseeable:

> By not holding servicers accountable for instances of noncompliance with Federal loan servicing requirements, FSA did not provide servicers with an incentive to take actions to mitigate the risk of continued servicer noncompliance that could harm students. Further, FSA's not holding servicers accountable could lead to servicers being paid more than they should be (the contracts with servicers allow FSA to recover amounts paid for loans not serviced in compliance with requirements).[192]

526. To illustrate, OIG found the Department to have required servicers to return insufficiently serviced funds on just 4 occasions in the 5 years ending in September 2017.

> In the 5 years that ended September 2017, FSA had required only three servicers to return about $181,000 to FSA for four instances of failure to service loans in compliance with Federal loan servicing requirements. Additionally, FSA's methodology for assigning new loans to servicers was not adjusted to take into account servicers' compliance with Federal loan servicing requirements. Therefore, servicers with more frequent instances of noncompliance experienced no reduction in the amount of new loans that FSA assigned to them. Although FSA stated that enforcement actions since September 2017 have resulted in about $2 million in recommended recoveries, *the amount represents less than 0.12 percent* of $1.7 billion that FSA budgeted for its loan servicing contracts in 2018 and 2019.[193]

---

[190] *Id.*

[191] U.S. Gov't Accountability Off., GAO-18-587R, Federal Student Loans: Key Weaknesses Limit Education's Management of Contractors, at 6 (Aug. 27, 2018) [hereinafter *August 2018 GAO Report*], *available at* https://www.gao.gov/assets/700/693475.pdf.

[192] *March 2019 OIG Report*, at 17.

[193] *Id.* at 4. (emphasis added).

**G.     The Department Fails to Maintain Records Transferred from Prior Loan Servicers**

527.     Beginning in January 2012, borrowers could track their progress towards forgiveness under the PSLF Program by submitting an Employment Certification Form to PHEAA. If the borrower is approved for qualified employment, PHEAA reviews the borrower's account to provide an up-to-date count of the borrower's qualifying payments. Until the borrower has made 120 qualifying payments, they cannot apply for and receive forgiveness under the PSLF Program.

528.     When a borrower with loans serviced by another loan servicer submits a PSLF Employer Certification Form, the Department transfers his or her loan account to PHEAA as the exclusive loan servicer of the PSLF Program.

529.     Pursuant to the HEA, the Department is obligated to maintain and manage the National Student Loan Data System ("NSLDS"), a centralized database for tracking Title IV loans and grants through their entire life cycle.[194] The purpose of the NSLDS is to contain information regarding FFEL and Direct Loans and allow the electronic exchange of information between loan servicers and other program participants. The Department is required to manage the NSLDS as "necessary to maintain confidence in the data system."[195]

530.     Loan servicers report loan information to NSLDS on a weekly basis. Thus, the Department (falsely) assures borrowers that when loans are transferred, "*[a]ll of your loan information* will be transferred from your assigned servicer to your new servicer" and that "[y]our previous loan servicer and new loan servicer will work together to make sure that all

---

[194] 20 U.S.C. § 1092b(a).
[195] 20 U.S.C. §1092b(d).

payments you make during the transfer process are credited to your loan account with the new servicer."[196]

531.    However, the Department has not maintained borrowers' payment data in the NSLDS in a way that allows the transfer of accurate information between servicers.

532.    As reported in the September 2018 GAO Report, "Education does not ensure that [PHEAA] receives consistent information on borrowers' prior loan payments from other loan servicers, which could raise the risk of qualifying payments being miscounted."[197]

533.    Further complicating the Department's failure to maintain reliable payment data is the fact that the Department does not require loan servicers to use the same loan servicing data system. Each of the four TIVAS Entities has developed their own proprietary loan servicing data system. For example, PHEAA uses its own proprietary COMPASS[SM] Student Loan Management System to service its portfolio of federal loans. As a result, there is a "lack of standard definitions and terminology among loan servicers [that] leads servicers to interpret some data fields differently, resulting in inconsistencies in the data other loan servicers report to [PHEAA]."[198]

534.    In an attempt to address the inadequacies of the NSLDS and the differences between the loan servicers' data systems, the Department created "templates" for the purposes of transferring information between loan servicers. But these "templates" failed to cure the problem. According to the September 2018 GAO Report:

> Education established a process for servicers to use in transferring loan and prior payment information to [PHEAA]. The servicers transfer most information through standardized templates that Education developed. However, despite the use of standardized

---

[196] https://studentaid.ed.gov/sa/repay-loans/understand/servicers#transfer.

[197] *September 2018 GAO Report*, at 21.

[198] *Id.*

templates, [PHEAA] does not receive consistent and reliable information from other servicers, according to PSLF servicer officials.[199]

535.    The Department and PHEAA have admitted that these inconsistencies "[i]ncrease the risk of miscounting qualifying payments."[200]

536.    For example, Plaintiff Levis has made consistent, on-time, monthly payments as required under the PSLF program for at least six years while working for the U.S. Department of State – a PSLF qualifying employer - and therefore should have credit for at least 72 PSLF qualifying payments. As of January 2019, however, Defendants have credited her for only 12 payments.

537.    Likewise, Plaintiff Davis has made consistent, on-time, monthly payments as required under the PSLF program for more than ten years while working for a PSLF qualified employer. However, Defendants have credited her for only 59 payments as of June 2019.

538.    Plaintiff Bonham has made consistent, on-time, monthly payments as required by the PSLF program for more than ten years while working for a PSLF qualified employer. Defendants have credited her for less than 60 payments.

539.    Plaintiff Miller has made consistent, on-time, monthly payments since enrolling in an IDR Plan with another servicer for approximately two years as required by the PSLF Program. As a result, she should have approximately 30 Qualifying Payments towards loan forgiveness under the PSLF program. However, Defendants have credited her for less than half that amount.

---

[199] *Id.*

[200] *Id.* at 22.

540.     Plaintiff Shelley has made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF Program since 2008. Shelley should have been eligible to apply for PSLF loan forgiveness in 2018. However, Defendants miscounted his qualifying payments.

541.     Although Plaintiff Harig has made consistent, on-time, monthly payments while working for a PSLF qualifying employer since April 2011, Defendants have credited him with only 70 payments as of October 3, 2018.

542.     Plaintiff Anderson has been employed by a PSLF eligible employer and made consistent, on-time monthly payments, as required by the PSLF Program, since July 2015. Defendants, however, has credited her with only 5 payments as of January 2018.

543.     Since graduating, Plaintiff Coleman has worked for a PSLF qualifying employer and made consistent, on-time, monthly payments for at least the past 8 years. Defendants have credited her for only 32 of her 86 qualifying payments.

## H.     The Department Fails to Comply with Congressional Mandate When Administering the TEPSLF Program

544.     The Department expressly requires PHEAA to assist with forgiveness programs, including PSLF and TEPSLF: "All contracted federal student loan servicers are responsible for . . . communicating with borrowers about the general availability of the program and enrolling borrowers in selected repayment plans that may enable them to qualify for PSLF."[201]

---

[201] Alexandra Hegji, Cong. Research Serv., No. R45389, *The Public Service Loan Forgiveness Program: Selected Issues*, 22 (Oct. 29, 2018), *available at* https://fas.org/sgp/crs/misc/R45389.pdf (last visited Oct. 17, 2019).

545.     Unfortunately, the Department has failed to oversee and otherwise administer the PSLF and TEPSLF programs in a manner that achieves the objective of those programs – failure for which the Department has faced mounting criticism.

546.     On April 6, 2017, 36 U.S. Senators sent a letter to Secretary DeVos after the Department suggested in other litigation "that borrowers could not rely on [loan servicers] to say accurately whether they qualify for debt forgiveness." The letter identified how the Department's failure to oversee PHEAA has injured borrowers working for certain non-profit organizations:

> Additionally, the Department has created a great deal of confusion for applicants who are employed by non-profit organizations that provide certain types of public service but are not categorized under Section 501(c)(3) of the Internal Revenue Code. To clarify this confusion, we request that the Department further define and formally clarify the types of eligible employers that qualify for PSLF. These include, but are not limited to, organizations working in the areas of emergency management, military service, public safety, law enforcement, public interest law services, early childhood education, service for individuals with disabilities and the elderly, public health, public education, and school-based services.[202]

547.     To address these failures, and others, Congress created an add-on program called Temporary Expanded Public Service Loan Forgiveness ("TEPSLF"). Under TEPSLF, borrowers who made some or all of their payments under a nonqualifying repayment plan may receive loan forgiveness. Congress set aside $700 million for the program available to borrowers on a first come, first serve basis.

---

[202] U.S. Senate Committee on Health, Education, Labor & Pensions, *Senate Democrats Demand Fair and Consistent Treatment of Student Loan Borrowers in Public Service* (Apr. 6, 2017), *available at* https://www.help.senate.gov/ranking/newsroom/press/-senate-democrats-demand-fair-and-consistent-treatment-of-student-loan-borrowers-in-public-service (last visited Oct. 17, 2019).

548.    Senator Tim Kaine and other U.S. Senators wrote to Secretary DeVos on March 29, 2018 to bring the TEPSLF program to her attention.[203] TEPSLF, Senator Kaine explained, "would allow loan cancellation for public service borrowers who were enrolled in the wrong repayment plan."[204] Senator Kaine requested that Secretary DeVos implement Sections 315 and 316 swiftly, responding with the Department's progress within thirty days.[205]

549.    But the TEPSLF Program proved to be as big of a failure as PSLF itself. According to a review by GAO, approximately 54,000 TEPSLF applications were processed; *99% of those applications were rejected*.[206] As of June 2019, PHEAA had processed 102,051 PSLF applications; *only 1.2% were approved*. Of those applications, 55% were denied because they had not yet made the 120 qualifying payments; 15% were denied because they did not have Direct Loans.[207]

550.    These failings came under fire on June 19, 2018, when Senator Tim Kaine and three other Senators wrote to Defendant Secretary DeVos, to share their concerns with the TEPSLF application process, "to urge the Department to properly implement the law[,]" and to

---

[203] Letter from Tim Kaine to Secretary DeVos, *Whitehouse, Kaine, Duckworth, Hassan Push DeVos to Put New Public Service Student Debt Relief Into Action*, at 1 (May 29, 2018) ("May 29, 2018 Kaine Letter"), *available at* https://www.whitehouse.senate.gov/imo/media/doc/180329_PSLF%20Letter%20to%20Secretary%20DeVos.pdf (last visited Oct. 17, 2019).

[204] *Id.*

[205] *Id.*

[206] *September 2019 GAO Report*, at 11.

[207] U.S. Dept. of Education, Federal Student Aid, June 2019 PSLF Report, *available at* https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last visited Oct. 14, 2019).

"request improvements to the policies, changes to the website and communications, and the release of data regarding the implementation of this program."[208]

551. Senator Kaine's letter explained how the Department was undermining the TEPSLF application process:

> [W]e are deeply concerned by unnecessary hurdles that have been put in place for borrowers. Many of our constituents have expressed frustration and confusion with the Department's unnecessarily restrictive approach to determining borrowers' eligibility for TEPSLF. Section 315 [of the *Consolidated Appropriations Act of 2018*] directed the Secretary to "make available a *simple method* for borrowers to apply for loan cancellation," but the current process appears anything but simple.
>
> First, the Department is significantly and needlessly restricting access to TEPSLF by requiring borrowers to either have been denied or to have a fully PSLF Application for Forgiveness in process, in order to be considered. Many borrowers in graduated or extended repayment have previously been told by their loan servicer that they are ineligible for PSLF because they were enrolled in a non-qualifying repayment plan, and therefore they never sought out forgiveness or took steps to formally complete their full PSLF application. The Department's communications should tell these borrowers they can proceed to complete a PSLF Application for Forgiveness *despite* confusing language on that form referring to "qualifying payments."
>
> …
>
> Our constituents have also raised concerns that the TEPSLF rejection email misleads borrowers to believe they are ineligible. . .. This rejection notice, especially the last sentence, is unnecessary and unclear for borrowers as to why they are not being considered for TEPSLF at the moment they submitted an email, and due only to a procedural barrier. No borrower should be denied relief simply due to the order in which they filed their paperwork.
>
> Additionally, the Department's website is plainly incorrect. It repeatedly asserts that borrowers must have filled out a PSLF application and "had that PSLF application denied." However, the Department has indicated that it will process a PSLF Application for Forgiveness that is currently in process—but not yet denied. The

---

[208] *June 19, 2018 Kaine Letter*, at 1.

Department's website, and all communications with borrowers, must make clear that a borrower can submit such application today while they apply for TEPSLF, and does not need to wait for a denial notice which could take weeks or months to receive.209

552.    Senator Kaine followed up with Secretary DeVos almost a year later, on April 25, 2019, when the Department "did not take any significant action to make it easier for borrowers who had ended up in the wrong repayment plans to qualify for the loan forgiveness opportunity that was created for them."[210] He continued:

> The Department did not remove the requirement to submit the PSLF Application for Forgiveness to be reviewed for TEPSLF or significantly alter its outreach to contact borrowers who are the most likely to be eligible for relief and encourage them to apply. This lack of action suggests that the Department has treated TEPSLF, and the applicants to this program, as an unwanted burden. Reflecting this lack of priority, your Fiscal Year 2020 budget proposed to eliminate both the PSLF and TEPSLF programs entirely.[211]

553.    Like Senator Kaine's constituents, various Plaintiffs here have been injured by the Department's failure to administer the TEPSLF program adequately.

## I.    The Department Fails to Adhere to Federal Internal Control Standards

554.    The Department has repeatedly and consistently failed to adhere to Federal Internal Control Standards despite repeated audits, congressional testimony, and government investigations identifying deficiencies in the Department's internal monitoring procedures as well as the Department's lack of appropriate procedures to communicate with borrowers. In addition to its failure to adhere to internal control standards, the Department has also failed to

---

[209] *June 19, 2018 Kaine Letter*, 2-3 (emphasis in original).

[210] Letter from Tim Kaine to Betsy DeVos, *Kaine & Whitehouse Call On DeVos To Fix Missteps With Implementation Of TEPSLF Program*, at 1 (Apr. 25, 2019) ("Apr. 25, 2019 Kaine Letter"), *available at* https://www.kaine.senate.gov/press-releases/kaine-and-whitehouse-call-on-devos-to-fix-missteps-with-implementation-of-tepslf-program (last visited Oct. 17, 2019).

[211] *Id.*

remedy deficiencies in a timely manner and has refused to cooperate with external regulatory

bodies.

1. **The Department fails to implement and adhere to internal monitoring procedures as required by Federal Internal Control Standards**

555.    As early as August 2013, the Department's own internal audits identified

significant deficiencies in the Department's monitoring of loan servicers including using

"improper criteria to measure the performance and adequacy of TIVAS…loan conversions and

servicing procedures…"[212] The report found:

> Because referenced criteria in the FSA Operations Services monitoring procedures plan were improper, not effectively communicated within FSA, and not accessible to FSA monitoring staff, there is heightened risk that FSA's monitoring may not uncover TIVAS performance and compliance issues.[213]

556.    In November 2015, the GAO found the Department's "instructions and guidance

to loan servicers are sometimes lacking, resulting in inconsistent and inefficient services to

borrowers. For example, when assessing the call monitoring aspect of the Department's

procedures, the GAO found that their approach "contains notable methodological weaknesses"[214]

including results that are poorly documented[215] and reports that do not reflect the actual

prevalence of problems in the calls.[216] Such deficiencies limit the usefulness of the monitoring

procedures.

---

[212] U.S. Dep't of Ed., Office of Inspector Gen., ED-OIG/A02L0006, Final Audit Report, at 16 (Aug. 20 2013), *available at* https://www2.ed.gov/about/offices/list/oig/auditreports/fy2013/a02l0006.pdf.

[213] *Id.* at 17.

[214] *November 2015 GAO Report*, at 10.

[215] *Id.* at 12.

[216] *Id.* at 13.

557.    Additionally, the Department does not include any performance metrics that measures servicers' program compliance. Although compliance reviews "have found repeated servicer issues related to how loan payments are processed, improper track of and use of deferments, and improper loan discharges and default processing," those issues had no effect on the number of accounts servicers were awarded the following year.[217]

558.    The most recent internal audit by the OIG found that the Department's "oversight activities regularly identified instances of servicers' not servicing federally held student loans in accordance with Federal requirements."[218] The OIG found that from January 1, 2015 – September 30, 2017, "61 percent (210) of 343 reports on [the Department's] oversight activities disclosed instances of servicer noncompliance."[219] Despite having this information at its fingertips, the Department has failed to take corrective actions to force compliance. In fact, the Department provided the OIG "with evidence of only four instances, affecting three servicers, in the past 5 years in which it required a servicer to return funds to the Federal Government for failure to service loans in compliance with Federal requirements."[220]

### 2.    <u>The Department fails to communicate necessary quality information to borrowers or servicers</u>

559.    A GAO report from February 2015 found that the Department "and the servicer provide incomplete and inconsistent information to recipients about the availability of and

---

[217] U.S. Gov't Accountability Office, GAO-16-523, Education Could Improve Direct Loan Program Customer Service and Oversight, at 26 (May 2016) [hereinafter *May 2016 GAO Report*], *available at* https://www.gao.gov/assets/680/677159.pdf.

[218] *March 2019 OIG Report*, at 2.

[219] *Id.*

[220] *Id.* at 15

criteria for disputing [TEACH] conversions".[221] In August 2015, the GAO again identified

problems with the Department's communication procedures. Specifically, it found that the

Department had "not established specific requirements for how servicers communicate with

other borrowers about the plans."[222] A representative for a loan servicer stated that "borrowers

must actively seek information" independently.[223] When the Department did provide information

to borrowers it was inconsistent and "did not include information about how the plans work or

their eligibility requirements."[224]

560.    Internal Control Standards require that information should be communicated in a

form that enables entities to carry out its responsibilities. However, loan servicers reported that

instructions and guidance from the Department is often "absent, unclear and inconsistent" and "it

did not consistently share them with all servicers."[225] Such inconsistent communication and

guidance has resulted in confusion as to how to apply over or under-payments to TEACH Loans

and how and when interest is applied.[226]

561.    In September 2018, the GAO found that the Department's "guidance and

instructions to the PSLF servicer are dispersed in a piecemeal manner across multiple

documents, including [Department]'s original contract with the servicer, multiple updates to the

contract, and hundreds of emails."[227] Further, the use of "email to communicate certain policy

---

[221] *February 2015 GAO Report*.

[222] *August 2015 GAO Report,* at 24.

[223] *Id.*

[224] *Id.*

[225] *November 2015 GAO Report*, at Intro.

[226] *Id.* at 8.

[227] *September 2018 GAO Report*, at 16.

clarifications involving employer eligibility and payment counting…[has] affected hundreds of borrowers and set precedents for future eligibility decisions."[228]

562.     When the Department collects information through its monitoring procedures, its "communications with servicers were not always sufficient to ensure servicers complied with requirements for servicing federally held student loans."[229] For instance, the Department failed to provide reporting of the call monitoring team for a ten month period which prevented servicers from using the feedback to correct compliance issues.[230]

### 3.   **The Department Fails to Remedy Identified Deficiencies in a Timely Manner**

563.     In a July 2018 report to Congress, the GAO noted that the Department had only implemented two out of six recommendations from prior audits.[231] Further, in testimony to Congress in March 2019, the Assistant Inspector General stated that the Department's "oversight policies, processes, and activities collectively did not provide reasonable assurance that the risk of servicer noncompliance with requirements for servicing federally held student loans was being mitigated or reduced.

564.     In September 2019, the GAO reiterated to the Department the importance of developing a central comprehensive servicing manual which it had initially recommended in 2018. At the time of the report, the Department did not have a timeline on when this recommendation would be implemented but had pushed the estimated timeline to 2020.[232] This

---

[228] *Id.* at 17.

[229] *March 2019 OIG Report*, at 21.

[230] *Id.*

[231] *July 2018 GAO Report*, at 3.

[232] *September 2019 GAO Report*, at 9.

recommendation is in addition to the Congressional mandate in 2015 requiring the Department to establish a Common Manual for loan servicers. As of this writing, neither of these recommendations have been implemented. All the while, loan servicers are continuing to rely on inconsistent information and guidance, contrary to federal internal control standards.

565.     Despite the Department's claims of ongoing improvements, it "took only two actions against loan servicers and recovered $2 million in contractual fees…. representing less than 0.12 percent of the $1.7 billion that [FSA] budgeted for its servicing contracts across that period."[233] None of that money was returned to student borrowers.

566.     While the Department has failed to remedy identified deficiencies, it has also refused to cooperate with external regulatory agencies with oversight authority. Since December 2017, the Department has refused to produce information or documents requested by the CFPB as part of its supervisory duties. Additionally, in the same month, the Department terminated its Memorandum of Understanding with the CFPB that allowed the two parties to share information related to oversight of federal loans.[234]

---

[233] Letter from Robert C. Scott, Chairman, Committee on Education and Labor, to Betsy Devos, Secretary, U.S. Dept. of Educ. (Aug. 13, 2019), *available at* https://edlabor.house.gov/imo/media/doc/2019-08-13.Waters%20Scott%20and%20EEC%20%20to%20Betsy%20DeVos-DOEd%20re.%20Loan%20Servicing.pdf (last visited Oct. 23, 2019).

[234] Letter from Betsy Devos, Secretary, U.S. Dept. of Educ., to Richard Cordray, Director, Consumer Fin. Prot. Bd. (Aug. 31, 2017), *available at* https://article.images.consumerreports.org/prod/content/dam/consumerist/2017/09/2017-09-01_signed_letter_to_cfpb.pdf (last visited Oct. 23, 2019).

567. Further, in June 2018, the Department published a notice in the Federal Register ending the Department's policy of collaboration with state law enforcement, stating, "The Department no longer intends to disclose any records" for use by law enforcement agencies.[235]

568. The Department has failed to rectify serious deficiencies in its monitoring and servicing of student loan servicers – deficiencies that have been reported in audits and investigations repeatedly since at least 2013. The Department's failure to remedy these deficiencies and its public and blatant disregard for the oversight authority of other regulatory agencies is a direct violation of federal internal control standards.

## STATE AND FEDERAL INVESTIGATIONS INTO DEFEENDANTS' MISCONDUCT

569. The consequences suffered by borrowers from Defendants' misconduct is the subject of ongoing agency investigation and litigation by various state's Attorneys General.

570. "Since 2012, the [CFPB] has handled complaints from individual student loan borrowers, and the CFPB Student Loan Ombudsman has monitored these complaints. Each year, reports by the Student Loan Ombudsman emphasize the individual challenges borrowers identify in their complaints. These reports also highlight where challenges may be systemic in nature and illustrate where law enforcement, regulatory action, or market-driven reform may be necessary to better protect similarly situated student loan borrowers."[236]

---

[235] 83 Fed. Reg. 27587 (June 13, 2019), *available at* https://www.federalregister.gov/documents/2018/06/13/2018-12700/privacy-act-of-1974-system-of-records#print (last visited Oct. 23, 2019).

[236] CFPB, *Annual Report of the Student Loan Ombudsman* 2 (Oct. 2017) [hereinafter *October 2017 CFBP Annual Report*], *available at* https://files.consumerfinance.gov/f/documents/cfpb_annual-report_student-loan-ombudsman_2017.pdf (last visited Oct. 15, 2019).

571. The 2017 CFPB Report on Student Loans identifies several significant issues raised by student loan borrowers who submitted federal student loan complaints from September 1, 2016 through August 31, 2017, including, among others:[237]

    a.      "Borrowers complain about encountering obstacles when seeking to enroll in IDR Plans."

    b.      "Borrowers report that when they attempt to recertify their IDR Plan, their loans are placed into forbearance, despite their right to continue making IDR payments while their new payment amount is determined."

572. Less than a year after publishing the 2017 CFPB Report on Student Loans, Seth Frotman, CFPB's Student Loan Ombudsman, resigned. His resignation letter highlights how Defendants' misconduct is harming student loan borrowers:[238]

    a.      "In addition, when the Education Department unilaterally shut the door to routine CFPB oversight of the largest student loan companies, the Bureau's current leadership folded to political pressure."

    b.      "Similarly, senior leadership also blocked attempts to alert the Department of Education to the far-reaching harm borrowers will face due to the Department's unprecedented and illegal attempts to preempt state consumer laws and shield student loan companies from accountability for widespread abuses."

573. So far, two states have sued PHEAA over its servicing of student loans held by the federal government.

574. "The Commonwealth of Massachusetts [ ] sued the Pennsylvania Higher Education Assistance Agency (PHEAA) [on or about August 23, 2017] for engaging in allegedly unfair and deceptive acts and practices against Massachusetts student loan borrowers…The Commonwealth claims that PHEAA violated the federal Consumer Financial Protection Act and

---

[237] *Id.* at 10-18.

[238] Letter from Seth Frotman to Mick Mulvaney, 2 (Aug. 27, 2018), *available at* https://apps.npr.org/documents/document.html?id=4784891-Frotman-Letter (last visited Oct. 15, 2019).

G.L. c. 93A by charging and collecting amounts not owed by borrowers, failing to process borrowers' applications for income driven repayment plans in a timely and accurate manner, and failing to properly count borrowers' qualifying payments under the Public Service Loan Forgiveness program."[239]

575.     More recently, on October 3, 2019, New York's Attorney General filed suit against PHEAA because the servicer "has proven itself unwilling or unable to perform its most fundamental task as exclusive PSLF servicer—accurately counting the qualifying payments borrowers make towards the 120 required for forgiveness."[240] According to the complaint, "[PHEAA]'s failure to accurately count eligible payments drives up the cost of borrowers' loans, extends the time that they are in repayment, and leads to improper denials when borrowers apply for loan forgiveness."[241]

## CLASS ACTION ALLEGATIONS

576.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and the following classes:

**The TEACH Class**:

All persons in the United States (and U.S. territories) who received a TEACH Grant serviced by PHEAA that was converted to an interest-bearing loan, and:

    a)  the borrower submitted annual certification documentation to PHEAA for the TEACH Grant program by the deadline; or

---

[239] *Commonwealth v. PHEAA*, 1784CV02682-BLS2, 2018 WL 1137520, at *1 (Mass. Super. Mar. 1, 2018).

[240] Complaint at ¶ 11, *New York v. PHEAA, et al.*, No. 1:19-cv-09155 (S.D.N.Y. Oct. 3, 2019), (ECF No. 1).

[241] *Id.*

b) the borrower did not submit annual certification documentation to PHEAA by the deadline, and PHEAA sent notice of the annual certification deadline using only the "paperless inbox."

**The IDR Class**:

All persons in the United States (and U.S. territories):

    a) whose loans were serviced by PHEAA and who were eligible for, but not enrolled in, an IDR Plan at any time during their repayment period, or

    b) who were enrolled in an IDR Plan serviced by PHEAA, and incurred a capitalization of accrued interest as a result of PHEAA placing a loan in forbearance or a different IDR Plan.

**The PSLF Class**:

All persons in the United States (and U.S. territories):

    a) whose loans were serviced by PHEAA and who were eligible for, but not enrolled in, the PSLF Program, or

    b) who were enrolled in the PSLF Program serviced by PHEAA, and did not receive credit for a Qualifying Payment for each month the borrower was enrolled in the PSLF Program.

577. In addition, Plaintiffs bring this action on behalf of certain State Law Subclasses for purposes of pursuing the state unfair and deceptive acts and practices claims described herein. Each State Law Subclass will be defined as: "All persons who are a member of either the TEACH Class or the IDR Class, and who reside in [state]."

578. Excluded from the Classes are Defendants and their past and present officers, directors, management, employees, subsidiaries or affiliates, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, any attorneys who enter their appearance in this action, and governmental entities not named in this lawsuit.

579. Members of the classes are so numerous and geographically dispersed that joinder is impracticable. Plaintiffs believe there are thousands of members of the Classes, if not more.

Further, the Classes are readily identifiable by objective means from information and records maintained by PHEAA.

580.     Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct of PHEAA. Plaintiffs' claims and claims of the putative Classes originate from the same fraudulent and unfair practices. If brought and prosecuted individually, the claims of each putative class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. Plaintiffs would fairly and adequately protect the interests of the members of the putative class.

581.     PHEAA acted on grounds generally applicable to the entire Classes, therefore injunctive relief is appropriate. Such generally applicable conduct is inherent in PHEAA's wrongful conduct.

582.     Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class Members. Questions of law and fact common to the Classes include but are not limited to:

   a.     Whether PHEAA has a common and pervasive practice of improperly converting TEACH Grants into interest-bearing federal Direct Loans;

   b.     Whether PHEAA has a common and pervasive practice of misprocessing, delaying, and obstructing enrollment and recertification of IDR Plans;

   c.     Whether PHEAA's misconduct caused injuries to Plaintiffs and the Class by causing the improper capitalization of interest, and additional payments towards the payoff of loans and loan forgiveness;

   d.     Whether PHEAA as a consumer advocate owed a fiduciary duty to borrowers;

   e.     Whether PHEAA's misconduct constitutes unjust enrichment;

   f.     Whether PHEAA's misconduct violates state consumer protection statutes;

   g. Whether PHEAA's misconduct entitles Plaintiffs and the Classes to recover compensatory, statutory, treble, and/or putative damages;

  h. Whether PHEAA acted as an agent of the Department of Education;

  i. Whether PHEAA breached its contract with the Department of Education;

   j. Whether Plaintiffs and the proposed Classes were third-party beneficiaries of the contract between PHEAA and the Department of Education;

   k. Whether Plaintiffs and the Classes are entitled to injunctive relief enjoining PHEAA from further engaging in unfair and deceptive practices alleged herein; and

   l. Whether Plaintiffs and the putative Classes are entitled to recover attorney's fees.

583. These and other questions of law and fact are common to the Classes and predominate over any questions affecting only individual Class Members, including legal and factual issues relating to liability and damages.

584. PHEAA's conduct was generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

585. This class action is superior to any alternatives for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise could not afford to litigate the claim, such as those asserted herein. Prosecution as a class action will eliminate the possibility of repetitive litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would produce.

586. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for PHEAA.

587. Class action treatment also is superior to any alternative method to compensate the victims of PHEAA's unlawful conduct—Plaintiffs and the proposed Classes—for the injuries they have suffered as a direct result of Defendant PHEAA's conduct.

## COUNT 1 – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious, an Abuse of Discretion or Not in Accordance with Law (TEACH Grant Program),

### (Against the Department and Secretary DeVos)

588. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

589. This count is brought on behalf of the TEACH Plaintiffs and members of the TEACH Class against the Department of Education and Secretary DeVos.

590. The Administrative Procedures Act ("APA") provides that "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

591. The Department acted arbitrarily and capriciously, abused its discretion, and/or failed to comply with the requirements of applicable statutes and regulations with respect to each of the following actions:

a. Failing to seek OMB approval for the annual TEACH Grant Certification form as required by The Paperwork Reduction Act, 44 U.S.C. § 3506(c);[242]

b. Subjecting TEACH Plaintiffs and members of the TEACH Class to penalties, as prohibited by The Paperwork Reduction Act, 44 U.S.C. § 3512(a), by converting recipients' TEACH Grants to TEACH Loans for failure to submit a completed annual TEACH Grant Certification form, or for submitting a TEACH Grant Certification form that contained what the Department arbitrarily determined to be errors;

c. Failing to submit to Congress every two years beginning in 2010, a report on "TEACH grants with respect to the schools and students served by recipients of such grants," as mandated by 20 U.S.C. § 1070g-4;

d. Converting eligible TEACH Plaintiffs' and members of the TEACH Class' TEACH Grants to TEACH Loans:

      i. without sufficiently communicating the requirements of the TEACH Grant program to recipients, as required by Principle 15 of the Federal Internal Control Standards;

      ii. without providing proper notice of the annual TEACH Grant certification deadline, as required by Principle 15 of the Federal Internal Control Standards;

      iii. due to hyper-technical "mistakes" on completed certification forms without allowing TEACH Plaintiffs and members of the TEACH Classes time to correct deficiencies;

      iv. without providing the required amount of time after notice of the annual certification deadline to submit the TEACH Grant Certification form; and

      v. for reasons not authorized by 20 U.S.C. § 1070g-2(c) and 34 C.F.R. § 686.43.

---

[242] 44 U.S.C. § 3506; 5 C.F.R. § 1320.5.

e.  Denying applications for reconsideration of eligible TEACH Plaintiffs and members of the TEACH Class pursuant to the TEACH Grant Reconsideration Process;

f.  Denying TEACH Plaintiffs and members of the TEACH Class whose application for reconsideration were granted, with credit and/or a refund for (i) accrued, but unpaid, interest on TEACH Loans and (ii) payments of principal and interest made towards TEACH Loans;

g.  Failing to sufficiently communicate instructions and guidance to PHEAA and other loan servicers, as required by Principle 15 of the Federal Internal Control Standards;

h.  Failing to monitor PHEAA and other loan servicers for servicer misconduct, as required by Principle 16 of the Federal Internal Control Standards;

i.  Failing to correct deficiencies identified in internal and external audits and investigations, as required by Principle 17 of the Federal Internal Control Standards.

j.  Failing to enforce accountability for PHEAA and other loan servicers' failure to comply with all applicable laws, regulations, and FSA requirements, as required by Principle 5 of the Federal Internal Control Standards;

592.  Each of the Department's actions identified in Paragraph 591, and collectively, constitute a long-standing pattern of failing to administer the TEACH Grant Program in a manner that furthers the important policy and goals of the HEA and TEACH Grant Program which constitutes actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

593.     Each of the Department's actions identified in Paragraphs 591 and 592 constitute final agency actions.

594.     No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

595.     Accordingly, the Department's actions should be set aside. Plaintiffs request an order requiring the Department to (i) reconvert TEACH Plaintiffs' and members of the TEACH Class's TEACH Loans back to TEACH Grants, (ii) provide credit for all accrued but unpaid interest, (iii) provide a credit or refund for payments of principal and interest made towards the TEACH Loans.

## COUNT 2 – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious, an Abuse of Discretion or Not in Accordance with Law (IDR Plans)

### (Against the Department and Secretary DeVos)

596.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

597.     This count is brought on behalf of the IDR Plaintiffs and members of the IDR Class against the Department of Education and Secretary DeVos.

598.     The Administrative Procedures Act ("APA") provides that "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

599.     The Department acted arbitrarily and capriciously, abused its discretion, and/or failed to comply with the requirements of applicable statutes and regulations with respect to each of the following actions:

a. Failing to communicate the availability of IDR Plans to IDR Plaintiffs and members of the IDR Class, as required by Principle 15 of the Federal Internal Control Standards, by steering them into general forbearance and capitalizing accrued interest;

b. Improperly placing IDR Plaintiffs' and members of the IDR Class's loans into general forbearance, instead of a B-9 administrative forbearance, to accommodate a failure to timely and promptly process IDR Plan Request Forms seeking a change of repayment plans, in violation of 34 C.F.R. § 685.205(b)(9);

c. Failure to disclose full extent of interest capitalization, as required by 34 C.F.R. § 682.211(e)(1).

d. Capitalizing accrued interest on the loans of IDR Plaintiffs and members of the IDR Class during periods of a B-9 administrative forbearance, in violation of 34 C.F.R. § 685.205(b)(9);

e. Denying IDR Plaintiffs' and members of the IDR Class's IDR Plan Request Forms for deficiencies without allowing time to correct the deficiencies, as required by internal policies and procedures;

f. Failing to apply the Missed Deadline Exception to qualified IDR Plaintiffs and members of the IDR Class, as required by 34 C.F.R. § 685.209(a)(2)(vii) and (ix) (PAYE), §685.209(b)(vi)(D) and (F) (ICR), §685.209(c)(4)(vii) (REPAYE), and 34 C.F.R. § 685.221(e)(7) and (9) (IBR);

g.      Failing to effect mandatory notice of the requirements of the IDR Plan and the annual deadline for submitting the IDR Plan Request Form and recertification documents, as required by 34 C.F.R. § 685.209(a)(5)(ii)-(v) (PAYE), § 685.209(b)(v) and (vi)(B); § 685.209(c)(4)(ii) and (iii) (REPAYE), and 34 C.F.R. § 685.221(e)(2)-(5) and by the provisions of the FFEL and Direct Loans Master Promissory Note;

h.      Capitalizing accrued interest on the loans of IDR Plaintiffs and members of the IDR Class who request to change from an IDR Plan to another repayment plan, without providing sufficient notice that leaving the IDR Plan to switch to another plan would cause the capitalization of interest, in violation of Principle 15 of the Federal Internal Control Standards;

i.      Failing to issue instructions and guidance to PHEAA and other loan servicers in the form of a Common Manual for the Direct Loan Program, as instructed by Congress in the Consolidated Appropriations Act of 2016 (P.L. 114-113);

j.      Failing to sufficiently communicate instructions and guidance to PHEAA and other loan servicers, as required by Principle 15 of the Federal Internal Control Standards;

k.      Failing to monitor PHEAA and other loan servicers for servicer misconduct, as required by Principle 16 of the Federal Internal Control Standards;

l.      Failing to correct deficiencies identified in internal and external audits and investigations, as required by Principle 17 of the Federal Internal Control Standards.

m.     Failing to enforce accountability for PHEAA and other loan servicers' failure to comply with all applicable laws, regulations, and FSA requirements, as required by Principle 5 of the Federal Internal Control Standards;

600.    Each of the Department's actions identified in Paragraph 599, and the actions collectively, constitute a long-standing pattern of failing to administer the FFEL and Direct Loan Programs and IDR Plans in a manner that furthers the important policy and goals of the HEA and TEACH Grant Program – to serve the best interests of students.

601.    The Department's failure to administer the FFEL and Direct Loan Programs and IDR Plans over time in a manner that furthers the important policy and goals of the HEA and the FFEL and Direct Loan Programs further constitutes actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

602.    The Department's actions in Paragraphs 599 and 600 constitute final agency action.

603.    No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

604.    Accordingly, the Department's actions should be set aside. Plaintiffs request an order requiring the Department to provide IDR Plaintiffs and members of the IDR Class with a credit or refund for (i) the amount of interest improperly capitalized or capitalized as a result of the Department's actions, (ii) an amount that represents the lost federal interest subsidy benefits

as a result of periods of improper forbearance or periods of forbearance that resulted from the Department's actions; and (iii) credit for qualifying payments towards forgiveness under the IDR Plan and/or PSLF Program missed as a result of periods of improper forbearance or forbearance that resulted from the Department's actions.

### COUNT 3 – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious, an Abuse of Discretion or Not in Accordance with Law (PSLF Program)

**(Against the Department and Secretary DeVos)**

605.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

606.    This count is brought on behalf of the PSLF Plaintiffs and members of the PSLF Class against the Department of Education.

607.    The Administrative Procedures Act ("APA") provides that "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

608.    The Department acted arbitrarily and capriciously, abused its discretion, and/or failed to comply with the requirements of applicable statutes and regulations with respect to each of the following actions:

      a.      Denying loan forgiveness for borrowers who met the requirements of the PSLF Program, in violation of 20 U.S.C. § 1087e(m);

      b.      Denying loan forgiveness for borrowers who met the requirements of the TEPSLF Program;

c.      Denying PSLF Plaintiffs and members of the PSLF Class credit for all

qualifying payments made towards PSLF forgiveness;

d.      Failing to effectively communicate the requirements of the PSLF Program

to PSLF Plaintiffs and members of the PSLF Class, as required by

Principle 15 of the Federal Internal Control Standards;

e.      Failing to notify PSLF Plaintiffs' and member of the PSLF Class who

submitted PSLF Employment Certification forms or otherwise expressed

interest in enrolling in the PSLF Program that they were not on a PSLF

qualifying repayment plan, in violation of Principle 15 of the Federal

Internal Control Standards;

f.      Failing to maintain the National Student Loan Data System in a way that

(i) allows for the electronic exchange of data, including payments that

qualify for PSLF forgiveness, between loan servicers, and (ii) maintains

confidence in the data system, as required by 20 U.S.C § 1092b;

g.      Failing to maintain records with accuracy, relevance, timeliness, and

completeness reasonably necessary to assure fairness to decision making

as required by the Freedom of Information Act, 5 U.S.C. §552(e)(5);

h.      Failing to issue instructions and guidance to PHEAA and other loan

servicers in the form of a Common Manual for the Direct Loan Program,

as instructed by Congress in the Consolidated Appropriations Act of 2016

(P.L. 114-113);

i.      Failing to sufficiently communicate instructions and guidance to PHEAA and other loan servicers, as required by Principle 15 of the Federal Internal Control Standards;

j.      Failing to monitor PHEAA and other loan servicers for servicer misconduct, as required by Principle 16 of the Federal Internal Control Standards;

k.      Failing to correct deficiencies identified in internal and external audits and investigations, as required by Principle 17 of the Federal Internal Control Standards; and

l.      Failing to enforce accountability for PHEAA and other loan servicers' failure to comply with all applicable laws, regulations, and FSA requirements, as required by Principle 5 of the Federal Internal Control Standards.

609.    Each of the Department's actions identified in Paragraph 608, and collectively, constitute a long-standing pattern of failing to administer the PSLF Program in a manner that furthers the important policy and goals of the HEA and PSLF Program further constitutes actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

610.    The Department's actions in Paragraphs 608 and 609 constitute final agency action.

611.    No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

612.    Accordingly, the Department's actions should be set aside. PSLF Plaintiffs request an order requiring the Department to (i) conduct a full accounting review of the

qualifying payments made by PSLF Plaintiffs and members of the PSLF Class and provide

explanation for any payment that is deemed a non-qualifying payment; (ii) provide additional

credit for all payments made after Plaintiffs and members of the PSLF Class submitted PSLF

Employment Certification Requests or otherwise expressed a documented interest in the PSLF

Program, regardless of repayment plan; (iii) grant loan forgiveness for any PSLF Plaintiff or

member of the PSLF Class who have made 120 qualifying payments and such additional

payments; (iv) provide a credit or refund for any payment of principal and interest made after the

date of the last qualifying or additional payment.

## COUNT 4 - FIFTH AMENDMENT DUE PROCESS

### (Against the Department and Secretary DeVos)

613.     Plaintiffs incorporate by reference the allegations contained in the proceeding

paragraphs as if fully set forth herein.

614.     This Count is brought on behalf of the TEACH Plaintiffs and members of

TEACH Class against the Department of Education and Secretary Devos.

615.     The Fifth Amendment of the U.S. Constitution provides: "No person shall…be

deprived of life, liberty, or property, without due process of law." Due process requires that, at a

minimum, individuals receive notice and an opportunity to be heard before they are deprived of

property.

616.     The TEACH Plaintiffs and members of the TEACH Class who have completed

four years of the required teaching service have a constitutionally protected property interest in a

government benefit to which they are legitimately entitled, namely their statutory interest in the

TEACH Grant.

617.     The TEACH Plaintiffs and members of the TEACH Class were deprived of their property interest when the Department improperly converted their TEACH Grants to interest bearing TEACH Loans due to the Department's own misconduct. The Department denied the TEACH Plaintiffs and members of the TEACH Class their right to the TEACH Grants without adequate process.

618.     The Department failed to institute an adequate process to identify and account for errors the Department and loan servicers made in converting the TEACH Plaintiffs' and members of the TEACH Class's Grants into interest bearing TEACH Loans.

619.     The Due Process Clause requires the Department to implement a process that gives borrowers adequate notice of conversions, etc. and a meaningful process to identify and account for issues related to this statutory entitlement including payment counting issues.

## COUNT 5 - FIFTH AMENDMENT DUE PROCESS

### (Against the Department and Secretary DeVos)

620.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

621.     This Count is brought on behalf of the PSLF Plaintiffs and members of PSLF Class against the Department of Education and Secretary DeVos.

622.     The Fifth Amendment of the U.S. Constitution provides: "No person shall…be deprived of life, liberty, or property, without due process of law." Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

623.     The PSLF Plaintiffs and members of the PSLF Class who have made 120 qualifying payments while working full time for a qualifying employer have a constitutionally

protected property interest in a government benefit to which they are legitimately entitled, namely loan forgiveness under the PSLF Program.

624.    The PSLF Plaintiffs and members of the PSLF Class were deprived of their property interest when the Department denied their PSLF applications. The Department denied the PSLF Plaintiffs and members of the PSLF Class their right to loan forgiveness under the PSLF Program.

625.    The Department failed to institute an adequate process to identify and account for errors the Department and loan servicers made in denying PSLF applications.

626.    The Due Process Clause requires the Department to implement a process that gives borrowers adequate notice of conversions, etc. and a meaningful process to identify and account for issues related to this statutory entitlement.

## COUNT 6 - BREACH OF CONTRACT (TEACH AGREEMENT TO SERVE)

### (Against the Department and Secretary DeVos)

627.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

628.    This count is brought on behalf of the TEACH Plaintiffs and members of a TEACH Class against the Department of Education and Secretary DeVos.

629.    At all relevant times, TEACH Plaintiffs and members of the TEACH Class had a valid and enforceable contract with the Department in the form of the TEACH Agreement to Serve attached as Exhibit B.

630.    TEACH Plaintiffs and members of the TEACH Class have performed or substantially performed all material terms of their obligations under the contract.

631. Despite TEACH Plaintiffs' and members of the Class's substantial compliance with the Agreement to Serve, the Department breached its contractual obligations by improperly converting the grants to interest-bearing loans.

632. As a proximate consequence of the Department's breach, the TEACH Plaintiffs and members of the TEACH Class suffered injury due to the improper conversion of the TEACH Grant to a TEACH Loan.

## COUNT 7 - BREACH OF CONTRACT (MASTER PROMISSORY NOTE)
### (Against the Department and Secretary DeVos)

633. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

634. This count is brought on behalf of the IDR Plaintiffs and IDR Classes against the Department of Education and Secretary DeVos.

635. At all relevant times, IDR Plaintiffs and members of the IDR Class had a valid and enforceable contract with the Department in the form of an FFEL or Direct Loan Master Promissory Note ("MPNs') attached as Exhibits E and F.

636. IDR Plaintiffs and members of the IDR Classes have performed or substantially performed all material terms of their obligations under the MPNs.

637. The MPNs between the Department and IDR Plaintiffs and IDR Classes require the Department to comply with all applicable federal law.

638. The MPNs further require that any required notice to be given "will be effective if it is sent by first-class mail to the most recent address that [the Department has] for [Plaintiff], by electronic means to an email address [Plaintiff has] provided, or by any other method of notification that is permitted or required by applicable law and regulations."

639. Despite IDR Plaintiffs' and members of the IDR Class's substantial compliance with the MPNs, the Department failed to follow applicable federal statutes and regulations as alleged herein. It further failed to effect notice of the required notices under 34 C.F.R. § 685.209(a)(5)(ii)-(v) (PAYE), § 685.209(b)(v) and (vi)(B); § 685.209(c)(4)(ii) and (iii) (REPAYE), and 34 C.F.R. § 685.221(e)(2)-(5) by sending the required notices only to an online "paperless inbox."

640. As a proximate consequence of the Department's breach, IDR Plaintiffs and members of the IDR Class have suffered various injuries including (a) exhaustion of their eligibility for forbearance in the future, when they may actually need it, (b) denial of the benefits of an IDR Plan, (c) denial of the opportunity to make qualifying payments toward forgiveness under the PSLF Program and IDR Plans, (d) denial of federal interest subsidies that the Department must contribute on their behalf during repayment; (e) capitalization of accrued interest, which increases the principal loan balance and monthly payment amount, (f) loss of credit for qualifying payments towards forgiveness under the PSLF Program, and (g) denial of forgiveness under the PSLF Program.

## COUNT 8 – BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY)

### (Against PHEAA)

641. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

642. This count is brought on behalf of all Plaintiffs and Plaintiff Classes against PHEAA.

643. The Department and PHEAA entered into a contract on or about June 17, 2009 (Contract No. ED-FSA-09-D-0014), pursuant to which PHEAA agreed to provide servicing for

certain Federal Student Loans, including the student loans of Plaintiffs and members of all Classes, and have since amended and expanded the scope of work of such contract on numerous occasions (hereinafter, collectively, the "Servicing Contract").

644.    The specific work to be performed by PHEAA pursuant to the Servicing Contract includes, *inter alia*, the servicing of the Public Service Loan Forgiveness program, implementation of the various Income Driven Repayment options (including ultimate loan forgiveness under such options), and the TEACH Grant program.

645.    PHEAA's obligation under the Servicing Contract is to "be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur."

646.    The Servicing Contract further requires PHEAA to "provide commercially available services that will yield . . . high levels of customer satisfaction[,]" and to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt."

647.    The Servicing Contract sets forth detailed requirements for PHEAA's performance of its loan servicing work, including, but not limited to, the following:

- "The servicer shall post payments to the borrower accounts on the same date of receipt of payment information from the treasury."

- "The servicer shall maintain proper controls over payment posting and accounting activities, and perform daily and monthly required reconciliations."

- "The servicer shall promptly manage credit balance accounts, and other payments and accounts requiring a refund.  The servicer shall process refund transactions to borrowers (borrower overpayments) . . . ."

- "The servicer shall establish a system and processes to correctly record all transactions on their database."

- "The servicer's procedures and systems shall include a system of internal controls that ensures resource use is consistent with laws, regulations and policies."

- "The servicer shall process discharge transactions with required supporting documentation following the required regulatory guidelines. The servicer is required to facilitate the timely and accurate processing of discharge requests by ensuring that complete loan discharge documentation for the individual is submitted."

- "The servicer shall respond to written and email questions and requests timely and accurately."

- "The servicer shall respond and resolve customer complaints; and create and execute a plan to escalate complaints to FSA and the Ombudsman."

648. The Servicing Contract expressly imposes various responsibilities on PHEAA to the borrowers. For example, with regard to PHEAA's servicing of the PSLF program, the Servicing Contract states: "The purpose of this effort is to implement a PSLF servicer to enable borrowers to track qualifying payments and employment, using the Employment Certification Form, while in the process of qualifying for PSLF."

649. Further, the Servicing Contract requires PHEA to be able to:

- "Collect, review and retain the submitted employment certifications;

- Receive all eligible loans and provide comprehensive servicing of all federally held loans to borrowers who may or may not ultimately be eligible for forgiveness based on public service;

- Determine that the borrower has made qualifying payments while employed in qualifying public service;

- Track PSLF eligibility status for the on-track borrower;

- Report tracking information to NSLDS."

650.     With regard to IDR Plans, the Servicing Contract sets forth numerous detailed performance requirements for PHEAA for the benefit of the borrower, including, *inter alia*, that PHEAA "shall process the loan forgiveness after the borrower has satisfied 25 years of repayment on income-based repayment."

651.     With regard to TEACH Grants, PHEAA's promise in the Servicing Contract is to "to accept, process, and service TEACH Grants, in accordance with Attachment 8 - TEACH Grant Requirements."

652.     The TEACH Grant Requirements in the Servicing Contract again obligate PHEAA to undertake specific responsibilities to borrowers, including, but not limited to:

- "Servicer will manage the TEACH Grant Certification Process for a recipient that has not started teaching."

- "Servicer will service TEACH Grant while Recipients are Completing their service obligation once employed as a teacher."

- "Servicer will evaluate a TEACH Grant Recipient's ability to satisfy his/her TEACH Grant service obligations."

653.     Plaintiffs and members of all Classes are the intended third-party beneficiaries of the Servicing Contract.

654.     The Servicing Contract reflects the express and/or implied intention by PHEAA and the Department to benefit the borrowers, *i.e.*, the Plaintiffs and members of all Classes. Specifically, by delineating the precise responsibilities undertaken by PHEAA to the borrowers, PHEAA and the Department demonstrate a clear intent to rebut any presumption that Plaintiff and members of all Classes are merely incidental beneficiaries of the Servicing Contract, and

further demonstrate that Plaintiff and members of all Classes are the intended beneficiaries of the Servicing Contract.

655. The text and purpose of the Servicing Contract, and an examination of the Servicing Contract as a whole, evinces the intent of PHEAA and the Department to benefit the Plaintiffs and members of all Classes.

656. Further evincing the intent to benefit the borrowers are the circumstances of the transaction between PHEAA and the Department, which, because the Servicing Contract is mandated by a federal statute, includes the governing statute and its purpose. To this end, 20 U.S.C. § 1087f provides "the Secretary [of Education] shall enter into contracts only with entities that have extensive and relevant experience and demonstrated effectiveness."

657. The Department specifically contracted with PHEAA for the purpose of servicing the federal student loans of Plaintiffs and members of all Classes. Indeed, the MPN, the contract between borrowers and the Department, indicates that a contractor, like PHEAA, may service the loans and directs borrowers to such servicers for loan-related issues. After the loan repayment period has begun, the Department directs borrowers to contact their loan servicers for information about repayment issues. For example, since at least 2015, if not earlier, the Department has issued the following instruction to borrowers after submitting an IDR Request Form: "If you have questions regarding the next steps in the processing of your application, or wish to cancel the application, contact your servicer(s)."

658. In addition to the specific obligations imposed on PHEAA for the benefit of the borrowers, the Servicing Contract required compliance with all applicable federal law.

659. As set forth in detail herein, PHEAA breached the Servicing Contract by failing to properly service borrowers' federal student loans, including Plaintiffs and members of all Classes, as required by the terms of the Servicing Contract and applicable federal law.

660. Alternatively, even if it is determined that PHEAA did not breach its express obligations under the Servicing Contract, PHEAA breached the covenant of good faith and fair dealing implied in the Servicing Contract.

661. PHEAA's breach of the Servicing Agreement directly harmed Plaintiffs and members of all Classes, as detailed herein.

662. As a result of PHEAA's breach of the Servicing Contract, of which Plaintiffs and members of all Classes were intended third party beneficiaries, Plaintiffs and members of all Classes are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court, as set forth below.

## COUNT 9 – BREACH OF FIDUCIARY DUTY

### (Against PHEAA)

663. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

664. This count is brought on behalf of all Plaintiffs and Plaintiff Classes against PHEAA.

665. The Department, as the owner and guarantor of Plaintiffs' federal student loans, has a confidential and/or fiduciary relationship with Plaintiff and the Class Members.

666. PHEAA, by virtue of its loan servicing contract, the policies and goals of the HEA and Title IV Programs, has a confidential and/or fiduciary relationship with Plaintiffs and Class Members.

667. PHEAA further holds itself out as a fiduciary

668. In accordance with the 2009 Contract, the Department represents to Plaintiffs, the Class Members, the public, and Congress that it acts in the best interest of borrowers, including providing them advice, information, and other tools to assist them in choose the "right" or "best" repayment plan based on their circumstances.

669. As such, the Department and PHEAA act in a position of advisor or counselor and represents that it will act in good faith and in the interests of Plaintiffs and Class Members.

670. Furthermore, the relative positions of the Department, PHEAA, and borrowers, including Plaintiffs and Class Members, is such that the Department and PHEAA have the power and means to take advantage of, or exercise undue influence over, borrowers, including Plaintiffs and Class Members.

671. The Department and PHEAA exploited its relationship with Plaintiffs and Class Members by making representations and engaging in misconduct that violated this confidential or fiduciary relationship. As such, the Department and PHEAA are operating in a manner most beneficial to themselves rather than the borrowers, including Plaintiffs and Class Members.

672. The Department and PHEAA's breach of its confidential or fiduciary relationship was the direct and proximate cause of the injuries suffered by Plaintiff and the Class Members, as detailed herein.

## COUNT 10 - CONSTRUCTIVE FRAUD

### (Against PHEAA)

673. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

674.     This count is brought on behalf of all Plaintiffs and Plaintiff Classes against PHEAA.

675.     PHEAA holds itself out as having a confidential and/or fiduciary relationship with Plaintiffs and members of the Classes.

676.     PHEAA represents to Plaintiffs and Class Members that it is acting in their best interests.

677.     As such, PHEAA acts in a position of advisor or counselor as reasonably to inspire confidence in student loan borrowers that they will act in good faith for the student loan borrower's interest.

678.     Further, the relative position of PHEAA and student loan borrowers, including Plaintiffs and members of the Classes, is such that PHEAA has the power and means to take advantage of or exercise undue influence over the student loan borrowers, and in fact has exercised power and undue influence over student loan borrowers.

679.     Some of PHEAA's misrepresentations and/or omissions include, but are not limited to:

    a.   failing to communicate or miscommunicating the requirements of Title VI programs to borrowers;

    b.   misrepresenting to borrowers that there is no cost to switching repayment plans;

    c.   failing to disclose to borrowers that they do not have PSLF eligible loans and/or repayment plans;

    d.   failing to fully disclose that interest will capitalize or the full extent to which interest will capitalize during periods of forbearance;

    e.   failing to disclose the circumstances in which a borrowers' loans will be placed into forbearance;

       f.    failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history.

680.    As such, PHEAA is operating in a way most beneficial to itself and, often, in a manner directly opposite of that requested by the student loan borrower, such as Plaintiffs and members of the Classes, despite holding themselves out as acting in the best interest of the student loan borrower.

681.    PHEAA's fraudulent actions and fraudulent misrepresentations were directed toward Plaintiffs and members of the Classes.

682.    PHEAA intended for student loan borrowers, including Plaintiffs, to rely on its actions and fraudulent misrepresentations in determining which IDR Plan was best for the student loan borrowers, in being placed in the correct and best IDR Plan for the student loan borrowers, and in having their IDR Plan Request Forms processed and carried out in an effective and efficient manner.

683.    PHEAA also intended for student loan borrowers, including Plaintiffs and members of the Classes, to rely on their documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and other documents were often incorrect.

684.    As such, PHEAA intended for student loan borrowers to rely on its actions and fraudulent misrepresentations and, therefore, create, or cause a likelihood of, confusion or of misunderstanding about the best IDR Plan for the student loan borrowers, how they could be treated after requesting to return to their previous plan, and how their IDR Plans were to be processed and carried out.

685.    PHEAA's actions and misrepresentations occurred during the presentation of information involving its loan servicing activities.

686.     Plaintiffs and members of the Classes relied on PHEAA's confidential or fiduciary relationship and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by PHEAA about IDR Plans, (2) being coerced or forced into forbearance due to PHEAA's actions, (3) being unable to return to their previously chosen IDR Plan without ramifications, and (4) PHEAA's document and information processing procedures that last more than one month.

687.     Plaintiffs and members of the Classes damages were directly and proximately caused by PHEAA's breach of a confidential or fiduciary relationship.

688.     As such, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of PHEAA's willful, intentional, and outrageous conduct, warranting punitive damages for PHEAA's irreprehensible behavior and injunctive.

689.     PHEAA's conduct was outrageous and done with a bad motive or with reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter PHEAA and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

## COUNT 11 - UNJUST ENRICHMENT

### (Against PHEAA)

690.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

691.     This count is brought on behalf of all Plaintiffs and Plaintiff Classes against PHEAA.

692.     To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

693.     PHEAA has unlawfully benefited from the misconduct alleged in this Complaint.

694.     PHEAA unlawfully received millions of dollars in loan servicing fees by collecting for the Department millions of dollars in overpayments of additional principal and interest that were not otherwise owed but for PHEAA's unlawful actions.

695.     PHEAA's financial benefits resulting from the unlawful and inequitable acts are traceable to the overpayments made by Plaintiffs and the Classes.

696.     Plaintiffs and the Classes have conferred upon PHEAA an economic benefit in the nature of loan servicing profits that resulted from the unlawful collection of overpayments, to the economic detriment of Plaintiffs and the Classes.

697.     The economic benefit of loan servicing fees derived by PHEAA through collecting overpayments of principal and interest is a direct and proximate result of PHEAA's unlawful conduct.

698.     The economic benefits derived by PHEAA rightfully belong to Plaintiffs and the Classes, as they made overpayments of principal and interest, benefiting PHEAA.

699.     It would be inequitable under unjust enrichment principles under the law of Pennsylvania to be permitted to retain any of the loan servicing fees derived from Plaintiffs' and the Classes overpayments of principal and interest as a result of PHEAA's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

700.     PHEAA is aware of and appreciate the benefits bestowed upon it by Plaintiffs and the Classes.

701.     PHEAA should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Classes all unlawful or inequitable proceeds they received.

702.     A constructive trust should be imposed upon all unlawful or inequitable sums received by PHEAA traceable to Plaintiffs' and the Classes.

## COUNT 12 – NEGLIGENCE

### (Against PHEAA)

703.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

704.     This count is brought on behalf of all Plaintiffs and Plaintiff Classes against PHEAA.

705.     PHEAA owed—and continues to owe—duties to Plaintiffs and the Class to use reasonable care in:

a.   Providing accurate information to borrowers regarding the terms and status of their loans;

b.   Providing accurate and timely information to borrowers regarding their options and obligations with respect to repayment, grant certification, forgiveness, discharge, cancellation, default, and forbearance;

c.   Assisting borrowers with choosing an appropriate repayment plan, program, or strategy;

d.   Processing documents, inquiries, certifications, and applications from borrowers in a timely fashion to ensure borrowers remain eligible for the programs they qualify for;

e.   Collecting payments from borrowers and applying payments to loan balances; and

f.   Updating borrowers' files and loan status information based on the information and payments received.

706. These duties arise from several sources, including, but not limited to, the sources described below, and are independent of any duty PHEAA owed as a result of contracts between it and Plaintiffs and the Class Members.

707. PHEAA has a common law duty to prevent the foreseeable risk of harm to others, including Plaintiffs and the Class. Plaintiffs have student loans held by the Department of Education. With respect to the loans at issue in this case, borrowers such as Plaintiffs and Class Members have no ability to choose their loan servicer. The Department's choice to award PHEAA the servicing contract for these loans made PHEAA the exclusive entity borrowers could interact with to obtain information about their specific loans or conduct any repayment-related actions. As a result of PHEAA's position as the exclusive servicer for these loans, it was foreseeable to PHEAA that Plaintiffs and the Class could suffer financial harm if PHEAA failed to exercise reasonable care while performing its servicing functions.

708. It was foreseeable to PHEAA that borrowers would be injured if PHEAA failed to properly administer the TEACH Grants Program by improperly converting TEACH Grants to TEACH Loans, failing to timely notify borrowers of their recertification requirements, or failing to process recertification information submitted by borrowers. PHEAA knew that the conversion of TEACH Grants into direct loans would cause the grant recipients to incur a significant increase in their debt and interest repayment obligations.

709. It was also foreseeable to PHEAA that injury would result from a failure to use reasonable care in servicing the IDR and PSLF programs. As explained above, participation in these programs depends on whether borrowers qualify, whether they submit timely recertification documents, and whether the correct number of qualifying payments are made. To this end, it was foreseeable that if PHEAA did not administer and service these programs with

reasonable care, PHEAA's servicing failures would exhaust borrowers' future forbearance eligibility, block the Department of Education from paying Federal Interest Subsidies borrowers are entitled, deny borrowers the opportunity to participate in alternative payment plans, erase reduced interest rates available to borrowers in repayment, delay borrowers' opportunity to seek loan forgiveness, add to borrowers' principal loan balance, and increase their monthly loan payments.

710.    It was also foreseeable to PHEAA that if it failed to use reasonable care in advising borrowers when and whether forbearance was an appropriate choice for them, and providing borrowers with pertinent information about the consequences of forbearance, then borrowers could be financially injured if their loans were put into forbearance at an inappropriate time and accrued interest was capitalized.

711.    In addition to its general duty to exercise reasonable care, PHEAA also had a duty of care as a result of the special relationship that existed between PHEAA on one hand and Plaintiffs and the Class Members on the other. The special relationship arose because the Department of Education entrusted PHEAA to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." Only PHEAA was in a position to ensure that its servicing systems were sufficient to protect against the harm to Plaintiffs and the Class Members from PHEAA's insufficient servicing measures.

712.    PHEAA assumed a duty to use reasonable care in servicing loans for the millions of borrowers in its portfolio. Even beyond PHEAA's assumption of these duties through its contract with the Department, PHEAA's statements to borrowers indicate that PHEAA intended for borrowers to rely on PHEAA as a primary source for information and assistance when

deciding what actions to take with respect to their student loans. For instance, PHEAA refers to its call center representatives as "Loan Counselors," and its websites are replete with representations and instructions PHEAA clearly intended borrowers to rely on when making decisions about repaying their loans. For virtually every potential repayment or forgiveness option, PHEAA's website directs borrowers to contact PHEAA in order to initiate, continue, or discuss the option with one of PHEAA's representatives. PHEAA knew that if it failed to provide accurate information or use reasonable care in servicing loans, borrowers could be confused, misled, or incorrectly processed, leading to significant financial consequences for the borrowers.

713.     PHEAA was also under statutory and regulatory duties to use reasonable care in servicing loans.  For instance, under 34 C.F.R. § 682.211 and as a result of PHEAA's contracts with the Department, PHEAA owed a duty to borrowers like Plaintiffs and the Class to provide them with information that would aid them in understanding the impact of capitalization of interest on the loan principal, including information regarding the total interest to be paid over the life of the loan if the loan was placed into forbearance.

714.     Under the Consumer Financial Protection Act of 2010, PHEAA was under a duty to refrain from engaging in in any "unfair, deceptive or abusive act or practice" when servicing student loans. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

715.     Finally, PHEAA's duty to use reasonable care in servicing student loans arose not only as a result of the common law and the statutes described herein, but also because it was bound by, and had committed to comply with, industry standards, as represented by the Department of Education to borrowers, as well as in the Department's contract for services with PHEAA.

716.    PHEAA breached its duties and thus was negligent by failing to use reasonable care in servicing Plaintiffs' and the Class Members' loans correctly and on time. Upon information and belief, the specific negligent acts and omissions committed by PHEAA include, but are not limited to, some, or all, of the following:

g.    Failing to provide accurate information to borrowers regarding the terms and status of their loans, including the requirements and deadlines for maintaining status in various repayment and forgiveness programs;

h.    Failing to timely notify borrowers of upcoming deadlines to comply with TEACH Grant requirements, failing to properly record and process recertifications submitted by TEACH Grant recipients, and improperly converting TEACH Grants into loan and interest balances;

i.    Placing borrowers' accounts into forbearance to accommodate its own servicing failures, or as a result of breaching its duty to assist borrowers, and failing to timely and fully inform borrowers of the financial consequences and interest capitalization that will result from forbearance;

j.    Denying borrowers the opportunity to make Qualifying Payments for PSLF and IDR forgiveness when it fails to timely and properly process IDR Request Forms, or fails to notify borrowers of recertification requirements, thereby extending the life of borrowers' loans;

k.    Failing to properly count borrowers' PSLF and IDR Qualifying Payments;

l.    Exhausting borrowers' eligibility to request forbearance in the future, when they may actually need it;

m.    Denying borrowers Federal Interest Subsidies the Department of Education must make on their behalf;

n.    Triggering the capitalization of borrowers' interest, thereby increasing borrowers' outstanding principal and monthly payment amounts;

o.    Failing to educate borrowers about the consequences of switching repayment plans, including but not limited to borrowers having to choose between forbearance and the fixed, 10-year Standard Repayment Plan upon a change; and

p.    Collecting amounts not legitimately due and owing and failing to refund them to borrowers.

717.    In connection with the conduct described above, PHEAA acted wantonly, recklessly, and with complete disregard for the consequences.

718.     As a direct and proximate result of PHEAA's negligent conduct, Plaintiff and the

Class have suffered substantial losses as detailed herein.

## COUNT 13 - NEGLIGENCE *PER SE* (VIOLATIONS OF 34 C.F.R. § 682.211(E)(1); VIOLATIONS OF CONSUMER FIANCIAL PROTECTION ACT OF 2010)

### (Against PHEAA)

719.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

720.     This count is brought on behalf of all Plaintiffs and Plaintiff Classes against

PHEAA.

721.     The regulations implementing the HEA include the following statement of policy

regarding forbearance:

> The Secretary encourages a lender to grant forbearance *for the benefit of a borrower* or endorser in order to prevent the borrower or endorser from defaulting on the borrower's or endorser's repayment obligation, or to permit the borrower or endorser to resume honoring that obligation after default.

34 C.F.R. § 682.211(a)(1) (emphasis added).

722.     The regulations require, in pertinent part, that:

> (e)(1)At the time of granting a borrower or endorser a forbearance, the lender must provide the borrower or endorser with information to assist the borrower or endorser in understanding the impact of capitalization of interest on the loan principal and total interest to be paid over the life of the loan; and

> (2) At least once every 180 days during the period of forbearance, the lender must contact the borrower or endorser to inform the borrower or endorser of—

> (i) The outstanding obligation to repay;

> (ii) The amount of the unpaid principal balance and any unpaid interest that has accrued on the loan since the last notice provided to the borrower or endorser under this paragraph;

175

(iii) The fact that interest will accrue on the loan for the full term of the forbearance;

(iv) The amount of interest that will be capitalized, as of the date of the notice, and the date capitalization will occur;

(v) The option of the borrower or endorser to pay the interest that has accrued before the interest is capitalized; and

(vi) The borrower's or endorser's option to discontinue the forbearance at any time.

34 C.F.R. § 682.211(e)(1).

723.     The purpose of this part of the regulation, which is clear from its text and supported by additional authority, is to ensure borrowers are provided with sufficient information to assess and understand the financial consequences of forbearance—*at the time* the borrowers are evaluating whether to request forbearance— so that borrowers can make informed, financially sound decisions.

724.     PHEAA was required to comply with these requirements under the terms of its contracts with the Department.[243]

725.     Under 34 C.F.R. § 682.211 and as a result of PHEAA's contracts with the Department, PHEAA owed a duty to borrowers like Plaintiffs and Class Members to provide them with information that would aid them in understanding the impact of capitalization of interest on the loan principal, including information regarding the total interest to be paid over the life of the loan if the loan was placed into forbearance.

726.     PHEAA breached this duty. Instead of providing borrowers with the required information "at the time" of forbearance, PHEAA never provided that information, or, at best, it did not provide the information until long after the loans had been placed into forbearance.

---

[243] 2009 Contract at p. 20, Paragraph C.1.4.3; *id.* at Attachment A-1, p.3.

727. Instead, PHEAA's standard operating procedure was to initiate or grant forbearance during, or very shortly after, phone calls with borrowers. During these calls, the information required under 34 C.F.R. § 682.211(e)(1) was not provided to Plaintiffs or Class Members.

728. PHEAA's failure to provide this information was negligence *per se*.

729. Plaintiffs and Class Members are within the class of persons designed to protected by the disclosure requirements of 34 C.F.R. § 682.211(e)(1).

730. As a direct and proximate result of PHEAA's negligence *per se*, Plaintiffs and Class Members suffered damages.

731. The damages were caused by PHEAA's negligence because PHEAA's failure to provide the required information at the time Plaintiffs and Class Members were considering forbearance deprived Plaintiffs and Class Members of the ability to fully understand the financial consequences of forbearance and compare the choice of forbearance to other potential options, such as incurring late payment charges for a short period of time, or enrolling in an IDR Plan.

732. The damages suffered by Plaintiffs and Class Members as a result of PHEAA's failure to provide the required information are the exact types of harms that 34 C.F.R. § 682.211(e)(1) was enacted to prevent.

733. Plaintiffs and all Class Members are "consumers" under the Consumer Financial Protection Act of 2010, ("CFPA") 12 U.S.C. § 5481(4).

734. PHEAA is a "covered person" as defined by 12 U.S.C. § 5481(6) & (15)(A) because it services loans made for personal, family, or household purposes.

735. The servicing PHEAA provided to Plaintiffs is a "consumer financial product or service" as defined by 12 U.S.C. § 5481(5).

736. The CFPA forbids covered persons from committing or engaging in any "unfair, deceptive or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

737. The Consumer Financial Protection Bureau has interpreted this provision as specifically prohibiting a federal student loan servicer like PHEAA from engaging in the following:

738. Steering borrowers experiencing long-term financial hardship into loan forbearance rather than adequately advising borrowers about income-driven repayment options that would have been financially beneficial to those borrowers;

739. Steering borrowers experiencing long-term financial hardship into consecutive loan forbearance periods and capitalizing interest without providing sufficient information to those borrowers about alternative repayment plans so the borrowers could make informed decisions about their loan repayment options.

740. Failing to adequately notify borrowers of upcoming recertification/renewal deadlines for income-driven repayment plans by using only vague electronic email notices.

741. PHEAA was therefore under a statutory and regulatory duty to refrain from these acts and practices.

742. PHEAA breached these duties, and committed all of the prohibited acts, when it: 1) steered borrowers into loan forbearance without advising them about their income-driven repayment options, or other options, that would have been less financially harmful to the borrowers than forbearance; 2) steered borrowers into consecutive loan forbearance periods, and capitalized interest, without providing borrowers with information sufficient to inform them about alternative options; and 3) failed to advise borrowers about upcoming

renewal/recertification deadlines for TEACH Grants or income-driven repayment plans, and using instead non-descriptive electronic forms of notice that would not signal to a reasonable person that the message was important.

743.     PHEAA's acts and practices above were negligent *per se*.

744.     Plaintiffs and Class Members are within the class of persons designed to be protected by the CFPA because they are borrowers who transacted with PHEAA with respect to their loans.

745.     As a direct and proximate result of PHEAA's negligence *per se*, Plaintiffs and Class Members suffered damages.

746.     The damages suffered by Plaintiffs and Class Members as a result of PHEAA's unfair, deceptive, and abusive acts and practices are exactly the types of harms that the CFPA was enacted to prevent.

## COUNT 14 - NEGLIGENT MISREPRESENTATION

### (Against PHEAA)

747.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

748.     This count is brought on behalf of all Plaintiffs and Plaintiff Classes against PHEAA.

749.     Because its primary function is loan servicing, PHEAA is in the business of routinely supplying information that is intended to be relied upon by borrowers and is in fact relied upon by borrowers. PHEAA earns income by fulfilling its loan servicing obligations under its contract with the Department. Since PHEAA knew that borrowers needed to rely on PHEAA,

and as a result of PHEAA's pecuniary interest in servicing borrowers' loans, PHEAA was under a duty to provide timely, accurate information to borrowers.

750.    By virtue of the Department's selection of PHEAA as the *exclusive* servicer of the subject loans, and the obligations imposed by the HEA and implementing regulations, PHEAA was under a public duty to provide accurate information to the borrowers about the terms and status of their loans, their options for repayment, and the consequences of various courses of action.

751.    Borrowers like Plaintiffs and the Class reasonably relied on information provided by PHEAA, and reasonably relied upon PHEAA to provide accurate information at timely intervals. In fact, Plaintiffs and the Class had no other choice but to rely on communications from PHEAA while managing their student loan repayment options.

752.    PHEAA breached its duties to provide timely and accurate information to borrowers in various ways.  In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."

753.    At no time did PHEAA notify Plaintiffs and Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a)

failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and

IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE,

within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only

communicate through a "paperless inbox" and then deleting messages and/or account borrower

account history; (d) placing borrowers into deferment or forbearance who did not apply for or

did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR

programs were available; (f) failing to fully explain and/or provide borrowers with information

to understand the consequences of entering forbearance, including the impact of capitalization of

interest; (g) failing to properly calculate borrowers' monthly payments under IDR Plans at a

level consistent with their income and family size; and (h) failing to process borrowers'

recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF

payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

### COUNT 15 - VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW AND CONSUMER LEGAL REMEDIES ACT, Cal. Bus. & Prof. Code § 17200 *et seq.*; Cal. Civ. Code § 1750 *et seq.*

**(Against PHEAA)**

754.     Plaintiffs incorporate by reference the allegations contained in the proceeding

paragraphs as if fully set forth herein.

755.     Plaintiffs Chris Stevens, Tanuja Goulet Arany, and Dr. Garima Gupta (for the

purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the California

Class against PHEAA. Plaintiffs' injuries and those of the California Class arise from PHEAA's

violation of California's Consumer Legal Remedies Act (for the purposes of this section,

"California CLRA") as a commercial student loan servicer.

756.     PHEAA is a "person" under Cal. Civ. Code § 1761(c).

181

757.     Plaintiffs and Class Members are "consumers" of PHEAA's federal student loan services under Cal. Civ. Code § 1761(d). Their loans are serviced by PHEAA and they applied through PHEAA to take advantage of the PSLF, IDR, and TEACH programs that PHEAA administers.

758.     PHEAA's student loan servicing business qualifies as a "service" as defined by Cal. Bus. & Prof. Code § 17500 and Cal. Civ. Code § 1761, and as a "transaction" as defined by Cal. Civ. Code § 1761.

759.     The California CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer" including (7) "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," (9) "Advertising goods or services with intent not to sell them as advertised," and (10) Advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity."

760.     In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and California Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable

federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[244]

761. At no time did PHEAA notify Plaintiffs and California Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA:

a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs;

b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period;

c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history;

d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason;

e) steering borrowers into forbearance when IDR programs were available;

f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest;

g) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

762. PHEAA thus violated the California CLRA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and California Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their

---

[244] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

763.    By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the California Class Members specifically, in violation of California CLRA .

764.    PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

765.    Plaintiffs and California Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Plaintiffs and California Class Members qualified for loan forgiveness, causing Plaintiffs and the California Class to incur additional payment obligations before the end of their loan terms.

766.    Additionally, Plaintiffs and many California Class Members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and California Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

767.    PHEAA's violations present a continuing risk to Plaintiffs, California Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

768.     Plaintiffs and California Class Members seek all monetary and non-monetary relief allowed by law; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the Cal. Civ. Code § 1750.

769.     Plaintiffs and the California Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the California Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 16 - VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT, Conn. Gen. Stat. Ann. § 42-110a *et seq.*

### (Against PHEAA)

478.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

770.     Plaintiff Andrea Davis (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Connecticut Class against PHEAA. Plaintiff's injuries and those of the Connecticut Class arise from PHEAA's violation of Connecticut's Unfair Trade Practices Act (for the purposes of this section, "CUTPA") as a commercial student loan servicer.

771.     Plaintiff and members of the Connecticut Class are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3).

772.     PHEAA's student loan servicing business qualifies as a "trade" and "commerce" as defined by Conn. Gen. Stat. Ann. § 42-110a(4).

773.     The CUTPA prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

774.     In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiff and Connecticut Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[245]

775.     At no time did PHEAA notify Plaintiff and Connecticut Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into

---

[245] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last visited Oct. 23, 2019).

forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

776.     PHEAA thus violated the CUTPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiff and Connecticut Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiff did in fact rely on such deceptive acts or practices described herein.

777.     By failing to carry out its federal loan programs as advertised, PHEAA created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiff and the Connecticut Class Members specifically, in violation of CUTPA.

778.     PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

779.     Plaintiff and Connecticut Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiff and Connecticut Class Members qualified for loan forgiveness, causing Plaintiff and the Connecticut Class to incur additional payment obligations before the end of their loan terms.

780.    Additionally, Plaintiff and many Connecticut Class Members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiff and Connecticut Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

781.    PHEAA's violations present a continuing risk to Plaintiff, Connecticut Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

782.    Plaintiff and California Class Members seek all monetary and non-monetary relief allowed by law; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the CUTPA.

783.    Plaintiff and the Connecticut Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Connecticut Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts with the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 17 - VIOLATION OF THE DISTRICT OF COLUMBIA'S CONSUMER PROTECTION PROCEDURES ACT, D.C. Code. § 28-3901 *et seq.*

### (Against PHEAA)

784.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

785.    Plaintiff Arianne Gallagher (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves and the District of Columbia Class ("D.C. Class") against PHEAA. Plaintiff's injuries and those of the D.C. Class arise from PHEAA's violation of the District of Columbia's Consumer Protection Procedures Act (for the purposes of this section, "CPPA") as a commercial student loan servicer.

786.    PHEAA is a "person[s]" under the CPPA. D.C. Code § 28-3901(a)(1).

787.    Plaintiff and D.C. Class are "consumers," as defined by the CPPA. D.C. Code § 28-3901(1)(2).

788.    PHEAA's actions as set forth herein constitute "trade practices" under the CPPA. D.C. Code § 28-3901(6).

789.    The CPPA declares several specific actions to be unlawful, including to: (d) "represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another." (e) "misrepresent as to a material fact which has a tendency to mislead," (f) "fail to state a material fact if such failure tends to mislead," (h) "advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered," and (i) "advertise or offer goods or services without supplying reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition which has no tendency to mislead."

790.    In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiff and D.C. Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[246]

791.    At no time did PHEAA notify Plaintiff and D.C. Class that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms under the PSLF and TEACH

---

[246] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

792.     PHEAA thus violated the CPPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiff and D.C. Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiff did in fact rely on such deceptive acts or practices described herein.

793.     By failing to carry out its federal loan programs as advertised, PHEAA created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiff and the D.C. Class Members specifically, in violation of CPPA.

794.     PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

795.     Plaintiff and D.C. Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiff and D.C. Class Members qualified for loan forgiveness, causing Plaintiff and the D.C. Class to incur additional payment obligations before the end of their loan terms.

796.     Additionally, Plaintiff and D.C. Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiff and D.C.

Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

797. PHEAA's violations present a continuing risk to Plaintiffs, D.C. Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

798. Plaintiffs and D.C. Class Members seek all monetary and non-monetary relief allowed by law, including treble damages or $1,500, whichever is greater; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the CPPA.

799. Plaintiff and the D.C. Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the D.C. Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

800. Plaintiff and the D.C. Class Members also seek punitive damages against PHEAA because PHEAA's conduct evidences malice and/or egregious conduct.

## COUNT 18 - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. § 501.201 *et seq.*

### (Against PHEAA)

801. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

802.     Plaintiffs Michael Asby and Adele S. Turnage (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Florida Class against PHEAA. Plaintiffs' injuries and those of the Florida Class arise from PHEAA's violation of Florida's Deceptive and Unfair Trade Practices Act (for the purposes of this section, "FDUTPA") as a commercial student loan servicer.

803.     Plaintiffs and Florida Class Members are "consumers" within the meaning of FDUTPA, Fla. Stat. § 501.203(7).

804.     PHEAA's student loan servicing business qualifies as a "trade or commerce" as defined by Fla. Stat. § 501.203(8).

805.     The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

806.     In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Florida Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[247]

---

[247] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last visited Oct. 23, 2019).

807.     At no time did PHEAA notify Plaintiffs and Florida Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

808.     PHEAA thus violated the FDUTPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and Florida Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

809.     By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the Florida Class Members specifically, in violation of FDUTPA.

810.     PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

811.     Plaintiffs and Florida Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiffs and Florida Class Members qualified for loan forgiveness, causing Plaintiffs and the Florida Class to incur additional payment obligations before the end of their loan terms.

812.     Additionally, Plaintiffs and many Florida Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and Florida Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

813.     PHEAA's violations present a continuing risk to Plaintiffs, Florida Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

814.     Plaintiffs and Florida Class Members seek all monetary and non-monetary relief allowed by law; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the FDUTPA.

815.     Plaintiffs and the Florida Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Florida Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute

false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 19 - VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFDBPA"), 815 ILCS 505/2

### (Against PHEAA)

816.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

817.     Plaintiffs Jacquelynn Charles, Megan Musser, Stacey Puccini, and Hannah Rockwell (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Illinois Class against PHEAA. Plaintiffs' injuries and those of the Illinois Class arise from PHEAA's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (for the purposes of this section, "ICFDBPA") as a commercial student loan servicer.

818.     PHEAA, Plaintiffs, and the Illinois Class Members are "persons" within the meaning of 815 ILCS 505/1(c).

819.     The federal student loan services that PHEAA provides is "merchandise" within the meaning of 815 ILCS 505/1(b).

820.     Plaintiffs and the Illinois Class Members are "consumers" within the meaning of 815 ILCS 505/1(e).

821.     PHEAA's student loan servicing business qualifies as a "trade" or "commerce" as defined by 815 ILCS 505/1(f).

822. The ICFDBPA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of any trade or commerce…whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

823. In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Illinois Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[248]

824. At no time did PHEAA notify Plaintiffs and Illinois Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower

---

[248] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last visited Oct. 23, 2019).

account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

825.     PHEAA thus violated the ICFDBPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and Illinois Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

826.     By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the Illinois Class Members specifically, in violation of ICFDBPA.

827.     PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

828.     Plaintiffs and Illinois Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiffs and Illinois Class Members qualified for

loan forgiveness, causing Plaintiffs and the Illinois Class to incur additional payment obligations before the end of their loan terms.

829.    Additionally, Plaintiffs and many Illinois Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and Illinois Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

830.    PHEAA's violations present a continuing risk to Plaintiffs, Illinois Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

831.    Plaintiffs and Illinois Class Members seek all monetary and non-monetary relief allowed by law, including punitive damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the ICFDBPA.

832.    Plaintiffs and the Illinois Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Illinois Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 20 - VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT, Kan. State. Ann. § 50-623, *et seq.*

### (Against PHEAA)

833. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

834. Plaintiff Lindsey Jones (for the purpose of this section, "Plaintiff") brings this action on behalf of herself and the Kansas Class against PHEAA. Plaintiff's injuries and those of the Kansas Class arise from PHEAA's violation of the Kansas Consumer Protection Act (for the purposes of this section, "KCPA") as a commercial student loan servicer.

835. Plaintiff, the Kansas Class Members, and PHEAA are each a "person" under the KCPA. Kan. Stat. Ann. § 50-624(i).

836. Plaintiff and the Kansas Class Members are "consumers" as defined by the CPA. Kan. Stat. Ann. § 50-624(b).

837. The federal student loan services that PHEAA provides are "services" within the meaning of the KCPA. Kan. Stat. Ann. § 50-624(k).

838. The KCPA declares several specific actions to be unlawful, including the use of representations that: "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have," "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation," "(F) property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation," "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact," "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact," and "(6) offering

property or services without intent to supply reasonable, expectable public demand, unless the offer discloses the limitation," or engaging in any other unconscionable act or practice in connection with a consumer transaction." KCPA. Kan. Stat. Ann. §§ 50-626, -627.

839.    In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Kansas Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[249]

840.    At no time did PHEAA notify Plaintiff and Kansas Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information

---

[249] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

841. PHEAA thus violated the KCPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiff and Kansas Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

842. By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the Kansas Class Members specifically, in violation of the KCPA.

843. PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

844. Plaintiff and Kansas Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiffs and Kansas Class Members qualified for loan forgiveness, causing Plaintiff and the Kansas Class to incur additional payment obligations before the end of their loan terms.

845. Additionally, Plaintiff and many Kansas Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned

loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and Kansas Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

846.     PHEAA's violations present a continuing risk to Plaintiff, Kansas Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

847.     Plaintiff and Kansas Class Members seek all monetary and non-monetary relief allowed by law, including statutory damages in the amount of $10,000 for each plaintiff; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the CPA.

848.     Plaintiff and the Kansas Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Kansas Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 21 - VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, Md. Com. Law Code Ann § 13-101 *et seq.*)

### (Against PHEAA)

849.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

850.     Plaintiffs Yannet Lathrop (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves and the Maryland Class against PHEAA. Plaintiff's injuries and those of the Maryland Class arise from PHEAA's violation of Maryland's Consumer Protection Act (for the purposes of this section, "MCPA") as a commercial student loan servicer

851.     Plaintiff, the Maryland Class Members, and PHEAA are each a "person" within the meaning of MCPA. Md. Com. Law Code Ann. § 13-101(h).

852.     PHEAA's student loan servicing business qualifies as a "service" as defined by Md. Com. Law Code Ann. § 13-101(j).

853.     Plaintiff and the Maryland Class Members are each a "consumer" within the meaning of CPA. Md. Com. Law Code Ann. § 13-101(c).

854.     PHEAA is a "merchant" as defined by Md. Com. Law Code Ann. § 13-101(g).

855.     The MCPA declares several specific actions to be "unfair or deceptive," including: "(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," representations that "(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have," or "(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not," "(3) Failure to state a material fact if the failure deceives or tends to deceive;" and "(5) Advertisement or offer of consumer goods, consumer realty, or consumer services: (i) Without intent to sell, lease, or rent them as advertised or offered; or (ii) With intent not to supply reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition." Md. Com. Law Code Ann. § 13-301.

856. In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Maryland Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[250]

857. At no time did PHEAA notify Plaintiff and Maryland Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms

---

[250] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last visited Oct. 23, 2019).

under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

858.    PHEAA thus violated the MCPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiff and Maryland Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

859.    By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiff and the Maryland Class Members specifically, in violation of the MCPA.

860.    PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

861.    Plaintiff and Maryland Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiff and Maryland Class Members qualified for loan forgiveness, causing Plaintiffs and the Maryland Class to incur additional payment obligations before the end of their loan terms.

862.    Additionally, Plaintiff and many Maryland Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus,

Plaintiff and Maryland Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

863.     PHEAA's violations present a continuing risk to Plaintiff, Maryland Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

864.     Plaintiff and Maryland Class Members seek all monetary and non-monetary relief allowed by law; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the CPA.

865.     Plaintiff and the Maryland Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Maryland Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 22 - VIOLATION OF MASSACHUSETTS'S CONSUMER PROTECTION LAW, M.G.L.A 93A § 1 *et seq.*

### (Against PHEAA)

866.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

867.     Plaintiff Maggie Webb (for the purpose of this section, "Plaintiff") bring this action on behalf of themselves and the Massachusetts Class against PHEAA. Plaintiff's injuries

and those of the Massachusetts Class arise from PHEAA's violation of the Massachusetts

Consumer Protection Law (for the purposes of this section, "Chapter 93A") as a commercial

student loan servicer.

868.    Plaintiff, Massachusetts Class Members, and PHEAA are each a "person" as

meant by Chapter 93A. M.G.L.A. 93A § 1(a).

869.    PHEAA's student loan servicing business qualifies as a "trade" or "commerce" as

defined by Chapter 93A. M.G.L.A. 93A § 1(b).

870.     Chapter 93A makes it unlawful to engage in any "unfair or deceptive acts or

practices in the conduct of any trade or commerce." M.G.L.A. 93A § 2(a).

871.    In the course of its business, PHEAA concealed and suppressed material facts

concerning the commercial student loan services it provided Plaintiff and Massachusetts Class

Members. PHEAA accomplished this by representing, for example and without limitation, that it

"best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and

[their] situation." PHEAA also represented, for example, that its "ability to address [borrowers']

concerns will be based on – and in some cases limited by – " three factors: (1) "applicable

federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or

promissory note," and (3) "lender policies and guidelines."[251]

872.    At no time did PHEAA notify Plaintiff and Massachusetts Class Members that its

ability to "best serve" their needs would also be undermined by its own insufficient, unfair,

and/or fraudulent practices and procedures, including for example and without limitation,

PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF,

---

[251] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under IDR Plans at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

873. PHEAA thus violated Chapter 93A by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and Massachusetts Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

874. By failing to carry out its federal loan programs as advertised, PHEAA also intentionally created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiff and the Massachusetts Class Members specifically, in violation of Chapter 93A.

875. PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

876. Plaintiff and Massachusetts Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Plaintiff and Massachusetts Class Members qualified for loan forgiveness, causing Plaintiff and the Massachusetts Class to incur additional payment obligations before the end of their loan terms.

877. Additionally, Plaintiff and many Massachusetts Class Members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiff and Massachusetts Class Members were required to continuing having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

878. PHEAA's violations present a continuing risk to Plaintiff, Massachusetts Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

879. Plaintiff and Massachusetts Class Members seek all monetary and non-monetary relief allowed by law, including double or treble damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under Chapter 93A.

880. Plaintiff and the Massachusetts Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Massachusetts Class will be irreparably

harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 23 - VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT, Mo. Rev. Stat. § 407.010, *et seq.*

### (Against PHEAA)

881.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

882.    Plaintiff Brittany King (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves and the Missouri Class against PHEAA. Plaintiff's injuries and those of the Missouri Class arise from PHEAA's violation of the Missouri Merchandising Practice Act (for the purposes of this section, "MPA") as a commercial student loan servicer.

883.    Plaintiff, the Missouri Class, and PHEAA are each a "person" within the meaning of the MPA. Mo. Rev. Stat. § 407.010(5).

884.    PHEAA engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

885.    The MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

886.    In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiff and Missouri Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[252]

887.    At no time did PHEAA notify Plaintiff and Missouri Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms

---

[252] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

888.    PHEAA thus violated the MPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiff and Missouri Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

889.    By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiff and the Missouri Class Members specifically, in violation of the MPA.

890.    PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

891.    Plaintiffs and Missouri Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiff and Missouri Class Members qualified for loan forgiveness, causing Plaintiff and the Missouri Class to incur additional payment obligations before the end of their loan terms.

892.    Additionally, Plaintiff and many Missouri Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus,

Plaintiffs and Missouri Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

893. PHEAA's violations present a continuing risk to Plaintiff, Missouri Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

894. Plaintiff and Missouri Class Members seek all monetary and non-monetary relief allowed by law; punitive damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the MPA.

895. Plaintiff and the Missouri Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Missouri Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 24 - VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT, N.J. Stat. Ann. § 56:8-1 *et seq.*)

### (Against PHEAA)

896. Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

897. Plaintiffs Seniqua Johnson, Amanda Leone, and Jamie Coleman a/k/a Jamie McFarland (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves

and the New Jersey Class against PHEAA. Plaintiffs' injuries and those of the New Jersey Class arise from PHEAA's violation of New Jersey's Consumer Fraud Act (for the purposes of this section, "NJCFA") as a commercial student loan servicer.

898.    PHEAA, Plaintiffs, and the New Jersey Class Members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

899.    PHEAA's student loan servicing business qualifies as a "sale" of "merchandise" as those terms are defined by N.J. Stat. Ann. §§ 56:8-1(c) and (e).

900.    The NJCFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

901.    In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and New Jersey Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable

federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[253]

902. At no time did PHEAA notify Plaintiffs and New Jersey Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; and (g) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

903. PHEAA thus violated the NJCFA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and New Jersey Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

---

[253] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

904. By failing to carry out its federal loan programs as advertised, PHEAA also created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the New Jersey Class Members specifically, in violation of the NJCFA.

905. PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

906. Plaintiffs and New Jersey Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, increased interest, and extended time until Plaintiffs and New Jersey Class Members qualified for loan forgiveness, causing Plaintiffs and the New Jersey Class to incur additional payment obligations before the end of their loan terms.

907. Additionally, Plaintiffs and many New Jersey Class Members often had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and New Jersey Class Members were required to continue having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

908. PHEAA's violations present a continuing risk to Plaintiffs, New Jersey Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

909. Plaintiffs and New Jersey Class Members seek all monetary and non-monetary relief allowed by law, including treble damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the NJCFA.

910.     Plaintiffs and the New Jersey Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the New Jersey Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 25 - VIOLATION OF N.Y. GEN. BUS. LAW § 349 *et seq.*

### (Against PHEAA)

911.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

912.     Plaintiffs Katherine Wardlow and Laura Brady, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the New York Class against PHEAA. Plaintiffs' injuries and those of the New York Class arise from PHEAA's violation of New York's Gen. Bus. Law § 349 (for the purposes of this section, "GBL § 349") as a commercial student loan servicer

913.     Plaintiffs, New York Class Members, and PHEAA are "persons" within the meaning of GBL § 349(h).

914.     PHEAA's actions as set forth herein occurred in the conduct of trade or commerce under GBL § 349.

915. GBL § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

916. In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and New York Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[254]

917. At no time did PHEAA notify Plaintiffs and New York Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including

---

[254] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under IDR Plans at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

918.    PHEAA thus violated GBL § 349 by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and New York Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

919.    By failing to carry out its federal loan programs as advertised, PHEAA also intentionally created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the New York Class Members specifically, in violation of GBL § 349.

920.    PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

921.    Plaintiffs and New York Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Plaintiffs and New York Class Members qualified for loan forgiveness, causing Plaintiffs and the New York Class to incur additional payment obligations before the end of their loan terms.

922.    Additionally, Plaintiffs and many New York Class Members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and New York Class Members were required to continuing having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

923.    PHEAA's violations present a continuing risk to Plaintiffs, New York Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

924.    Plaintiffs and New York Class Members seek all monetary and non-monetary relief allowed by law, including treble damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under GBL § 349.

925.    Plaintiffs and the New York Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the New York Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 26 - VIOLATION OF OREGON'S UNLAWFUL TRADE PRACTICES ACT, Or. Rev. Stat. § 646.605 et *seq.*

### (Against PHEAA)

926.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

927.    Plaintiffs Nichole Wolff and Heather Pruess (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Oregon Class against PHEAA. Plaintiffs' injuries and those of the Oregon Class arise from PHEAA's violation of Oregon's Unlawful Trade Practices Act (for the purposes of this section, "OUTPA") as a commercial student loan servicer.

928.    PHEAA, Plaintiffs, and the Oregon Class Members are each a person within the meaning of Or. Rev. Stat. § 646.605(4).

929.    PHEAA was and is engaged in "'trade and commerce'" within the meaning of Or. Rev. Stat. § 646.605(8).

930.    The OUTPA declares several specific actions to be an "unlawful trade practice," including a person who: "(g) Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or services are of another," "(q) Promises to deliver real estate, goods or services within a certain period of time with intent not to deliver the real estate, goods or services as promised," "(t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity," and "(u) Engages in any other unfair or deceptive conduct in trade or commerce."

931.    In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Oregon Class

Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[255]

932. At no time did PHEAA notify Plaintiffs and Oregon Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under IDR Plans at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in

[255] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

## COUNT 27 - VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Stat. Ann. § 201-1 *et seq.*)

### (Against PHEAA)

933.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

934.    All Plaintiffs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves, the Nationwide Class, and the Pennsylvania Class (Plaintiffs Adam Morris, Mark Hawkins, Nathan Harig, Meagan Pryor) against PHEAA. Plaintiffs' injuries and those of the Nationwide Class and Pennsylvania Class arise from PHEAA's violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (for the purposes of this section, "UTPCPL") as a commercial student loan servicer.

935.    Plaintiffs, Nationwide Class Members, Pennsylvania Class Members, and PHEAA are "persons" within the meaning of 73 P.S. § 201-2(2).

936.    PHEAA is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

937.    The Pennsylvania UTPCPL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 7.3 P.S. § 201-3.

938.    In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Pennsylvania Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers']

224

concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[256]

939. At no time did PHEAA notify Plaintiffs and Pennsylvania Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under IDR Plans at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

940. PHEAA thus violated the Pennsylvania UTPCPL by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

---

[256] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

omission of any material fact with the intent that Plaintiffs and Pennsylvania Class Members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

941.    By failing to carry out its federal loan programs as advertised, PHEAA also intentionally created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the Pennsylvania Class Members specifically, in violation of Pennsylvania UTPCPL.

942.    PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

943.    Based on the forgoing, PHEAA also violated the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), *see* 73 Pa. Stat. Ann. § 2270.5(a), by engaging in false, deceptive, and misleading representations and means, and unfair and unconscionable means in connection with the collection of alleged debts. See 73 Pa. Stat. Ann. § 2270.4(b)(5) and (6).

944.    PHEAA is a "creditor" and Plaintiff is a "consumer" under the FCEUA. *See* 73 Pa. Stat. Ann. § 2270.3. Plaintiff has suffered ascertainable loss as a result of PHEAA's violations of the FCEUA, which constitutes a violation of the UTPCPL

945.    Plaintiffs and Pennsylvania Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Plaintiffs and Pennsylvania Class Members qualified for loan forgiveness, causing Plaintiffs and

the Pennsylvania Class to incur additional payment obligations before the end of their loan terms.

946.    Additionally, Plaintiffs and many Pennsylvania Class Members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and Pennsylvania Class Members were required to continuing having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

947.    PHEAA's violations present a continuing risk to Plaintiffs, Pennsylvania Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

948.    Plaintiffs and Pennsylvania Class Members seek all monetary and non-monetary relief allowed by law; punitive damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the Pennsylvania UTPCPL.

949.    Plaintiffs and the Pennsylvania Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Pennsylvania Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## COUNT 28 - VIOLATION OF WASHINGTON'S CONSUMER PROTECTION ACT, Wash. Rev. Code § 19.86.010 *et seq.*

### (Against PHEAA)

950.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

951.     Plaintiffs Arielle M. Anderson and Shon Meckfessel (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves and the Washington Class against PHEAA. Plaintiffs' injuries and those of the Washington Class arise from PHEAA's violation of Washington's Consumer Protection Act (for the purposes of this section, "WCPA") as a commercial student loan servicer.

952.     Plaintiffs, the Washington Class Members, and PHEAA are each a "person" within the meaning of the WCPA. Wash. Rev. Code. Ann. § 19.96.010(1).

953.     PHEAA was and is engaged in "'trade' and 'commerce'" within the meaning of Wash. Rev. Code. Ann. § 19.96.010(2).

954.     The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code. Ann. § 19.96.020.

955.     In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Washington Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable

federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[257]

956.    At no time did PHEAA notify Plaintiffs and Washington Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR Plans, including REPAYE, within the necessary fifteen day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under IDR Plans at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH Grants being incorrectly converted into TEACH Loans, respectively.

957.    PHEAA thus violated the WCPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and Washington Class Members rely upon such

---

[257] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

958.    By failing to carry out its federal loan programs as advertised, PHEAA also intentionally created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the Washington Class Members specifically, in violation of WCPA.

959.    PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, state and federal investigations have brought PHEAA's deceptive acts and practices to light.

960.    Plaintiffs and Washington Class Members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Plaintiffs and Washington Class Members qualified for loan forgiveness, causing Plaintiffs and the Washington Class to incur additional payment obligations before the end of their loan terms.

961.    Additionally, Plaintiffs and many Washington Class Members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and Washington Class Members were required to continuing having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

962.    PHEAA's violations present a continuing risk to Plaintiffs, Washington Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

963. Plaintiffs and Washington Class Members seek all monetary and non-monetary relief allowed by law, including treble damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the WCPA.

964. Plaintiffs and the Washington Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Washington Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH Grant, and IDR programs. Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms consumers and directly conflicts PHEAA's representations as serving the best interests of borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines, as detailed more fully herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes pray that the Court:

A. Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs as Class Representatives and Laura K. Mummert of Lowey Dannenberg, P.C. and Gary F. Lynch of Carlson Lynch, LLP as Co-Lead Class Counsel;

B. Declare that the Department's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA;

C. Setting aside the Department's alleged actions;

D. Granting preliminary and permanent injunctive relief;

E. Issue an order declaring PHEAA's conduct as alleged herein is unlawful;

F.     Issue an order enjoining PHEAA from continuing the unlawful practices alleged in this Complaint;

G.     Enter judgment for the damages sustained by Plaintiffs and members of the Classes and Subclasses defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages, statutory damages and/or punitive damages;

H.     Issue an order requiring PHEAA to institute a corrective review process to remedy PHEAA's wrongful conduct;

I.     Award Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

J.     Award Plaintiffs and Class Members their reasonable attorney's fees and costs; and

K.     Award such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a jury trial on all matters so triable.

Dated: November 11, 2019

Respectfully submitted,

**LOWEY DANNENBERG, P.C.**

/s/ Laura K. Mummert

Laura K. Mummert (PA ID 85964)
Anthony M. Christina (PA ID 322528)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
lmummert@lowey.com
achristina@lowey.com

*Co-Lead Counsel for Plaintiffs*

Roland St. Louis III
**LOWEY DANNENBERG, P.C.**
44 S. Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
rstlouis@lowey.com

*Executive Committee Member*

Bryan L. Bleichner
**CHESTNUT CAMBRONNE PA**
17 Washington Avenue North - Suite 300
Minneapolis, MN 55401
Tel: (612) 339-7300
bbleichner@chestnutcambronne.com

*Executive Committee Member*

Troy J. Doucet
**DOUCET GERLING CO., L.P.A.**
700 Stonehenge Parkway, 2B
Dublin, OH 43017
Tel: (614) 944-5219
Troy@Doucet.Law

*Executive Committee Member*

**CARLSON LYNCH, LLP**

/s/ Gary F. Lynch

Gary F. Lynch (PA ID 56887)
Kevin W. Tucker (PA ID 312144)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
glynch@carlsonlynch.com
ktucker@carlsonlynch.com

*Co-Lead Counsel for Plaintiffs*

Karen H. Riebel
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
khriebel@locklaw.com

*Executive Committee Member*

Brian C. Gudmundson
**ZIMMERMAN REED LLP**
1100 IDS Center 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 341-0400
brian.gudmundson@zimmreed.com

*Executive Committee Member*

Brandon Wise
**PEIFFER WOLF CARR & KANE, APLC**
818 Lafayette Avenue, Floor 2
St. Louis, MO 63104
Tel: (314) 833-4825
bwise@pwcklegal.com

*Executive Committee Member*