# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| *IN RE: FEDLOAN STUDENT LOAN SERVICING LITIGATION* | MDL Docket No. 18-2833 (ALL CASES)<br><br>HON. C. DARNELL JONES, II<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY'S MOTION TO <u>DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 3

       A.    The Higher Education Act and Federal Financial Aid Programs. ........................ 3

       B.    The Department Delegates Its Loan Servicing Functions to PHEAA .................. 4

       C.    Defendants Fail to Comply with Certain Statutes, Regulations, and Rules
             Governing the Programs at Issue. ............................................................ 6

             1.    The TEACH Grant Program and the TEACH Plaintiffs ........................... 6

             2.    IDR Plans for FFEL and Direct Loans and the IDR Plaintiffs ................. 8

             3.    The PSLF Program and the PSLF Plaintiffs ........................................ 14

III.   LEGAL STANDARD ........................................................................................ 17

       A.    Subject-Matter Jurisdiction .................................................................. 17

       B.    Failure to State a Claim ....................................................................... 18

IV.    ARGUMENT ..................................................................................................... 19

       A.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED
             BY THE HIGHER EDUCATION ACT ................................................. 19

             1.    The Starting Point Is a Presumption Against Preemption ..................... 20

             2.    Plaintiffs' Claims Are Not Expressly Preempted ................................ 22

             3.    Conflict Preemption Does Not Apply ............................................... 25

             4.    The Department's "Guidance" Deserves No Deference ......................... 27

       B.    PHEAA IS NOT ENTITLED TO DERIVATIVE
             SOVEREIGN IMMUNITY .................................................................. 29

             1.    Derivative Sovereign Immunity Is Not a Jurisdictional Issue ............... 30

             2.    Plaintiffs' Claims Arise from PHEAA's Failure to
                   Service Federal Student Loans as "Authorized and Directed"
                   by the Federal Government. ........................................................... 31

       C.    THE COURT HAS SUBJECT-MATTER JURISDICTION
             OVER PLAINTIFFS' CLAIMS. ........................................................... 34

|  |  | 1. | PSLF Plaintiffs Have Standing. | 34 |
|---|---|---|---|---|
|  |  | 2. | The PSLF Claims Are Ripe. | 39 |
|  |  | 3. | Plaintiffs Have Standing to Bring Claims Under Each Jurisdiction. | 41 |

D. PLAINTIFFS ADEQUATELY ALLEGE A CLAIM FOR BREACH OF CONTRACT UNDER FEDERAL COMMON LAW ... 42

    1. PHEAA Breached Core Terms of the Servicing Contract. ... 42

    2. Plaintiffs Are Intended Third-Party Beneficiaries of the Servicing Contract. ... 43

    3. Plaintiffs Adequately State an Alternative Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing. ... 46

E. PLAINTIFFS SUFFICIENTLY ALLEGE STATE COMMON LAW CLAIMS FOR UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE FRAUD, NEGLIGENCE, NEGLIGENT MISREPRESENTATION, AND NEGLIGENCE *PER SE* ... 49

    1. Pennsylvania Law Applies to Plaintiffs' State Common Law Claims (Counts 9–14) ... 49

    2. Plaintiffs Have Stated a Claim for Unjust Enrichment. ... 52

    3. Plaintiffs Sufficiently Allege Facts Supporting a Fiduciary Relationship Between PHEAA and Plaintiffs ... 54

    4. PHEAA Owed A Duty of Reasonable Care to Borrowers Even If It Was Not a Fiduciary ... 58

    5. Plaintiffs State A Claim for Negligence *Per Se* ... 60

F. PLAINTIFFS SUFFICIENTLY ALLEGE CONSUMER PROTECTION CLAIMS. ... 62

    1. Plaintiffs Have Satisfied Any Notice Requirements. ... 62

    2. Plaintiffs Stated Claims Under the Kansas, District of Columbia, and California Consumer Protection Statutes ... 64

    3. Plaintiffs Stated a Claim Under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). ... 67

G. PLAINTIFFS PLEADED THEIR NEGLIGENT MISREPRESENTATION, CONSTRUCTIVE FRAUD, AND CONSUMER PROTECTION CLAIMS WITH SUFFICIENT PARTICULARITY ... 67

V.      REQUEST FOR LEAVE TO AMEND..............................................................................68

VI.     CONCLUSION.....................................................................................................................69

# TABLE OF AUTHORITIES

## Cases

*Ackerson v. Bean Dredging LLC*, 589 F.3d 196 (5th Cir. 2009) ............................................. 31, 34

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641 (6th Cir. 2015) ............................................ 31

*Adler v. Vision Lab Telecommns., Inc.*, 393 F. Supp. 2d 35 (D.D.C. 2005) ................................ 65

*Aetna, Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541 (E.D. Pa. 2018) ....................... 53, 54

*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va.) ................................. 32

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 18, 19

*Basile v. H & R Block, Inc.*, 777 A.2d 95 (Pa. Super. Ct. 2001) ................................................. 55

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 18

*Bell v. Blue Cross & Blue Shield*, 823 F.3d 1198 (8th Cir. 2016) ......................................... 20, 21

*Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005) ..................... 59

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247 (3d Cir. 2014) .................................................. 35

*Brand Marketing Group LLC v. Intertek Testing Services, N.A., Inc.*,
   801 F.3d 347 (3d Cir. 2015) ................................................................................................. 59

*Brooks v. Conston*, 51 A.3d 684 (Pa. 1947) ............................................................................... 55

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ......................................................... 30, 31

*Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. 1993) ........................................................... 31

*Carrick v. Zurich-American Ins. Group*, 14 F.3d 907 (3d Cir. 1994) ......................................... 51

*CEC Energy Co. v. Pub. Serv. Comm'n of Virgin Islands*, 891 F.2d 1107 (3d Cir. 1989).......... 41

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ......................................................... 22, 25, 26

*Chesney v. Tennessee Valley Auth.*, 782 F. Supp. 2d 570 (E.D. Tenn. 2011) ............................. 34

*Cipollone v. Liggett Group*, 505 U.S. 504 (1992) ......................................................... 23, 25, 26

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................................. 35, 38

iv

*ClubCom, Inc. v. Captive Media, Inc.*, Civ. A. No. 07-1462,
2009 WL 249446 (W.D. Pa. Jan. 31, 2009) .............................................................. 52

*CNA v. United States*, 535 F.3d 132 (3d Cir. 2008) ..................................................... 18

*Com. ex rel. Pappert v. TAP Pharm. Prod., Inc.*, 885 A.2d 1127 (Pa. 2005) ........................ 52, 54

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014) ...................... 36, 38

*Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-CV-101,
2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) ................................................................ 61, 68

*Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002 (N.D. Cal. 2009) ......................... 66

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640 (4th Cir.) ................................ 33

*Daniel v. Navient Sols., LLC*, 328 F. Supp. 3d 1319 (M.D. Fla. 2018) .......................... 22, 25, 55

*Davis v. Navient Corp.*, No. 17-CV-00992-LJV-JJM,
2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018) .............................................................. 23

*DFP Mfg. Corp. v. Northrop Grumman Corp.*, No. 97-CV-4494,
1999 WL 33458384 (E.D.N.Y. Mar. 23, 1999) ............................................................. 45

*Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018) ............................................................. 59

*Educ. Corp. of Am. v. United States Dep't of Educ.*, No. 2:18-cv-01698,
2018 WL 5786077 (N.D. Ala. Nov. 5, 2018) ................................................................ 38

*Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010) ..................................................... 27

*Fisher v. Great Socialist People's Libyan Arab Jamahiriya*,
541 F. Supp. 2d 46 (D.D.C. 2008) ............................................................................ 49

*Flexfab LLC v. United States*, 424 F.3d 1254 (Fed. Cir. 2005) ...................................... 43, 45

*Foman v. Davis*, 371 U.S. 178, 182 (1962) ................................................................. 69

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ............................................. 18, 19

*Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149 (3d Cir. 2016) .............. 37

*Gen. Motors Corp. v. Abrams*, 897 F.2d 34 (2d Cir. 1990) ............................................... 21

*Genna v. Sallie Mae, Inc.*, 2012 WL 1339482 (S.D.N.Y. Apr. 16, 2012) ................................ 23

*Gills v. Respond Power, LLC*, No. 14-cv-3856,
2018 WL 3427636 (E.D. Pa. July 16, 2018)...............................................48

*Glob. Ground Support, LLC v. Glazer Enters., Inc.*,
581 F. Supp. 2d 669 (E.D. Pa. 2008) ........................................................53

*Griffith v. United Air Lines, Inc.*, 203 A.2d 796 (1964) ..............................52

*Harper v. LG Elecs. USA, Inc.*, 595 F.Supp.2d 486 (D.N.J. 2009) ............50

*Harris v. Kellogg, Brown & Roots Servs*, No. 08-cv-563,
2016 WL 4720058 (W.D. Pa. Sept. 9, 2016).............................................31

*Hassett v. Dafoe*, 74 A.3d 202 (Pa. Super. Ct. 2013) ..................................62

*Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015) .....................20, 21

*Humphreys v. Budget Rent a Car Sys. Inc.*, No. 10-cv-1302,
2014 WL 1608391 (E.D. Pa. Apr. 22, 2014) .............................................48

*Hyland v. Navient Corp.*, No. 18-cv-9031 (DLC),
2019 WL 2918238 (S.D.N.Y. July 8, 2019) ........................................23, 45

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ........................................28

*In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159 (S.D. Cal. 2010) ....63

*In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718 (E.D.N.Y. 1986) ......................50

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014)....................34

*In re Liquid Aluminum Sulfate Antitrust Litig.*, No. CV 16-MD-2687,
2017 WL 3131977 (D.N.J. July 20, 2017)..................................................41

*In re New Jersey Title Ins. Litig.*, 683 F.3d 451 (3d Cir. 2012)...................37

*In re Niaspan Antitrust Litigation*, 42 F. Supp. 3d 735 (E.D. Pa. 2014) ....42

*In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133 (E.D. La. 2002)...........50

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)......................................................................41

*In re Samsung DIP Television Class Action Litig.*, No. 07–2141,
2009 WL 3584352 (D.N.J. Oct. 27, 2009)..................................................50

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012)............................................................ 64

*In re Thalomid & Revlimid Antitrust Litig.*, No. CV 14-6997,
    2015 WL 9589217 (D.N.J. Oct. 29, 2015)..................................................... 41

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019)......................................................................... 30

*In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F. 3d 71 (3d Cir. 2017) ................................... 21

*In re Wellbutrin XL Antitrust Litigation*, 260 F.R.D. 143 (E.D. Pa. 2009) .......................... 42, 49

*Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 310 F.R.D. 166 (E.D. Pa. 2015) ..................... 54

*Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421 (E.D. Pa. 2015).......................................... 47

*Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222 (9th Cir. 1994) ................................................ 22

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ..................................................... 50

*Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1 (D.D.C. 2019).......................................................... 65

*Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs., Inc.*,
    853 F.3d 173 (5th Cir. 2017) ........................................................................ 30

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908 (11th Cir. 2020).............. passim

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 17-cv-0252,
    2018 WL 5621872 (N.D. Fla. Sept. 20, 2018)............................................. 25

*Leveto v. Lapina*, 258 F.3d 156 (3d Cir. 2001).......................................................................... 31

*Love v. PHEAA*, No. 19-cv-2387, 2020 WL 1545798 (N.D. Ga. Mar. 16, 2020) ....................... 38

*Mahan v. Am-Gard, Inc.*, 841 A.2d 1052 (Pa. Super. Ct. 2003)................................................ 60

*Mansoor Int'l Dev. Servs., Inc. v. United States*, 121 Fed. Cl. 1 (Fed. Cl. 2015).................. 46, 47

*Maurer v. HMS Assocs. of New Jersey*, No. CV 17-3560 (JBS/JS),
    2018 WL 915123 (D.N.J. Feb. 15, 2018) ..................................................... 37

*McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804 (E.D. Pa. 2016)............................................ 68

*McTernan v. City of York*, 577 F.3d 521 (3d Cir. 2009)............................................................ 19

*Metcalf Const. Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014) .......................................... 46

*Montana v. United States*, 124 F.3d 1269 (Fed. Cir. 1997) .................................................... 43, 44

*Morgan v. AT&T Wireless Servs., Inc.*, 99 Cal. Rptr. 3d 768 (Cal. Ct. App. 2009)............... 63, 64

*Moronta v. Nationstar Mortg., LLC*, 64 N.E.3d 1287 (Sup. Ct. Mass. 2016) ............................ 63

*Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977)................................... 18

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ............................................... 39

*Nat'l Sur. Corp. v United States*, 31 Fed Cl. 565 (1994) ........................................................ 43, 45

*Nationwide Ins. Indep. Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co.*,
   518 F. App'x 58 (3d Cir. 2013) ................................................................................................ 37

*Nelson v. Great Lakes Educational Loan Servs., Inc.*, 928 F.3d 639 (7th Cir. 2019) ........... passim

*New York by James v. Pennsylvania Higher Educ. Assistance Agency*,
   No. 19 CIV. 9155 (ER), 2020 WL 2097640 (S.D.N.Y. May 1, 2020) ............................... passim

*New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*,
   651 F. Supp. 802 (S.D.N.Y. 1986)........................................................................................... 45

*Olsen v. Nelnet, Inc.*, 392 F. Supp. 3d 1006 (D. Neb. 2019) ...................................................... 68

*Ortiz v. Fibreboard*, 527 U.S. 815 (1999) ................................................................................... 42

*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development
   Commission*, 461 U.S. 190 (1983)........................................................................................... 41

*Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018) ................................. 21, 22

*Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019) ...................................... 35

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)......................................................... 18

*Reginella Const. Co. v. Travelers Cas. & Sur. Co. of Am.*,
   949 F. Supp. 2d 599 (W.D. Pa. 2013).................................................................................... 55

*Rocks v. Philadelphia*, 868 F.2d 644 (3d Cir. 1989)................................................................... 19

*Sammons v. Nat'l Comm'n on Certification of Physician Assistants, Inc.*,
   104 F. Supp. 2d 1379 (N.D. Ga. 2000) ................................................................................. 38

*Sanchez v. ASA College, Inc.*, No. 14-5006,
   2015 WL 3540836 (S.D.N.Y. June 5, 2015) ......................................................................... 28

*Scarpitti v. Weborg*, 609 A.2d 147 (Pa. 1992) .................................................................. 46, 47

*Schuerman v. United States*, 30 Fed. Cl. 420 (1994) ....................................................... 45

*Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98 (D.D.C. 2017). ............................... 30, 34

*Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451 (E.D. Pa. 2009) ....................................... 68

*SEPTA v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688 (E.D. Pa. 2015) ............................................ 49

*Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016) ........................................... 20

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................................................ 27, 28, 29

*Sonoda v. Amerisave Mortg. Corp.*, No. 11-cv-1803,
    2011 WL 2690451 (N.D. Cal. July 8, 2011) ................................................................... 66

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .............................................................. 34

*Stanton v. Astra Pharmaceutical Prods., Inc.*, 718 F.2d 553 (3d Cir. 1983) ............................... 62

*Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26 (D.D.C. 2018) ......................... 22, 27, 28

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .................................................... 35

*Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131 (3d Cir. 1977) ......................... 50

*Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538 (E.D. Pa. 2014) ............................. 49

*Trupp v. Ally Fin., Inc.*, No. CV 17-5404-CDJ,
    2018 WL 2462777 (E.D. Pa. May 31, 2018) ................................................................. 17, 18

*United States v. Basin Elec. Power Co-op*, 248 F.3d 781 (8th Cir. 2001) ............................... 46, 47

*Univ. of Med. & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57 (3d Cir. 2003) ................... 39

*USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433 (3d Cir. 1993) ............................................ 48

*Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 220 (Pa. 2018) ................................ 62

*Watt v. Alaska*, 451 U.S. 259 (1981) ............................................................................ 28

*White v. U.S. Gov't Dep't of Treasury*, 969 F. Supp. 321 (E.D. Pa.) ...................................... 17

*William v. Ewen*, 634 P.2d 1061 (Kan. 1981) ................................................................ 64

*Winebarger v. PHEAA*, 411 F. Supp.3d 1070 (C.D. Cal. 2019) ............................................ 38

*Wong v. Navient*, No. 19-cv-1233, 2020 WL 978520 (W.D. Wash. Feb. 28, 2020) ................... 58

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................. 27

*Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940) ........................................ 30, 31

**Statutes**

20 U.S.C. § 1018 ..................................................................................... 3

20 U.S.C. § 1071 .................................................................................... 26

20 U.S.C. § 1078 ................................................................................. 23, 26

20 U.S.C. § 1083 ............................................................................... passim

20 U.S.C. § 1086 .................................................................................... 4

20 U.S.C. § 1087f ................................................................................... 4

20 U.S.C. § 1091a ............................................................................... 23, 26

20 U.S.C. § 1098g .............................................................................. passim

20 U.S.C. § 3472 .................................................................................... 4

California Legal Remedies Act, Cal. Civ. Code § 1782 ...................................... 63, 64, 66

Consumer Financial Protection Act ("CFPA") of 2010, 12 U.S.C. § 5481 ............................. 60

District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.* ....... 65

Kansas Consumer Protection Act, K.S.A. §§ 50-623, *et seq.* ...................................... 64

Massachusetts Consumer Protection Law, M.G.L. c. 93A § 9 ........................................ 62

**Other Authorities**

Federal Preemption and State Regulation of the Department of Education's
  Federal Student Loan Programs and Federal Student Loan Servicers,
  83 Fed. Reg. 10,619 (Mar. 12, 2018) ...................................................... 27, 28, 29

Policy Memo from Ted Mitchell, Under Secretary, U.S. Dept. of Educ., to James Runcie,
  Chief Operating Officer, Fed. Student Aid, July 20, 2016,
  as updated October 17, 2016 ................................................................ 9–10, 12

**Rules**

Fed. R. Civ. P. 9(b) .................................................................................... 2, 67, 68

Fed. R. Civ. P. 12(b)(1) ......................................................................... 1, 17, 18, 30

Fed. R. Civ. P. 15 ............................................................................................ 68

Fed. R. Civ. P. 23 ............................................................................................ 41

**Treatises**

5 Wright & Miller, *Federal Practice and Procedure* § 1253 (3d. ed. 2004) .............................. 49

Restatement (Second) Conflict of Laws, § 145 ................................................... 52

Restatement (Second) of Contracts, § 205 ................................................ 46, 47, 48

Restatement (Second) of Contracts, § 302 ................................................ 43, 44, 46

Restatement (Second) of Contracts, § 313 ................................................ 44, 45, 46

Restatement (Second) of Torts, § 285 ................................................................ 61

Restatement (Second) of Torts, § 286 ................................................................ 61

Restatement (Second) of Torts, § 552 ................................................................ 59

Restatement (Second) of Torts, § 874 ................................................................ 54

**Regulations**

34 C.F.R. § 682.203 ......................................................................................... 4

34 C.F.R. § 682.209 ......................................................................................... 4

34 C.F.R. § 682.211 ....................................................................................... 60

34 C.F.R. § 682.215 ......................................................................................... 4

34 C.F.R. § 685.208 ......................................................................................... 4

34 C.F.R. § 685.209 .................................................................................... 4, 9, 10

34 C.F.R. § 685.221 ...................................................................................... 9, 10

34 C.F.R. § 686.43 ....................................................................................... 6, 32

34 C.F.R. §§ 682.210-211 ................................................................................. 4

34 C.F.R. §§ 685.204-205 ............................................................................................ 4, 12

34 C.F.R. § 685.220 ................................................................................................... 4

**Constitutional Provisions**

U.S. Const. art. III ............................................................................... 1, 2, 34, 41

I.      INTRODUCTION

The federal financial aid system is failing its purpose – to serve the best interests of students and their families. Plaintiffs are a group of 33 individuals who obtained student loans or grants and participated in certain financial aid programs and/or repayment plans governed by Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1001 *et seq.* ("HEA"), specifically the TEACH Grant Program, Income-Driven Repayment ("IDR") Plans, and the Public Service Loan Forgiveness ("PSLF") Program. As alleged in detail in Plaintiffs' Consolidated Amended Class Action Complaint ("CAC"), the long-standing failures of Defendant, Pennsylvania Higher Education Assistance Agency, doing business as FedLoan Servicing (hereinafter, "PHEAA"),  to properly administer and service these programs has caused them significant financial harm.

Plaintiffs' claims against PHEAA include the following: breach of contract (Count 8); breach of fiduciary duty (Count 9); constructive fraud (Count 10); unjust enrichment (Count 11); negligence (Count 12); negligence *per se* (Count 13); negligent misrepresentation (Count 14), and violations of fourteen states' consumer protection statutes (Counts 15–28).

PHEAA has moved to dismiss under Rule 12(b)(1) on the basis of federal preemption, derivative sovereign immunity, and lack of Article III jurisdiction, and under Rule 12(b)(6) for failure to adequately plead the elements of each state law claim. As explained below, all of PHEAA's arguments for dismissal should be rejected.

This Court should apply the presumption against federal preemption to find that Plaintiffs' state law claims are not preempted by the HEA's express terms or under principles of conflict preemption. The HEA's preemptive effect is limited to state laws that impose "disclosure requirements," but Plaintiffs' claims arise out of PHEAA's affirmative misrepresentations and/or breaches of more generalized duties that govern conduct beyond

specific loan-related disclosures, such as duties of reasonable care, the duty not to deceive, or fiduciary duties. PHEAA's primary authorities with respect to its preemption argument have either been reversed or distinguished by more recent and persuasive opinions.

PHEAA is not entitled to derivative sovereign immunity because Plaintiffs' claims relate to conduct that was *not* specifically authorized by law or directed by the federal government, but rather conduct that actually violated the HEA, its implementing regulations, and PHEAA's servicing contract. The narrow doctrine of sovereign immunity does not apply in this context, or to claims of this nature.

Plaintiffs asserting claims related to the TEACH Grant and PSLF Programs have Article III standing and their claims are ripe for adjudication. PHEAA argues that the PSLF Plaintiffs do not have standing because they have not yet made the number of qualifying payments necessary for loan forgiveness. This argument misses the mark, as PHEAA has already miscounted the Plaintiffs' qualifying payments, and Plaintiffs' allegations are sufficient to establish that their harm is "imminent" or "certainly impending," and that the claims are ripe for adjudication.

As to PHEAA's Rule 12(b)(6) arguments, Plaintiffs allege facts that plausibly demonstrate that they can prove the elements of each claim, including the existence of the underlying duties, and PHEAA has not shown that these claims fail as a matter of law. PHEAA's argument for application of the heightened pleading standard of Rule 9(b) should also be rejected, as it has by numerous courts, because Plaintiffs' deception and misrepresentation-based claims do not sound in common law fraud or mistake.

For these reasons, and as detailed below, the Court should deny PHEAA's motion to dismiss in its entirety.

**II.      STATEMENT OF FACTS**

**A.      The Higher Education Act and Federal Financial Aid Programs.**

To make the cost of higher education more affordable for students who otherwise could not afford it, Congress established several federal financial aid programs under the HEA, including: the Federal Family Education Loan ("FFEL") Program (1965 – 2010), which provided private student loans subsidized and guaranteed by the U.S. government (¶ 257[1]); the Direct Loan Program (2010 – present), which provides student loans funded and owned by the U.S. Government (¶ 258), and the TEACH Grant Program (2007 – present), which provides grants to students who plan to become teachers in a high-need field in a low-income area. ¶ 299, 302-03. The terms of FFEL and Direct Loans are governed by a Master Promissory Note ("MPN") executed by the borrower. CAC, Exs. E and F. Key provisions of the MPN require the Department of Education ("the Department") to interpret the terms of the MPN "in accordance with the applicable federal statutes and regulations." ¶ 637, CAC, Ex. E at 2, 4, and Ex. F at 3-4.

The Department, through its Office of Federal Student Aid, is responsible for "manag[ing] the administrative and oversight functions" of the Title IV programs. ¶ 341 (citing 20 U.S.C. § 1018(a)(1)). These responsibilities include a statutory mandate to administer the Title IV programs to "ensure" their "integrity." 20 U.S.C. § 1018(b)(2)(A)(vi). Both Congress and the Department additionally have emphasized the need for these programs to "serve the best interests of students." ¶¶ 259–61, 328–35. For instance, the U.S. Senate Committee on Health, Education, Labor, and Pensions stated in its 2007 report on the HEA:

> The committee believes strongly that lenders, guaranty agencies and
> institutions of higher education must act with honesty and integrity

---

[1] Citations to the CAC will be cited herein as "¶ [___]".

3

> at all times to ensure that the financial aid programs under title IV
> *serve the best interests of students*.

¶ 259. Similarly, the Department echoed that objective in 2008, stating its "pledge to work with the student lending community in forward looking solutions to ensure FFEL Program and other student lending programs *serve the best interests of students* and taxpayers for years to come." ¶ 260.

This litigation specifically concerns: (1) the improper conversion of grants to loans under the TEACH Grant Program, (2) violations of certain provisions of the FFEL and Direct Loan Programs with respect to Income Driven Repayment Plans; and (3) erroneous Employment Certification Form determinations and denial of applications for loan forgiveness under the Direct Loan Program's Public Service Loan Forgiveness ("PSLF") Program.

## B. The Department Delegates Its Loan Servicing Functions to PHEAA

The HEA requires the Department, "to the extent practical," to contractually delegate its loan servicing functions to third parties for its Direct Loans, ¶ 342 (citing 20 U.S.C. § 1087f), and authorizes it to delegate its functions to third parties for FFEL loans. ¶ 342 (citing 20 U.S.C. § 1086(a)). As PHEAA duly notes, "federal regulations govern every aspect of federal loan servicing, including administration of loan repayment, 34 C.F.R. §§ 682.209, 685.208; IDR plans, *id*. §§ 682.215, 685.209; deferments and forbearances, *id*. §§ 682.210-211, 685.204-205; Direct Loan consolidation, *id*. § 685.220, and 'a carefully crafted disclosure regime specifying what information must be provided.'" PHEAA Br. at 8. Importantly, however, the delegation of loan servicing functions to PHEAA and other loan servicers does not "relieve the Secretary of responsibility for the administration of such functions." 20 U.S.C. § 3472; *see also* 34 C.F.R. § 682.203.

4

Since 2009, the Department has contracted with PHEAA as one of several loan servicers to service its FFEL and Direct Loans. ¶¶ 310, 314. In 2012 and 2013, the Department awarded PHEAA an exclusive contract to manage the PSLF and TEACH Grant Programs, respectively. ¶¶ 289, 300. PHEAA's loan servicing contract requires it to "maintain[] a full understanding of all federal and state laws and regulations and FSA requirements," "ensure[] that all aspects of the service continue to remain in compliance as changes occur," and maintain "procedures and systems," including "a system of internal controls that ensures resource use is consistent with laws, regulations and policies." ¶ 316; CAC, Ex.  C at 20 (Paragraph C.1.4.3).

Given the complexity of the FFEL and Direct Loan Programs, PHEAA (and other servicers) are required to provide borrowers with the necessary information to best manage their loans. ¶ 326. In fact, what the Department describes as a "borrower-centric approach" (¶ 331), instructs loan servicers to "[e]stablish a relationship with the borrower," "[e]ducate and inform borrowers regarding the tools and options available to assist them in the management of their student loans," and provide "information on repayment options that best meet the borrower's financial situation." ¶ 330. This aims to focus servicers on the Department's priorities: "effective counseling and outreach to ensure borrowers select the best repayment option for them." ¶ 329. PHEAA underscores this advisory role by referring to its call center representatives as "Loan Counselors" (¶ 336), and maintaining an "Office of Consumer Advocacy," whose stated mission is to "provide[] assistance to consumers with problems and concerns related to their student loans" and "listen to and investigate your concerns, and serve as your liaison with PHEAA operational staff regarding your issue."  ¶ 337. PHEAA even instructs borrowers to be "transparent about your concerns and your situation *so that we may best serve your needs." Id.*

**C.    Defendants Fail to Comply with Certain Statutes, Regulations, and Rules Governing the Programs at Issue.**

**1.    The TEACH Grant Program and the TEACH Plaintiffs**

The TEACH Grant Program provides grants up to $4,000 each year for students who sign an "Agreement to Serve" (CAC, Ex. B) and agree to teach in a high-need subject area, such as special education, mathematics, and science, in a school that serves low-income families for at least four years within eight years of graduation. ¶¶ 8, 299, 302. Recipients must "actively confirm at least annually his or her intention to satisfy the Agreement to Serve." ¶ 305. Recipients do so by submitting a TEACH Grant Certification form provided by Defendants. ¶ 362.

If a recipient fails to satisfy the teaching service obligation, his or her Grant will be converted to an interest-bearing Direct Loan ("TEACH Loan"). ¶ 8. The Department's regulations identify specific situations in which this may occur, including at the request of the recipient, when a recipient ceases enrollment in an eligible program, when the recipient is not able to meet the teaching requirement within the 8-year timeframe, and when the recipient does not actively confirm his or her intention to satisfy the agreement to serve at least annually. ¶ 306 (citing 34 C.F.R. § 686.43(a)). Despite these defined limitations, PHEAA routinely converts grants to loans for reasons not authorized by statute or regulation, or otherwise after failing to comply with the Department's rules, including conversions (1) based on hyper-technical mistakes on the Certification form, such as a missing signature or the inadvertent omission of the start and end dates for the qualifying academic year (¶ 362–71); (2) after PHEAA failed to provide sufficient notice of the annual deadline for submitting the required paperwork by posting it only to a paperless inbox on PHEAA's website (¶¶ 372–85); and (3) after PHEAA failed to provide recipients with sufficient time to submit their annual paperwork. ¶¶ 386–88.

After several public reports of the problems with the TEACH Grant Program, including reports by the U.S. Government Accountability Office ("GAO"), the Treasury Department, and the Department itself (¶¶ 355, 356–57, 376, 381, 387–88), the Department implemented the TEACH Grant Reconsideration Program in February 2019, wherein recipients could apply to have their loans reconverted to TEACH Grants (¶¶ 11, 308, 509). However, by delegating the administration of that Program to PHEAA – the loan servicer who contributed to the improper conversions in the first instance – the Department employed the same faulty system that created the problems it was trying to fix. ¶ 510. Unsurprisingly, some recipients were improperly denied, and others were not fully refunded the amount of principal and interest they paid toward their loans. ¶¶ 511–13.

Plaintiffs Asby, Charles, Jones, Meyer, Musser, Stevens, Wardlow, and Webb (the "TEACH Plaintiffs") are TEACH Grant recipients who have been injured by Defendants' conduct. PHEAA converted Plaintiff Stevens TEACH Grant to a loan on a hyper-technicality because his April 2016 annual paperwork identified a teaching service end date in the future. ¶ 370; *see also* ¶ 221 (converting Wardlow's grant to a loan due to a hyper-technicality on the certification form). The grants of Plaintiffs Asby, Jones, Meyer, and Musser were converted to loans because they never received notice of the annual certification deadline when PHEAA posted notice only to a paperless inbox on PHEAA's website. ¶ 384 (Asby), ¶ 385 (Jones), ¶ 142 (Meyer), ¶ 383 (Musser). The grants of Plaintiffs Charles, Stevens, Wardlow, and Web were converted to a loan even though they each had submitted the annual certification paperwork. ¶¶ 54–55 (Charles), ¶¶ 204–05 (Stevens), ¶¶ 220–21 (Wardlow), ¶¶ 226–229 (Webb).

Each of the TEACH Plaintiffs applied to have their loans converted back to grants. However, at the time the CAC was filed, Plaintiff Asby's application had been denied (¶ 42) and

Plaintiff Meyers' application was still pending. ¶ 145. Defendants approved the applications of the other TEACH Plaintiffs but did not refund all of the principal and/or interest they paid toward their TEACH Loans. ¶¶ 58–59 (Charles), ¶¶ 106–07 (Jones), ¶ 165 (Musser), ¶¶ 210–212 (Stevens), ¶¶ 222–23 (Wardlow), ¶¶ 230–31 (Webb).[2]

The TEACH Plaintiffs bring claims against PHEAA for breach of PHEAA's Servicing Contract with the Department as a third-party beneficiary, state common law claims for breach of fiduciary duty, constructive fraud, unjust enrichment, negligence, negligence per se, and negligent misrepresentation, and for violation of state consumer protection statutes.

### 2.      IDR Plans for FFEL and Direct Loans and the IDR Plaintiffs

To address the financial difficulties borrowers face in repaying their federal student loans, Congress required the Department to offer repayment programs that base the monthly repayment amount on the borrower's income and family size and provide other benefits that traditional repayment plans do not, including forgiveness after a period of 20 or 25 years. ¶¶ 12, 265–72. Borrowers enroll in an IDR plan by submitting an IDR Request form, which according to Department guidance, should be processed within 15 days. ¶¶ 419–20. If additional time is necessary, the Department may place the borrower's loans into an "administrative forbearance" for a period up to 60 days; however, interest may *not* be capitalized during this period. ¶ 421.

---

[2] The Department submits the Declaration of Cristin Bulman to argue that each TEACH Plaintiff has now been made financially whole. ECF No. 61. Even assuming the facts stated within Ms. Bulman's declaration are true, most of the TEACH Plaintiffs were not made whole because they did not receive full refunds of the payments they made towards their improperly converted loans. In addition, to the extent any Plaintiffs were truly made whole, their claims remain justiciable because they fall within one or more established exceptions to the mootness doctrine, as discussed in Section IV.A.2 of Plaintiffs' brief in opposition to the Department's motion to dismiss.

IDR Plans are often appropriate for borrowers experiencing long-term difficulty paying back their loans simply because of their income level. ¶ 407. Part of the loan servicing function of the federal loan programs is to provide borrowers with information about their repayment options, as well as their options during periods of financial hardship. ¶¶ 312–14.[3]

A borrower's enrollment in an IDR plan is effective for a one-year period. ¶ 273. Therefore, borrowers must submit documentation of their income and family size for each year they wish to remain on an IDR Plan. *Id.*[4] Generally, if a borrower does not submit his or her annual recertification paperwork within 10 days of the deadline, their repayment amount will be recalculated at the Standard Repayment amount and any accrued interest will be capitalized. ¶ 443.[5] However, certain regulatory exceptions may apply, including when the Department is able to determine the borrower's new repayment amount before the end of the borrower's current annual payment period. ¶¶ 445–47.[6] In these circumstances, a borrower's payment will *not* be recalculated under the Standard Repayment plan and any accrued interest will *not* be capitalized. ¶ 445. Upon receipt of a recertification request, the Department must process the request "promptly," or within 10 days, and maintain a borrower's current payment until their new payment can be determined. ¶¶ 275–77.[7] If a deficiency is identified in the enrollment or re-

[3] 20 U.S.C. § 1083(e)(2).

[4] 34 C.F.R. § 685.209(a)(5)(i) (PAYE); 34 C.F.R. § 685.209(b)(3)(vi) (ICR); 34 C.F.R. § 685.209(c)(4)(i) (REPAYE); 34 C.F.R. § 685.221(e)(1) (IBR).

[5] 34 C.F.R. § 685.209(a)(5)(iii) (PAYE); § 685.209(b)(vi)(B)) (ICR); §685.209(c)(4)(iii) (REPAYE); 34 C.F.R. § 685.221(e)(3)) (IBR).

[6] 34 C.F.R. § 685.209(a)(5)(vii) and (ix)(A) (PAYE); § 685.209(b)(vi)(D) and (F)(1) (ICR); 685.209(c)(4)(v) and (c)(4)(vii) (REPAYE); and 34 C.F.R. § 685.221(e)(7) and (9)(i) (IBR).

[7] 34 C.F.R. § 685.209(a)(5)(viii)(a) (PAYE); 34 C.F.R. § 685.209(b)(3)(vi)(E)(1) (ICR); 34 C.F.R. § 685.209(c)(4)(viii)(a) (REPAYE); 34 C.F.R. § 685.221(e)(8)(i) (IBR); Policy Memo from Ted Mitchell, Under Secretary, U.S. Dept. of Educ., to James Runcie, Chief Operating Officer, Fed. Student Aid, July 20, 2016, as updated October 17, 2016, 11, *available at*

certification paperwork, PHEAA is required to contact the borrower several times by phone and email to provide "high touch servicing" and "a clear expectation of what is needed to complete their enrollment or re-enrollment so they can stay on track." ¶¶ 438–41.

The Department is required to provide borrower's with notice of the recertification obligation, the consequence for failing to comply, and the deadline. ¶ 274.[8] The MPN requires that the Department send all required notices "by first-class mail," "by electronic means to an email address [Plaintiff has] provided," or "by any other method of notification that is permitted or required by applicable law and regulations." ¶ 452, CAC, Ex. E at 3 and Ex. F at 7–8. Notice of the recertification obligation, however, was routinely posted to a "paperless inbox" on PHEAA's website. ¶ 453.

Borrowers may change repayment plans, including to an IDR Plan, at any time. ¶ 278. Although the Department tells borrowers that they can do so "for free," changing from an IDR plan to another plan has harsh financial consequences, *i.e.* all outstanding interest is capitalized. ¶¶ 278, 461–62.[9] Without regard to a borrower's specific need, and without sufficiently disclosing that interest will capitalize, the Department includes a blanket recommendation on the form used for the annual recertification process to choose the option that allows the Department to change the borrower's repayment plan to the plan with the lowest monthly payment – which triggers interest capitalization. ¶¶ 463–65, CAC, Ex. G at 1 (Section 2).

---

https://www.help.senate.gov/imo/media/doc/Servicing%20Recompete%20Policy%20Memo.pdf (last visited Oct. 14, 2019) ("July 2016 Policy Memo").

[8] 34 C.F.R. § 685.209(a)(5)(ii)-(v) (PAYE); 34 C.F.R. § 685.209(b)(v) and (vi)(B) (ICR); 34 C.F.R. § 685.209(c)(4)(ii) and (iii) (REPAYE); 34 C.F.R. § 685.221(e)(2)-(5) (IBR).

[9] 34 C.F.R. § 685.221(b)(4) (IBR); 34 C.F.R. § 685.209(a)(2)(iv)(A) (PAYE); 34 C.F.R. § 685.209(c)(2)(iv) (REPAYE).

Despite the Department's obligation to protect the integrity of the FFEL and Direct Loan Programs and serve the best interests of borrowers, Defendants routinely fail to comply with certain statutes and regulations that govern IDR Plans in several ways, including the following:

First, Defendants misrepresent the options available to distressed borrowers struggling as a result of income level to repay their loans, steering them instead into forbearance, and capitalizing accrued interest. ¶¶ 403–18. When the Standard Repayment Plan amount proved to be unaffordable for Plaintiffs Turnage and King, Defendants misrepresented their available options, steered them into forbearance, and capitalized accrued interest, rather than discuss alternative repayment plans, such as IDR Plans. ¶ 417 (capitalizing $4,864.34 interest on Turnage's loans), ¶ 418 (capitalizing interest on King's loans).

Second, Defendants failed to timely and properly process requests for enrollment in an IDR Plan, and either placed a borrower's loans improperly into a general forbearance where interest is capitalized (¶ 425), or placed them into an administrative forbearance, but improperly capitalized interest during the forbearance period. ¶¶ 424, 426. When Plaintiffs Pruess, Gallagher, and Lathrop submitted their annual recertification paperwork, PHEAA failed to timely and properly process their paperwork, placed them into general forbearance (instead of administrative forbearance), and capitalized accrued interest. ¶ 427 (capitalizing $4,667.25 of interest on Pruess' loans), ¶ 431 (capitalizing more than $13,000 of interest on Gallagher's loans), ¶¶ 118–19 (capitalizing interest on Lathrop's loans).

Plaintiff Puccini's request to be enrolled in an IDR plan was delayed after PHEAA required her to re-submit her request at least twice, once because she hadn't used the most recent version of the IDR Request Form (even though she obtained it from the Department's website) (¶¶ 181–84), and once because her request contained "conflicting information." ¶ 185. Although

11

additional time was necessary to correct these purported deficiencies and process her request, her loans were placed into general forbearance (instead of administrative forbearance) and interest was capitalized. ¶ 186. During these periods of forbearance, these Plaintiffs were also deprived of the opportunity to make payments toward either loan forgiveness under the terms of the IDR Plan they sought to enroll in, and/or the PSLF Program, as well as receipt of federal interest subsidies. ¶ 173 (Pruess), ¶ 81 (Gallagher), ¶ 122 (Lathrop), ¶ 187 (Puccini). In switching Plaintiff Hawkins from one repayment plan to an IDR Plan, Defendants placed his loans into an administrative forbearance pursuant to 34 C.F.R. § 685.205(b)(9), but improperly capitalized interest. ¶ 426.

Third, Defendants failed to timely and properly process a request for the annual recertification of an IDR Plan by not providing borrower's with "high-touch" service and sufficient time to correct deficiencies,[10] recalculating their monthly payment at the significantly higher Standard Repayment amount, steering them into forbearance as their only real option when they couldn't afford the higher payment, and then capitalizing accrued interest. ¶¶ 428, 434–42. PHEAA rejected Plaintiff Arany's timely IDR recertification request for failing to provide supporting documentation of her income, rather than allow her to correct the deficiency. ¶¶ 32–33. As a result, Arany was placed into forbearance and $22,707.56 interest was capitalized. ¶ 35.

Fourth, Defendants failed to apply certain regulatory exceptions to borrowers who submit their annual IDR recertification paperwork after the deadline. ¶¶ 443–51. When Plaintiffs

___

[10] April 4, 2016 Amendment to PHEAA's Servicing Contract (requiring PHEAA to contact borrowers multiple times by phone and mail or email when processing an application with deficiencies, ¶¶ 438; July 2016 Policy Memo (requiring "high touch servicing" and "a clear expectation of what is needed to complete [a borrower's] enrollment or re-enrollment so they can stay on track," ¶¶ 439–40.

Anderson and Pryor timely submitted their income documents to PHEAA, but without the IDR Request Form itself, PHEAA considered each Plaintiff to have missed her annual recertification deadline. ¶ 26–27 (Anderson), ¶ 176 (Pryor). But instead of using their income documents to recalculate their new repayment amount, as required by a regulatory exception for "missing the deadline," Defendants recalculated their new payment at the much higher Standard Repayment amount and capitalized accrued interest. ¶ 27 (Anderson), ¶ 177 (Pryor). Faced with an unaffordable payment, Plaintiffs were steered into forbearance and interest was capitalized. ¶ 27 (Anderson), ¶ 178 (Pryor).

Fifth, Defendants failed to provide sufficient notice of the recertification obligation and the deadline for doing so by posting notice only to a paperless inbox on PHEAA's website. ¶¶ 452–58. Plaintiffs Brady and Rockwell fell victim to this practice and were not aware of the annual recertification deadline. ¶ 458 (Brady), ¶ 193 (Rockwell). As a result, their repayment amounts were recalculated to the Standard Repayment amount and accrued interest was capitalized. ¶ 458 (Brady), ¶ 194 (Rockwell).

Sixth, Defendants misrepresented the consequences of changing from an IDR plan to another plan, including the capitalization of accrued interest. ¶¶ 459–68. When Plaintiffs Coleman, Gallagher, Lathrop, Leone, and Morris requested a change from one IDR Plan to another, Defendants misrepresented the consequences of doing so, particularly that any accrued interest would capitalize. ¶¶ 63–64, 468 (Coleman), ¶¶ 17, 78–80 (Gallagher), ¶¶ 18, 116–17, 467 (Lathrop), ¶ 126 (Leone), ¶¶ 156–57, ¶ 466 (Morris). In fact, Plaintiff Coleman was informed by PHEAA that it would *not* capitalize. ¶¶ 63, 468.

Defendants' failures have been widely investigated and reported by several government entities, including the Department's own Office of Inspector General, the GAO, and the U.S.

13

Consumer Financial Protection Bureau ("CFPB"). ¶¶ 6, 404–05, 414, 428–29, 570–72. Defendants' failure with respect to IDR Plans have also resulted in at least two lawsuits by State Attorneys General. ¶¶ 573–75 (discussing lawsuits by the Pennsylvania and New York Attorneys General).

Plaintiffs Anderson, Arany, Brady, Coleman, Gallagher, Hawkins, Leone, King, Lathrop, Morris, Pruess, Pryor, Puccini, Rockwell, Shelley, and Turnage (the "IDR Plaintiffs") bring claims against the Department for judicial review under the APA and for breach of the MPN. They bring claims against PHEAA for breach of PHEAA's Servicing Contract with the Department as third-party beneficiaries, state common law claims for breach of fiduciary duty, constructive fraud, unjust enrichment, negligence, negligence per se, and negligent misrepresentation, and for violation of state consumer protection statutes.

### 3.    The PSLF Program and the PSLF Plaintiffs

To address the financial disparity between the costs of a higher education and the income levels of those who choose to work in a public service role, Congress established the PSLF Program. ¶ 285. Program participants are eligible for loan forgiveness after making 120 payments on a qualifying repayment plan while working for a qualifying employer. ¶ 287. Payments made during periods of forbearance, however, do not count towards the 120-payment requirement. ¶ 288. To track one's progress towards loan forgiveness, the Department recommends that borrowers submit an Employment Certification Form ("ECF") to determine the number of qualifying payments made so far and certify a borrower's employer as a qualifying employer. ¶¶ 290–92. The Department delegates the ECF Determination process to PHEAA, as the exclusive loan servicer of the PSLF Program. ¶ 292. Accordingly, when a borrower expresses interest in the PSLF Program, his or her loans are transferred to PHEAA for servicing. ¶ 528.

As of April 2018, over 19,300 borrowers had submitted applications for PSLF loan forgiveness. ¶ 294. The Department approved less than 1% of those applicants. *Id*. Over 40% were denied only because they had not yet made the 120 qualifying payments. *Id*. After a public outcry over borrowers' inability to obtain forgiveness, Congress created the Temporary Expanded Public Service Loan Forgiveness ("TEPSLF") Program, under which borrowers who made payments under a non-qualifying repayment play may receive loan forgiveness. ¶ 295. But of the 54,000 TEPSLF applications processed, only 1% were accepted. ¶ 296. These numbers are reflective of the significant problems borrowers faced with the PSLF Program.

First, as the Consumer Financial Protection Bureau reported in 2017, "[b]orrowers report spending years making payments, believing they were making progress towards PSLF, before servicers explain that their loans do not qualify for PSLF." ¶ 471. Likewise, "[b]orrowers complain that servicers may enroll them into non-qualifying repayment plans, despite borrowers expressing interest in PSLF." ¶ 472. After Plaintiff Wolff submitted ECF requests in 2016, her loans were transferred to PHEAA. ¶ 235. Although PHEAA acknowledged in writing her interest in the PSLF Program, it did not advise her that she was on a non-qualifying repayment plan. *Id*. It was not until after she made 120 payments and submitted an application for loan forgiveness that PHEAA informed her that she was on the wrong repayment plan. ¶¶ 236–37. Likewise, Plaintiff Morris submitted PSLF Employment Certification forms each year beginning in 2012, as recommended by the Department, and each time he changed employers. ¶¶ 154, 477. PHEAA, however, did not advise Morris that he held a non-qualifying loan until 2016. ¶¶ 154, 477. When Plaintiff Meckfessel inquired about the PSLF Program, PHEAA falsely informed him that he was not eligible for a qualifying IDR Plan. ¶ 476. As a result, Meckfessel made payments under

a non-qualifying plan for approximately 3 years, until after repeated inquiries, PHEAA eventually enrolled him in an IDR Plan. *Id*.

Second, the Department assures borrowers that when loans are transferred to PHEAA from another servicer, the loan servicers "will work together to make sure that all payments … are credited to your loan account." ¶ 530. But as the GAO found, "Education does not ensure that [PHEAA] receives consistent information on borrowers' prior loan payments from other loan servicers, which could raise the risk of qualifying payments being miscounted." ¶ 532. The GAO observed that a lack of standard definitions and terminology among loan servicers results in inconsistencies in the data other loan servicers report to PHEAA, despite the Department's attempt to cure the problem with "templates". ¶ 533–34. Defendants have admitted that these inconsistencies "[i]ncrease the risk of miscounting qualifying payments." ¶ 535.

Plaintiff Shelley has made consistent PSLF qualifying payments since 2008 and should have been eligible for forgiveness in 2018. ¶ 198. However, because Defendants miscounted his qualifying payments, his ability to apply for loan forgiveness was delayed until October 2019. ¶¶ 199-200. Similarly, after Plaintiffs Bonham, Coleman, Davis, Dr. Gupta, Harig, Levis, and Miller submitted ECF Requests, Defendants issued determinations that undercounted the number of qualifying payments each had actually made. ¶ 46 (Bonham), ¶ 66 (Coleman), ¶ 70 (Davis), ¶ 85 (Dr. Gupta), ¶¶ 89–90 (Harig), ¶ 131 (Levis), and ¶ 149 (Miller).

Like the other Programs, Defendants' failures with respect to the PSLF Program have been widely investigated and reported on by several government entities, including the Department's OIG, GAO, and the CFPB. ¶¶ 471, 483–85, 493–95, 514, 518, 532–35, 559–62. These failures are also the subject of the lawsuits brought by the Pennsylvania and New York State Attorneys General. ¶¶ 573–75.

16

Plaintiffs Bonham, Coleman, Davis, Dr. Gupta, Harig, Levis, Meckfessel, Miller, Morris, Shelley, and Wolff (the "PSLF Plaintiffs")[11] bring claims against the Department for judicial review under the APA and the Fifth Amendment Due Process clause. They bring claims against PHEAA for breach of PHEAA's Service Agreement with the Department as a third-party beneficiary, state common law claims for breach of fiduciary duty, constructive fraud, unjust enrichment, negligence, negligence per se, and negligent misrepresentation, and for violation of state consumer protection statutes.

Summaries of (1) Plaintiffs' claims by Program, and (2) Plaintiffs' causes of action by Defendant are attached as Exhibits A and B, respectively.

## III.    LEGAL STANDARD

### A.    Subject-Matter Jurisdiction

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "must be measured according to a different standard than a motion to dismiss under F.R.C.P. 12(b)(6)." *White v. U.S. Gov't Dep't of Treasury*, 969 F. Supp. 321, 322 (E.D. Pa.), *aff'd sub nom. White v. U.S. Gov't*, 135 F.3d 768 (3d Cir. 1997). "A challenge to subject matter jurisdiction under Rule 12(b)(1) may take two forms: a facial challenge or a factual challenge." *Trupp v. Ally Fin., Inc.*, No. CV 17-5404-CDJ, 2018 WL 2462777, at *1 (E.D. Pa. May 31, 2018).

If the defendant asserts a facial challenge over a pleading deficiency, the standard of review is the same as for a motion to dismiss under Rule 12(b)(6) and "the trial court is restricted to a review of the allegations of the complaint and any documents referenced therein." *Trupp*,

---

[11] Plaintiffs Gallagher, King, Lathrop, and Pruess are also identified in the CAC as "PSLF Plaintiffs" on the basis that they were denied the opportunity to make payments toward PSLF forgiveness during periods of forbearance. But those claims arise from Defendants' failures with respect to the servicing of their IDR Plans.

2018 WL 2462777, at *1 (citing *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)). When

doing so, "the court must consider the allegations of the complaint as true." *Mortensen v. First*

*Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A factual challenge under Rule 12(b)(1) "concerns the actual failure of a plaintiff's

claims to comport factually with the jurisdictional prerequisites." *CNA*, 535 F.3d at 139 (internal

quotation, citation, and alterations omitted). "With a factual challenge, the court may weigh

evidence outside the pleadings and make factual findings related to the issue of jurisdiction."

*Trupp*, 2018 WL 2462777, at *1. The plaintiff ultimately bears the burden of proof that

jurisdiction does in fact exist. *Mortensen*, 549 F.2d at 891.

## B.      Failure to State a Claim

A Rule 12(b)(6) motion to dismiss for failure to state a claim must be denied where "a

complaint [] contain[s] sufficient factual matter, accepted as true, [that] 'state[s] a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id*. This "'does not impose a probability requirement at the pleading

stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery

will reveal evidence of' the necessary element." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234

(3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

In evaluating motions to dismiss under Rule 12(b)(6), courts use a two-part analysis.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, courts separate the factual

and legal elements of the claim and accept all of the complaint's well-pleaded facts as true. *Id*. at

210–11. Second, courts determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679).

"Determining whether a complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). The Court must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989).

IV.     **ARGUMENT**

    A.     **PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE HIGHER EDUCATION ACT**

PHEAA's assertion that the claims brought forth by Plaintiffs are preempted expressly and by implication under 20 U.S.C. § 1098g are without merit and rely heavily on overturned or easily distinguishable case law.

As discussed in greater detail herein: (A) the presumption against preemption should apply, as Plaintiffs' claims are founded on tort and consumer protection principles that are historically handled by state rather than federal law; (B) Plaintiffs' claims are not expressly preempted by Section 1098g, which states only "Loans made, insured, or guaranteed pursuant to a program authorized by Title IV of the [HEA] shall not be subject to any disclosure requirements of any State law"; (C) Plaintiffs' claims are not preempted under the theory of conflict preemption, as Plaintiffs' state law claims are based on more generalized duties that do

not create an obstacle or conflict with the HEA; and, (D) the Department's guidance deserves no deference, as it has been found to be wholly inconsistent with past statements and unreliable.

### 1.    The Starting Point Is a Presumption Against Preemption

"[T]here is a strong presumption against preemption in areas of the law that States have traditionally occupied." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016). PHEAA is correct in that the presumption against preemption may not apply where "considerable federal interest[s]" are at stake. (PHEAA Motion to Dismiss Brief at 24, ECF No. 55-2) ("PHEAA Br."). However, since the claims brought by Plaintiffs sound primarily in negligence- and consumer protection-based torts, areas historically handled by the states, PHEAA wrongfully concludes that the presumption against preemption should not be applied in this case.

PHEAA cites to *Bell*[12] and *Helfrich*[13] as its authority to not apply the presumption against preemption. (PHEAA Br. at 24-25). *Bell* considered whether the Federal Employees Health Benefits Act preempted a state law anti-subrogation defense that would have permitted an injured federal worker to avoid reimbursing her insurance company with some of the funds she received from the tortfeasor's insurance company. 823 F.3d at 1199–1200. The court declined to apply the presumption against preemption because the dispute involved uniquely federal interests involving the terms of a federal health insurance plan negotiated by a federal agency for the purpose of providing it to federal employees, and therefore the scope of the benefits "has a significant impact on the federal treasury and on premiums or benefits for other employees." *See Bell*, 823 F.3d at 1201–02.

---

[12] *Bell v. Blue Cross & Blue Shield*, 823 F.3d 1198 (8th Cir. 2016).

[13] *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090 (10th Cir. 2015).

20

*Helfrich* involved an identical issue, 804 F.3d at 1094–95, and that court similarly found the presumption inapplicable because contracts relating to federal employment have been legislated by Congress "from the outset." *Id.* at 1105. PHEAA also cites to *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F. 3d 71 (3d Cir. 2017), as authority that the presumption does not apply. Again, the *In re Vehicle Carrier* case involved an issue surrounding international maritime commerce, which is "uniquely in the federal domain." *Id.* at 84. Since the claims in these cases involved areas of law that stem from, incorporate, and involve only matters of federal law, no federalism concerns were implicated and the presumption against preemption was not applicable. *Bell*, *Helfrich*, and *In re Vehicle Carrier* are therefore easily distinguishable from this case.

Similar claims to Plaintiffs' were analyzed under *New York by James v. Pennsylvania Higher Educ. Assistance Agency*, No. 19 CIV. 9155 (ER), 2020 WL 2097640 (S.D.N.Y. May 1, 2020). In *New York*, the Court held that "[w]hile the case does touch on a program established by the federal government, it concerns the relationship between two entities, PHEAA and borrowers, neither of which are the federal government, and a subject, consumer protection, that has historically been regulated by the states." *Id.* at *13. "Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *Id.* (quoting *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990)). A long litany of cases uphold this principle. *See, e.g.*, *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 548 (M.D. Pa. 2018), *motion to certify appeal granted*, No. 3:17-CV-1814, 2019 WL 1052014 (M.D. Pa. Mar. 5, 2019) ("As consumer protection is within the traditional police power of the state, the Court will apply the presumption against preemption in analyzing Navient's preemption arguments against the Commonwealth's CPL claims."); *Keams v. Tempe*

21

*Tech. Inst., Inc.*, 39 F.3d 222, 226 (9th Cir. 1994) (presumption against preemption of state law claims by the HEA was applied because "[n]egligence tort claims are traditionally regulated by state law."); *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (applying presumption against preemption to analysis of "the preemptive scope of the statutes and regulations governing lenders and third-party loan servicers under the Federal Family Education Loan Program of the Higher Education Act."); *Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 47 (D.D.C. 2018) ("*SLSA*") ("Indeed, there is an established presumption against preemption. … Consumer protection is one such area that traditionally has been regulated by the states.") (internal citations omitted).

Just as in *New York v. PHEAA*, the issues before this Court stem from tort common law and consumer protection laws, areas historically regulated by states rather than the federal government. In short, PHEAA has not identified any cases in which courts declined to apply presumption against preemption with respect to the HEA. Therefore, at the pleadings stage, this Court should find that the presumption against preemption weighs against PHEAA's arguments here, in favor of Plaintiffs, and proceed from there.

## 2.    Plaintiffs' Claims Are Not Expressly Preempted

PHEAA's express preemption arguments based on 20 U.S.C. § 1098g have been rejected by numerous courts. *See, e.g.*, *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908 (11th Cir. 2020); *Nelson v. Great Lakes Educational Loan Servs., Inc.*, 928 F.3d 639 (7th Cir. 2019); *Chae*, 593 F.3d at 943; *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 552 (M.D. Pa. 2018);[14] *Daniel v. Navient Sols., LLC*, 328 F. Supp. 3d 1319, 1324 (M.D. Fla. 2018); *Hyland*

---

[14] The decision in *Pennsylvania v. Navient* is currently on appeal to the Third Circuit. *See Pennsylvania v. Navient*, Case No. 19-2116 (3d Cir.).

*v. Navient Corp.*, No. 18-cv-9031 (DLC), 2019 WL 2918238, at \*6 (S.D.N.Y. July 8, 2019);

*Davis v. Navient Corp.*, No. 17-CV-00992-LJV-JJM, 2018 WL 1603871, at \*2–3 (W.D.N.Y.

Mar. 12, 2018); *Genna v. Sallie Mae, Inc.*, 2012 WL 1339482, at \*8 (S.D.N.Y. Apr. 16, 2012);

(all rejecting express preemption).

The starting point of an express preemption analysis is to "'identify the domain expressly

pre-empted'" *Lawson-Ross*, 955 F.3d at 917 (quoting *Cipollone v. Liggett Group*, 505 U.S. 504,

517 (1992)). The HEA contains multiple sections that provide for express preemption of state

law: § 1078(d), which preempts state usury laws; § 1091a(a)(2), which preempts state statutes of

limitations; § 1091a(b)(2), which preempts state law infancy defenses; and, at issue here, §

1098g, which "preempts only state law that imposes disclosure requirements." *Lawson-Ross*, 955

F.3d at 917.

Although neither "disclosure" nor "disclosure requirements" are defined in the HEA,

multiple courts have held that the disclosure requirements referenced in § 1098g must refer to the

disclosure requirements of § 1083, which sets forth specific information to be disclosed to

borrowers throughout the life of their loan. *See Lawson-Ross*, 855 F.3d at 916–17; *New York v.

PHEAA*, 2020 WL 2097640, at \*14. Therefore, what § 1098g expressly preempts—its

"domain"—are state laws that impose duties on servicers to make specific disclosures other than

those identified in § 1083.

Most relevant here is 20 U.S.C. § 1083(e), as it governs disclosures during the period of

repayment, the period from which Plaintiffs' claims stem. In pertinent part, these disclosure

requirements involve information regarding the loan (principal amount, interest rate, description

of fees, etc.), and information for borrowers having difficulty with payments (description of

available repayment plans, requirements for forbearance, and options to help avoid default).

23

Therefore, any state law requiring additional disclosures during repayment other than the ones set forth in § 1083(e) and summarized above would be expressly preempted by § 1098g.

Plaintiffs' claims, however, are primarily based on either affirmative misrepresentations by PHEAA, or PHEAA's broader pattern of negligent and deceptive conduct through a variety of acts and omissions.  For instance, Plaintiffs allege PHEAA affirmatively misrepresented that it would act in borrowers' best interests, ¶¶ 337, 412–12, 676, 680, 752–53; that there was no "cost" or capitalization involved with switching repayment plans, ¶¶ 63–64, 461, 465, 679(b); or that Plaintiffs were either eligible or ineligible for certain plans and programs when the opposite was true, ¶ 134; *see also* Exhibit C (summarizing allegations of misrepresentation). Section 1098 does not preempt these claims. *Lawson-Ross*, 55 F.3d at 918; *Nelson*, 928 F.3d at 648–49 (finding no preemption of claims related to servicers' misrepresentations about "its expertise and its devotion to borrowers' best interests, and in recommending forbearance as the best option for borrowers in financial trouble.").

To provide context, Plaintiffs' CAC includes numerous allegations that PHEAA failed to disclose certain material information to borrowers, but these facts do not convert all of Plaintiffs' state law claims into "failure to disclose" claims. *See New York v. PHEAA*, 2020 WL 2097640, at 16. ("[T]he allegations do refer to alleged failures to disclose information . . . that does not transform them into disclosure claims – highlighting the failure to provide information in this context is reasonably read as a means of illustrating why the affirmative representations the [plaintiff] points to are allegedly misleading." ). Plaintiffs' tort and consumer protection claims also rely on more general state-law duties, such as the duty not to deceive, that cannot be preempted by a statute like the HEA that concerns only a specific type of required disclosures.

*See Lawson-Ross*, 955 F.3d at 919 n.10 ("[T]he Borrowers' claims are based not on a duty to disclose but the duty not to deceive.") (citing *Cipollone*, 505 U.S. at 528–29).

PHEAA's repeated reliance upon the analysis in *Chae* and the Northern District of Florida's decision in *Lawson-Ross*[15] is misplaced. The Eleventh Circuit recently reversed the district court decision in *Lawson-Ross*. In doing so, it directly overturned the analysis relied upon by PHEAA and correctly distinguished *Chae*. In *Chae*, the plaintiffs claimed that, although defendants made certain disclosures of the type that are covered under § 1083, they failed to make additional disclosures regarding the loan terms and repayment (which disclosures are specifically governed by § 1083(e)). *See Chae*, 593 F.3d at 942–43. In distinguishing *Chae*, the Eleventh Circuit found that the claims in *Chae* "challenged how the servicer communicated information that the HEA required it to disclose." *Lawson-Ross*, 955 F.3d at 919 (11th Cir. 2020). Distinguishing between that type of claim and a claim that the defendant "provided information on a matter on which it was not required to disclose, and while doing so made affirmative misrepresentations," the Eleventh Circuit was not persuaded that *Chae* stood for the proposition that affirmative misrepresentation claims were preempted by the HEA. *Id.*

### 3.    Conflict Preemption Does Not Apply

PHEAA's argument that the HEA preempts state law by way of "conflict preemption" (PHEAA Br. at 29), also has been rejected by numerous courts. *Lawson-Ross*, 955 F.3d at 920–23; *Nelson*, 928 F.3d at 650–51; *Daniel*, 328 F. Supp. 3d at 1324. Conflict preemption does not apply to the HEA in general, since Congress provided for specific provisions limiting the areas

---

[15] *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 17-cv-0252, 2018 WL 5621872 (N.D. Fla. Sept. 20, 2018).

of express preemption. Even if it did apply, however, the laws on which Plaintiffs rely upon to bring their claims would not create an obstacle or conflict with the HEA.

Conflict preemption does not apply where "Congress has expressly preempted specific areas of state law: that it did not intend to preempt state law more broadly." *Lawson-Ross*, 855 F.3d at 920. As stated above, the HEA contains multiple sections that provide for express preemption of state law: § 1078(d), which preempts state usury laws; § 1091a(a)(2), which preempts state statutes of limitations; § 1091a(b)(2), which preempts state law infancy defenses; and § 1098g, the disclosure requirements of § 1083. Section 1098g is a specific enough provision that it is of a type that "offer[s] no cause to look beyond" it, with "no need to infer congressional intent to pre-empt state laws from the substantive provisions." *See Cipollone*, 505 U.S. at 517 (citations and quotation marks omitted).

PHEAA again cites *Chae* in its argument that the HEA commands "uniformity." (PHEAA Br. at 30). The HEA provides an express purpose of the program under § 1071(a)(1) but does not include the word "uniformity" anywhere within. If Congress wanted to provide uniform preemption and control over all facets of student loan servicing, it would have done so. To the contrary, Congress explicitly provides for preemption in specific areas of the HEA, not in one broad sweep. Since Congress expressly preempted some specific areas of state law but not others, and there is no evidence that the HEA was meant to create uniformity, it follows that Congress did not intend to preempt all state law in this field.

However, even if this Court were to find that conflict preemption should apply to certain aspects of the HEA, there is no conflict between the state law from which Plaintiffs' claims arise and the HEA. Conflict preemption "nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an 'obstacle to

the accomplishment and execution of the full purposes and objectives of Congress.'" *Farina v. Nokia, Inc.*, 625 F.3d 97, 115 (3d Cir. 2010). Plaintiffs' claims under state law are based on false statements and misrepresentations made by PHEAA to Plaintiffs. Plaintiffs do not rely on state law to impose additional disclosure requirements. PHEAA is wholly capable of abiding by the regulations in § 1083, as well as not making affirmative misrepresentations, without conflict or obstacle. Further, as stated above, the purpose and objective of Congress was only to preempt the specific provisions in which it clearly calls for express preemption.

### 4.    The Department's "Guidance" Deserves No Deference

In 2018, the Department issued informal guidance to voice its opinion that recent state enactments of regulatory requirements for loan servicers are preempted by the HEA. *See* Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10,619 (Mar. 12, 2018) (the "Preemption Notice").

An agency's informal opinion that is not sufficiently thorough, consistent, and persuasive should be given no deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Contrary to PHEAA's contention (PHEAA Br. at 31), the Preemption Notice should be given no deference for several reasons.

First, it "draws broad conclusions about the regulations' preemptive effect without actually interpreting any specific regulations." *SLSA*, 351 F. Supp. 3d at 51. It is "a retroactive, ex-post rationalization for [the Department's] policy changes" and "does not analyze in any real way the regulations it cites." *Id.* "[N]o deference is owed to an 'agency's ***conclusion*** that state law is preempted.'" *Id.* (citing *Wyeth v. Levine*, 555 U.S. 555, 576 (2009)) (emphasis in original).

Second, the Preemption Notice "represents a stark, unexplained change" in the Department's position. *Nelson*, 928 F.3d at 651 n.2 (quoting *SLSA*, 351 F. Supp. 3d at 48–49);

27

*Lawson-Ross*, 955 F.3d at 921 n.13; *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)). The Department's previous position could not be clearer:

> Nothing in the HEA or its legislative history even suggests that the HEA should be read to preempt or displace state or federal laws. Nor is there anything in the HEA or the regulations promulgated thereunder to evince any intent of Congress or [the Department] that the HEA or its regulations establish an exclusive administrative review process of student claims brought under state or deferral law, even if the conduct alleged may separately constitute an HEA violation."

*SLSA*, 351 F. Supp. 3d at 50 (quoting the Department's Statement of Interest in *Sanchez v. ASA College, Inc.*, No. 14-5006, 2015 WL 3540836 (S.D.N.Y. June 5, 2015)). This "dramatic inconsistency" entitles the Preemption Notice to no deference. *SLSA*, 351 F. Supp. 3d at 50.

Third, the Preemption Notice relies heavily on the now overturned district court decision in *Nelson*. In rejecting the district court's finding of express preemption pursuant to § 1098g, the Seventh Circuit made clear that the Preemption Notice was not entitled to deference:

> We do not give special deference to the U.S. Department of Education's 2018 informal guidance, entitled "Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers."83 Fed. Reg. 10619 (Mar. 12, 2018). The Department expressed its view that the HEA preempts all state regulations that "impact" FFELP loan servicing. We agree with the district court's thorough analysis of this issue in *Student Loan Servicing Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 48-49 (D.D.C. 2018), that *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944), provides the appropriate test for deference here. We also agree that the Preemption Notice is not persuasive because it is not particularly thorough and it "represents a stark, unexplained change" in the Department's position. *Student Loan Servicing Alliance*, 351 F. Supp. 3d at 50; *see Skidmore*, 323 U.S. at 138...

*Nelson*, 928 F.3d at 651 n.2.

PHEAA also relies (again) on the now overturned district court decision in *Lawson-Ross v. Great Lakes Higher Educ. Corp*. In overturning that ruling and finding that the Preemption Notice is unpersuasive, the Eleventh Circuit stated:

> [W]e conclude that the Notice is entitled to no special deference. We find persuasive the district court's analysis of what deference the Notice is owed in *Student Loan Servicing Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 48–49 (D.D.C. 2018), and similarly conclude that *Skidmore*, 323 U.S. at 138, 140, 65 S.Ct. 161, provides the appropriate framework for determining whether the agency's determination is entitled to deference. Under *Skidmore*, we conclude that the Notice should be given little weight because "it is not particularly thorough and it 'represents a stark, unexplained change' in the Department's position." *Nelson*, 928 F.3d at 651 n.2 (quoting *Student Loan Servicing Alliance*, 351 F. Supp. 3d at 50). We acknowledge that the Notice also addresses express preemption; however, we find the Notice unpersuasive as to express preemption for the same reason.

*Lawson-Ross*, 955 F.3d at 921 n.13.

Accordingly, the Department's Preemption Notice should be given no deference in consideration of preemption issues.

For the reasons stated above, Plaintiffs' claims are not preempted expressly or otherwise, and the Court should deny PHEAA's motion to dismiss on preemption grounds.

## B.   PHEAA IS NOT ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY

PHEAA argues it is entitled to dismissal of Plaintiffs' claims under the doctrine of "derivative sovereign immunity." (PHEAA Br. at 17). However, because Plaintiffs' claims against PHEAA, at their very core, relate to conduct that was *not* specifically authorized by law or directed by the federal government, they fall outside this narrowly tailored, case-specific doctrine.

Derivative sovereign immunity is extremely limited in scope, applying only to actions "authorized and directed by the [federal government]." *Campbell-Ewald Co. v. Gomez*, 136 S.

29

Ct. 663, 673 (2016) (internal citations omitted). In instances where the federal government would be immune from suit, "government contractors may *sometimes* obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 68 (D.C. Cir. 2019) ("*In re OPM*") (internal citations omitted) (emphasis added). However, in *Campbell-Ewald*, the Supreme Court rejected the idea that contractors on which authority has been "validly conferred" by the federal government are guaranteed "unqualified immunity" as a matter of law. *Campbell-Ewald*, 136 S. Ct. at 673. Instead, the Court found that *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), the case from which the doctrine stems, recognized immunity only for contractors "who simply performed as the Government directed." *Campbell-Ewald*, 136 S. Ct. at 673 (citing *Yearsley*, 309 U.S. at 20–21). Accordingly, in order to invoke the doctrine of derivative sovereign immunity, a "contractor's performance in compliance with all federal directions" is "critical." *Campbell-Ewald*, 136 S. Ct at 673 n.7; *In re OPM*, 928 F.3d at 70 (strict and unwavering adherence to the direction given by the government in carrying out the conduct at issue is the essential inquiry of derivative sovereign immunity); *Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs., Inc.*, 853 F.3d 173, 185 (5th Cir. 2017) ("[a] contractor may not be liable for harm resulting from its strict execution of an…authorized government order").

When a Plaintiff alleges that a contractor of the federal government exceeded its validly conferred authority, a motion to dismiss on grounds of derivative sovereign immunity must be denied. *See Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017).

### 1.    Derivative Sovereign Immunity Is Not a Jurisdictional Issue

PHEAA seeks to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction under Rule 12(b)(1) on the basis of derivative sovereign immunity. But PHEAA's contention that the issue of derivative sovereign immunity is jurisdictional based on Fourth Circuit

precedent (PHEAA Br. at 17) goes against more persuasive authority to the contrary. *See, e.g.*, *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009) ("Based on the Supreme Court's actions in *Yearsley*, we hold that concluding *Yearsley* is applicable does not deny the court of subject-matter jurisdiction."); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) ("*Yearsley* immunity is, in our opinion, closer in nature to qualified immunity for private individuals under government contract, which is an issue to be reviewed on the merits rather than for jurisdiction"); *Campbell-Ewald Co.*, 136 S. Ct. at 672–74, (affirming Ninth Circuit's reversal of the District Court's grant of ***summary judgment*** under *Yearsley*) (emphasis added); *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) (qualified immunity may be granted under Rule 12(b)(6) "only when the immunity is established on the face of the complaint"); *Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. 1993) (government contractor defense under Boyle analyzed under Rule 56 summary judgment standard); *Harris v. Kellogg, Brown & Roots Servs*, No. 08-cv-563, 2016 WL 4720058, at *1 (W.D. Pa. Sept. 9, 2016) (finding that a *Yearsley* defense is not jurisdictional and must be raised under Rule 12(b)(6)). Accordingly, even if derivative sovereign immunity were applicable, which it is not, it alone does not prevent the Court from exercising subject matter jurisdiction.

> **2.    Plaintiffs' Claims Arise from PHEAA's Failure to Service Federal Student Loans as "Authorized and Directed" by the Federal Government.**

PHEAA's assertion that Plaintiffs "allege[] no instance of PHEAA's failure to comply with federal directives" (PHEAA Br. at 24) completely ignores the detailed allegations that comprise the entire bedrock of Plaintiffs' CAC – that PHEAA violated the very federal laws and directives the Department contractually required it to comply with in servicing federal student loans.  ¶¶ 289, 300, 315. "When a contractor breaches the terms of its contract with the government or violates the law, sovereign immunity will not protect it." *Al Shimari v. CACI*

31

*Premier Tech., Inc.*, 368 F. Supp. 3d 935, 970 (E.D. Va.), *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019).

For the TEACH Grant Program, Plaintiffs specifically allege that PHEAA exceeded its authority by improperly converting Plaintiffs' TEACH Grants into interest-bearing loans for reasons not authorized by 34 C.F.R. § 686.43. ¶¶ 306–07, 365–66, 370. For the PSLF Program, Plaintiffs allege that PHEAA failed to provide borrowers with the necessary information to qualify for PSLF, as contractually required. ¶¶ 469–78. With respect to IDR Plans, Plaintiffs allege PHEAA exceeded its authority by violating several laws and internal policies, including its failure to advise distressed borrowers with the availability of IDR Plans (¶ 413), failure to promptly process borrowers' IDR applications (¶¶ 275, 420–33), failure to allow borrowers to correct deficiencies in IDR paperwork (¶¶ 436–42), failure to apply an exception for borrowers who submitted their IDR applications after the deadline, failure to effect statutorily mandated notices as required by borrowers' MPNs (¶¶ 452–58), and failure to advise borrowers of the effects of capitalization of interest (¶¶ 459–68). In *New York v. PHEAA*, the Court refused to apply derivative sovereign immunity for these reasons:

> While PHEEA contends that the DOE directs various aspects of its performance, it does not point to any evidence that in performing the complained-of conduct, it simply followed the DOE's instructions. It does not argue that the DOE instructed it to incorrectly report to borrowers the number of PSLF-qualifying payments borrowers made, to provide incorrect monthly payment amounts in IDR plans, to fail to recertify applications in a timely fashion, or any of the other conduct that forms the basis of the NYAG's Complaint. Such an argument would strain credulity.

No. 19-cv-9955, 2020 WL 2097640, at *7 (S.D.N.Y. May 1, 2020).

PHEAA attempts to downplay its wide-spread violations of law by claiming that a contractual provision allowing for the correction of "servicing errors" gives it a wide berth for misconduct and a free pass to violate the law. Such an interpretation does not comport with

PHEAA's contractual obligation to comply with all applicable laws. *See* ¶ 316. Nor is it consistent with the Department's contractual right to withhold payment for non-compliance related to the calculation of interest and loan balances and required borrower notices – issues that fall squarely within Plaintiffs' complaint. *See* ¶ 317.[16] The provision allowing for correction of servicing errors is "a far cry from authorizing, much less directing, PHEAA to make errors." *New York v PHEAA*, 2020 WL 2097640, at *7. "Nor does it immunize PHEAA from liability for any errors it may make." *Id*.[17]

The cases cited by PHEAA fail to carry the day. In *Cunningham v. Gen. Dynamics Info. Tech., Inc*., 888 F.3d 640, 645 (4th Cir.), *cert. denied*, 139 S. Ct. 417 (2018), a federal government contractor placed phone calls to individuals interested in signing up for insurance provided by the Affordable Care Act. The federal government provided the list of phone numbers, specifically scheduled the timing of the calls, and provided the contractor with a script of what was to be said. An individual who received one of these calls brought a TCPA claim against the contractor. The court held derivative sovereign immunity applied, stating: "[q]uite plainly, [the contractor] performed exactly as [the government] directed: [it] called the number [the government] instructed [it] to call, on the prescribed day, and followed [the government's] provided script when leaving the message." *Id*. at 647.

The applicability of derivative sovereign immunity in the handful of other cases on which PHEAA relies, was also based on the contractor's strict compliance with federal law and government directives. *See, e.g.*, *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir.

---

[16] The fact that the Department may elect not to sue PHEAA for misconduct also does not mean that the Department "authorized or directed" that misconduct in the first place.

[17] PHEAA also relies on *other* federal contracts that incorporate a degree of error tolerance but do not point to any similar provision in its contract.

2014) (the record on defendant's motion to dismiss did not adequately establish whether the contractor "acted in conformity with [the contract], its appended task orders, and any laws and regulations that the contract incorporates"); *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d at 108 (same); *Chesney v. Tennessee Valley Auth.*, 782 F. Supp. 2d 570, 585 (E.D. Tenn. 2011) (contractor simply conducted the policy decisions of Tennessee Valley Authority); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196 at 207, (plaintiffs did not allege "that the Contractor Defendants exceeded their authority or in any way deviated from Congress's direction or expectations.").

Unlike each of PHEAA's cases, Plaintiffs' entire CAC is premised on PHEAA's failure to comply with the regulatory scheme that governs the federal student loan programs at issue. It is implausible for PHEAA to argue that it was "authorized and directed" by the Department to violate those regulations. Thus, there can be no defense of derivative sovereign immunity with respect to this claim.

## C. THE COURT HAS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS.

### 1. PSLF Plaintiffs Have Standing.

A plaintiff demonstrates standing to sue under Article III when they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). PHEAA challenges only the first requirement – Plaintiffs' ability to allege an injury-in-fact for their PSLF and TEACH Grant claims.

To show an injury-in-fact, Plaintiffs must allege that they suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* When a plaintiff alleges the prospects of a future injury, the

"threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) (internal quotations omitted). However, plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about." *Id.* at 414 n.5. "Instead, '[a]n allegation of future injury may suffice if ... there is a substantial risk that the harm will occur.'" *Pennsylvania v. President United States*, 930 F.3d 543, 562 (3d Cir. 2019), *as amended* (July 18, 2019)[18] (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). At the motion to dismiss stage, the Third Circuit has held that "the '[i]njury-in-fact element is not Mount Everest." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014). "The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege [] some specific, identifiable trifle of injury." *Id.*

PHEAA does not appear to contest the particularized nature of Plaintiffs' alleged PSLF injury, *i.e.*, the significant delay to PSLF forgiveness and unnecessary payments of principal and interest. PHEAA's argument instead focuses on whether there is a substantial risk that harm will occur, and thus is sufficiently imminent, on the basis that many Plaintiffs have not yet made all 120 payments.

Plaintiffs allege several facts, however, that demonstrate a substantial risk that their PSLF forgiveness indeed will be delayed. For instance, each challenged Plaintiff[19] has taken significant

---

[18] *Cert. granted sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 918 (2020), and c*ert. granted sub nom. Trump v. Pennsylvania*, 140 S. Ct. 918 (2020).

[19] PHEAA is wrong to assert that "Plaintiffs Coleman, Gallagher, Dr. Gupta, Harig, King, Lathrop, Levis, Meckfessel, Miller, and Morris (the Pre-Forgiveness Plaintiffs) allege only that they have been denied 'the opportunity to make qualifying [loan] payments, which delays loan forgiveness under the PSLF program." (PHEAA Br. at 34). Plaintiffs Coleman, Dr. Gupta, Harig, Levis, and Miller also allege that Defendants issued ECF determinations that miscount the number of qualifying PSLF payments they made. *See* ¶ 66 (Coleman), ¶ 85 (Dr. Gupta), ¶¶ 89-90 (Harig), ¶ 131 (Levis), and ¶ 149 (Miller).

Furthermore, Plaintiffs Coleman, Gallagher, King, Lathrop, Levis, Meckfessel, Miller, and Morris allege multiple other injuries as a result of PHEAA's failures, including exhaustion of

steps toward qualifying and applying for PSLF forgiveness: they have been employed by PSLF qualifying employers for several years; they consistently have made PSLF qualifying payments towards the required 120 payments; and they voluntarily submitted PSLF Certification forms to track the number of qualifying payments made and their progress towards loan forgiveness.[20] These facts demonstrate more than a mere interest in the Program. They show Plaintiffs' commitment and full intent to apply for forgiveness after making all qualifying payments.

Further, *when* Plaintiffs intend to apply for forgiveness and *when* they will begin to incur additional payments of principal and interest as a result of the delay, can both be determined based on the number of qualifying payments credited by the Defendants. For example, "[s]ince graduating, Plaintiff Coleman has worked for a PSLF-qualifying employer and made consistent, on-time, monthly payments for at least the past 8 years. Defendants have credited her for only 32 of her 86 qualifying payments." ¶ 543. Thus, Plaintiff Coleman will begin to incur unnecessary additional payments of principal and interest as a result of the delay after making the next 34 payments. The fact that she and other Plaintiffs may have several years remaining to make qualified payments does not defeat the imminence of their claims. *See Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 364–65 (3d Cir. 2014) ("Because campaign planning decisions have to be made months, or even years, in advance of the election to be effective, the plaintiffs' alleged injuries are actual and threatened.") (internal quotations omitted). Allegations of plaintiffs' intent to act at a certain time in the future, like those here, can demonstrate the

---

forbearance eligibility, denial of federal interest subsidies, capitalization of accrued interest, and denial of the benefits of IDR Plans. *See* ¶ 67 (Coleman), ¶ 81 (Gallagher), ¶ 111 (King), ¶ 122 (Lathrop), ¶ 136 (Meckfessel), ¶ 150 (Miller), and ¶ 158 (Morris). Defendants thus concede that these Plaintiffs have standing to pursue these other injuries.

[20] *See* ¶ 46 (Bonham), ¶ 66 (Coleman), ¶ 70 (Davis), ¶ 85 (Dr. Gupta), ¶¶ 89–90 (Harig), ¶ 131 (Levis), ¶ 149 (Miller), and ¶ 198 (Shelley).

imminence of their injury for purposes of standing. *See e g.*, *In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012) (allegations that plaintiffs had planned to file new proposed insurance rates at a certain time in the future would "raise their claims above the speculative level"); *Nationwide Ins. Indep. Contractors Ass'n, Inc. v. Nationwide Mut. Ins. Co.*, 518 F. App'x 58, 62 (3d Cir. 2013) (a description of concrete plans, including a specific time for those plans, may support a finding of the actual or imminent injury required to establish standing); *Maurer v. HMS Assocs. of New Jersey*, No. CV 17-3560 (JBS/JS), 2018 WL 915123, at *4 (D.N.J. Feb. 15, 2018) (plaintiff's past habit of visiting defendant shopping center every few months along with his intent to return to the shopping center in the future demonstrate a prospective injury-in-fact).

Furthermore, Defendants' history of (1) failing to properly credit borrowers for qualifying payments due to a faulty database (¶¶ 527–43), and (2) denying more than 99% of all PSLF applications (¶ 294) – 40% of which were denied because the borrower, by Defendants' count, hadn't made 120 qualifying payments (¶¶ 531–35) – make Plaintiffs' future injury even more certain. *See Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149, 166 (3d Cir. 2016) ("the fact that some of FSC's members have been subjected to records inspections in the past makes the threat of future inspections more credible."). The deficiencies in Defendants' systems and business practices that led to these failures have not been remediated and are ongoing. ¶¶ 563–68. PHEAA's argument that Defendants may ultimately correct the number of qualifying payments credited to each Plaintiff, which failure to do so has prompted this and several other lawsuits[21], is disingenuous. Plaintiff Harig, for instance, requested that PHEAA

---

[21] *See Love, et al. v. PHEAA*, No. 19-cv-02387 (N.D. Ga.) (filed Apr. 12, 2019); *Weingarten, et al. v. DeVos, et al.*, No. 19-cv-02056 (D.D.C.) (filed July 11, 2019); *Christensen, et al. v. DeVos, et al.*, No. 19-cv-00509 (D. Utah) (filed July 17, 2019); *New York v. PHEAA*, No. 19-cv-09155

review his payment history to confirm the number of qualifying payments; PHEAA has not

provided Harig with the credit for the "missing" payments.[22] ¶ 90.

PHEAA's argument that "there is no *guarantee*" that Plaintiffs will make all 120

qualifying payments or that Defendants will fail to correct the miscounted payments

misunderstands the "certainly impending" requirement established by *Clapper v. Amnesty Int'l*

*USA*. "*Clapper's* statement that injury must certainly be impending does not mean that

[plaintiffs] must certainly" [incur harm]." *Constitution Party of Pennsylvania*, 757 F.3d at 365

(internal citations omitted). "It is enough that there is a reasonable evidentiary basis to conclude

that [plaintiffs'] activity will be limited by [defendant's] scheme."[23] *Id.*

Plaintiffs' alleged facts, taken as true and construed in Plaintiffs' favor, are not a

speculative series of conditions. They support a reasonable inference that Plaintiffs will continue

---

(S.D.N.Y.) (filed Oct. 3, 2019); *Winebarger, et al. v. PHEAA, et al.*, No. 19-cv-01503 (C.D. Cal.) (filed Feb. 28, 2019).

[22] Importantly (and tellingly), Defendants have yet to correct the other Plaintiffs' qualifying payment counts too, or even offered to do so.

[23] PHEAA relies on *Winebarger v. PHEAA*, 411 F. Supp.3d 1070 (C.D. Cal. 2019) and *Love v. PHEAA*, No. 19-cv-2387, 2020 WL 1545798 (N.D. Ga. Mar. 16, 2020). Plaintiffs respectfully suggest that those decisions overlooked key allegations, discussed herein, and were decided incorrectly. Furthermore, the Court in *Love* relied on caselaw that is distinguishable from the facts here. First, it relied on *Clapper*, 568 U.S. at 409, which turned only on the contingent decisions of the government. Plaintiffs' prospective harm here turns primarily on *their* intent to make 120 payments and apply for PSLF forgiveness. Second, it relied on *Educ. Corp. of Am. v. United States Dep't of Educ.*, No. 2:18-cv-01698, 2018 WL 5786077, at *5 (N.D. Ala. Nov. 5, 2018), which was based on plaintiffs' failure to allege that the defendant had a history of misconduct. Plaintiffs here allege a history of Defendants' failure to properly credit borrowers with qualifying payments as a result of its faulty data systems (¶¶ 527–43) and that 40% and 55% of PSLF and TEPSLF denials, respectively, were based on borrowers not having made 120 qualifying payments (¶¶ 294, 549). Finally, in *Sammons v. Nat'l Comm'n on Certification of Physician Assistants, Inc.*, 104 F. Supp. 2d 1379, 1381 (N.D. Ga. 2000), the plaintiff never actually applied for a physicians assistant certification. Plaintiffs here have actually submitted ECF Forms and received Defendants' determinations.

to make qualifying payments, Defendants will continue to miscount Plaintiffs' total payments, and there is therefore a substantial risk that their PSLF forgiveness will be delayed.[24]

### 2.    The PSLF Claims Are Ripe.

"Determining whether a dispute over agency action is ripe involves a two-part inquiry." *Univ. of Med. & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 68 (3d Cir. 2003). Courts must assess: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).

"The fitness question, in turn, requires an assessment of whether the issues presented are purely legal, whether the agency action is final for purposes of section 10 of the Administrative Procedures Act, and whether further factual development would significantly advance [the court's] ability to deal with the legal issues presented." *Corrigan*, 347 F.3d at 68. (citing *Nat'l Park*, 538 U.S. at 812) (internal quotations omitted). PHEAA's argument that ECF Determinations that miscount the number of PSLF-qualifying payments are not "final agency action" fails for the reasons discussed in detail in Section IV.B.2.c of Plaintiffs' Opposition to the Department's Motion to Dismiss, which are incorporated herein. In sum, the ECF determinations constitute final agency decisions because borrowers need not *resubmit* the ECF request with their final application for forgiveness, there is no appeals process to challenge the

---

[24] PHEAA also argues that two of TEACH Plaintiffs (Jones and Webb) do not have standing, because they have been made whole through the 2019 reconsideration process. (PHEAA Br. at 36). However, these TEACH Plaintiffs have not been made whole, as the Bulman Declaration submitted by the Department demonstrates that neither Jones or Webb received full refunds. (Bulman Decl. ¶ 14(c) (stating that $1,700.88 that Jones paid was applied to her Direct Loans, rather than refunded); ¶ 14(h) (stating that $340.70 that Webb paid was applied to her Direct Loans, rather than refunded)).  Even if they had received full refunds, their claims fall well within established exceptions to the mootness doctrine for the reasons stated in Section IV.A.2 of Plaintiffs' brief in opposition to the Department's motion to dismiss.

ECF determinations, the ECF determination letters use definitive language, and they determine borrowers' rights to have their payments count toward the 120 payments necessary for forgiveness.

PHEAA also argues that each claim is highly factual and further factual development would aid a decision by the Court, but do not identify what facts remain to be determined. Plaintiffs' claims turn on the problems with the Department's National Student Loan Data System and the data systems of its loan servicers, which prevent the exchange of complete and accurate data between servicers. These facts that are not disputed by either Defendant. ¶¶ 532–35 (Defendants acknowledge that the flaws in the loan servicing data systems "increase the risk of miscounting qualifying payments") (citing Sept. 2018 GAO Report). It is these problems that result in the miscount of PSLF qualifying payments when a borrower's loan is transferred from one loan servicer to PHEAA, as the exclusive PSLF servicer. ¶¶ 531–34.

Plaintiff Coleman's loans, for example, were transferred from her previous loan servicer to PHEAA after submitting a PSLF ECF Request. ¶ 66. The response to her Request determined that she had made only 32 of 86 qualifying payments. *Id*. The Court's analysis will thus focus on whether the inaccurate ECF Determinations are based on the Department's failure to maintain accurate data systems, is arbitrary and capricious, an abuse of discretion, or not in accordance with law. Facts related to Plaintiffs' future PSLF application and denial do not change this analysis.

With respect to hardship, the Department's miscount of PSLF qualifying payments have caused significant delay in the time to loan forgiveness which ultimately results in additional payments of principal and interest. "Although a party need not wait until a threatened hardship becomes a reality, the hardship must be certain and impending to obtain preventive relief." *CEC*

*Energy Co. v. Pub. Serv. Comm'n of Virgin Islands*, 891 F.2d 1107, 1111 (3d Cir. 1989) (citing

*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development*

*Commission*, 461 U.S. 190, 201 (1983)). PHEAA's argument that Plaintiffs' claims are not

actual or imminent fails for all the same reasons discussed in Section IV.C.1, *supra.*

### 3.   Plaintiffs Have Standing to Bring Claims Under Each Jurisdiction.

PHEAA argues that this Court does not have subject matter jurisdiction because Plaintiffs

who bring claims related to only one Program at issue (for example TEACH) but not others (*i.e.*,

PSLF and IDR) under the consumer protection statute of their home state do not have standing to

bring those claims on behalf of class members asserting claims pertaining to the other programs

(PHEAA Br. at 38–39).

A motion to dismiss is not the proper or most efficient stage to resolve this question;

rather, a plaintiff's standing to pursue state law claims on behalf of absent class members is not

an Article III jurisdictional issue and should be addressed in a Rule 23 analysis. *In re Prudential*

*Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 307 (3d Cir. 1998) ("[O]nce the

named parties have demonstrated they are properly before the court, 'the issue [becomes] one of

compliance with the provisions of Rule 23, not one of Article III standing'") (citation omitted);

*see also In re Thalomid & Revlimid Antitrust Litig.*, No. CV 14-6997, 2015 WL 9589217, at

*18–19 (D.N.J. Oct. 29, 2015); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. CV 16-MD-

2687, 2017 WL 3131977, at *19 (D.N.J. July 20, 2017) ("[T]he United States Supreme Court has

made it clear that District Courts should defer addressing standing questions concerning putative

class members who are not named until after class certification when certification of the class is

'logically antecedent' to the issue of standing."). Where standing issues would not exist but for

posture of the case as a class action, Rule 23 questions should be evaluated first rather than

deciding the standing issues at the motion to dismiss stage. *See Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999).[25]

PHEAA's argument here relates to class certification, not standing. For each state consumer protection law claim in the CAC, there is at least one named Plaintiff who resides in that state, as PHEAA admits. (PHEAA Mot. to Dismiss at Ex. 5). If at least one named Plaintiff has standing to bring the claim, and PHEAA's other arguments for dismissal are rejected, the claim should not be dismissed. Questions regarding the scope of a class that the named Plaintiffs can represent for the claims will be resolved during the class certification process.

### D.   PLAINTIFFS ADEQUATELY ALLEGE A CLAIM FOR BREACH OF CONTRACT UNDER FEDERAL COMMON LAW.

#### 1.   PHEAA Breached Core Terms of the Servicing Contract.

The foundation of the Servicing Contract requires PHEAA to "maintain[] a full understanding of all federal and state laws and regulations and FSA requirements" and "ensure[] that all aspects of the service continue to remain in compliance as changes occur." ¶ 316 & Ex. C (2009 Contract, Attachment A-1, p.7). PHEAA's contention that Plaintiffs fail to identify the specific terms of the Servicing Contract that PHEAA breached ignores this important provision of the Servicing Contract and numerous allegations that PHEAA failed to comply with federal law in several material ways.

---

[25] PHEAA's cases—which addressed the named plaintiffs' constitutional standing to bring their own claims in states in which they do not reside and not whether they had standing to represent absent class members—are not instructive. *See In re Wellbutrin XL Antitrust Litigation*, 260 F.R.D. 143, 152 (E.D. Pa. 2009); *In re Niaspan Antitrust Litigation*, 42 F. Supp. 3d 735, 758–59 (E.D. Pa. 2014).

**2.      Plaintiffs Are Intended Third-Party Beneficiaries of the Servicing Contract.**

A third party to a contract may enforce its terms where the contract "reflects the express or implied intention of [the contracting parties] to benefit [the third party]." *Nat'l Sur. Corp. v United States*, 31 Fed Cl. 565, 576 (1994); *see also Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). Section 302 of the Restatement (Second) of Contracts ("Restatement") provides the test for determining whether a third party is an intended beneficiary:

> Unless otherwise agreed between the promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance."

Restatement, § 302(1).

The most important factor for determining whether a third party is an intended beneficiary is the intention of the parties. *Flexfab LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) ("The intent of the parties to the contract is therefore the cornerstone of a claim for third-party beneficiary status."). Third-party beneficiary status is not limited to those specifically named in the contract and may include a class of people that benefit from performance under the contract. *Montana v. U.S.*, 124 F.3d at 1273 ("The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby."). "One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Id.* (citing Restatement, § 302(1)(b)).

Here, the Servicing Contract clearly evidences an intent to benefit a specific class of individuals – federal student loan borrowers whose loans are serviced by PHEAA. Indeed, the entire purpose of the contract is to ensure that student loan borrowers receive the benefit of

federal student loan programs. *See* CAC, Ex. C, Addendum 2, at 19 ("FSA's core mission is to

ensure that ***all eligible individuals benefit from federal financial assistance*** – grants, loans, and

work-study programs – for education beyond high school." (emphasis added)); *see also id.* at 14

(stating that allocating loan servicing volume to PHEAA must be in the best interest of

borrowers). Outside the contract, the Department has repeatedly stated that the purpose of the

federal aid program and the role of servicers is to act in the best interests of students and provide

specific assistance to borrowers. ¶¶ 259–61, 329–35. To that end, the contract requires PHEAA

to provide a host of services *to borrowers* to ensure their satisfaction. ¶¶ 275–78, 312-14, 317,

320, 330–31, 644, 646-52. For that reason, borrowers would be reasonable in relying on the

benefits and promises outlined in the Servicing Contract. *Montana*, 124 F.3d at 1273. In fact,

both DOE and PHEAA *told them they may rely on those benefits*. ¶¶ 331–33, 336–37. Plaintiffs

and other borrowers were consistently directed to PHEAA for loan-related questions, assistance,

and services. *Id.* The Servicing Contract therefore illustrates PHEAA's and the Department's

intent to benefit student loan borrowers above and beyond the usual services associated with loan

servicing and PHEAA was to provide those services *to borrowers*. ¶ 327.

Attempting to avoid the test provided in § 302 of the Restatement that examines the

benefit to third parties under the contract, PHEAA incorrectly asserts § 313 of the Restatement

applies. Section 313 states that "a promisor who contracts with a government or governmental

agency to do an act for or render a service *to the public* is not subject to contractual liability to a

member of the public . . . [unless] the terms of the promise provide for such liability."

Restatement, § 313 (emphasis added). Pursuant to § 313, members of the public are generally

considered incidental beneficiaries of government contracts where the contract benefits the

public at large. *See id.* cmt. a ("individual members of the public are treated as incidental

beneficiaries . . . ."). Unlike intended beneficiaries, incidental beneficiaries do not have a right to sue under a contract unless the contract expressly states otherwise. *See, e.g.*, *Hyland v. Navient Corp.*, 2019 WL 2918238, at *8 (finding that in "the case of government contracts, individual members of the public are treated as incidental beneficiaries . . ." and requiring plaintiffs to show "language in the Servicing Contracts that clearly evidences an intent to permit enforcement by the third party in question.").

But § 313 is not "a *per se* rule to be employed in all third-party beneficiary cases" involving government contracts. *Schuerman v. United States*, 30 Fed. Cl. 420, 432 (1994); *Nat'l Sur Corp. v. United States*, 31 Fed. Cl. at 575 (rejecting the requirement that "the contract reflect [an] intent to give the third party the direct right to compensation or to enforce that right against the promisor" because "§ 313 only applies to suits by members of the public for consequential damages against promisors who contract to render a public service.").

Where, as here, a government contract does not benefit the public at large, but rather a specific class of people, those specific people are intended beneficiaries with the right to enforce the contract regardless of whether they are expressly afforded a right of enforcement in the contract. *See e.g.*, *Flexfab LLC*, 424 F.3d at 1260 (the intended beneficiary "need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby."); *New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 817 (S.D.N.Y. 1986) (holding that a plaintiff who "can show a special benefit to himself in contrast to any benefit he enjoys as a member of the public generally may be an intended [third-party] beneficiary of a government contract"); *DFP Mfg. Corp. v. Northrop Grumman Corp.*, No. 97-CV-4494, 1999 WL 33458384, at *8 (E.D.N.Y. Mar. 23, 1999) ("[t]his

45

is not an instance in which the beneficiary is one of many members of the general public, or third parties, who would reap the benefit of a government contract.").

Plaintiffs here do not allege the Servicing Contract benefits the public at large; rather, they assert the contract requires PHEAA to provide benefits directly to a specific and identifiable class of people, namely, federal student loan borrowers whose loans PHEAA services. As such, PHEAA and the cases it relies on are mistaken in requiring that the Servicing Contract expressly permit a right of enforcement under § 313. As § 302 recognizes, it is enough that the Servicing Contract provide direct benefits to Plaintiffs, who reasonably relied on those benefits. *See, e.g.*, *Scarpitti v. Weborg*, 609 A.2d 147, 151 (Pa. 1992) (finding the plaintiff was a third-party beneficiary even where "the agreement between appellant and Winchester does not expressly manifest an intent to benefit the subdivision homeowners" because "recognition of a right to uniform enforcement . . . in [the third party] [wa]s appropriate to effectuate the intention of the parties."). Plaintiffs, therefore, are intended third-party beneficiaries with the right to enforce the terms of the Servicing Contract.

### 3. Plaintiffs Adequately State an Alternative Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014); *United States v. Basin Elec. Power Co-op*, 248 F.3d 781, 796 (8th Cir. 2001) ("The Government correctly urges every contract implies that each party will act in good faith."). In evaluating the duty of good faith and fair dealing in federal contracts, courts typically look to Section 205 of the Restatement (Second) of Contracts. *Mansoor Int'l Dev. Servs., Inc. v. United States*, 121 Fed. Cl. 1, *6–7 (Fed. Cl. 2015) ("A claim that a party to a contract breached the duty of good faith and fair dealing implicates common law and is generally addressed by … § 205

(1981).").[26]  Under the Restatement, "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealings may require more than honesty."  Restatement, § 205, cmt. d.

As third-party beneficiaries to the contract, Plaintiffs may sue to enforce the implied covenant described in § 205. *See, e.g.*, *Scarpitti*, 609 A.2d at 148 (third party beneficiary may enforce implied contractual terms).  Even so, PHEAA claims Plaintiffs' implied covenant claim should be dismissed because it is either redundant of the breach of contract claim or it improperly expands PHEAA's contractual duties under the Servicing Contract.  Both contentions fail.

While a breach of the covenant of good faith and fair dealing is not a separate claim, it is a separate basis for a breach of contract claim.  *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 430 (E.D. Pa. 2015).  Here, Plaintiffs expressly bring this claim as an alternative basis for its breach of contract claim should the court find that PHEAA did not expressly violate a provision of the contract. ¶ 660.

Such a claim does not improperly expand PHEAA's contractual duties under the Servicing Contract, but rather recognizes that PHEAA must carry out its contractual obligations in good faith.  *Mansoor*, 121 Fed. Cl. at *6–7 ("[T]he implied duty stems from the consensual terms reflected in an express contract, but it addresses the parties' reasonable expectations that may not have been embodied in the contractual language."); *Gills v. Respond Power, LLC*, No.

---

[26] Courts applying federal common law also "take into account the best in modern decision and discussion[,]" *Basin*, 248 F.3d at 796, which may include evaluations of § 205 made under state contract law.  *See, e.g.*, *Mansoor*, 121 Fed. Cl. at *6 n.7 (discussing a California state law case interpreting § 205).

14-cv-3856, 2018 WL 3427636, at *7 (E.D. Pa. July 16, 2018) (noting that while the implied

covenant "may not 'override . . . agreed-upon expectations and duties[,]'" it "may aid a party in

effectuating that to which the parties have agreed[.]" (quoting *Humphreys v. Budget Rent a Car*

*Sys. Inc.*, No. 10-cv-1302, 2014 WL 1608391, at *7 (E.D. Pa. Apr. 22, 2014)); *USX Corp. v.*

*Prime Leasing, Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (holding the implied covenant requires the

parties to "bring about a condition or . . . exercise discretion in a reasonable way.").  Indeed,

Restatement, § 205 cmt. d recognizes the types of misconduct constituting "bad faith" transcend

the mere breach of a contract and include: "evasion of the spirit of the bargain, lack of diligence

and slacking off, willful rendering of imperfect performance, abuse of power to specify terms,

and interference with or failure to cooperate in the other party's performance."

      Here, Plaintiffs assert that, should the Court find PHEAA complied with the letter of the

contract, it nevertheless did not comply with its intent.  Plaintiffs allege that PHEAA deliberately

undermined Plaintiffs by servicing their loans not to Plaintiffs' or other borrowers' benefit, but to

ensure PHEAA increased its own revenue. For instance Plaintiffs allege PHEAA improperly

converted TEACH grants to direct loans to increase its servicing fees, used tactics to ensure

borrowers took longer to pay off their loans, and obtained improper financial benefits by

withholding services it was required to provide.  ¶¶ 358–61, 391–99.  Such actions are contrary

to the Serving Contract's intent to benefit borrowers and ensure their timely repayment of

student loans.  By taking advantage of provisions in the Servicing Contract that increased

PHEAA's profits at the expense of borrowers, PHEAA contravened the purpose of the contract

and breached the implied covenant of good faith and fair dealing.

**E.  PLAINTIFFS SUFFICIENTLY ALLEGE STATE COMMON LAW CLAIMS FOR UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE FRAUD, NEGLIGENCE, NEGLIGENT MISREPRESENTATION, AND NEGLIGENCE *PER SE***

**1.  Pennsylvania Law Applies to Plaintiffs' State Common Law Claims (Counts 9–14)**

PHEAA argues that five of the common law claims alleged by Plaintiffs should be dismissed because Plaintiffs did not "identify governing law." (PHEAA Br. at 47). This argument fails because the state law applicable to these claims is not a matter of pleading, but instead a choice of law issue. *Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46, 52 (D.D.C. 2008) (noting that plaintiffs "need not specify in the complaint a particular state out of which each claim arises," and that "Choice of law is a legal determination that the court will make under its choice of law rules."); *see also* 5 Wright & Miller, *Federal Practice and Procedure* § 1253 (3d. ed. 2004) ("it is not necessary to plead state law, whether it be the forum state's law or the law of another state.").[27]

Choice of law questions often require factual development before a proper analysis can be conducted, leading many courts to deny Rule 12(b)(6) motions that depend on choice of law conclusions in favor of revisiting the issue with the benefit of discovery at the class certification

---

[27] For its argument that "failure to identify governing law" in a complaint requires automatic dismissal of a common law claim, PHEAA cites to *In re Wellbutrin XL*, 260 F.R.D. at 167. But the court dismissed in that case because it interpreted the plaintiffs to be pleading a "pan-jurisdictional" unjust enrichment claim under general federal common law (which claim does not exist), or the laws of a collection of unspecified states. *See id.* That is not the case here, as Plaintiffs argue for the application of Pennsylvania law to all the common law claims. The other cases cited to by PHEAA in turn cited to *In re Wellbutrin*, but both ultimately reviewed the common law of at least one potentially applicable state before ordering dismissal. *SEPTA v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 705 (E.D. Pa. 2015); *Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 550 n.15 (E.D. Pa. 2014). To the extent *In re Wellbutrin* could be read as standing for the proposition that plaintiffs must always identify an applicable state law in a complaint to prevent dismissal of a common law claim, that notion is wrong.

or summary judgment stages. *See, e.g.*, *Harper v. LG Elecs. USA, Inc.*, 595 F.Supp.2d 486, 490 (D.N.J. 2009); *In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 744 (E.D.N.Y. 1986); *In re Samsung DIP Television Class Action Litig.*, No. 07–2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009). For these reasons alone, the Court should reject PHEAA's argument that Plaintiffs were required to "identify governing law" in their complaint.

Nevertheless, if the Court decides to examine the choice of law question at this stage, Plaintiffs' factual allegations are sufficient for the Court to determine that Pennsylvania law applies to their state common law claims with respect to all Plaintiffs. Normally, "a federal district court adjudicating a state law issue must apply the law of the forum state." *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977). When conflict of laws may be an issue, this maxim requires application of the forum states' conflict of laws rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "In an MDL setting, the forum state is usually the state in which the action was initially filed before it was transferred to the court presiding over the MDL proceedings." *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 140 (E.D. La. 2002).

This MDL includes actions originally filed in Pennsylvania, Illinois, and Ohio federal courts, but the five claims at issue for this portion of PHEAA's motion to dismiss were originally brought either in the CAC itself[28] or initial complaints filed in this District or the Middle District of Pennsylvania.[29] The cases transferred from the Ohio and Illinois courts did not allege these

---

[28] The claim for negligence *per se* is stated as a separate claim only in the CAC, ¶¶ 719–46.

[29] *See* Compl. ¶¶ 418–44, 458–72, pp. 97–99, *Wardlow v. PHEAA*, 2:19-cv-5278 (E.D. Pa.) (alleging breach of fiduciary duty, constructive fraud, negligence, negligent misrepresentation); Compl. ¶¶ 144–55, *Gallagher v. PHEAA*, 1:17-cv-2416 (M.D. Pa.) (alleging negligence); Compl. ¶¶ 297–310, *Neumann v. PHEAA*, 1:18-cv-960 (M.D. Pa.) (alleging negligence); Compl. ¶¶ 93–106, *Anderson v. PHEAA*, 1:18-cv-1378 (E.D. Pa.) (alleging breach of fiduciary duty, negligent misrepresentation); Compl. ¶¶ 163–76, *Keegan v. PHEAA*, 2:18-cv-1143 (E.D. Pa.) (alleging

claims at the time of transfer.[30] Therefore, Pennsylvania's choice of law rule applies to these

particular claims.[31] Pennsylvania utilizes a "hybrid approach that 'combines the approaches of

both [Restatement (Second) Conflict of Laws] (contacts establishing significant relationships)

and interest analysis (qualitative appraisal of the relevant States' policies with respect to the

controversy)." *Carrick v. Zurich-American Ins. Group*, 14 F.3d 907, 909 (3d Cir. 1994) (citation

and internal quotation marks omitted).

PHEAA presumes without argument or support that each common-law claim could only

be brought by an individual plaintiff under the laws of that plaintiff's respective state of

residence. This is not correct. Both PHEAA's headquarters and its operations, including most of

its call centers, are located in Pennsylvania. ¶¶ 245, 448. The Court can therefore draw a

reasonable inference that all, or the vast majority, of PHEAA's actions occurred in Pennsylvania.

The only factor that arguably could weigh in support of application of another state's common

law is that some Plaintiffs reside outside of Pennsylvania and may have "felt" their injuries in

their states of residence. But "when the injury occurred in two or more states, or … is fortuitous

and, with respect to the particular issue, bears little relation to the occurrence and the parties, the

place where the defendant's conduct occurred will usually be given particular weight in

---

constructive fraud, negligent misrepresentation); Compl. ¶¶ 170–83, *Morris v. PHEAA*, 2:18-cv-031 (E.D. Pa) (alleging constructive fraud, negligent misrepresentation).

[30] *See* 2d Am. Compl. ¶¶ 217–59, *Ford v. PHEAA*, 5:17-cv-049 (N.D. Ohio) (bringing only claims under RICO, breach of contract, and unjust enrichment); Compl. ¶¶ 95– 202, *Rockwell v. PHEAA*, 1:18-cv-367 (N.D. Ill.) (alleging only tortious interference with contract, breach of contract, and statutory claims).

[31] If no conflict exists with respect to a particular claim, then it is still proper to review that claim under Pennsylvania law because the outcome should be the same regardless of which state's law applies. Although PHEAA does not present a full choice-of-law argument, Plaintiffs presume actual conflicts exist with respect to at least some of the claims at issue and proceed to argue why Pennsylvania law applies.

determining the state of applicable law." *ClubCom, Inc. v. Captive Media, Inc.*, Civ. A. No. 07-1462, 2009 WL 249446, at *8 (W.D. Pa. Jan. 31, 2009) (quoting Restatement (Second) Conflict of Laws § 145 cmts. e, f.).

Given that PHEAA is a Pennsylvania entity that operates primarily within Pennsylvania, the outcome of the choice of law analysis should clearly favor application of Pennsylvania law. Otherwise, if dispositive weight were given to the location of individual borrowers, the laws of *all* fifty states would apply. Such an outcome would entirely undermine the rationale of the "most significant relationship" test, which was adopted by Pennsylvania because it was designed to identify the *one* state with the *most* significant relationship to the claims. *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 806 (1964) ("The merit of such a rule is that it gives to *the* place having the *most interest* in the problem paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of *the* jurisdiction most intimately concerned with the outcome of [the] particular litigation") (all emphasis added, internal quotation marks and citation omitted).

## 2.    Plaintiffs Have Stated a Claim for Unjust Enrichment.

In Pennsylvania, unjust enrichment is an equitable doctrine that implies a contract where "a party is found to have been unjustly enriched" and "requires the offending party to pay the plaintiff the value of the benefit he has conferred on the defendant." *Com. ex rel. Pappert v. TAP Pharm. Prod., Inc.*, 885 A.2d 1127, 1137 (Pa. 2005). To state an unjust enrichment claim, Plaintiffs must establish: (1) that they conferred a benefit on the defendant; (2) that the defendant appreciated the benefit; and (3) the defendant's acceptance and retention of the benefit without paying for the value of the benefit is inequitable under the circumstances. *Id*. Plaintiffs meet those requirements here.

Plaintiffs adequately allege that they conferred a benefit onto PHEAA, that PHEAA appreciated that benefit, and that it would be unjust to allow PHEAA to retain the benefit conferred. ¶¶ 696–97. Specifically, Plaintiffs allege PHEAA had an incentive to ensure loans remain in active repayment for as long as possible because, under the Servicing Contract, its fees are based on the number of loans it services. ¶ 391. To maximize its fees, PHEAA steered borrowers into forbearance, improperly prolonging Plaintiffs' repayment periods, and delaying loan forgiveness, which resulted in borrowers paying more in principle and interest than they would have had PHEAA adequately serviced their loans. ¶¶ 391–99. PHEAA also benefited by converting TEACH Grants to direct loans because it received more fees per direct loan serviced than per TEACH Grant serviced. ¶¶ 359–60. While PHEAA profited from its misconduct, Plaintiffs and the Class have paid and will continue to pay more than they would have had PHEAA properly managed their loans. Such a result is unjust because PHEAA acted contrary to the intent of the Servicing Contract, the MPNs, and its own representations.

 Despite the fact that PHEAA will unfairly receive more fees due to its alleged misconduct, PHEAA claims Plaintiffs' unjust enrichment claim should be dismissed because the Department, rather than Plaintiffs, paid PHEAA.  However, direct payment is not necessary to show Plaintiffs conferred a benefit on PHEAA. *See Aetna, Inc. v. Insys Therapeutics, Inc*., 324 F. Supp. 3d 541, 559 (E.D. Pa. 2018) ("Pennsylvania law does not require that the alleged benefit in an unjust enrichment claim be conferred directly by the plaintiff upon the defendant, so long as the benefit is not too attenuated to support equitable relief."); *Glob. Ground Support, LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 676 (E.D. Pa. 2008) ("It is true that plaintiff need not have directly dealt with each defendant in order to allege a claim of unjust enrichment against them. The claim of unjust enrichment simply requires that plaintiff 'confer' benefits on a

defendant; it does not require that plaintiff 'directly confer' those benefits."); *Pappert*, 885 A.2d at 1137 ("[T]he plaintiff bears the burden of establishing either that the defendant wrongly secured the benefit or passively received a benefit that it would be unconscionable to retain." (emphasis added)); *Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 310 F.R.D. 166, 176–77 (E.D. Pa. 2015) ("Plaintiffs need not have purchased the vaccine lots at issue directly from Defendants to have conferred benefits on the defendant." (internal quotations omitted)).

Here, Plaintiffs conferred a benefit onto PHEAA that is not "too attenuated" for Plaintiffs' unjust enrichment claim to survive. *See Insys*, 324 F. Supp. 3d at 559. As Plaintiffs allege, PHEAA's misconduct prolonged their student loan repayment period directly resulting in increased profits that PHEAA would not have earned but for its efforts to ensure Plaintiffs remain in repayment. Plaintiffs' payments are the necessary source of the revenue at issue in this case. That benefit is sufficient for Plaintiffs' to have adequately stated an unjust enrichment claim.

### 3.  Plaintiffs Sufficiently Allege Facts Supporting a Fiduciary Relationship Between PHEAA and Plaintiffs

PHEAA argues that Plaintiffs' breach of fiduciary duty and constructive fraud claims should be dismissed because PHEAA is not Plaintiffs' fiduciary. PHEAA Br. at 48–50. This argument fails because Plaintiffs allege numerous facts that demonstrate PHEAA had a fiduciary duty to borrowers, including the obligation to "establish a relationship with the borrower" (¶ 330), provide them with "effective counseling and outreach" (¶ 329), and "best serve [their] needs" (¶ 337). This unique advisory role was meant by Congress to go beyond traditional loan servicing functions. ¶ 327. Furthermore, borrowers have no free market choice in selecting a loan servicer such that they had to rely on PHEAA to provide advice and accurate information (¶¶ 289, 313, 707). *See* Restatement (Second) of Torts § 874 cmt. a. ("A fiduciary

relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.").

In Pennsylvania, a fiduciary relationship "may be established as a matter of fact to be decided by evidence. The disparity in position between the parties is the key factor in determining whether a fiduciary-in-fact relationship developed between parties in an otherwise arm's-length business relationship. *Reginella Const. Co. v. Travelers Cas. & Sur. Co. of Am.*, 949 F. Supp. 2d 599, 611 (W.D. Pa. 2013).

Although PHEAA broadly argues that many courts have ruled there is no fiduciary relationship formed between a loan servicer and a borrower, in truth there is no categorical legal rule precluding the existence of a fiduciary relationship in this context. *Basile v. H & R Block, Inc.*, 777 A.2d 95, 103 (Pa. Super. Ct. 2001) ("The possibility of a confidential relationship *cannot be excluded* by a concrete rule. So long as the requisite disparity is established between the parties' positions in the relationship, and the inferior party places primary trust in the other's counsel, a confidential relationship may be established.") (emphasis added). A confidential relationship may attach "wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Id.* at 102 (quoting *Brooks v. Conston*, 51 A.3d 684, 688 (Pa. 1947)).

Because the actual existence of a fiduciary or confidential relationship is generally considered a factual question, courts usually decline to resolve the issue at the motion to dismiss stage as long as Plaintiffs' allegations provide facts upon which a jury could find such a relationship exists. *See Daniel v. Navient*, 328 F. Supp. 3d at 1325 (finding that breach of fiduciary duty claim was stated through allegations that student loan servicer held itself out as

having expertise regarding repayment plans and in fact provided advice regarding loan repayment program requirements).

Plaintiffs' allegations here meet this threshold because Plaintiffs had virtually no bargaining power compared to PHEAA. As Plaintiffs explain in their complaint, PHEAA is no ordinary loan servicer, and its relationship with borrowers is not an ordinary "arm's-length relationship" because Plaintiffs' had no ability to choose their servicer. ¶¶ 289, 313, 707. Instead, the government chose PHEAA as a servicer and assigned Plaintiffs' loans to PHEAA for servicing. *See, e.g.*, ¶¶ 310, 530, 766, 780, 796, 812. Congress intended the student loan servicing contractors to "serve in a unique advisory capacity that far exceeds the role of conventional loan services." ¶ 327. And the federal government itself has observed that a "natural consequence" of the complexity of the student loan programs is that even sophisticated borrowers "rely on servicers" to answer questions and provide assistance in choosing the appropriate plans. ¶ 326. Plaintiffs' complaint includes detailed factual support showing that Congress and the Department fully expected and intended borrowers would put their trust into the servicing contractors and rely upon them for advice and assistance, and that the contractors were expected to perform their services for the benefit of student borrowers. ¶¶ 4, 314, 326–35, 707, 711–12. The Department has gone so far as to discourage borrowers from seeking loan-related assistance from third parties, emphasizing that the servicers can provide such advice at no cost to borrowers. ¶¶ 333–35. PHEAA embraced its advisory role, referring to its call center representatives as "Loan Counselors," (¶ 336), claiming that "we have one goal: to help you successfully repay your loans," (¶ 411), and "[w]e are here to help ease that stress and find a solution that works for you and your budget." ¶ 412; *see also* ¶ 712.

Indeed, borrowers had no choice but to rely on PHEAA for assistance. In the normal private loan market, borrowers have at least *ex ante* freedom to choose among different lenders, and in turn, servicers, and even after those borrowers enter a loan agreement, they typically may refinance most loans to acquire more favorable loan and servicing terms. Here, Plaintiffs are "assigned" a loan servicer. *See* ¶¶ 310, 530, 766, 780, 796, 812. Furthermore, those with TEACH Grants, or those participating in the PSLF Program, are automatically assigned to PHEAA as the exclusive servicer of those Programs. ¶¶ 4, 289, 300, 313. And Plaintiffs cannot refinance their federal loans and remain eligible for the PSLF or IDR programs. In short, when borrowers' loans are unilaterally assigned by the Department to PHEAA as their servicer, borrowers *have no choice* but to rely on PHEAA to do its job correctly. Plaintiffs could not "take their business elsewhere" if they were unsatisfied with PHEAA. This may not pose a problem, if as Congress intended, PHEAA and other servicers chosen to administer the programs at issue provided accurate information and advice and quality services that the borrowers *could rely upon*. But they do not.

By contrast, through the statutory and regulatory structure of the HEA and the Servicing Contract, PHEAA obtained overwhelming control over each Plaintiff's grants or loans and, consequently, the Plaintiff's financial well-being. For instance, PHEAA has the ability to switch a borrower into forbearance and instantly capitalize thousands or tens of thousands of dollars' worth of interest during a short phone call, or convert a TEACH Grant into an interest-bearing loan due to minor technicalities, causing the Plaintiffs' debt obligations to *immediately* and significantly increase. ¶¶ 9–11, 14–18, 307, 365, 398, 410. PHEAA could foresee that negligent performance of these services would cause Plaintiffs financial harm. ¶¶ 708–11.

As a result of the unique nature of the federal programs at issue, there was no occasion at all for arm's-length bargaining between Plaintiffs and PHEAA. The numerous cases cited by PHEAA (PHEAA Br. at 49 nn.22–23) involved *traditional* borrower-lender relationships in the private market and are therefore inapposite; the rationale underlying the reluctance of those courts to find a fiduciary relationship does not apply here where Plaintiffs allege that PHEAA's loan servicing role far exceeds that of conventional loan servicers. ¶ 327.  PHEAA also relies on *Wong v. Navient*, No. 19-cv-1233, 2020 WL 978520 (W.D. Wash. Feb. 28, 2020). *See* PHEAA Notice of Supplemental Authority (ECF No. 60).  However, *Wong* was decided under the standard for summary judgment. 2020 WL 978520 at *1. And, as PHEAA points out, the Court held that loan servicers do not "owe a fiduciary duty to borrowers" under Washington law, unless "the lender's actions in servicing the loan exceed that of a traditional lender, in which case a fiduciary duty may exist." *Wong*, 2020 2020 WL 978520 at *6. Because plaintiffs in that case did not allege that Navient "exceed[ed] the role of a traditional lender in servicing" the plaintiff's loans, no fiduciary duty was found to exist. *Id*.

Plaintiffs' allegations include sufficient facts upon which a jury could find that Plaintiffs had no choice but to place their trust and confidence in PHEAA to provide them with accurate information and properly service their loans. Accordingly, PHEAA's motion with respect to Plaintiffs' breach of fiduciary duty and constructive fraud claims should be denied.

### 4.    PHEAA Owed A Duty of Reasonable Care to Borrowers Even If It Was Not a Fiduciary

Even if there were no fiduciary relationship between PHEAA and borrowers, PHEAA still owed an ordinary duty of reasonable care while providing information to borrowers and servicing their loans. In Pennsylvania, anytime an actor engages in affirmative conduct, "he is generally under a duty to others to exercise the care of a reasonable man to protect them against

58

an unreasonable risk of harm to them arising out of the act." *Dittman v. UPMC*, 196 A.3d 1036, 1046 (Pa. 2018) (quotation and citation omitted). Here, PHEAA voluntarily undertook the responsibility to service Plaintiffs' loans and to provide them with accurate information. PHEAA could foresee that negligence in those activities would result in exactly the type of harms Plaintiffs allege, including improperly converted TEACH Grants, capitalized interest, and delayed loan forgiveness. ¶¶ 707–12. PHEAA fails to identify any Pennsylvania authority standing for the proposition that student loan servicers are exempt from this ordinary duty of care.

Additionally, Pennsylvania courts have adopted the theory of negligent misrepresentation under Section 552 of the Restatement (Second) of Torts, which provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 286–87 (Pa. 2005); *see also Brand Marketing Group LLC v. Intertek Testing Services, N.A., Inc.*, 801 F.3d 347, 353–55 (3d Cir. 2015) (discussing viability of § 552 negligent misrepresentation claim in Pennsylvania). Here, PHEAA is in the business of providing accurate information about Plaintiffs' loan statuses and the various repayment program requirements, and PHEAA knew Plaintiffs would reasonably rely on that information when making decisions about how to comply with the TEACH, PSLF, or IDR program requirements or how to best repay their loans. Plaintiffs' allegations to this effect are sufficient to allege that PHEAA was under a duty of reasonable care to borrowers.

59

### 5.    Plaintiffs State A Claim for Negligence *Per Se*

In Pennsylvania, claims of negligence *per se* based on a defendant's violations of statutes

or regulations require plaintiffs to prove the following elements:

> (1) The purpose of the statute must be, at least in part, to protect the interest of a
> group of individuals, as opposed to the public generally;
> (2) The statute or regulation must clearly apply to the conduct of the defendant;
> (3) The defendant must violate the statute or regulation;
> (4) The violation of the statute or regulation must be the proximate cause of the
> plaintiff's injuries.

*Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1059 (Pa. Super. Ct. 2003).

Plaintiffs' allegations are sufficient to state a plausible claim of negligence *per se*. First,

with respect to Plaintiffs' reliance on 34 C.F.R. § 682.211(e)(1), the purpose of the regulation is

to specify forbearance procedures *for the benefit of student borrowers* like Plaintiffs in order to

ensure they have sufficient information to make informed choices about forbearance, and to

prevent unnecessary loan defaults. ¶¶ 721, 723. Plaintiffs allege the regulation clearly applies to

PHEAA (¶¶ 724–25), that PHEAA failed to provide the required information "at the time" of

forbearance (¶¶ 726–27), and that PHEAA's failure to provide the information deprived

Plaintiffs of the ability to understand the financial consequences of forbearance or compare

forbearance to other potential options and caused Plaintiffs harm. ¶ 731.

Plaintiffs also allege PHEAA violated the Consumer Financial Protection Act ("CFPA")

of 2010, 12 U.S.C. § 5481(4), which prohibits any "unfair, deceptive or abusive act or practice"

towards a consumer in a financial services context. Plaintiffs allege PHEAA violated the CFPA

by improperly steering borrowers into forbearance and failing to properly notify them of

recertification and renewal deadlines. ¶¶ 738–42.

PHEAA argues that the CFPA does not provide specific enough standards to support a

negligence *per se* claim. The Consumer Financial Protection Bureau ("CFPB"), the agency

charged with interpreting and enforcing the CFPA, brought an enforcement action against Navient for essentially the same types of acts and omissions that Plaintiffs allege against PHEAA. *See Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *1–4 (M.D. Pa. Aug. 4, 2017) (describing factual background). The CFPB alleged that Navient violated the CFPA by, *inter alia*, inducing borrowers to believe that Navient "would help borrowers find a repayment option appropriate for the individual borrower's situation," but instead "steer[ing] borrowers into forbearance without adequately advising them about other repayment options." *Id.* at *19.

  Like PHEAA here, Navient argued that the statute was not specific enough to provide "fair notice" of what conduct it prohibited, and that CFPB had not previously promulgated specific enough rules. *Id.* at *8. The court rejected that argument and denied Navient's motion to dismiss in its entirety. *See id.* at *26.

PHEAA's next argument is that the statute and regulation do not authorize private rights of action, but this is generally irrelevant to whether a negligence *per se* claim may be stated:

> The standard of conduct of a reasonable man may be
> (a) Established by a legislative enactment or administrative regulation which so provides, or
> (b) Adopted by the court from a legislative enactment or administrative regulation which *does not* so provide
>
> …
>
> Even where a legislative enactment contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence. The same is true of municipal ordinances and administrative regulations

Restatement (Second) of Torts, § 285 & *id.* cmt. c (emphasis added); *see also id.* § 286 & cmt. d. Pennsylvania courts routinely allow plaintiffs to allege duties and standards of care derived from federal statutes and regulations that do not provide for private causes of action. *E.g.*, *Walters v.*

*UPMC Presbyterian Shadyside*, 187 A.3d 214, 220, 241–43 (Pa. 2018) (affirming finding that hospital's violation of its duty under federal regulations to report employee who stole drugs could support plaintiff's negligence claim); *Hassett v. Dafoe*, 74 A.3d 202, 216–17 (Pa. Super. Ct. 2013) (finding that violation of federal regulation may establish a standard of care regardless of availability of a private cause of action); *see also Stanton v. Astra Pharmaceutical Prods., Inc.*, 718 F.2d 553, 563–65 (3d Cir. 1983) (recognizing that defendant's violation of its FDA reporting requirements could support plaintiff's negligence *per se* claim under Pennsylvania law).

Plaintiffs' allegations are sufficient to state a plausible claim of negligence *per se.*

### F.   PLAINTIFFS SUFFICIENTLY ALLEGE CONSUMER PROTECTION CLAIMS.

PHEAA seeks to dismiss, for various reasons, five of Plaintiffs' consumer protection claims, specifically, their claims under the Massachusetts Consumer Protection Law ("MCPA"), the California Legal Remedies Act ("CLRA"), the Kansas Consumer Protection Act ("KCPA"), the District of Columbia Consumer Protection Procedures Act ("DC CPPA"), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). None of PHEAA's arguments warrant dismissal of any of Plaintiffs' consumer protection claims.

#### 1.   Plaintiffs Have Satisfied Any Notice Requirements.

PHEAA asserts Plaintiffs' MCPA and CLRA claims should be dismissed because Plaintiffs' supposedly failed to provide notice. These arguments are without merit. To start, the MCPA's pre-suit demand requirement does not apply here because PHEAA does not operate a place of business in Massachusetts. *See* M.G.L. c. 93A § 9(3) ("The demand requirements of this paragraph shall not apply … if the prospective respondent does not maintain a place of business or keep assets within the commonwealth . . . ."); *Moronta v. Nationstar Mortg., LLC*, 64 N.E.3d

62

1287, 1289–90 (Sup. Ct. Mass. 2016) ("[T]he provision clearly excuses the plaintiff from serving a demand letter if the prospective respondent either lacks a place of business in Massachusetts or does not keep assets in Massachusetts."). PHEAA has not asserted, nor have Plaintiffs alleged, that it has a place of business in Massachusetts or has assets residing there. As such, Plaintiffs need not have provided PHEAA notice to bring a claim under the MCPA.[32]

Dismissal of Plaintiffs' CLRA claim is likewise unwarranted. Generally, the CLRA requires prospective plaintiffs to provide 30 days' notice prior to submitting a claim for damages under the CLRA. Cal. Civ. Code § 1782, subd. (a)(2). The notice provision serves to inform the defendant of the alleged violations and provide an opportunity to correct, replace, or otherwise rectify the goods or services at issue. *See, e.g.*, *Morgan v. AT&T Wireless Servs., Inc.*, 99 Cal. Rptr. 3d 768, 788 (Cal. Ct. App. 2009). That purpose was served here when the initial complaints were filed against PHEAA. ECF No. 1 (Jun. 18, 2018) (consolidating cases before this MDL). The CLRA claim was added in the Consolidated Amended Class Action Complaint which was filed more than 30 days later. ECF No. 49 (Nov. 12, 2019). Those initial complaints served to put PHEAA on notice of the allegedly wrongful conduct and the harm Plaintiffs suffered, which is sufficient to satisfy the purpose of the CLRA. *See, e.g.*, *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1178 (S.D. Cal. 2010) (Named plaintiffs could rely on notice provided by a non-Plaintiff for their CLRA claims).

Even if this Court finds the initial complaints did not provide sufficient notice of Plaintiffs' claims under the CLRA for damages, the deficiency is easily cured. Courts have

---

[32] PHEAA also asserts Plaintiffs have not stated a MCPA claim because it alleges that PHEAA merely negligently mismanaged Plaintiff Webb's loan when it converted her TEACH Grant to a Direct Loan. To the contrary, Plaintiffs allege PHEAA deliberately converted TEACH Grants to Direct Loans to receive increased servicing fees. ¶¶ 358–61. PHEAA's assertion, therefore, fails.

simply allowed plaintiffs to send notice and, after 30 days, amend their Complaint to pursue damages under the CLRA with an allegation that it provided notice. *Morgan*, 99 Cal. Rptr. 3d at 789 ("To the extent AT&T argues the plaintiffs were precluded from seeking damages under the CLRA by failing to comply with the notice requirement before filing the second amended complaint . . . we disagree. . . . Instead, the claim must simply be dismissed until 30 days or more after the plaintiff complies with the notice requirements."); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 971 (S.D. Cal. 2012) (recognizing plaintiffs may amend their complaint and bring a claim for damages under the CLRA 30 days after providing notice). Furthermore, as to Plaintiffs' claims for injunctive relief, the proper remedy is not dismissal because Plaintiffs need not provide notice for claims seeking injunctive relief under the CLRA. *Morgan*, 99 Cal. Rptr. 3d at 788–90. As such, Plaintiffs CLRA claim should not be dismissed.[33]

### 2. Plaintiffs Stated Claims Under the Kansas, District of Columbia, and California Consumer Protection Statutes

The court should reject PHEAA's assertions that Plaintiffs cannot state a claim under the KCPA, DC CPPA, or the CLRA. To start, the KCPA bars "suppliers" from "engag[ing] in any deceptive act or practices in connection with a consumer transaction." K.S.A. § 50-626. PHEAA asserts loan servicing does not constitute a "consumer transaction" and therefore, its conduct is not covered by the Act. PHEAA Br. at 59. However, the KCPA bars deceptive and unconscionable acts made "in connection with" a consumer transaction, including those "occurring before, during or after the transaction." *William v. Ewen*, 634 P.2d 1061, 1065 (Kan. 1981); *see also* K.S.A. 50-627. Indeed, the KCPA defines "suppliers" to include entities that

---

[33] At a minimum, Plaintiffs should be granted leave to amend after providing the requisite notice.

"enforce[ ] consumer transactions," indicating that wrongful conduct need not have occurred at the point of sale. K.S.A. § 50-624(l). PHEAA admits a loan constitutes a "consumer transaction," PHEAA Br. at 59, and therefore, its deceptive and unconscionable conduct in "enforce[ing]" the terms of the loan are covered by the KCPA.

Next, PHEAA asserts Plaintiffs cannot maintain a claim under the DC CPPA because liability is limited to "merchants" and PHEAA does not constitute a "merchant" because it did not loan money to Plaintiffs. PHEAA Br. at 59. The DC CPPA defines a "merchant" as one "who in the ordinary course of business does or would sell, lease, or transfer, either directly or indirectly, consumer goods or services . . . or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(a)(3). Where a defendant's services "are so connected with the supply side of the consumer transaction," they are considered "merchants" and are subject to the CPPA regardless of whether they were involved in the initial sale of goods or services. *See Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 37 (D.D.C. 2019) (finding defendants to be merchants because they had "extensive responsibilities with respect to marketing, advertising, soliciting, and administering Medigap policies" even though they did not specifically sell those policies to plaintiffs) (citing *Adler v. Vision Lab Telecommns., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005)).

Here, PHEAA may not have provided the loan to Plaintiffs, but it performed substantially all the services promised to borrowers in connection with the loan. This includes sending invoices and collecting payments, handling customer service inquiries, advising borrowers about IDR, assisting borrowers with managing their PSLF, and ensuring borrowers receive the benefits of their TEACH Grants. *E.g.*, ¶¶ 312–13.  PHEAA is thus essential in supplying the benefits

65

promised when Plaintiffs borrowed from the federal government and is "so connected with the supply" of those services that it falls under the contours of the DC CPPA.

Finally, PHEAA contends Plaintiffs' CLRA claim should fail because the CLRA does not consider a loan to be a good or service. PHEAA Br. at 59–60. A CLRA claim must relate to "a transaction intended to result or which results in the sale or lease of goods or services to any consumer. Cal. Civ. Code § 1770(a). While a loan is not a good or service under the CLRA, where the loan agreement includes promised services that exceed the usual ancillary loan services, those services may be encompassed by the CLRA. *See, e.g.*, *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1016 (N.D. Cal. 2009) (where "the defendant provide[s] additional services over and above the extension of credit," the defendant may be liable under the CLRA); *Sonoda v. Amerisave Mortg. Corp.*, No. 11-cv-1803, 2011 WL 2690451, at *4 (N.D. Cal. July 8, 2011) ("To be sure, if Amerisave was not loaning but instead acted only as a broker for other third-party lenders, then arguable what Amerisave was selling was its work or labor . . . . Such brokerage services might well qualify as 'services' under the CLRA.").

Here, Plaintiffs specifically allege that PHEAA is obligated to provide advisory services that are unique to the federal student loan program. ¶ 327 ("Congress intended for loan servicers [like PHEAA] to serve in a unique advisory capacity that far exceeds the role of conventional loan servicers."). Because those services go above and beyond the usual ancillary loan services, they are properly considered "services" under the CLRA. Cal. Civ. Code § 1770(a) (covering "transaction[s] . . . which result[e]d in the sale . . . of services."). The Court should not dismiss Plaintiffs' CLRA claim.

### 3. Plaintiffs Stated a Claim Under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

PHEAA asserts Plaintiffs Harig and Hawkins have not alleged reliance as required by the UTPCPL. (PHEAA Br. at 60). In reality, PHEAA simply ignores Plaintiffs' allegations. The CAC recites PHEAA's numerous representations about the services it would provide to Plaintiffs concerning IDR and PSLF, and that it deliberately skirted those responsibilities to increases its own revenue. *E.g.*, ¶¶ 336–37, 372–85, 389–402. Pursuant to those representations, Plaintiff Harig relied on PHEAA to adequately track his payments made towards obtaining loan forgiveness and Plaintiff Hawkins trusted PHEAA's decision to place him into forbearance pending his IDR application. ¶¶ 87–96. Indeed, both Harig and Hawkins continued to rely on PHEAA to their detriment because PHEAA represented itself as acting in their best interests (when it was not). *Id.* Those allegations are sufficient to plausibly allege that Harig and Hawkins justifiably relied on PHEAA's representations when initially allowing PHEAA to manage the PSLF and IDR programs on their behalf and continuing to rely on them even when issues arose.

### G. PLAINTIFFS PLEADED THEIR NEGLIGENT MISREPRESENTATION, CONSTRUCTIVE FRAUD, AND CONSUMER PROTECTION CLAIMS WITH SUFFICIENT PARTICULARITY

PHEAA argues that the heightened pleading standard of Rule 9(b) applies to several of Plaintiffs' claims. (PHEAA Br. 60–63). But PHEAA is mistaken because Plaintiffs do not bring claims of common law fraud; instead, Plaintiffs' tort claims are in the nature of negligent misrepresentations and omissions and unfair and deceptive practices.

Allegations regarding ongoing patterns of negligent misrepresentation, omission, and deceptive practices do not require plaintiffs to identify the place, location, or speaker of singular, specific fraudulent statements. For instance, the court in *CFPB v. Navient* noted that the CFPB's claims, which very closely mirror the Plaintiffs' tort claims here, were consumer protection

67

related and did not sound in fraud and are not subject to Rule 9(b), "even if there is a deceptive dimension to them." 2017 WL 3380530, at *24–25; *see also McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 830 (E.D. Pa. 2016) (finding that the Rule 12(b)(6) standard applied to negligent misrepresentation claim, rather than the Rule 9(b) standard, and the complaint was only required to contain "sufficient factual matter to show that the claim is facially plausible."); *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 469–70 (E.D. Pa. 2009) (concluding that the Rule 9(b) standard does not apply to PA UTPCPL claims sounding in deception rather than fraud).

Even to the extent Rule 9(b) applies, Plaintiffs' allegations are sufficient to meet it. In *Olsen v. Nelnet, Inc.*, a district court found that plaintiffs satisfied Rule 9(b)'s requirements by identifying the timeframes in which the plaintiffs submitted payment plan renewal applications and by alleging the defendants inaccurately represented that the plaintiffs were no longer eligible for the IDR plans at issue, causing the plaintiffs to enter standard repayment and then forbearance. 392 F. Supp. 3d 1006, 1019–20 (D. Neb. 2019).

Plaintiffs' CAC provides the requisite specificity. For each Plaintiff, the complaint specifies the grant, repayment, or forgiveness program that Plaintiff was enrolled in or sought, the general timeframes in which the Plaintiff experienced an adverse action by PHEAA, and how PHEAA's conduct resulted in harm. *See generally* ¶¶ 24–241. These details are sufficient to give PHEAA notice of the conduct complained of and prepare an adequate defense.

## V.   REQUEST FOR LEAVE TO AMEND

Should the Court conclude that Plaintiffs' Complaint is insufficient to sustain any claim against PHEAA, Plaintiffs respectfully request leave to amend their Complaint under the liberal pleading standard of Rule 15(a)(2). Fed. R. Civ. P. 15(a)(2) (courts should freely give parties

leave to amend their pleadings "when justice so requires."); *Foman v. Davis*, 371 U.S. 178, 182

(1962) ("this mandate is to be heeded").

## VI.    CONCLUSION

For the reasons above, Plaintiffs respectfully submit that the Court should deny

PHEAA's motion to dismiss in its entirety.

Dated: June 8, 2020

**LOWEY DANNENBERG, P.C.**                    **CARLSON LYNCH, LLP**


*/s/ Laura K. Mummert*                                   */s/ Gary F. Lynch*
Laura K. Mummert (PA ID 85964)           Gary F. Lynch (PA ID 56887)
Anthony M. Christina (PA ID 322528)     Jamisen A. Etzel (PA ID 311554)
William Olson (PA ID 322948)               1133 Penn Avenue, 5th Floor
One Tower Bridge                                  Pittsburgh, PA 15222
100 Front Street, Suite 520                     Tel: (412) 322-9243
West Conshohocken, PA 19428              glynch@carlsonlynch.com
Tel: (215) 399-4770                               jetzel@carlsonlynch.com
lmummert@lowey.com
achristina@lowey.com
wolson@lowey.com

*Co-Lead Counsel for Plaintiffs*                 *Co-Lead Counsel for Plaintiffs*

Roland St. Louis, III                               Brian C. Gudmundson
**LOWEY DANNENBERG, P.C.**            **ZIMMERMAN REED LLP**
44 S. Broadway, Suite 1100                    1100 IDS Center
White Plains, NY 10601                          80 South 8th Street
Tel: (914) 997-0500                               Minneapolis, MN 55402
rstlouis@lowey.com                               Tel: (612) 341-0400
                                                         brian.gudmundson@zimmreed.com

*Executive Committee Member*                 *Executive Committee Member*

Bryan L. Bleichner                                 Troy J. Doucet
**CHESTNUT CAMBRONNE PA**            **DOUCET GERLING CO., L.P.A.**
17 Washington Avenue North - Suite 300     655 Metro Place South, Suite 600-9

Minneapolis, Minnesota 55401
Tel: (612) 339-7300
bbleichner@chestnutcambronne.com

Dublin, Ohio 43017
Tel: (614) 944-5219
Troy@Doucet.Law

*Executive Committee Member*

*Executive Committee Member*

Karen H. Riebel
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
khriebel@locklaw.com

*Executive Committee Member*

## CERTIFICATE OF SERVICE

I, Gary F. Lynch, hereby certify that on June 8, 2020, I filed and served through the Court's ECF system a true and correct copy of the foregoing document. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system and notice of these filings will be sent to these parties by operation of this Court's electronic filing system.

*/s/ Gary F. Lynch*
Gary F. Lynch