# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  FEDLOAN STUDENT LOAN     :
SERVICING LITIGATION            :        **MDL NO. 18-2833**
                                :        **ALL CASES**
                                :

NITZA I. QUIÑONES ALEJANDRO, J.                          FEBRUARY 18, 2025

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiffs, a group of thirty-three federal student loan borrowers, filed these putative class actions against the *United States Department of Education and the Secretary of Education* (together, the "Department") and one of the Department's contractual student loan servicers, the *Pennsylvania Higher Education Assistance Agency* ("PHEAA") (collectively, "Defendants"), based on alleged administration and servicing errors relating to three federal student borrower benefit programs:  (1) the ***Teacher Education Assistance for College and Higher Education Grant*** Program (the "TEACH Program"), (2) the ***Public Service Loan Forgiveness*** Program (the "PSLF Loan Forgiveness Program"), and (3) ***the income driven repayment*** ("IDR") plans.[1] Plaintiffs bring federal claims against the Department under the Administrative Procedure Act (the "APA") and the Fifth Amendment Due Process Clause and bring common law breach of contract claims premised on various contracts governing the plaintiffs' federal student loans.  Against PHEAA, Plaintiffs assert various state common law claims and claims for violations of various state consumer protection statutes.

Presently before the Court are Defendants' motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), in which Defendants argue that Plaintiffs' claims

---

[1]        These and other programs are in bold to facilitate the reading of this memorandum opinion.

must be dismissed because, *inter alia*, Plaintiffs lack standing and/or the claims are moot. For the reasons set forth herein, Defendants' motions are granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The ***Higher Education Act*** of 1965 (the "HEA") was enacted to increase educational opportunities and "assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education . . . ." 20 U.S.C. § 1070(a). To make the cost of higher education more affordable for students who otherwise could not afford it, Congress established several federal financial aid programs under Title IV of the HEA, 20 U.S.C. § 1001 *et seq*. Under the HEA, the Department has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1070–1099c. Initially, the federal government guaranteed privately issued loans through the ***Federal Family Education Loan*** **Program** (the "FFEL Program"). Beginning in 1994, the federal government began originating loans under the ***William D. Ford Direct Loan Program*** (the "Direct Loan Program"). *See* 20 U.S.C. §§ 1087a–1087j. In 2010, Congress discontinued the FFEL Program, meaning that all new federal student loans since that time have been Direct Loans.

The Department, through its Office of Federal Student Aid, is responsible "for managing the administrative and oversight functions" of the Title IV student financial aid programs. 20 U.S.C. § 1018(a)(1). Direct Loans are governed by standardized ***Master Promissory Notes*** ("MPNs") constituting contracts between the federal government and the borrower. 20 U.S.C. §§ 1802(m)(1)(D), 1087e(a)(1). Key provisions of the MPNs require the Department to interpret the terms of the MPNs in accordance with applicable federal statutes and regulations. The Direct Loan Program is highly regulated by the Department, including the administration of loan repayment

(34 C.F.R. §§ 682.209 and 685.208), income-based repayment plans (34 C.F.R. §§ 682.215 and 685.209), and deferments and forbearances (34 C.F.R. §§ 682.210–211 and 685.204–205).

The HEA requires the Department to contractually delegate Direct and FFEL Loans servicing functions to third parties. 20 U.S.C. § 1086(a). Since 2009, the Department has contracted with PHEAA as one of several loan servicers to service its FFEL and Direct Loans. In 2012 and 2013, the Department also awarded PHEAA an exclusive contract to manage the PSLF Loan Forgiveness and TEACH Grant Programs, respectively. PHEAA's loan servicing contract requires it to "maintain[] a full understanding of all federal and state laws and regulations and FSA requirements," "ensure[] that all aspects of the service continue to remain in compliance as changes occur," and maintain "procedures and systems," including "a system of internal controls that ensures resource use is consistent with laws, regulations and policies."

Given the complexity of the FFEL and the Direct Loan Programs, PHEAA (and other servicers) are required to provide borrowers with the necessary information to best manage their loans. The Department instructs loan servicers to establish a relationship with the borrower, educate and inform borrowers regarding the tools and options available to assist them in the management of their student loans, and provide information on repayment options that best meet the borrower's financial situation.

### *The TEACH Grant Program*

In 2007, Congress created the TEACH Grant Program with the goal of attracting and retaining teachers in certain fields at low-income schools. 20 U.S.C. §§ 1070g–1070g-4. Through the TEACH Grant Program, participants may receive up to $4,000 per academic year for undergraduate, post-baccalaureate, and graduate programs. Undergraduate students may receive a maximum of $16,000 in grants, while graduate students are capped at $8,000 in grants. 20 U.S.C.

§ 1070g-1(d). In 2013, the Department contracted with PHEAA to be the exclusive servicer of the TEACH Grant Program.

To receive a TEACH grant, a student must sign an "Agreement to Serve" with the Department, by which the student agrees to teach for a total of at least four years in an eligible position at a low-income school within eight years of graduating. Included in the Agreement to Serve are a series of notices and rules established by the Department, providing, *inter alia*, that recipients must: (1) certify within 120 days of completing school that they are employed in a qualifying position or intend to satisfy the terms of service; and (2) certify annually that they intend to complete their service and are on track to do so within the permitted time frame.

If a recipient fails to satisfy the teaching service obligation, the Teach Grant will be converted to an interest-bearing Direct Loan (a "TEACH Loan") that the recipient must pay back. The Department's regulations identify specific situations in which this conversion may occur, including, at the request of the recipient, when a recipient ceases enrollment in an eligible program, when the recipient is not able to meet the teaching requirement within the eight-year timeframe, and when the recipient does not actively confirm his or her intention to satisfy the agreement to serve at least annually. According to the TEACH Plaintiffs, PHEAA routinely converts grants to loans for reasons not authorized by statute or regulation or, otherwise, after failing to comply with the Department's rules, including conversions: (1) based on hyper-technical mistakes on the Certification form, such as a missing signature or the inadvertent omission of the start and end dates for the qualifying academic year; (2) after PHEAA failed to provide sufficient notice of the annual deadline for submitting the required paperwork by posting it only to a paperless inbox on PHEAA's website; and (3) after PHEAA failed to provide recipients with sufficient time to submit their annual paperwork.

After several public reports of the problems with the TEACH Grant Program, including reports by the U.S. Government Accountability Office ("GAO"), the Treasury Department, and the Department itself, the Department implemented the TEACH Grant Reconsideration Program in February 2019, wherein recipients could apply to have their TEACH Loans reconverted to TEACH Grants.  According to the TEACH Plaintiffs, under the reconsideration program, some recipients were improperly denied, and others were not fully refunded the amount of principal and interest they paid toward their loans.

### *The Public Service Loan Forgiveness Program (the "PSLF Program")*

In 2007, Congress authorized the Department to administer a number of loan forgiveness programs, including the Public Service Loan Forgiveness Program (the "PSLF Program").  *See* 20 U.S.C. § 1087e(m).  The PSLF Loan Forgiveness Program provides an opportunity for student borrowers with Direct Loans to seek forgiveness of their student loan balance after satisfaction of several conditions.  *See id.*; *see also* 34 C.F.R. § 685.219.  Federal law provides that to be eligible for forgiveness, the borrower must (1) make 120 separate, on-time monthly qualifying payments on a Direct Loan (2) while enrolled in a qualifying repayment plan (3) while working full-time (4) for a qualifying public-service employer.  20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219(c).  Only some repayment plans are PSLF qualifying.  34 C.F.R. § 685.219(c)(1)(iv).  These include the Standard Repayment Plan and the IDR Plans.  *Id.*  Since 2012, the Department has contracted with PHEAA as its sole servicer for borrowers pursuing PSLF relief.  Only loans made under the Direct Loan Program are eligible to be forgiven under PSLF.  Borrowers with other types of loans, such as FFEL Loans, are not eligible for PSLF, but may consolidate these other types of loans into a Direct Consolidation Loan to become eligible.

Borrowers may, but need not, submit an interim ***Employment Certification Form*** ("ECF") to receive confirmation that their employer qualifies and to track their progress toward PSLF forgiveness. To track one's progress towards loan forgiveness, the Department recommends that borrowers submit an ECF to determine the number of qualifying payments made so far and certify the borrower's employer as a qualifying employer. The Department delegates the ECF determination process to PHEAA, as the exclusive loan servicer of the PSLF Program. Accordingly, when a borrower expresses interest in the PSLF Program, his or her loans are transferred to PHEAA for servicing.

In 2018, Congress created the ***Temporary Expanded Public Service Loan Forgiveness Program*** (the "TEPSLF Program"), which extended PSLF loan forgiveness to Direct Loan borrowers who were enrolled in an ineligible repayment plan for some or all of their payments, but otherwise satisfied the requirements of PSLF. *See* Consolidated Appropriations Act, Pub. L. No. 115-141, § 315, 132 Stat. 348, 752–53 (2018).

### *Income Driven Repayment Plans*

To address the financial difficulties students faced in repaying their student loans, Congress required the Department to offer borrowers repayment plans that base the monthly repayment amount on the borrower's income and provide other benefits that traditional repayment plans do not, including loan forgiveness after a period of 20 or 25 years. The federal government offers four ***income-driven repayment plans*** ("IDR Plans") designed to make the repayment of federal student loans less onerous and to help borrowers better manage their student loan debt: (1) ***Income-Contingent Repayment*** ("ICR"); (2) ***Income-Based Repayment*** ("IBR"); (3) ***Pay-As-You-Earn*** ("PAYE"); and (4) ***Revised Pay-As-You-Earn*** ("REPAYE") (collectively, the "***IDR Plans***"). Payments on an IDR Plan can result in forgiveness of any remaining loan balance after

twenty or twenty-five years, depending on the plan. *See* 34 C.F.R. §§ 685.209(a)(6); 685.209(c)(5); 682.15(f); 685.221(f). Periods of forbearance do not count towards the qualifying repayment period. If a borrower chooses to switch repayment plans or is obligated to switch repayment plans due to a change in eligibility, federal regulations require that outstanding interest be capitalized, *i.e.*, added to the principal balance of the loan. *See* 34 C.F.R. §§ 682.215(b)(5); 685.221(b)(4); 685.209(a)(2)(iv)(A); 685.209(c)(2)(iv).

Borrowers enroll in an IDR plan by submitting an IDR Request form, which according to Department guidance, should be processed within fifteen days. If additional time is necessary, the Department may place the borrower's loans into an "administrative forbearance" for a period up to sixty days. During this forbearance period, interest may not be capitalized.

A borrower's enrollment in an IDR plan is effective for a one-year period. Therefore, borrowers must submit documentation of their income and family size for each year they wish to remain on an IDR Plan. Generally, if a borrower does not submit his or her annual recertification paperwork within ten days of the deadline, the borrower's repayment amount will be recalculated at the Standard Repayment amount and any accrued interest will be capitalized. However, certain regulatory exceptions may apply, including, when the Department is able to determine the borrower's new repayment amount before the end of the borrower's current annual payment period. In these circumstances, a borrower's payment will not be recalculated under the Standard Repayment plan and any accrued interest will not be capitalized. Upon receipt of a recertification request, the Department must process the request "promptly," or within ten days, and maintain a borrower's current payment until their new payment can be determined. If a deficiency is identified in the enrollment or recertification paperwork, PHEAA is required to contact the borrower several times by phone and email to provide "high touch servicing" and "a clear

expectation of what is needed to complete their enrollment or re-enrollment so they can stay on track."  (Compl, ECF 49, at ¶ 440).

The Department is required to provide borrowers with notice of the recertification obligation, the consequence for failing to comply, and the deadline.  The MPNs require that the Department send all required notices "by first-class mail," "by electronic means to an email address [the borrower has] provided," or "by any other method of notification that is permitted or required by applicable law and regulations."  Notice of the recertification obligation, however, was routinely posted to a "paperless inbox" on PHEAA's website.  (*Id*. at ¶¶ 452-43).

Borrowers may change repayment plans, including to an IDR Plan, at any time.  Although the Department tells borrowers that they can do so "for free," changing from an IDR plan to another plan has harsh financial consequences, *i.e.*, all outstanding interest is capitalized.  (*Id.* at ¶¶ 461-62).  Without regard to a borrower's specific need, and without sufficiently disclosing that interest will capitalize, the Department includes a blanket recommendation on the form used for the annual recertification process to choose the option that allows the Department to change the borrower's repayment plan to the plan with the lowest monthly payment.

### ***The Consolidated Class Action Complaint***

As noted, Plaintiffs are thirty-three federal student loan borrowers and grant recipients from seventeen jurisdictions, bringing claims on behalf of themselves and three putative classes. Against PHEAA, Plaintiffs assert claims for (1) violations of the consumer protection statutes of fourteen state jurisdictions and (2) state common-law claims for: (a) breach of contract; (b) breach of fiduciary duty; (c) constructive fraud; (d) unjust enrichment; (e) negligence; (f) negligence per se; and (g) negligent misrepresentation.  Against the Department, Plaintiffs assert claims under the APA and the Fifth Amendment Due Process clause, and for breach of various contracts governing

the Plaintiffs' student loans.  The factual basis for each named plaintiff's claim(s) varies depending on which student loan program applies to their loans.  Plaintiffs are divided into three (sometimes overlapping) sub-groups, each raising claims pertaining to one of the three student loan programs described above.

### 1. *The TEACH Plaintiffs*

Eight plaintiffs (the "TEACH Plaintiffs") bring TEACH-related claims on behalf of themselves and a putative class.[2]  The TEACH Plaintiffs allege that they were harmed by the inappropriate conversion of their TEACH Grants to TEACH Loans after:  (1) PHEAA rejected certification paperwork for "hyper-technical" errors; and/or (2) PHEAA failed to give appropriate notice of certification deadlines.  All eight TEACH Plaintiffs applied for reconsideration of their conversions through the Department's reconsideration process.   At the time the operative complaint was filed:  (a) Plaintiff Asby's application for reconsideration had been denied; (b) Plaintiff Meyers' application for reconsideration was pending; and (c) Defendants had approved the applications for reconsideration of the other six TEACH Plaintiffs but had not refunded all of the principal and/or interest that these TEACH Plaintiffs had paid toward their TEACH Loans.  As of the date of this opinion, all of the TEACH Plaintiffs have received full relief with respect to their TEACH-related claims:  all TEACH Grants have been reinstated, all accrued interest has been removed, all payments on the loans have been refunded, and all TEACH Plaintiffs have been advised that they satisfied their service obligations.

---

[2]      The TEACH Plaintiffs are Michael Asby, Jacquelynn Charles, Lindsey Jones, Steven Meyer, Megan Musser a/k/a Megan Holland, Chris Stevens, Katherine Wardlow, and Maggie Webb.  (*See* Compl., ECF 49, at ¶ 242).

###    2.    **_The PSLF Plaintiffs_**

Fifteen Plaintiffs (the "PSLF Plaintiffs") bring PSLF-related claims on behalf of themselves and a putative class.[3]   The PSLF Plaintiffs allege that they have been harmed by PHEAA's undercounting their PSLF-qualifying payments and by the Department's improper administration and oversight of the PSLF Programs, such that they claim to be either already eligible for PSLF forgiveness or are closer than Defendants' disclosed figures would indicate.  At the time the operative complaint was filed, however, ten of the fifteen PSLF Plaintiffs — even if credited with the PSLF-qualifying payments that they say PHEAA has not counted — were at least a full year away from potentially qualifying for PSLF forgiveness.[4]  As of the date of this opinion, all of the PSLF Plaintiffs have received full relief with respect to their PSLF-related claims:  the balances of all of the PSLF Plaintiffs' eligible loans have either been forgiven under the PSLF Loan Forgiveness Program or the PSLF Limited Waiver or have been fully paid by the Plaintiff prior to meeting the 120 payment requirement.

###    3.    **_The IDR Plan Plaintiffs_**

Nineteen plaintiffs (the "IDR Plaintiffs") assert IDR-related claims on behalf of themselves and a putative class.[5]  The IDR Plaintiffs' claims arise from allegations that PHEAA failed to:  (1)

---

[3]    The PSLF Plaintiffs are Katie Bonham, Jamie Coleman, Andrea Davis, Arianne Gallagher, Dr. Garima Gupta, Nathan Harig, Brittany King, Yannet Lathrop, Adela Levis, Shon Meckfessel, Amanda Miller, Adam Morris, Heather Pruess, Seth Shelley, and Nicole Wolff. (*See* Compl., ECF 49, at ¶ 244).

[4]    Specifically, at the time of the operative complaint, these ten PSLF Plaintiffs had the following minimum repayment durations remaining: Coleman - 2 years (*Id.* at ¶ 62); Gallagher - 2 years (*Id.* at ¶ 74); Gupta - 3 years (*Id.* at ¶ 84); Harig - 1 year (*Id.* at ¶ 88); King - 6 years (*Id.* at ¶ 108); Lathrop - 2 years (*Id.* at ¶ 115); Levis - 3 years (*Id.* at ¶ 131); Meckfessel - 7 years (*Id.* at ¶ 134); Miller - 7 years (*Id.* at ¶ 149); Morris - 6 years (*Id.* at ¶¶ 154–55).

[5]    The IDR Plaintiffs are Arielle M. Anderson, Tanuja Goulet Arany, Laura Brady, Jamie Coleman a/k/a Jamie McFarland, Arianne Gallagher, Mark Hawkins, Seniqua Johnson, Brittany King, Yannet Lathrop, Amanda Leone, Shon Meckfessel, Adam Morris, Heather Pruess, Meagan Pryor, Stacey Puccini, Hannah Rockwell, Seth Shelley, Adele S. Turnage, and Nichole Wolff.  (*See* Compl., ECF 49, at ¶ 243).

disclose the availability of IDR plans; (2) disclose that accrued interest would capitalize after periods of forbearance or when a borrower switched IDR plans; (3) timely process IDR applications; and (4) give adequate notice of annual IDR recertification deadlines; and by the Department's improper administration and oversight of the IDR Plans. The IDR Plaintiffs allege they were harmed by having to pay higher monthly amounts, losing eligibility for future forbearances, and losing the opportunity to make qualifying payments toward IDR forgiveness. As of the date of this opinion, the balances on all but three of the nineteen IDR Plaintiffs' federal student loans have been fully paid and/or forgiven. Only IDR Plaintiffs Anderson, Arany, and Leone have remaining student loan balances. Each of these three IDR Plaintiffs has earned additional months of progress toward IDR and/or PSLF forgiveness.

**STANDARD OF REVIEW**

As noted, Defendants move to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) on the basis that this Court lacks subject-matter jurisdiction because some of the Plaintiffs lack Article III standing to assert their claims and some or all of the claims have been mooted by undisputed events that occurred after Plaintiffs filed the operative complaint.

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns 'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Submitting a signed declaration or otherwise presenting competing jurisdictional facts presents a factual challenge. *Davis*, 824 F.3d at 346. When a party presents a factual challenge to the Court's jurisdiction, a court is not limited to the pleadings in

resolving the challenge.  *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 281, 251 (3d Cir. 2002) ("When a Rule 12(b)(1) motion is evaluated as a 'factual attack' on the Court's subject matter jurisdiction, the court may consider evidence outside the pleadings in evaluating that attack.").  Here, Defendants have made a factual challenge, and all parties have submitted jurisdictional evidence.

**DISCUSSION**

Though federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), Article III of the Constitution limits the federal judiciary's authority to exercise its "judicial Power" to resolving "Cases" and "Controversies."  U.S. Const. Art. III, § 2.  This case-or-controversy limitation is "essential to our system of separated powers," *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009).  It "ensur[es] that the Federal Judiciary respects the proper — and properly limited — role of the courts in a democratic society."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted).   Federal courts enforce this limitation "through the several justiciability doctrines that cluster about Article III," including "standing, ripeness, [and] mootness . . . ."  *Toll Bros.*, 555 F.3d at 137 (internal quotation marks omitted).

## I.    *ARTICLE III STANDING*

Defendants argue that many of the Plaintiffs falling into one or more of the three categories described above lack Article III standing because they have not suffered an injury in fact and, therefore, this Court lacks subject-matter jurisdiction over these Plaintiffs' claims.   Before addressing any of Plaintiffs' claims, this Court must determine whether Plaintiffs have Article III standing to assert their claims.  *Biden v. Nebraska*, 600 U.S. --, 143 S. Ct. 2355, 2365 (2023).

Under Article III, Plaintiffs must have a "personal stake" in the case. *Id.* at 2365. To meet this requirement, a "plaintiff must have suffered an injury in fact — a concrete and imminent harm to a legally protected interest, like property or money — that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Id.*; *see also Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 268 (3d Cir. 2020). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). As the parties invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing Article III standing. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020).

To satisfy Article III standing, a plaintiff must allege facts sufficient to show: (1) an injury in fact that is concrete and particularized, as well as actual and imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 180-81 (2000). In a class action, named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Gratz v. Bollinger*, 539 U.S. 244, 289 (2003).

The first element, injury in fact, "is often determinative." *Toll Bros.*, 555 F.3d at 138. "To allege injury in fact sufficiently, a plaintiff must claim 'that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "A harm is 'actual or imminent' rather than 'conjectural or hypothetical' where it is presently or actually occurring, or is sufficiently imminent . . .

[P]laintiffs relying on claims of imminent harm must demonstrate that they face a realistic danger of sustaining a direct injury from the conduct of which they complain." *Sherwin-Williams*, 968 F.3d at 269 (citation omitted). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Id.* (citation omitted).

"Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components, as financial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact." *Cottrell*, 874 F.3d at 162 (3d Cir. 2017) (citation omitted). However, "there is a significant difference between . . . an actual harm that has occurred" and "a mere risk of future harm." *TransUnion*, 594 U.S. 437. The Supreme Court has repeatedly held that a risk of future injury must be "certainly impending" to constitute injury in fact, and that allegations of "*possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 564 n.2.

When a plaintiff fails to establish Article III standing, the court lacks subject-matter jurisdiction, *Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016), and dismissal is required, *Goodmann v. People's Bank*, 209 F. App'x 111, 113 (3d Cir. 2006). Where the named plaintiff fails to establish Article III standing, the putative class action must also be dismissed for lack of subject-matter jurisdiction. *Finkelman*, 810 F.3d at 195.

### A.    *The TEACH Plaintiffs*

Defendants argue that five of the eight TEACH Plaintiffs (hereinafter, the "Reconsideration TEACH Plaintiffs")[6] lack standing to bring their TEACH claims because they had not suffered an injury in fact as of the time of the operative complaint. Specifically, Defendants argue that because the Reconsideration TEACH Plaintiffs were provided a full remedy through the TEACH Program's Reconsideration process **prior** to the filing of the operative complaint, the Reconsideration TEACH Plaintiffs lack standing. This Court agrees with Defendants.

At the core of the TEACH Plaintiffs' claims is their allegation that Defendants wrongfully converted the TEACH Plaintiffs' grants into interest-bearing repayable loans, effectively depriving the TEACH Plaintiffs of the benefits of the TEACH Grant Program. As remedy for the Defendants' alleged wrongdoing, the TEACH Plaintiffs seek injunctive relief in the form of "an order requiring the Department to (i) reconvert [their] . . . TEACH Loans back to TEACH Grants, (ii) provide credit for all accrued but unpaid interest, (iii) provide a credit or refund for payments of principal and interest made towards the TEACH loans." (Compl., ECF 49, at ¶ 595). Notably, in the operative complaint, the Reconsideration TEACH Plaintiffs allege that Defendants approved their applications for reconsideration, resulting in the conversion of the repayable loans back into grants. (*See* Comp., ECF 55, at ¶¶ 58-59, 106, 165, 222-23, and 230). In addition, according to the unrebutted declaration of Christin Bulman, a loan analyst with the U.S. Department of Education, each of the Reconsideration TEACH Plaintiffs' requests for reconsideration was approved and each of the Reconsideration TEACH Plaintiffs was granted complete relief prior to the filing of the operative complaint. (*See* Bulman Decl., ECF 61-1, at ¶ 14(b)-(c), (e), (g)-(h)).

---

[6]    The Reconsideration TEACH Plaintiffs include the following: Plaintiffs Charles, Jones, Musser, Wardlow, and Webb.

Specifically, each of the requests for reconsideration was granted and any amounts previously paid were either refunded or applied to the borrower's other loan balances, prior to the filing of the complaint. (*Id.*). Each of the Reconsideration TEACH Plaintiffs has also been advised that they have fully satisfied their service obligation. (*Id.*). As such, each of the Reconsideration TEACH Plaintiffs obtained the remedies sought in the operative complaint ***prior*** to its filing. Because the Reconsideration TEACH Plaintiffs have not asserted an injury in fact, they lack Article III standing, and this Court lacks subject-matter jurisdiction over their claims.

Despite receiving the very remedies they sought in the operative complaint, the Reconsideration TEACH Plaintiffs now argue that they suffered an injury in fact in the form of having their payments credited to other school loan balances and the lost time value of their money. Notably, as argued by Defendants, the operative complaint does not contain any allegations to support these alleged injuries. (*See generally* Compl, ECF 49). Indeed, the Reconsideration TEACH Plaintiffs expressly sought as remedy "a credit or refund for payments of principal and interest made towards TEACH Loans." (Compl., ECF 49, at ¶ 595(iii); *see also id.* at ¶¶ 11, 43(a), 60(a), 107(a), 146(a), 167, 212(b)-(c), 224(a), and 231(a)) (alleging injuries from failure to refund and/or credit payments)). The Reconsideration TEACH Plaintiffs each received either refunds or credits to their other school loan balances, the very remedies requested in the operative complaint. As such, the Reconsideration TEACH Plaintiffs have not alleged an injury in fact, and, thus, lack standing. Accordingly, the TEACH-related claims of Plaintiffs Charles, Jones, Musser, Wardlow, and Webb are dismissed for lack of standing.

B.    **_The PSLF Plaintiffs_**

Defendants argue that ten of the fifteen PSLF Plaintiffs (hereinafter, the "Pre-Forgiveness PSLF Plaintiffs")[7] lack standing to bring any of their PSLF claims because they have not suffered an injury in fact.  Specifically, Defendants argue that because the Pre-Forgiveness PSLF Plaintiffs' alleged injuries are contingent on their successful completion of 120 qualifying loan payments and ten years of employment with a qualifying employer, the alleged injuries are not real and immediate but instead speculative.  This Court agrees with Defendants.

Notably, this case is not the first in which federal student loan borrowers have brought suit against student loan servicers claiming they were wrongfully denied access to or the benefits of the PSLF Loan Forgiveness Program.  When adjudicating those cases, courts have held that the plaintiff borrowers do not have standing to sue until they have suffered the actual injury alleged, *i.e.*, making more than the required 120 payments while working in public service for ten years. *See e.g.*, *Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070 (C.D. Cal. 2019); *Love v. Pa. Higher Educ. Assistance Agency*, 2020 WL 1545798 (N.D. Ga. Mar. 16, 2020). For example, in *Winebarger*, federal student loan borrowers alleged that their student loan servicers incorrectly calculated the number of qualifying payments they had made towards the 120 required for loan forgiveness under the PSLF Loan Forgiveness Program.  411 F. Supp. 3d at 1080. As for their alleged injuries, the *Winebarger* plaintiffs asserted that as a result of the servicer's mistakes, the plaintiffs would be required to make more student loan payments than necessary to qualify for forgiveness and had been unable to make informed decisions about whether to continue working in the public sector.  *Id*.  Adopting the standing argument made by Defendants in the case *sub judice*, the *Winebarger* court concluded that the plaintiffs lacked standing because they had

---

[7]    The Pre-Forgiveness PSLF Plaintiffs are the following:  Plaintiffs Coleman, Gallagher, Gupta, Harig, King, Lathrop, Levis, Meckfessel, Miller, and Morris.

not asserted an injury in fact since they had not yet met the statutory requirements for loan forgiveness. *Id.* at 1086-87. As for the alleged inability to make an informed decision between public and private employment, the court found such injury speculative and not "actual and imminent," particularly in the absence of any allegations that the plaintiffs had engaged in any private employment job search. *Id.* at 1087. Similarly, the court found the potential prolongation of payments beyond the necessary 120 payments was "purely hypothetical" because it was unknown whether the plaintiffs would eventually make all of the requisite 120 loan payments and/or remain employed by a qualifying employer. *Id.* "Thus, Plaintiffs' unfounded fear that they may need to make more than 120 qualifying payments to obtain PSLF loan forgiveness in five to seven years is wholly speculative and far too remote to confer standing." *Id.*

Other district courts have held similarly. *See e.g.*, *Love*, 2020 WL 1545798, at *4–5 (holding plaintiff student loan borrowers did not have Article III standing to bring claims against defendant PHEAA premised on the PSLF Loan Forgiveness Program because plaintiffs had not yet made the requisite 120 payments and plaintiffs may not remain eligible for the program in the future); *Alexander v. Great Lakes Higher Educ. Corp*, No. 17-00253, slip op. at *12 (N.D. Fla. June 19, 2021) (holding that while plaintiff loan borrowers had alleged sufficient facts to show misconduct on the part of loan servicer Great Lakes, those plaintiffs that had not yet made sufficient payments to apply for PSLF loan forgiveness had not suffered an Article III injury in fact, and any future injury was too speculative to confer standing); *Meenan v. Navient Corp.*, 2020 WL 5057654, at *2 (D. Ariz. Aug. 27, 2020) (holding that student loan borrower would not have had Article III standing to bring suit for claim premised on PSLF Loan Forgiveness Program until the plaintiff had made more than 120 payments towards repaying her student loans); *Lyons v. Great Lakes Educ. Loan Serv., Inc.*, 2022 WL 602972, at *9 (D. N.J. Mar. 1, 2022) (holding that student

loan borrowers lacked Article III standing where "no injury would materialize until Plaintiffs have to pay a single dollar towards 'wrongfully' accrued student loan interest—which could be years in the future.").

Similar to the claims asserted by the plaintiffs in the above-referenced cases, here, the core of the Pre-Forgiveness PSLF Plaintiffs' claims is their anticipation/fear that at some point in the future — **after** they have made 120 qualifying payments and have worked for a qualified employer for 10 years — their applications for loan forgiveness will be wrongfully denied, resulting in a delay in PSLF forgiveness and/or unnecessary payments of principal and interest.  Specifically, with respect to their requisite injury, the Pre-Forgiveness PSLF Plaintiffs allege that they have been denied "the opportunity to make qualifying [loan] payments, which delays loan forgiveness under PSLF. . . . ."  (Comp., ECF 49, at ¶ 96; *see also* ¶¶ 20, 67, 81, 86, 91, 111, 122, 132, 136, 150, 158).  The alleged "delay in loan forgiveness," however, is purely hypothetical.  The Pre-Forgiveness PSLF Plaintiffs may or may not make all their loan payments on time over the next few years; they may or may not continue to work for a qualifying employer for the required time; and Defendants may correct any allegedly incorrect qualifying payment tally.[8]  Indeed, the Pre-Forgiveness PSLF Plaintiffs have not applied for loan forgiveness nor have they alleged that they are currently eligible to do so.

This speculative chain of possibilities requires both assumptions that these ten PSLF Plaintiffs will fulfill all of the PSLF Loan Forgiveness Program requirements and guesswork regarding the Department's future decisions on each of these ten PSLF Plaintiffs' yet-to-be filed applications.  This is the precise type of hypothetical injury that courts have found to be insufficient

---

[8]    Indeed, as discussed below with respect to Defendants' mootness arguments, *see infra* at Section II.A, Defendants have implemented changes to the PSLF Loan Forgiveness Program that have effectively fixed the alleged problems.

to confer standing. With respect to these ten PSLF Plaintiffs, no injury will materialize unless and until their loan forgiveness under the PSLF Loan Forgiveness Program has been delayed beyond the point when they have made the requisite 120 payments while working for a qualifying employer. Taking the Pre-Forgiveness PSLF Plaintiffs' allegations in the operative complaint as true, this Court finds that the feared denials of the Pre-Forgiveness PSLF Plaintiffs' future applications for loan forgiveness depend on future contingencies that may or may not occur and, therefore, are not "certainly impending." As such, the Pre-Forgiveness PSLF Plaintiffs do not have standing to bring their PSLF Loan Forgiveness Program claims. Accordingly, the Pre-Forgiveness PSLF Plaintiffs' claims are dismissed for lack of subject-matter jurisdiction.

## II.  *MOOTNESS*

Defendants argue that many of Plaintiffs' claims have been mooted by various programmatic and legislative initiatives that address and remedy many of Plaintiffs' alleged claims with respect to the three student loan programs at issue — the TEACH Grant Program, the PSLF Loan Forgiveness Program, and the IDR Program. The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit and is concerned with the court's ability to grant effective relief." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (internal quotations and citations omitted). A case is moot if "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief." *Id.* (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996)).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v.*

*Hunt*, 455 U.S. 478, 481 (1982)).  Plaintiffs must maintain a personal stake in the resolution of the dispute throughout the litigation.  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  "Therefore, 'if developments occurring during the course of adjudication eliminate a plaintiff's personal stake in the outcome of a suit, then a federal court must dismiss the case as moot.'"  *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (citation omitted).

The party asserting mootness bears the burden of demonstrating mootness.  *Freedom from Religion Found. Inc. v. New Kennsington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016). "The party asserting that a claim is moot must show that it is 'absolutely clear that the allegedly wrongful behavior [is] not reasonably [] expected to recur.'"  *Id.* (quoting *Friends of the Earth*, 528 U.S. at 189).  If a party claims that some development has mooted the case, it bears "[t]he 'heavy burden of persua[ding]' the court" that there is no longer a live controversy.  *Friends of the Earth*, 528 U.S. at 189 (citation omitted).  A case will be found moot if "(1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *N.J. Tpk. Auth/ v. Jersey Cent. Power and Light*, 772 F.2d 25, 31 (3d Cir. 1985) (internal citations omitted).  "When a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct."  *Hartnett*, 963 F.3d at 306.

### A.  The PSLF Plaintiffs

As set forth above, this Court finds that the Pre-Forgiveness PSLF Plaintiffs (ten of the fifteen PSLF Plaintiffs) lack Article III standing to pursue the PSLF Loan Forgiveness Program claims asserted in this action because they failed to assert an injury in fact.  Defendants further argue that the PSLF Loan Forgiveness Program claims of the five remaining PSLF Plaintiffs

(PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff), as well as those of the Pre-Forgiveness PSLF Plaintiffs, are now moot because of the post-complaint programmatic changes to the PSLF Loan Forgiveness Program that have effectively cured the alleged failures in the program and have provided the PSLF Plaintiffs the remedies they seek in this action. This Court agrees with Defendants.

As described above, the PSLF Plaintiffs assert claims against Defendants premised on their allegation that, due to various systematic failures, Defendants effectively undercounted these plaintiffs PSLF-qualifying payments, thereby delaying and/or denying loan forgiveness under the PSLF Loan Forgiveness Program. As remedies, the PSLF Plaintiffs seek damages resulting from the undercounting and various injunctive relief, including "an order requiring the Department to (i) conduct a full accounting review of the qualifying payments made by PSLF Plaintiffs and members of the PSLF Class and provide explanation for any payment that is deemed a non-qualifying payment; (ii) provide additional credit for all payments made after Plaintiffs and members of the PSLF Class submitted PSLF Employment Certification Requests or otherwise expressed a documented interest in the PSLF Program, regardless of repayment plan; (iii) grant loan forgiveness for any PSLF Plaintiff or member of the PSLF Class who have made 120 qualifying payments and such additional payments; (iv) provide a credit or refund for any payment of principal and interest made after the date of the last qualifying or additional payment." (Compl., ECF 49, at ¶ 612; *see also* Prayer for Relief, at p. 231).

In October 2021, the Department announced (and has since implemented) a series of actions that significantly affect the PSLF Loan Forgiveness Program. Acting under authority of the HEROES Act, 20 U.S.C. § 1098bb, the Department implemented a time-limited ***waiver of many of the PSLF Loan Forgiveness Program's restrictions*** (the "PSLF Waiver"). Under the

PSLF Waiver, from October 2021 through October 2022, student loan borrowers (like the PSLF Plaintiffs here) were provided opportunity to obtain retroactive credit toward loan forgiveness for prior periods of repayment that would not have otherwise qualified under the original PSLF Loan Forgiveness Program. So long as applicable employment requirements are met, past periods of repayment are counted toward loan forgiveness — even if the borrower was in a nonqualifying loan program or repayment plan, and even if past payments were not made in full or on time. *See generally* https://studentaid.gov/announcements-events/pslf-limited-waiver (last visited August 26, 2024).

As set forth in the various declarations attached to Defendants' briefs, and not disputed by Plaintiffs, every PSLF Plaintiff was eligible to request relief under the above-described PSLF Waiver. Further, of the five PSLF Plaintiffs who have standing to assert PSLF-based claims (PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff), all but Plaintiff Bonham have received complete forgiveness/discharge of their federal student loans pursuant to the PSLF Loan Forgiveness Program. To the extent any of these PSLF Plaintiffs made payments after the effective date of their forgiveness, those payments have been fully refunded. PSLF Plaintiff Bonham received a complete retroactive discharge of one of her federal student loans and has received credits toward forgiveness for additional qualifying payments on her remaining federal student loan under the PSLF Waiver and will be eligible for additional PSLF forgiveness after making eighteen more qualifying payments.

As a result of the systemic changes to the PSLF Loan Forgiveness Program, particularly the PSLF Waiver, all of the PSLF Plaintiffs who have standing have effectively received the remedies sought in this action. Specifically, these PSLF Plaintiffs have received complete forgiveness/discharge of their qualifying federal student loans, received refunds for overpayments,

23

and/or have received credits for all qualifying payments made under the PSLF Loan Program.  As such, these PSLF Plaintiffs' claims are moot.  Accordingly, the PSLF-based claims of PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff are dismissed for lack of subject-matter jurisdiction.

### B.  The TEACH Plaintiffs

As set forth above, this Court finds that the Reconsideration TEACH Plaintiffs (five of the eight TEACH Plaintiffs) lack Article III standing to pursue their TEACH Grant Program claims in this action because they obtained full relief prior to the filing of the operative complaint. Defendants argue that the TEACH Grant Program claims of the three remaining TEACH Plaintiffs (**Plaintiffs Asby, Meyer, and Stevens**) (hereinafter, the "Remaining TEACH Plaintiffs") are moot because each of these TEACH Plaintiffs has similarly received full relief after the operative complaint was filed.  This Court agrees.

As set forth in the unrebutted declaration of Ms. Bulman, each of the requests for reconsideration submitted by the Remaining TEACH Plaintiffs was approved, and each of these TEACH Plaintiffs was granted complete relief after the filing of the operative complaint.  (*See* Bulman Decl., ECF 61-1, at ¶ 14(a), (d), and (f)).  Specifically, each of the requests for reconsideration was granted and any amounts previously paid were either refunded or applied to the borrower's other loan balances, after the filing of the complaint.  (*Id.*).  In addition, the Remaining TEACH Plaintiffs have all been advised that they have fully satisfied their service obligation.  (*Id.*  at ¶ 14(a) and (d)) (*see also* Sup. Bulman Decl., ECF 80-1, at ¶ 8(m)).  As such, each of the Remaining TEACH Plaintiffs obtained the remedies sought in the operative complaint after its filing.  Accordingly, the Remaining TEACH Plaintiffs' claims are moot, and this Court lacks subject-matter jurisdiction over them.

### C.  The IDR Plaintiffs

Defendants argue that the IDR Plaintiffs' claims are now moot because of post-complaint programmatic changes to the IDR Program (in combination with similar changes to the PSLF Loan Forgiveness Program) that have effectively cured the alleged failures in the program and provided the IDR Plaintiffs the remedies they seek in this action.  This Court agrees with Defendants.

On April 19, 2022, the Department announced changes to the manner in which it counts qualifying payments for purposes of loan forgiveness available to borrowers on IDR Plans.  To address concerns about servicers "steering" borrowers into forbearance, the Department explained that it would be conducting a review of accounts, and count toward IDR forgiveness certain periods of forbearance deemed to be excessive (12 or more consecutive months or 36 or more cumulative months).  Borrowers steered into shorter periods of forbearance may seek account review by filing a complaint with the FSA Ombudsman at StudentAid.gov/feedback.  The Department also announced that it was taking other steps to address complaints that loan servicers were inappropriately steering borrowers into forbearance when other options were more in the borrowers' interests.  *See id*.

As of the date of this opinion and as a result of these programmatic changes, the entire balances of sixteen of the nineteen IDR Plaintiffs' federal student loans have been fully forgiven and/or discharged under either the PSLF Loan Forgiveness Program or the IDR Program or other discharge/repayment options.  Indeed, only IDR Plaintiffs Anderson, Arany, and Leone have remaining student loan balances.  However, each of these three IDR Plaintiffs has received additional credits toward loan forgiveness under the IDR Programs and/or PSLF Loan Forgiveness Program since revisions have been made to those programs.[9]  As such, all of the IDR Plaintiffs

---

[9]     Notably, as of April 17, 2024, IDR Plaintiff Anderson needed only fifteen additional qualifying payments for loan forgiveness under the PSLF Loan Forgiveness Program.

have received the remedies sought in the operative complaint for which they are currently eligible. Accordingly, the IDR Plaintiffs' claims are moot, and this Court lacks subject-matter jurisdiction over them.

### D. Exceptions to Mootness

While not disputing Defendants' jurisdictional facts with respect to mootness, Plaintiffs argue that various exceptions to the mootness doctrine apply. When applicable, these exceptions allow a class plaintiff to continue to represent a class in a class action. Contrary to Plaintiffs' arguments, however, none of the mootness exceptions apply here.

When a plaintiff seeks to represent a class of similarly situated individuals, the general rule is that "the mooting of [the] named plaintiff's claim prior to class certification moots the entire case." *Richardson v. Bledsoe*, 829 F.3d 273, 286 (3d Cir. 2016) (citations omitted); *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000); *Hering v. Walgreens Boots Alliance, Inc.*, 341 F. Supp. 3d 412, 418 (M.D. Pa. 2018). However, "Article III mootness is more 'flexible' than other justiciability requirements, especially in the context of class action litigation." *Richardson*, 829 F.3d at 278 (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 400 (1980)). "A plaintiff who brings a class action presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class." *Rosetti v. Shalala*, 12 F.3d 1216, 1226 (3d Cir. 1993) (quoting *Geraghty*, 445 U.S. at 404). Accordingly, the Third Circuit has "recognized that '[i]n the class action context, special mootness rules apply' for determining at what point in time a named plaintiff must still have a personal stake in the litigation to continue seeking to represent a putative class action." *Richardson*, 829 F.3d at 278-79 (quoting *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003)).

Where a class has been certified, "mooting of the class representative's claims does not moot the entire action because the class 'acquire[s] a legal status separate from the interest asserted [by its named plaintiff].'" *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)). The Third Circuit has also held that "so long as a plaintiff files a motion to certify a class when he still has a live claim, the mooting of that claim while the motion is pending precludes the court from reaching the merits but does not preclude it from deciding the certification motion." *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 305 (3d Cir. 2016) (citing *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000)). In such circumstances, a motion for class certification is said to "relate back" to the complaint, before the plaintiff's individual claims became moot. *Id.* at 306-07.

The Third Circuit has expanded the "relation back doctrine" in limited cases where, like here, the plaintiff's claims were mooted prior to the filing of a motion for class certification. *Richardson*, 829 F.3d 273, 288 (3d Cir. 2016). In *Richardson*, the Third Circuit cited "the general principle that 'the class action process should be able to "play out" according to the directives of Rule 23 and should permit due deliberation by the parties and the court on the class certification issues." *Id.* at 281 (quoting *Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004)). The Court further explained that the mere "filing of a certification *motion*, rather than the entry of a certification *order* . . . does nothing significant" and simply "indicates that the named plaintiff intends to represent a class if allowed to so do." *Richardson*, 829 F.3d at 285 (quoting *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 707-08 (11th Cir. 2014)). Because the filing of a class action complaint provides equal notice of the plaintiff's intent to represent a class, the absence of a motion seeking certification is not alone fatal. *Id.* at 288. The *Richardson* Court went on to recognize the so-called "relation back doctrine," which allows a class action lawsuit to proceed

even when plaintiffs' claims were mooted prior to filing a motion for class certification when one of three mootness exceptions applies: the inherently transitory, capable of repetition yet evading review, and picking off exceptions. *Id.* at 279.

### 1. *The Inherently Transitory Exception*

Under the inherently transitory exception to mootness, the relation back doctrine may apply in class actions "where it is 'certain that other persons similarly situated' will continue to be subject to the challenged conduct and the claims raised are 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013) (citations omitted). This exception was developed "to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course." *Id.* This exception, however, "has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy." *Id.* at 76-77. Plaintiffs carry the burden of showing that their claims fall within this exception. *See Richardson*, 829 F.3d at 283 n.4.

Plaintiffs have not met their burden of showing application of this exception. First, it is far from a certainty that potential class plaintiffs will continue to be subject to the complained of conduct in light of the undisputed changes to the underlying student loan programs that have mooted Plaintiffs' claims. Second, the asserted claims are not so inherently transitory as to deprive a court of the time necessary to consider class certification. Indeed, as alleged, Defendants' conduct took place over a period of years. As such, Plaintiffs' claims do not meet this narrow exception to mootness.

### 2.  *The Capable of Repetition Yet Evading Review Exception*

The "capable of repetition yet evading review" exception is also "narrow" and "applies only in exceptional situations . . . ." *Cnty. of Butler v. Governor of Pennsylvania*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017)).  "A dispute qualifies for that exception only 'if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'"  *United States v. Sanchez-Gomez*, 584 U.S. 381, 391 (2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–440 (2011)).  "There must be more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability."  *Cnty. of Butler*, 8 F.4th 226 at 231 (citing *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).  It is the plaintiff's "burden to show that the 'capable of repetition yet evading review' exception applies."  *Id.*

Plaintiffs have not met their burden of showing that this exception applies.  The complained of actions by Defendants were not too short in duration to allow for full litigation, but rather occurred over multiple years.  Further, Plaintiffs have all received or are eligible to receive the remedies sought in the operative complaint.  Thus, there is not a reasonable expectation that Plaintiffs will be subject to the same conduct again.  As such, this exception does not apply.

### 3.  *The Picking Off Exception*

The "picking off" exception to mootness "permits courts to relate a would-be class representative's (now moot) claim for relief back in time to a point at which that plaintiff still had a personal stake in the outcome of the litigation."  *Duncan v. Governor of Virgin Islands*, 48 F. 4th 195, 204 (3d Cir. 2022) (quoting *Richardson*, 829 F.3d at 279).  This mootness exception has been applied where a defendant "picks off" a named plaintiff by mooting the individual plaintiff's

claims early in the litigation — such as through settlement offers — and thus cuts off the litigation before class action procedures progress. The *Richardson* Court limited its holding to permitting relation back in the absence of a certification motion "[w]hen an individual plaintiff's claim for relief is acutely susceptible to mootness and it is clear from the complaint that the plaintiff is seeking to represent a class." *Id.* at 286; *see also Duncan*, 48 F.4th at 204-05. The picking off exception, however, applies "only in situations where the mooting of the individual claim 'occurred at so early a point in litigation that the named plaintiff could not have been expected to file a class certification motion.'" *Id.* (quoting *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1249 (10th Cir. 2011)); *see also Smith v. Vision Solar LLC*, 2023 WL 2539017, at *3 (E.D. Pa. Mar. 16, 2023).

Though the operative complaint makes it clear that Plaintiffs intended to seek class certification, for the same reasons set forth above with respect to the other mootness exceptions, Plaintiffs' claims for relief are not acutely susceptible to mootness. Defendants' alleged conduct occurred over a period of years. Indeed, most of the asserted claims were not mooted until years after Plaintiffs filed the operative complaint. As such, the claims were not mooted "at so early a point in litigation that the named plaintiff could not have been expected to file a class certification motion." Accordingly, the picking off exception does not apply.

### 4.   *The Voluntary Cessation Exception/Doctrine*

Plaintiffs also argue that the TEACH Plaintiffs and PSLF Plaintiffs' claims should not be deemed mooted under the voluntary cessation exception.[10] "Voluntary cessation of challenged activity will moot a case only if it is 'absolutely clear that the allegedly wrongful behavior could

---

[10]     This Court is aware that reference to voluntary cessation as an "exception to mootness" is not entirely accurate. *See Hartnett v. Pa. State Educ. Assoc.*, 963 F.3d 301, 307 (3d Cir. 2020). Notwithstanding, its requirements are well-settled. *Id.*

not reasonably be expected to recur.'" *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)).   The crucial issue is whether the defendant "could reasonably be expected to engage in the challenged behavior again." *Hartnett v. Pennsylvania State Education Assoc.*, 963 F.3d 301, 306 (3d Cir. 2020) (citation omitted).   "[T]he focus is on whether the defendant made that change unilaterally and so may 'return to [its] old ways' later on." *Id*. at 307. (citations omitted). The party asserting mootness "bears the 'heavy burden' of showing that it will not 'revert to' its prior policy."   *Fields*, 936 F.3d at 161 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017)).   The Third Circuit has opined, however, that "[a]bsent any evidence to the contrary," a court "'generally presume[s] that government officials act in good faith.'"   *Parker v. Governor of Pa.*, 2021 WL 5492803, at *4 (3d Cir. Nov. 23, 2021) (quoting *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 230 (3d Cir. 2022)).

This Court finds that Defendants have carried their burden of showing that it is absolutely clear that recurrences are not reasonably likely.   The changes to the TEACH Grant Program that have now provided the TEACH Plaintiffs the remedies sought in the operative complaint are the result of President Biden's signing into law the Consider Teachers Act of 2021, Pub. L. 117-49, which amended statutory provisions pertaining to the TEACH Grant Program. These changes, codified into law, occurred in 2021 and remain in effect.   Moreover, each TEACH Plaintiff has obtained the relief sought in the operative complaint and has completed his/her service obligation. There is no record evidence to overcome the presumption of the Government's good faith in implementing these changes.   Under these undisputed facts, it is absolutely clear that Defendants cannot resort to their alleged previous misconduct to the TEACH Plaintiffs' detriment.

Similarly, the changes to the PSLF Loan Forgiveness Program that have now provided the PSLF Plaintiffs the remedies sought in the operative complaint are the result of a series of regulatory actions taken by the Department under the authority of the HEROES Act, 20 U.S.C. § 1098bb. These regulatory changes began in 2021 and, though these changes included a Limited PSLF Waiver, that limited waiver was extended through June 30, 2024. Moreover, each PSLF Plaintiff has obtained, or is eligible to obtain, the relief sought in the operative complaint. There is no record evidence to overcome the presumption of the Government's good faith in implementing these changes. Under these undisputed facts, it is absolutely clear that Defendants cannot resort to their alleged previous misconduct to the PSLF Plaintiffs' detriment.

**CONCLUSION**

For the reasons set forth, this Court lacks jurisdiction over Plaintiffs' claims in this action because Plaintiffs either lack Article III standing or the claims have become moot. Accordingly, Defendants' motions to dismiss are granted. An Order consistent with this Opinion shall follow.

*NITZA I. QUIÑONES ALEJANDRO*, J.